EXHIBIT D - Case 1:18-cv-00303-LJO-JLT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DONALD W. MOLLOY, JUDGE

```
                            )
                            )
            Plaintiff,      )   No. 16-CV-1213-DWM
                            )
vs.                         )   BENCH TRIAL
                            )      DAY 2
TEHACHAPI UNIFIED           )
SCHOOL DISTRICT,            )
                            )
            Defendant.      )
_____)
```

Fresno, California                    Thursday, May 11, 2017

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume 2, Pages 91 through 170, inclusive

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:          LAW OFFICES OF ANDRÉA MARCUS
                            BY:  **ANDRÉA MARCUS**
                            133 East De La Guerra Street
                            Suite 143
                            Santa Barbara, California 93101


For the Defendant:          SCHOOLS LEGAL SERVICE
                            BY:  **KYLE W. HOLMES**
                            1300 17th Street
                            Seventh Floor
                            Bakersfield, California 93303

1                              <u>INDEX</u>

2

<u>**DEFENDANT'S WITNESSES**</u>:

3

  **DARREN JOHN BOGIÉ**                                      94
4   DIRECT EXAMINATION BY MR. HOLMES                      95
   CROSS-EXAMINATION BY MS. MARCUS                       118
5   REDIRECT EXAMINATION BY MR. HOLMES                    138
   RECROSS-EXAMINATION BY MS. MARCUS                     145
6   FURTHER REDIRECT EXAMINATION. BY MR. HOLMES           147

7                              * * * * *

8

9

10

11

12                            **EXHIBITS**

13   No Exhibits Marked for Identification or Received in Evidence

14                              * * * * *

15

16

17

18

19

20

21

22

23

24

25

```
 1    Thursday, May 11, 2017                    Fresno, California
 2    9:00 a.m.
 3         THE CLERK:  Court calls item number one.
 4    1:16-CV-1213.   ████   versus Tehachapi Unified School
 5    District.  Bench trial.  Day 2.
 6         THE COURT:  All right.  Mr. Holmes, you have a
 7    witness?
 8         MR. HOLMES:  Yes, Your Honor.
 9         THE COURT:  All right.  You can call your witness.
10         MR. HOLMES:  Your Honor, Tehachapi would like to call
11    Mr. Darren Bogié to the stand.
12         THE COURT:  All right.  Would you please step up in
13    front of the clerk, raise your right hand and be sworn.  And
14    Mr. Holmes, I'd like if you would use the lectern when you're
15    doing your examination.
16         MR. HOLMES:  Yes, Your Honor.
17                        DARREN JOHN BOGIÉ,
18    called as a witness on behalf of the Defendant, having been
19    first duly sworn, testified as follows:
20         THE COURT:  If you would, have a seat over here.
21    Good morning.
22         THE WITNESS:  Good morning, Your Honor.
23         THE COURT:  For the record, would you please state
24    what your full name is.
25         THE WITNESS:  Darren John Bogié.  Last name spelled
```

1   B-O-G-I-E, accent over the E.

2           THE COURT:  Is it Bogié?

3           THE WITNESS:  Bogié.

4           THE COURT:  Bogié.  All right.  What city do you live

5   in?

6           THE WITNESS:  I live in Bakersfield, California.

7           THE COURT:  And what is your profession or

8   occupation?

9           THE WITNESS:  I am an attorney.  Senior counsel with

10  Schools Legal Service, attorney and labor negotiator.

11          THE COURT:  All right.  Mr. Holmes.

12          MR. HOLMES:  Your Honor, before we begin, is there a

13  copy of the plaintiff's trial exhibits that the witness may

14  refer to?

15          THE COURT:  Well, there is back in my chambers is

16  where I had them.  Do you need them here?

17          MR. HOLMES:  I have copies right there.  I'm only

18  going to have him refer to two exhibits.

19          THE COURT:  Do you have them over there?

20          THE LAW CLERK:  Yes.

21          THE COURT:  Okay.  Hand those to the witness, if you

22  would.

23                      DIRECT EXAMINATION

24  BY MR. HOLMES:

25  Q.  Good morning, Mr. Bogié.  If you would, could you please

1    give us a history of your general legal background.

2    A.   Certainly.  I graduated with distinction from McGeorge

3    School of Law, Order of the Coif in 1996.  Thereafter, I was

4    admitted to the Bar in the fall of 1996.  My first job as an

5    attorney was with the firm of Young Woolridge in Bakersfield

6    as a discovery coordination counsel.

7           After that -- after a brief stint of that, I joined

8    the US Army Judge Advocate General Corps where I was trial

9    counsel and also chief of administrative law.

10          In 2001, I left the active duty military and was

11   Deputy County Counsel for the County of San Benito focusing

12   primarily on federal litigation, including disability

13   litigation against the county, employment and budgeting items

14   for elected officials.

15          In 2005 -- 2005, 2006, I transitioned into private

16   practice in Sacramento, where I had my own law practice doing

17   both transactional work and also I was a trial consultant for

18   attorneys who needed assistance at trial in various federal

19   and state forums where trials were uncommon, such as bankrupt

20   adversary proceedings, tax court proceedings, probate

21   proceedings.  I also did some general civil litigation as

22   well.

23          In 2013, I joined Schools Legal Service as a senior

24   associate counsel or counsel level two, I forget the

25   designation at the time.  And thereafter have been made the

1    coordinating attorney for the special education practice

2    group.  And I also practice as the administrative trial

3    attorney for the labor section and the labor negotiator as

4    well.

5           I have given various seminar lectures for National

6    Business Institute on special education topics.  And I've also

7    given some invited lectures at McGeorge School of Law on trial

8    techniques.  And also was an adjunct professor of pre-law at

9    California State University Sacramento, teaching function and

10   structure of American courts as well as search and seizure

11   law.

12          Post active duty, I was in the reserves as a trial

13   defense attorney defending both active duty and reservist

14   soldiers in courts-martial administrative proceedings.

15   Q.  Regarding your work with Schools Legal Service, as of

16   today how long have you been in the practice of special

17   education?

18   A.  I would estimate about four years.  Approximately.

19   Q.  And have you --

20   A.  Actually, let me back up.  I did do some education work

21   when I was with County of San Benito as a deputy county

22   counsel, but that was minimal.  Very minimal special education

23   work.

24   Q.  What did the special education work for San Benito County

25   involve?

1   A.   It involved both overseeing student discipline at the

2   County Board of Education level and expulsions and then

3   coordinating some work of outside counsel.

4   Q.   While you were at San Benito, did you ever handle any due

5   process hearings?

6   A.   No.

7   Q.   Okay.  Have you handled due process hearings since your

8   employment with Schools Legal Service?

9   A.   Yes.  Both pre-hearing and hearing and post-hearing.

10  Q.   What do you mean by pre-hearing?

11  A.   Pre-hearing, with regard to that I've answered complaints,

12  attended mediation, done all the pre-hearing both discovery

13  and negotiation work to settle the case.  I've also litigated

14  cases at administrative hearing.

15  Q.   And what do you mean by post-hearing?

16  A.   Post-hearing would involve federal matters, appeals to the

17  federal court.

18  Q.   Okay.  How many due process cases have you taken to

19  hearing?

20  A.   I would estimate, approximately, taken to hearing, twelve

21  in the four years I've been at Schools Legal.

22  Q.   Okay.  And how many post-hearing civil complaints in the

23  federal court have you handled?

24  A.   I've handled two post-hearing and one interlocutory

25  matter.

1   Q.   Okay.  What is Schools Legal Service?

2   A.   Schools Legal Service is a joint powers agreement to

3   provide capitated in-house counsel rate, counsel service to

4   various school districts.  What we are is an optional program

5   component to provide legal services in a cost contained basis.

6   Q.   What is a joint powers agency?

7   A.   A joint powers agency, under California law, is an

8   agreement between a group of independent agencies, generally

9   independent political subdivisions of the state, that have

10  certain authorities or powers that they share to form an

11  agency and exercise those powers.  For example, all public

12  entities that are independent political subdivisions have the

13  right to contract with insurance companies and legal counsel.

14          Some public entities form a group to create their own

15  captive insurance company at no cost, that would be one

16  example.  Another example would be transportation authority

17  between public entities, generally in the form of counsel of

18  governments or COG.  Given that public entities have a right

19  to contract for legal services through their boards of

20  education or their various boards, they can form joint powers

21  agreements to provide in-house counsel in lieu of employing

22  their own individual in-house counsel.

23  Q.   And what types of clients, if any, does Schools Legal

24  Service represent?

25  A.   Schools Legal Service represents county offices of

1    education.  We represent two SELPAs with a third on a per

2    contract basis.  We also represent medium to small size school

3    districts, with a few very large school districts that find

4    our model more efficient.

5         Generally our clients are in the central valley and

6    eastern Sierra.  However, we do have some clients on the

7    Central Coast and also in the northern central valley as well.

8    And then we have one client, I believe, in the Los Angeles

9    area.

10   Q.  What is a SELPA?

11   A.  A SELPA is a special education area plan, it is basically

12   how districts determine the administration of special

13   education services.  Some SELPAs are single district SELPAs,

14   meaning the district forms its own SELPA.  Other districts are

15   what would be consortium SELPAs, where they form a joint SELPA

16   between two or three or more districts.  Some SELPAs are

17   hosted by county offices of education, some are not.

18        Generally SELPAs provide mental health services.

19   They provide monitoring and child -- monitoring to the state,

20   oversight, training, Child Find.  Also SELPAs act as a means

21   of providing funding for low-incidence disability and

22   residential placement.

23        One of the key points to a SELPA is given the fact

24   that school districts are required to maintain a minimum and

25   maximum reserve, money that's placed in a SELPA reserve does

1    not count against the school district for their maximum

2    reserve that has to be appropriated.  So it effectively is a

3    form of reinsurance.

4    Q.   And how many clients, approximately, does Schools Legal

5    Service currently represent?

6    A.   I believe, regarding both JPA members and non JPA members,

7    I believe around -- it would be in the 60s.

8    Q.   Okay.  How does Schools Legal Service bill for its time?

9    A.   Well, that is a fairly complicated question.  Full members

10   of the joint powers agreement have a retainer that is subject

11   to capitated overages.  So we're in effect a captive in-house

12   counsel.  Other districts are billed on a per project basis if

13   they're non-members, but basically one-time clients for

14   specialized expertise.  We represent in all areas of

15   educational, including charters, lease backs, various

16   re -- district re-alignments, so we're not just a special

17   education law firm.  So some of those more exotic services are

18   done on a per-project basis.  And then also for standing

19   clients, we do charge an hourly rate.

20   Q.   And how is the hourly rate set?

21   A.   Every year the board of directors of the joint powers

22   agency does a -- what's called a rate review.  And they look

23   at comparative rates in the central valley to determine what

24   our rates should be for different categories of counsel.  And

25   they look at that in the context of what our operating costs

1    are and then what would be an appropriate overage of the

2    operating cost for reserves.  As a government entity, however,

3    we are not allowed to make a profit.  But we can charge in

4    excess to ensure for reserve budget.

5    Q.   What is Schools Legal Service's current hourly rates?

6    A.   The current hourly rate for my time is -- for a client

7    that's a non JPA client charging on an hourly basis would be

8    220 an hour.

9    Q.   Okay.

10   A.   Yeah, 220 an hour.

11   Q.   Are you familiar with the -- generally with the lodestar

12   of the Eastern District?

13   A.   Yes.  Both from my private practice in Sacramento and from

14   my practice in Schools Legal Service, I believe I am.

15   Q.   And what are the respective rates for attorneys in the

16   Eastern District?

17   A.   Historically -- and it's my understanding from when I

18   opened my office, I discussed this with various counsel in

19   Sacramento.  It has been lower than both the bay area and Los

20   Angeles.  When I was in private practice, my rate, depending

21   on the nature of the work, fluctuated between 225 and 300 an

22   hour, which was consistent with Miller, Owen & Trost, which

23   did similar work, billed generally at 250 an hour.  And this

24   was during the time from -- up until 2013.

25            I actually happened to discuss the current rates

1  recently with my friend who bought my private practice.  And

2  he is now charging approximately 265 an hour for most work.

3  Q.  What is your friend's name?

4  A.  Matthew Roy.

5  Q.  And how long has Mr. Roy been in practice?

6  A.  I believe he's been in practice over ten years.

7  Q.  Okay.  In your special education practice, have you ever

8  had dealings with a Mr. Mark Woodsmall?

9  A.  Yes, I have.

10  Q.  How so?

11  A.  Mark both -- well, Mark Woodsmall, he does occasionally

12  file in the Bakersfield area.  So I've dealt with him both as

13  an opposing attorney and then also I've co-presented with him

14  at an NBI seminar.

15  Q.  And what is Mark Woodsmall's typical area of practice?

16  A.  It's my understanding he exclusively practices in special

17  education law, though he may do some general disability

18  rights.

19  Q.  And where is his office located?

20  A.  I believe it's somewhere in the Los Angeles area.

21  Q.  Has he represented children in Kern County in the past

22  five years?

23  A.  Yes, he has.

24  Q.  When Mr. Woodsmall represented students in Kern County,

25  what was his hourly rate?  If you know.

1   A.   The last time we dealt with him was about two years ago.

2   And his effective hourly rate at the resolution of the case

3   was approximately 250 an hour.

4   Q.   And how long had Mr. Woodsmall been in practice at that

5   time?

6   A.   I believe his Bar number is similar to mine, so I believe

7   he was admitted in the mid to late '90s.

8   Q.   Okay.  Have you ever dealt with an attorney by the name of

9   David Grey in your special education practice?

10  A.   Yes.  Recently we have dealt with him.  He has been

11  opposing counsel for our clients in Kern County.

12  Q.   How many cases have you handled against Mr. Grey?

13  A.   To resolution, we have handled two.  Though I believe we

14  have two more pending.

15  Q.   And how long, if you know, has Mr. Grey been a practicing

16  attorney?

17  A.   He's been a practicing attorney for quite some time, I

18  believe over 20 years.

19  Q.   Do you know what Mr. Grey's rate is when he's representing

20  students in Kern County?

21  A.   The case we just resolved with Mr. Grey, I believe his

22  hourly fee was $333 an hour.

23  Q.   Have you ever had dealings with an attorney by the name of

24  Sahar Durali in your special education practice?

25  A.   Yes, I have.

1    Q.   And how so?

2    A.   She represented some students in a rural district in

3    southern Kern County involving a discipline matter.

4    Q.   And how long has Ms. Durali been a practicing attorney, if

5    you know?

6    A.   I do not know, though I do not believe it's been very

7    long.

8    Q.   Do you know what Ms. Durali's hourly rate is?

9    A.   No.  I do not.  Because when we resolved the case, there

10   was no attorney fees at issue.

11   Q.   Okay.  Do you know, is Ms. Durali a private attorney or

12   does she work for a particular firm?

13   A.   She works for Rural Legal Assistance.

14   Q.   Have you had dealings with an attorney by the name of

15   Maureen Graves?

16   A.   Yes, I have dealt with her office and her directly over

17   the phone.

18   Q.   And how -- if you know, how long has Ms. Graves been a

19   practicing attorney?

20   A.   She's been a practicing attorney for, I believe, over 20

21   years exclusively in special education, to my knowledge, her

22   entire career or the majority of it.  And she's considered one

23   of the preeminent parents' attorneys in the field by both

24   COPAA and I would also say the school Bar.

25   Q.   What is COPAA?

1   A.   COPAA is council of -- it's an organization for parents

2   attorneys and advocates.  And I don't remember the actual

3   acronym.

4   Q.   When was the last time that you dealt with a case

5   involving Ms. Maureen Graves?

6   A.   This year.  We have just settled a case with Maureen

7   Graves for one of our clients in eastern Kern County.

8   Q.   And if you know, what was the rate that Ms. Graves

9   accepted while representing a student in Kern County?

10  A.   During the negotiations, I provided her information on the

11  Eastern District lodestar and she accepted -- her office

12  accepted $300 an hour for her work and 250 for her associate's

13  work.  Her associate was of a similar practice background to

14  me.  So he was also accepting 250 an hour.

15  Q.   Do you remember the associate's name?

16  A.   No, I do not.

17  Q.   Have you dealt with an attorney named Nicole Hodge Amey?

18  A.   Yes, several times.

19  Q.   How many times?

20  A.   I think I've dealt with her directly as lead counsel on

21  four matters as a lead attorney.  And then as either a

22  supervising or secondary attorney on another four matters

23  since the time I've been at Schools Legal Service the past

24  four years.  For a total of eight, eight distinct matters.

25  Q.   And are you aware of how long Ms. Hodge Amey has been a

1   practicing attorney?

2   A.   Yes.   She's been a practicing attorney for quite some

3   time.   I know it's over ten years.   I couldn't say precisely.

4   I believe over 15 years.

5   Q.   And based on your knowledge, what has Ms. Amey accepted as

6   her rate when representing students in Kern County?

7   A.   Ms. Amey is based out of Oakland and her Oakland rate that

8   she charges is 450 an hour.   However, when she has come to

9   Kern County and resolved matters, we've resolved matters for

10   between 150 and 250 an hour.

11   Q.   Have you dealt with a firm by the name of Adams &

12   Associates?

13   A.   Yes, I have.

14   Q.   How so?

15   A.   They've been a parents' attorney who have represented

16   parents against my clients.

17   Q.   How many times have you dealt with Adams & Associates?

18   A.   I have dealt with Adams & Associates as a lead counsel

19   once and as an second chair attorney in a matter, oh, I -- and

20   it didn't resolve to due process.   But once or twice.

21   Q.   And if you know, what were the hourly rates that Adams &

22   Associates accepted when representing students in Kern County?

23   A.   The last matter that I settled for Adams & Associates was

24   in 2013 and it was settled for 220 an hour.

25   Q.   And that was for an attorney with how many years

1    experience?

2    A.   It was an associate with -- from that firm with

3    over -- with over ten years experience.  And there was also

4    some work from Mr. Adams there as well.  He was one of the

5    pioneering attorneys in representing parents of children with

6    autism.

7    Q.   Have you dealt with a firm or an attorney by the name of

8    Adams Esquire?

9    A.   Yes.

10   Q.   How so?

11   A.   I -- they represented a parent against one of -- in a due

12   process against one of my micro clients in the Sierras.

13   Q.   What is a micro client?

14   A.   A micro client would be a very small school with less than

15   250 ADA, average daily attendance.  That's more of a

16   distinction for personnel law because it changes the rules

17   regarding teacher dismissal.

18   Q.   Is Adams & Associates the same entity as Adams Esquire?

19   A.   No, no.  They're separate firms.  Adams Esquire is out of

20   the bay area.

21   Q.   Okay.  What -- if you know, what was the hourly rate that

22   Adams Esquire accepted when representing students in Kern

23   County?

24   A.   I honestly do not know.  Their work was so efficient, they

25   presented total attorneys fees of $5,000, which I believe for

1    that point in the case -- I mean, I would have to estimate the

2    work done, but for that point in the case would have

3    represented between 20 and 30 hours worked.

4    Q.   Okay.  Have you had dealings with or are you familiar with

5    an attorney by the name of Martha Millar?

6    A.   Yes.  I have not directly dealt with her, however I have

7    supervised counsel in dealing with her.

8    Q.   Okay.  Has she represented students in Kern County in the

9    past?

10   A.   Yes.  She has.  To my knowledge, she has her office in

11   Grass Valley, which is located in the Eastern District of

12   California.

13   Q.   When was the last time that Ms. Millar represented a

14   student in Kern County?

15   A.   It would have been the end of last year, beginning of this

16   year.  I'm not sure exactly when the case resolved.

17   Q.   And if you know, what was the rate that Ms. Millar

18   accepted when representing a student in Kern County?

19   A.   Her invoice presented showed a billing rate of 280 an

20   hour, which was considered reasonable by my clients as

21   consistent with the Eastern District lodestar.

22   Q.   Have you had dealings with an attorney by the name of

23   Suzanne Snowden?

24   A.   Yes, I have.

25   Q.   How so?

1   A.   She has represented students in Kern County as a parents'

2   attorney.

3   Q.   Do you know how many times approximately?

4   A.   I know I have only dealt with her in one case involving

5   Kern County students directly.  Though I know she has, through

6   both discussions with prior counsel in our office and

7   overseeing her work, she appears regularly -- she'll appear

8   every few years representing a parent.  Every two to three

9   years, she'll appear in Kern County with our clients.  Just to

10  be clear, we do not represent every school district in Kern

11  County.

12  Q.   If you're aware, which school districts in Kern County do

13  you not represent?

14  A.   We do not represent certain charter entities.  We also do

15  not represent the -- well, no, we do represent the Bakersfield

16  City School District, but not in special education law.  We

17  represent them only in other areas.  And we do not represent

18  the Kern High School District at this time.  We used to,

19  however they decided to hire in-house counsel.

20  Q.   Are you aware of how long Ms. Snowden has been a

21  practicing attorney?

22  A.   I believe she's been a practicing attorney for

23  approximately over 15, approximately 20 years.

24  Q.   And when was the last time that you dealt with Ms. Snowden

25  on a case?

1    A.  I dealt with her two years ago.

2    Q.  And if you know, what was the hourly rate that Ms. Snowden

3    accepted for her representation of a student in Kern County?

4    A.  At that time, I believe she accepted 260 an hour.

5    Q.  Okay.  Have you had dealings with an attorney by the name

6    of Carolyn Zook?

7    A.  Yes, I have.

8    Q.  How so?

9    A.  She is an attorney that has represented parents in Kern

10   County.  She also represented parents -- both parents and

11   school districts in southern California.  And what's unique

12   about her as an attorney is she is also a licensed school

13   psychologist.  She later gave up private practice and became a

14   special education administrative law judge.

15   Q.  When was the last time that you dealt with Ms. Zook on a

16   due process case?

17   A.  It was 2014.

18   Q.  What rate did Ms. Zook accept for her representation in

19   2014, if you know?

20   A.  Ms. Zook's rate -- and she had -- her rate as billed was

21   2 -- I don't recall if it was between 250 and 280 an hour, but

22   it was below 300 an hour.  I believe it was 280.

23   Q.  Okay.

24   A.  And it was accepted as consistent with the Eastern

25   District lodestar by my client.  Also -- well, yeah.

1   Q.  Are you familiar with an attorney by the name of Richard

2   Isaacs?

3   A.  Yes, I am.

4   Q.  How so?

5   A.  He has represented parents against my clients in Kern

6   County.

7   Q.  Do you know how many times, approximately, you dealt with

8   Mr. Isaacs?

9   A.  As lead counsel, once.  As secondary counsel, another two

10  times.  Also he was a prior attorney with Adams & Associates,

11  so he was familiar to our organization.

12  Q.  And how long had Mr. Isaacs -- if you're aware, how long

13  has Mr. Isaacs been a practicing attorney?

14  A.  I'm not aware.

15  Q.  Okay.  If you know, what was Mr. Isaacs' hourly rate that

16  he accepted while representing families in Kern County?

17  A.  I believe he accepted 210 an hour.

18  Q.  And when was the last time that you dealt with Mr. Isaacs?

19  A.  I dealt with him directly, it would have been 2014, I

20  believe.

21  Q.  Okay.  Are you familiar with an attorney by the name of

22  Warren Finn?

23  A.  Yes, I am.

24  Q.  How so?

25  A.  He occasionally represents students in Kern County against

Bogié   D.

113

1    my clients.

2    Q.   And approximately how many times have you dealt with Mr.

3    Finn?

4    A.   Directly I have dealt with him once.

5    Q.   Okay.  When was the last time?

6    A.   The last time, I believe it was 2014.

7    Q.   And if you know, how many years has Mr. Finn been a

8    practicing attorney?

9    A.   He's been a practicing attorney for quite some time.  I

10   would estimate over 20 years.  He's -- he presents -- I don't

11   mean to say he looks old, but he's long in the tooth as an

12   attorney.

13   Q.   Okay.  And if you know, what was the hourly rate Mr. Finn

14   accepted when representing families in Kern County?

15   A.   At the time Mr. Finn billed, I believe, 150 an hour.

16   Q.   Okay.

17   A.   And that bill was accepted as reasonable.

18   Q.   Are you familiar with an attorney by the name of Kamilah

19   Holmes?

20   A.   Kamilah Holmes, yes.

21   Q.   Kamilah Holmes.  How so?

22   A.   She has represented clients, parents against my clients in

23   Kern County in various matters.

24   Q.   When was the last time that you dealt with Mrs. Holmes?

25   A.   With Mrs. Holmes, I believe it was 2014 or 15.

Bogié, D

114

1   Q.  And if you are aware, how long has Ms. Holmes been a
2   practicing lawyer?
3   A.  I'm not aware.
4   Q.  Okay.  Do you know what hourly rate Ms. Holmes accepts for
5   her services?
6   A.  No, I do not.
7   Q.  Are you familiar with a gentleman by the name of ████████
8   ████████
9   A.  Yes, I am.
10  Q.  How so?
11  A.  He was a parent represented by Ms. Holmes in a matter that
12  did involve Tehachapi Unified School District at the time.
13  Q.  And what makes you say that Ms. Holmes was representing
14  Mr. ████████
15  A.  Ms. Holmes informed me that she was representing Mr.
16  ████████ in an email and requested communication go through her.
17  We also had a negotiation meeting between myself, my client,
18  who was Tehachapi Unified School District with Kathleen
19  Siciliani at the time.  Mr. ████████ was present there and his
20  attorney, Ms. Holmes, was present as well at that meeting.
21  Q.  Are you familiar with an attorney by the name of Richard
22  Rudderman?
23  A.  No.
24  Q.  If you would, please, that binder that's there in front of
25  you, if you would turn to Plaintiff's Exhibit 9 and let me

1   know when you get there.

2   A.  Yes.

3   Q.  If you would, please, take a minute and read that and let

4   me know when you're done.

5   A.  Yes, I've reviewed it.

6   Q.  Could you tell us what this appears to be?

7   A.  This appears to be a declaration by Mr. Rudderman

8   outlining his practice qualifications, practice area, a brief

9   outlining the vitae and hourly rate.

10  Q.  What is Mr. Rudderman's practice area?

11  A.  He indicates that he represents, as an educational -- he

12  currently indicates representing parents of disabled students

13  in special education due process and court proceedings.

14  Q.  Where is Mr. Rudderman's office located?

15  A.  He states he is -- has his -- has an office in Sacramento.

16  Q.  And is Sacramento in the Eastern District?

17  A.  Yes, it is.

18  Q.  What is Mr. Rudderman's hourly rate?

19  A.  He states it under paragraph 10, that his current billing

20  rate is 550 an hour.

21  Q.  Based on your experience as a practicing attorney in

22  Sacramento, what do you think of that rate?

23  A.  I would see that rate as exceedingly high.  And almost, in

24  my opinion, improbable.  There are attorneys that charge that

25  rate, such as partners with Downey, Brand, Seymour & Rohwer or

1  Orrick Sutcliffe, Rutan & Tucker.  But that is a major law

2  firm rate, which would be out of line with a small to mid size

3  law firm in California.  In Sacramento specifically.

4         Also I believe this rate is not consistent with the

5  rate that I have seen assisting in litigation against entities

6  for disability related matters.

7         I do note that he has defended appeals in the

8  Northern District under paragraph 8.  And that rate would be

9  consistent with billings I've seen in the Northern District of

10 California, which has much higher rates.

11 Q.  What municipalities, if you know, are located in the

12 Northern District of California?

13 A.  San Francisco, Oakland, San Jose, the Silicon Valley, Palo

14 Alto.

15 Q.  Are you familiar with an attorney by the name of Daniel

16 Shaw?

17 A.  No, I am not.

18 Q.  I'd like to direct you to Plaintiff's Exhibit 10.  Let me

19 know when you've gotten there.

20 A.  Okay.  I'm there.

21 Q.  Would you please take a moment and read that and let me

22 know when you're finished.

23 A.  Okay.  I've reviewed it.

24 Q.  And if you would, please, what does this appear to be?

25 A.  A declaration outlining Mr. Shaw's qualifications,

Bogié  D.

117

1  practice area and hourly rate.

2  Q.   And how long has Mr. Shaw been a practicing attorney?

3  A.   According to his declaration, approximately ten years.

4  Q.   And what is his practice area?

5  A.   Representing adults and children with disabilities.

6  Q.   And where is his office located?

7  A.   I believe his office is located, according to the

8  declaration, in Sacramento.

9  Q.   And what is his hourly rate?

10 A.   He lists his hourly rate for special education cases at

11 375 an hour.  375 an hour for federal appeals and 400 an hour

12 for Ninth Circuit work.

13 Q.   And is that hourly rate consistent with your experience in

14 Sacramento?

15 A.   No.  With regard to the Ninth Circuit rate, I recently had

16 conversations with a certified appellate specialist and he

17 indicated to me -- looking for potential outsourcing of

18 appellate work.  And he indicated to me that he charged 300 an

19 hour for Ninth Circuit appeals.

20 Q.   Who was the certified appellate specialist?

21 A.   That is Joshua Wilson.

22 Q.   And where is Mr. Wilson located?

23 A.   Bakersfield.

24 Q.   And how many years has Mr. Wilson been a practicing

25 attorney?

Bogié - X

118

1    A.  I'm not sure.

2           MR. HOLMES:  That's all I have, Your Honor.

3           THE COURT:  Cross-examination, Ms. Marcus.

4           MS. MARCUS:  Yes, Your Honor.  Thank you.

5                        CROSS-EXAMINATION

6    BY MS. MARCUS:

7    Q.  Good morning, Mr. Bogié.

8    A.  Good morning.

9    Q.  When you were speaking earlier about Matthew Roy, do you

10   remember indicating that he charged $265 an hour?

11          MR. HOLMES:  Objection, Your Honor.  I believe

12   misstates prior testimony.  Mr. Bogié never testified that he

13   ever dealt with a Matthew Roy.

14          THE COURT:  What's the objection?  I know what your

15   view of the evidence is, but what's the objection?  It's not

16   relevant?  It's beyond the scope?

17          MR. HOLMES:  That Ms. Marcus characterized the

18   question as when you spoke earlier about Mr. Roy, Mr. Bogié

19   did not speak --

20          THE COURT:  Okay.  It's the form of the question.

21   Rephrase.

22          MS. MARCUS:  Thank you, Your Honor.

23   Q.  Mr. Bogié, could you please let me know -- strike that.

24          Could you please tell us who Matthew Roy is?

25   A.  Who Matthew Roy is?

Bogié   Y

119

1  Q.  Yes.

2  A.  He is an attorney that took over certain areas of my

3  practice.  He also does criminal and family law work in

4  Sacramento as a solo practitioner.

5  Q.  Does he practice special education law?

6  A.  No.

7  Q.  Okay.

8  A.  Not to my knowledge.

9  Q.  And when you mentioned Mark Woodsmall, do you remember

10  that?

11  A.  Yes.

12  Q.  And you -- I believe you testified that you last dealt

13  with him two years ago?

14  A.  Yes.  I believe that's correct.

15  Q.  And that he accepted $250 per hour; is that correct?

16  A.  That's correct.

17  Q.  Now, was that in settlement?

18  A.  That was in settlement, correct.

19  Q.  And for Mr. David Grey, you indicated that he'd been

20  practicing for over 20 years.

21  A.  I believe so, yes.

22  Q.  And you had two cases pending with him, but you had

23  resolved two cases with him; is that correct?

24  A.  We have two cases pending.  And we have also resolved two

25  cases pending -- two cases.

1   Q.  And in the cases pending, have attorneys fees been

2   awarded?

3   A.  In the cases pending?  No.  In fact, they're pending.

4   Q.  And the case that resolved, you're referring to

5   settlement; correct?

6   A.  We settled one post-federal pre-due process after the

7   interlocutory appeal.  And then one pre-due process, yes.

8   Q.  And when you say that he accepted $333 per hour.  Is that

9   in settlement?

10  A.  Yes.  Actually that was only one settlement.  In the other

11  settlement, I believe his effective rate was far, far less.

12  But I --

13  Q.  And --

14  A.  I would have to estimate as to his work and get a

15  calculator.

16  Q.  And how did you arrive at the $333 per hour as a rate that

17  he had accepted?

18  A.  We looked at his invoice and the amount accepted.

19  Q.  And from that --

20  A.  The amount paid.

21  Q.  And from that, that's how you deduced that he had accepted

22  $333 per hour?

23  A.  That's correct.

24  Q.  Is that the same for your testimony regarding Maureen

25  Graves?

1  A.  No.  She presented an invoice consistent with the Eastern

2  District rates.

3  Q.  On her invoice, she indicated that her rate was $300 an

4  hour?

5  A.  Yes.

6  Q.  And how many cases have you resolved with her having

7  presented an invoice with a rate of $300 an hour?

8  A.  As I testified, I dealt with her in one case.

9  Q.  And when was that?

10  A.  This year.  Yes, this year.  It was filed late last year,

11  resolved this year.

12  Q.  Okay.  And Ms. Sahar Durali, you said that was a

13  discipline matter.  That was not a special education matter;

14  was it?

15  A.  Yes, it was.  It involved disciplining a special education

16  student.

17  Q.  And in what forum did Ms. Durali file that matter?

18  A.  She did not file.  It was a manifestation determination.

19  Q.  Okay.  And for Ms. Nicole Hodge Amey.

20  A.  Yes.

21  Q.  That hourly rate that you determined, was that through

22  settlement?

23  A.  Yes.  We've had various settlements through her.  And then

24  also we've had settlements post-fee litigation with her in

25  which she's accepted the Eastern District rate.

Bogié   Y

122

1  Q.   Okay.  So that's a settlement, not an award.  Not a court

2  determination of the market rate.

3  A.   Not a court determination, but it was a settlement

4  post-due process hearing.

5  Q.   And did she present you with an invoice that indicated 150

6  to $250 per hour?

7  A.   Different matters, we arrived at a different hourly rate.

8  She also did charge for different work in different ways.  So

9  are you talking about that particular matter or different

10 matters?

11 Q.   Well, let's start with the one where you said she accepted

12 100 -- I'm talking about what she charged for as attorney

13 work.

14 A.   Oh.

15 Q.   Just for attorney work.

16 A.   Okay.

17 Q.   Did she submit a bill to you where she said she would

18 accept $150 an hour for attorney work?

19 A.   Yes.

20 Q.   And when --

21 A.   There was an occasion when she did.

22 Q.   -- was that?  I'm sorry.

23 A.   I --

24 Q.   I apologize.  The question was not properly crafted.

25          Did she submit a bill that indicated her hourly rate

1  for attorney work was $150 an hour?

2  A.  At times she has, yes.

3  Q.  When was that?

4  A.  In settlement when we arrived at her hourly rate, she had

5  resubmitted her bill indicating that was the bill.

6  Q.  Mr. Bogié, that doesn't answer my question.  My question

7  is actually:  Has she at any time submitted a bill to you

8  which indicated her hourly rate specifically for attorney work

9  at $150 an hour?

10  A.  Yes.

11       MR. HOLMES:  Objection, Your Honor.  I believe the

12  question is vague.  Are we talking about in the context of

13  settlement or not?

14       THE COURT:  Actually, it's helpful if you give me a

15  legal objection.  Because I don't know what your objection is

16  there.  So give me a legal objection to the question.

17       Which was:  "Mr. Bogié, that doesn't answer my

18  question.  My question is actually:  Has she at any time

19  submitted a bill to you which indicated her hourly rate

20  specifically for attorney work at $150 an hour?"

21       The answer is "Yes."

22       MR. HOLMES:  And my --

23       THE COURT:  And your objection --

24       MR. HOLMES:  Is vague.

25       THE COURT:  -- is the question is vague.  Overruled.

1          MS. MARCUS:   Thank you, Your Honor.

2     Q.   And I'm sorry.  Your answer was?

3     A.   Yes.

4     Q.   And had she submitted a bill previously in the same matter

5     with a different hourly rate?

6     A.   Yes.

7     Q.   So it was through the process of negotiation for

8     settlement that she reduced her rate to 150?

9     A.   Yes.  When we discussed the Eastern District lodestar.

10    Q.   As you were discussing settlement terms; is that correct?

11    A.   That's correct.

12    Q.   And Mr. Bogié, when you testified about Adams &

13    Associates, that hourly rate of $220 per hour in 2013.

14    A.   Uh-huh.

15    Q.   That was a rate accepted as a term of settlement; is that

16    correct?

17    A.   That was the invoice presented.

18    Q.   What do you mean "that was the invoice presented"?

19    A.   That was the invoice they presented showing work at 220

20    and we accepted it.

21    Q.   For which attorney?

22    A.   I don't recall.

23    Q.   So it may have been a new associate's rate?

24    A.   It was not a new associate's rate.  He had been an

25    associate for a while, but it was an associate's rate.

Bogié   X

125

1    Q.   Who was that associate?

2    A.   I don't recall.

3    Q.   Do you remember how long they had been an associate?

4    A.   I believe Ms. Inman informed me at the time that he had

5    been practicing for about six years with the firm.  But I

6    don't recall specifically.

7    Q.   Were you actually a party to this specific settlement,

8    where the $220 per hour was provided to Adams & Associates

9    associate?

10   A.   I was the attorney.

11   Q.   Were you in the settlement negotiations?

12   A.   Yes.

13   Q.   And you actually saw the invoice that indicated a $220 per

14   hour --

15   A.   Yes.

16   Q.   -- charge?

17   A.   I did.

18   Q.   And for Adams Esquire.

19   A.   Yes.

20   Q.   That was just in that one micro district; is that correct?

21   A.   That's correct.

22   Q.   And you were going to estimate the hourly rate that had

23   been accepted by dividing the 5,000 awarded in that settlement

24   negotiation by the 20 or 30 hours of work; is that how you

25   would do that?

1  A.  I did not estimate their hourly rate.  I said it was

2  5,000.  I estimated, in my opinion, it would have been about

3  20 to 30 hours of work.  But I'm not sure how efficient their

4  operation is.  That would be speculation.  But from my

5  experience, I would look at that level of work they did as

6  being between 20 and 30 hours.

7  Q.  And for Martha Millar, that -- when you testified she had

8  accepted $280 per hour.  That was as part of the settlement

9  negotiation; is that correct?

10  A.  We did not negotiate her rate.  She submitted her invoice

11  and there was no need to negotiate it.  That was her rate.

12  Q.  And how long has she been practicing?

13  A.  I am not sure.  I believe it is over -- I believe it's

14  over ten years.

15          MS. MARCUS:  Can I have just a moment, Your Honor?

16          THE COURT:  You may.

17          MS. MARCUS:  Thank you.

18          Thank you, Your Honor.

19  Q.  And how many times have you settled cases with Martha

20  Millar?

21  A.  Our firm has settled one case with her.

22  Q.  Okay.  And Ms. Suzanne Snowden, she accepted $260 per

23  hour.  That was also within a settlement context; is that

24  correct?

25  A.  That's correct.

1   Q.   And Carolyn Zook, the 250 to $280 per hour --

2   A.   I believe it was 280.

3   Q.   Okay.  And that was, again, in the context of settlement;

4   is that correct?

5   A.   She indicated that was her hourly rate and she would not

6   reduce it.

7   Q.   At $280 per hour.

8   A.   Yes.

9   Q.   But again, that was within the context of settlement?

10  A.   Correct.

11  Q.   And Richard Isaacs, you dealt with him twice; is that

12  correct?

13  A.   I've dealt with him directly twice.  I believe Stacy

14  Inman, a prior attorney with our firm, has dealt with him more

15  frequently.

16  Q.   And does he exclusively practice special education law?

17  A.   Yes.

18  Q.   And where is he located?

19  A.   Orange County.

20  Q.   And again, you testified that he accepted $210 per hour in

21  2014.  But that was within the context of settlement; is that

22  correct?

23  A.   That's correct.

24  Q.   And Warren Finn.  You dealt with him one time in 2014; is

25  that correct?

1    A.   That's correct.

2    Q.   And he is in Kern County, though; is that right?

3    A.   I believe -- well, I'm not quite sure.  He's in the

4    Frazier Park area.  So he could be located in Kern County, he

5    could not be.  I'm not quite sure where his address lies.

6    Q.   And when you testified earlier that he accepted $150 per

7    hour in settlement, that was again within the context of

8    settlement?

9    A.   That is what he hourly bills.  That is his fee.  There was

10   no discussion of what his fee would be.  So the

11   settlement -- the attorney fee aspect was not negotiated.

12   Q.   And you negotiated that yourself?

13   A.   Yes.

14   Q.   You were there for that settlement negotiation?

15   A.   Yes.

16   Q.   And that was the one and only case that you've had with

17   him?

18   A.   That's the one and only case I've directly had with him.

19   Our agency has dealt with him frequently over the years.

20   Q.   Specifically with regards to special education?

21   A.   Only with regards to special education.

22   Q.   Okay.  And Kamilah Holmes, when you dealt with her, you

23   didn't state that you were aware of what she charged per hour;

24   did you?

25   A.   No, I did not.

1  Q.  And she actually works for a non-profit agency; isn't that
2  correct?
3  A.  Greater Bakersfield Legal Assistance.  And we do deal with
4  her regularly on special education matters.
5  Q.  What do you mean "regularly," how often?
6  A.  I would estimate we deal with GBLA attorneys, I
7  can't -- GBLA attorneys on a yearly basis in special education
8  matters.
9  Q.  So about once a year they take a special education case
10  that you're aware of?
11  A.  No.  Primarily we're dealing with them continually.  About
12  every -- because I'm thinking Lyndsi has taken more than one a
13  year.  Lyndsi, I forget --
14  Q.  So maybe they take two special education cases a year in
15  Kern County?
16  A.  I can't speak to what they do with regard to Bakersfield
17  City, which would be where a majority of their client base
18  resides.  I'm saying with our clients, two cases would be
19  average.
20  Q.  So is it your understanding that their agency doesn't
21  generally represent children outside of Bakersfield?
22  A.  It is my understanding that their main client base are the
23  people who have needs within Bakersfield and the primary
24  population that utilizes them lives within the Bakersfield
25  City School District.

1   Q.   And how do you know that?

2   A.   How do I know what?

3   Q.   What's your knowledge based upon?

4   A.   They are a nonprofit that deals with low income clients.

5   A majority of the low income students do reside in the

6   Bakersfield City School District boundaries, if we looked at

7   it as a percentage of ADA versus net household income.  Or if

8   you wish to use free reduced lunch as a metric.  Therefore,

9   logically a majority of the low income clients in education

10  matters would come from the Bakersfield City School District.

11  Though that's just a logical extrapolation on my part.

12  Q.   So are you aware of the ADA for all of Kern County?

13  A.   Total ADA?

14  Q.   Yes.

15  A.   No, I am not aware of the total ADA.  It fluctuates.

16  Q.   But are you aware of what percentage of ADA roughly there

17  is within Kern County versus within Bakersfield only?

18  A.   Bakersfield is in Kern County.  I'm confused by your

19  question.

20  Q.   Well, if you were to extrapolate the ADA -- and for the

21  purposes of the record, that's average daily attendance; is

22  that correct?

23  A.   That's correct.

24  Q.   And that's a way of tracking the students; is that

25  correct?

1  A.  That's correct.

2  Q.  Okay.  So if we take all of Kern County, do you have an

3  estimate of what the ADA is for that?

4  A.  All of Kern County for -- well, are we dealing with K

5  through 8 or K-12 or --

6  Q.  K-12.

7  A.  K-12.  I would believe the ADA for Kern County is

8  roughly -- I would have to estimate -- well, I would estimate

9  that the ADA for Kern County is approximately 100,000.

10  Q.  Okay.  And then what would you estimate the ADA for

11  Bakersfield to be?

12  A.  The City of Bakersfield?

13  Q.  Yes.  Or actually is her nonprofit called Greater

14  Bakersfield?

15  A.  Greater Bakersfield Legal Assistance.

16  Q.  So for greater Bakersfield, what would you estimate the

17  ADA?

18  A.  I don't -- I wouldn't know.  I'd have to estimate is by

19  district.

20  Q.  Okay.  Going back just briefly on the nonprofit California

21  Rural Legal Assistance.  Are you familiar with them?

22  A.  Yes, I am.

23  Q.  And is that where Sahar Durali practices?

24  A.  Yes, that's my understanding.

25  Q.  And so you've had one discipline matter with her; is that

Bogie - X

1   correct?

2   A.  With her, correct.  However, I have -- we have dealt with

3   other CRLA attorneys on various special education matters.

4   Q.  And how many special education matters have you dealt with

5   through CRLA in the past three years?

6   A.  Me personally?

7   Q.  Your firm.

8   A.  My firm.  My agency.

9   Q.  Yeah.

10  A.  I don't -- I cannot estimate that.

11  Q.  And I'm talking only special education.  Would it be less

12  than five?

13  A.  I could not estimate that.  I believe it would be more

14  than five definitely.

15  Q.  Less than ten though?

16  A.  No, I believe it would be more than ten.

17  Q.  Okay.  Who are the other attorneys?

18  A.  Who are the other attorneys?

19  Q.  In CRLA.

20  A.  I don't know who they are at this time.

21  Q.  Who are the other attorneys in your firm who have dealt

22  with cases with CRLA?

23  A.  They would have been Kathleen LaMay and Stacy Inman.

24  Q.  Okay.  With any of the attorneys that you listed being

25  aware of hourly rates they accepted, were any of those hourly

1  rates awarded by a court or were they all in the context of

2  settlement?

3  A.  The hourly --

4  Q.  It's a yes or -- sorry.  Go ahead.

5  A.  I don't understand the question.

6  Q.  With each of the hourly rates you testified were accepted

7  by the various colleagues of mine and some of them people I've

8  never heard of, those were all rates in the context of

9  settlement; is that correct?

10  A.  Are you asking whether the rate was a point of the

11  settlement?  Or if the rate was not a point of the settlement?

12  Q.  I'm not asking either of those questions.

13       My question to you is whether any of the hourly rates

14  you just testified to attorneys allegedly representing

15  children in special education matters that you're personally

16  aware of.

17  A.  Uh-huh.

18  Q.  Those hourly rate estimates were all based upon the

19  context of settlement of cases; is that correct?

20  A.  Yes.

21  Q.  Okay.  And Mr. Bogié, does your firm assert frivolous

22  defenses to special education cases?

23       MR. HOLMES:  Objection, Your Honor.  Relevance.

24       THE COURT:  Sustained.

25  BY MS. MARCUS:

1    Q.  In settlement negotiations, there are more than attorneys'

2    fees considered by the parties; is that correct?  Yes or no.

3             MR. HOLMES:  Objection, Your Honor.  Relevance.

4             THE COURT:  Overruled.

5             THE WITNESS:  Could you repeat the question?

6    BY MS. MARCUS:

7    Q.  In the con --

8             THE COURT:  In settlement negotiations, there are

9    more than attorneys fees considered by the parties; is that

10   correct?

11            THE WITNESS:  I believe so, yes.

12   BY MS. MARCUS:

13   Q.  So it's certainly possible that an attorney would take a

14   reduced rate after reviewing the strength of their case; is

15   that correct?  Yes or no.

16            MR. HOLMES:  Objection, Your Honor.  Speculation.

17            THE COURT:  Overruled.

18            THE WITNESS:  Sometimes yes, sometimes no.

19   BY MS. MARCUS:

20   Q.  Thank you.  And just briefly, I wanted to go back to your

21   testimony that -- you did testify that Richard Rudderman's

22   rate of $550 an hour would be consistent, in your experience,

23   with rates awarded in the Eastern District -- in the Northern

24   District; is that correct?  Yes or no.

25   A.  No, that's not my testimony.

1   Q.  Can we go back to that?

2   A.  I can clarify it if you want, but that --

3        MS. MARCUS:  I'm asking the court reporter actually.

4   Is that possible to go back to that?

5        THE COURT:  No, just clarify your question.  We're

6   not going back to it.

7        MS. MARCUS:  Okay.  Thank you.

8   Q.  Did you testify -- strike that.

9        I believe you testified earlier that Richard

10  Rudderman's rate of $550 per hour was not something that

11  you -- strike that.  Nevermind.

12       If you go to Exhibit 10 in the binder in front of

13  you.

14  A.  Yes.

15  Q.  I believe you testified earlier that Mr. Daniel Shaw had

16  been practicing for over ten years.

17  A.  That's according to his declaration.  I don't know him

18  personally.

19  Q.  Okay.  If you look at item four.  He's actually been

20  practicing for six.  Is that correct?

21  A.  All right.

22  Q.  Is that a yes or no?

23  A.  That's what's indicated in the declaration.  Once again, I

24  don't know him personally or know his background independent

25  of the declaration.

1   Q.  Mr. Bogié, based on your extensive testimony today, do you

2   believe that you're an expert in the appropriate hourly rate

3   of fees to be awarded in special education cases in the

4   Eastern District?

5   A.  Do I believe I'm an expert?

6   Q.  Uh-huh.

7   A.  I believe I have a sense of what are the attorneys' fees

8   billed and awarded in the Eastern District.  Lodestar is a

9   legal calculation.  I don't believe a person can be an expert

10  in what a court awards.  I do want to clarify my testimony

11  with regard to Mr. Rudderman.  I did not testify that I

12  believed his fee of 550 would be -- was what was awarded in

13  the Northern District.  My testimony is it seemed consistent

14  with what attorneys bill in the Northern District.

15  Q.  Thank you.  And are you aware of how often they get that

16  in the Northern District?  The 550 range.

17  A.  I have not reviewed the case law with regard to lodestar?

18  The Northern District since I was a deputy county counsel with

19  the County of San Benito.  So I do not profess to be familiar

20  with the current rate, lodestar rates in the Northern District

21  of California.

22  Q.  Now, are you aware of a single case where an attorney's

23  acceptance of local rates in settlement is a factor in

24  determining what rate to apply to attorneys in subsequent

25  matters in the courts?

1    A.   I'm confused by your question.

2    Q.   You're aware of the *Kerr* analysis of attorneys' fees;

3    correct?

4    A.   Yes.

5    Q.   And how do they analyze the appropriate fee award?

6    A.   What you look at are prevailing rates in the community.

7    The level of work that is performed.  The difficulty of the

8    work.  The -- I believe the term is disfavor of the case or

9    disfavor of the plaintiff.  And you analyze it against what

10   would be the prevailing rates in the legal community.

11   Q.   And do you agree that that's an appropriate way to

12   determine attorneys' fee awards?

13   A.   You want my opinion as to whether or not I agree with the

14   law?

15   Q.   Sure.

16   A.   I don't see how that's relevant.

17   Q.   Could you answer the question?

18        MR. HOLMES:  Objection, Your Honor.  Relevance.

19        THE COURT:  Sustained.

20   BY MS. MARCUS:

21   Q.   Let me go back.  Are you aware of a single case where an

22   attorney's acceptance of local rates in the context of

23   settlement has been used to determine the appropriate hourly

24   rate by a court?

25   A.   I have not reviewed every lodestar case in the United

1   States.

2   Q.  Are you aware of a single case -- this is my last

3   question.  Are you aware of a single case where an attorney's

4   acceptance of local rates in the context of settlement is used

5   by a court as a factor in determining what rate to award?

6   A.  I have not searched for such a case.

7   Q.  So you're not aware of a single case; are you?

8   A.  No.

9         MS. MARCUS:  Okay.  Thank you.  I have nothing

10  further at this time.  But I would like to reserve for

11  rebuttal if -- well, recross if needed.

12        THE COURT:  Well, we've got this all messed up in

13  terms of what's the case in chief, what's the defense, what's

14  rebuttal.  Do you have any redirect?

15        MR. HOLMES:  Very briefly.

16        THE COURT:  All right.  If you would use the lectern.

17                 REDIRECT EXAMINATION

18  BY MR. HOLMES:

19  Q.  Mr. Bogié, your testimony is that concerning an attorney

20  by the name of Finn, that Mr. Finn accepted an hourly rate of

21  150; is that correct?

22  A.  That's correct.

23  Q.  And that was in the context of settlement?

24  A.  That was -- we were not settling his attorneys' fees

25  rates.  That was in the context of settlement.  That was his

1   hourly rate billed.

2   Q.  So let me clarify.  Mr. Finn presented you with a bill

3   with his amount of work and hourly rate and your -- you and

4   your client did not subsequently negotiate that rate down as a

5   point of settlement.  You simply accepted it as it was?

6   A.  Correct.

7   Q.  And his rate at that time was 150?

8   A.  Correct.

9   Q.  Concerning Martha Millar.  Again, that was in the context

10  of settlement.  But you accepted the hourly rate of 280?

11  A.  Correct.  There was no discussion as to what her rate was.

12  She simply presented the invoice with her rate and it was

13  accepted.

14  Q.  So it was not negotiated down?

15  A.  No.

16  Q.  Concerning Carolyn Zook, the same thing?

17  A.  It was not negotiated down, no.

18  Q.  Of the attorneys that we've talked about today, besides

19  Finn, Millar and Zook, were there others whose rates your

20  client simply accepted because they were within Eastern

21  District norms?

22  A.  Adams & Associates, yes.  Maureen Graves, yes.  He

23  asked -- the associate actually asked what the lodestar was of

24  the Eastern District and we provided the most current case

25  law.

1    Q.   Okay.

2    A.   Also Isaacs & Associates, yes.  Richard Isaacs.  It's not

3    Isaacs & Associates.  Richard Isaacs, yes.  Mark Woodsmall, I

4    don't -- we had discussion regarding his rate, but it was very

5    minimal.  And he -- once again, it is my recollection he asked

6    for case law on the lodestar.  And then of course with Adams &

7    Associates, the bill was so low -- Adams Esquire, excuse me,

8    the bill was so low we did not feel any need to negotiate it.

9    The request for fees was so low.

10            MR. HOLMES:  That's all I have, Your Honor.

11            THE COURT:  All right.  Thank you.  I have a question

12   for you.  I'm not sure entirely what happens in an IDEA case.

13   First the parent -- or the attorney representing the parent

14   comes and says "here's what we need."  Right?

15            THE WITNESS:  Correct, yeah.

16            THE COURT:  And at that point, the district says

17   you're right, here's what we'll do.  And so you say this is

18   the plan we're going to have.

19            THE WITNESS:  Well --

20            THE COURT:  I mean, it might --

21            THE WITNESS:  Do you want me to explain it?

22   Basically the parent says I want this sort of therapy.  The

23   district -- and it may be in the context of an IPT meeting,

24   maybe not.  The district will say either yes or no.  Or maybe

25   something else.

1          If the parties agree, we move on with our lives.  If

2     they disagree, generally the parents hire an attorney and file

3     due process and then it's sorted out by the administrative

4     judge.

5          THE COURT:  But if the parent's represented by an

6     attorney at that initial -- when they first come to you and

7     the attorney has ten hours of time in it, do you then just pay

8     whatever the going rate is for that attorney?

9          THE WITNESS:  It has been our practice.  And

10    there -- well, it's a complicated answer.  And let me explain.

11    If the attorney -- basically we pay what would be

12    reasonable -- what -- reasonable rates for that attorney.

13         If either there is a substantial likelihood of

14    litigation or you're in the context of litigation or if you

15    lose, obviously, you then owe what are reasonable attorneys'

16    fees.  And so that might be discussed post-hearing.  Generally

17    in post-hearing situations, we've always been able to work it

18    out.  Except with some notable exceptions, which I'm sure

19    you're now well aware of.

20         THE COURT:  So at that point, you can work it out.

21    That's a negotiated amount of attorneys' fees; right?

22         THE WITNESS:  Well, it is and it isn't.  What

23    generally happens, if they win the due process, they submit

24    their invoice.  If the invoice looks reasonable and is

25    consistent with what we believe the prevailing rates to be, we

1   pay it.  Occasionally attorneys request, you know, a net 30,

2   10 percent off.

3         If the invoice appears to be excessively high per

4   hour, we generally send the information to the parents'

5   counsel on the Eastern District rates and they will adjust

6   their rate downward accordingly.  And then we pay it.  Those

7   are the two typical scenarios.

8         THE COURT:  What's the tertiary scenario, where they

9   won't agree to lower their rate?  You end up here?

10        THE WITNESS:  Yes, Your Honor.

11        THE COURT:  So what role does the reality of an

12  attorney representing the parent on a contingent fee basis

13  have when it comes to analyzing the reasonableness of the

14  attorney's fee?

15        THE WITNESS:  Well, we have generally -- and it's

16  been my practice to look at what the prevailing rates are as

17  reflected in the lodestar amount, those recent cases in the

18  Eastern District.  And I believe it's the Court's good

19  judgment has taken that into account in establishing what the

20  hourly fee is.  So I believe that's an element of the lodestar

21  calculation that has already been taken into account when the

22  general prevailing rates are established.

23        THE COURT:  So the contingent nature of the work has

24  no relevance to whether or not the attorney gets his or her

25  ordinary and regular hourly rate?

Bogié 2 RD

1          THE WITNESS:  I believe it does in the nature that

2    when a district has determined what the lodestar is, they've

3    taken that into account.  So --

4          THE COURT:  When you say "a district," a school

5    district?

6          THE WITNESS:  I mean a district court.  And the

7    school districts look at the district court case law and the

8    prevailing -- in the Eastern District -- how we negotiate it

9    is we know what the lodestars are for special education work

10   in the Eastern District.  And we will pay the lodestar amount

11   generally as an offer.

12         I can think of one case where district lost and we

13   offered what we believed to be the lodestar, prevailing

14   lodestar rate flat out.  Now, sometimes attorneys will

15   quibble, say, "Hey, I need to be on the top end because of my

16   experience" and reasonable minds can differ on that.

17         But from my perspective, the Eastern District has

18   determined -- when they determined what the lodestar is for

19   the community, that encompasses the risk of a contingency

20   case.

21         And I'm going to say something in my opinion, given

22   the nature of special education law, things that go to due

23   process, given the number of split decisions, generally the

24   parent will win something at hearing.  So I think the risk

25   personally is very low on the student's attorney because a

1    technical violation can create a victory for the student that

2    creates fees.

3         If you look at the cases at OAH, I believe one-third

4    are student won outright, one-third are district won outright

5    and one-third are split decisions, meaning the parents won

6    some and the district won some.  So the parents still get

7    their fees in that case.  So I think that's why you see that's

8    an aspect of the rate.

9         THE COURT:  I'm curious about that.  It seems to be a

10   relative certainty in your view that there is a lodestar

11   amount.  But when I read all the cases out of this district,

12   they're all over the place in terms of what the hourly rate

13   is.  I don't think there's a consensus in this district that,

14   well, for some kind of case, $325 an hour is the lodestar.  I

15   mean, they go from 150 to -- I think the highest I saw was

16   450.

17        THE WITNESS:  Right.  And I believe that was some

18   exotic securities work, Your Honor, but not a disability case.

19   But I could be mistaken.  You know, generally what I've seen,

20   in all honesty, is the lodestar in this district has been in

21   the 250 to 300 range for various types of work.  And I know

22   they bounce it around and they don't have a specific lodestar

23   per hourly fee.  But I believe that's the -- that's the zone.

24   Which is consistent with practice in this district.

25        THE COURT:  All right.  Any brief followup?

1          MS. MARCUS:  Yes, Your Honor.

2          THE COURT:  Brief.

3          MS. MARCUS:  Yes.  Thank you.

4                    RECROSS-EXAMINATION

5  BY MS. MARCUS:

6  Q.  Mr. Bogié, you're aware of the documents that your firm

7  submitted as exhibits in this case with data from the Office

8  of Administrative Hearings; is that correct?

9  A.  I'm aware we did submit such data, I have not reviewed it.

10 Q.  None of that actually includes prevailing percentages from

11 the OAH website, does it, with regards to school district

12 versus student prevailing?

13 A.  Not that I'm aware of, no.

14 Q.  Okay.  Is it your testimony that a third of the cases are

15 resolved completely in favor of the student out of OAH?

16 A.  Looking at the annual report, I believe it was my

17 understanding at that time that a third were student

18 victories.  A third were joint, split decisions.

19 Q.  Leaving only a third that were --

20 A.  100 percent district, yes.

21 Q.  Okay.  How many due process cases have you been through in

22 Tehachapi?

23 A.  How many have I been through in Tehachapi?

24 Q.  Yes.

25          THE COURT:  So we're way beyond the questions that I

Bogie - RX

146

1    asked him.  So where are you going with this?

2            MS. MARCUS:  I just -- I had two questions I had

3    forgotten to ask.

4            THE COURT:  Well --

5            MS. MARCUS:  But I think they're important, Your

6    Honor, because they put into context the prior testimony.

7            THE COURT:  Yeah, the problem is we're not going to

8    go back and forth all day long.  How many questions do you

9    need the answer to?

10           MS. MARCUS:  Just two.

11           THE COURT:  Ask two questions.

12   BY MS. MARCUS:

13   Q.  How many due process hearings in Tehachapi have you done

14   where I was not opposing counsel?

15   A.  Due process hearings in Tehachapi where you were not

16   opposing counsel?

17   Q.  Nobody from my firm or myself was opposing counsel.

18   A.  None.

19   Q.  How many due process hearings have you done in Kern County

20   where myself or my firm were not involved as opposing counsel?

21   A.  It will take --

22   Q.  This is only special education.

23   A.  Right.  I understand that.  Just let me count for a

24   moment, because I have to think about it.  I believe seven.

25   Q.  And that's since 2013?

```
1    A.  That's correct.
2            MS. MARCUS:  Okay.  Thank you.
3            THE COURT:  Mr. Holmes?
4            MR. HOLMES:  I have a question.
5            THE COURT:  I would bet money you don't.
6            MR. HOLMES:  Your Honor, does the --
7            THE COURT:  Lawyers always say "I just have one
8    question."
9            MR. HOLMES:  I know.  Does the witness have a copy of
10   the OAH Quarterly Reports that are exhibits --
11           THE COURT:  They're right here.
12           MR. HOLMES:  -- 109 to 112.
13                   FURTHER REDIRECT EXAMINATION.
14   BY MR. HOLMES:
15   Q.  Mr. Bogié, please turn to District Exhibit 112 and turn to
16   page 9.
17           THE COURT:  For the record, I am going to judicially
18   note.  I think you had made a request.  I think the objection
19   was they were late.  And then we had a brief discussion about
20   Rule 201.
21           MR. HOLMES:  Correct.
22           THE COURT:  I will judicially note those.
23           MR. HOLMES:  Thank you.
24   Q.  Mr. Bogié, will you please tell us what this page says
25   with regard to hearing prevailing parties year to date.
```

1   A.  Yes.  It shows what the prevailing rate is of hearings,

2   district versus student.  And it appears I was slightly

3   mistaken.  Do you want me -- well, the indication from OAH

4   shows that 46 percent of the decisions were split decision,

5   meaning both student prevailed on some issues and did not

6   prevail on other issues.  And then student prevailed on -- I

7   believe that is 14 percent, where the student prevailed on all

8   issues.  And then the district prevailed on 40 issues -- or 40

9   percent.

10  Q.  Okay.

11          THE COURT:  See, I told you.

12          MR. HOLMES:  I got one more.

13  Q.  In what context would a school district be on the hook for

14  attorneys' fees, looking at this chart?

15  A.  In this context, a district is on the hook for attorneys'

16  fees for 46 percent, which would be the split decisions plus

17  the other 14 percent, which would be the student prevailed.

18  So out of all the decisions, the district would be on the hook

19  for 60 percent of them.

20          MR. HOLMES:  That's all, Your Honor.

21          THE COURT:  All right.  Thank you.  You can step

22  down.  Put those back here.

23          Are there any other witnesses, Mr. Holmes?

24          MR. HOLMES:  No, Your Honor.

25          THE COURT:  All right.  Ms. Marcus, you mentioned

1    rebuttal of the rebuttal.  Where are we?  Do you have somebody

2    else you're calling as a witness?

3            MS. MARCUS:  Well, to the extent that this testimony

4    is given any weight as expertise, I believe we have just heard

5    what's being asserted as expert testimony regarding prevailing

6    attorney rates in the area.

7            THE COURT:  Yeah, I don't -- I don't view it that

8    way.  I understood him to be stating his factual experience

9    with the rates in various cases that he or his organization

10   has been involved in.

11           MS. MARCUS:  Right.

12           THE COURT:  You asked him some opinion questions.

13   One of the objections was sustained regarding an opinion.  So

14   I don't view expert opinion as an issue in this case.  I don't

15   think his testimony was expert.  It was practical experience

16   that he's had and that's how I understand it.

17           MS. MARCUS:  Thank you, Your Honor.  My only other

18   concern about the testimony is that it was brought in as

19   rebuttal to Mr. ▇▇▇▇ and Ms. Markham's testimony.  Their

20   testimony was limited to the availability of attorneys to them

21   and their search for attorneys.  And I believe that the -- to

22   the extent that we went into hourly rates, that went beyond

23   rebuttal of those two witnesses and would move to strike that

24   on that basis.

25           THE COURT:  Well, Ms. ▇▇▇▇ testified that she had

1    to pay you a $2500 retainer, she testified that she had to pay

2    a lawyer from some place on -- in the Los Angeles area $8,000

3    to conduct a telephone participation.  And then that

4    particular attorney wanted $20,000.  And I think -- I can't

5    remember if Mr. ███████ testified as to what kind of retainer

6    he could not afford.

7            I don't think -- I mean, this goes right back to my

8    initial observation.  How do you have a trial when you don't

9    have direct testimony?  And for me, ███████ and ███████ seemed

10   to be your case in chief followed by the submissions of what

11   the rates would be.  Not rebuttal testimony.  You don't get to

12   rebut something unless the evidence is put on and then you

13   have an opportunity to rebut it.  I think the procedure here

14   is really messed up.

15           But that doesn't answer my question.  Do you have

16   another witness?

17           MS. MARCUS:  No, Your Honor.  And I agree.  And these

18   are hard lessons learned about the procedure.  I do have one

19   concern, though, with the legal assertion that was just made

20   and would like to have the chance to either provide the Court

21   with a case or a short memo on the issue of whether or not

22   prevailing on a procedural issue under the Office of

23   Administrative Hearings is a basis for obtaining any fees,

24   particularly in a contingency case.  There's a case, I believe

25   it's *Van Dyne*, but I'm afraid to cite it without web access.

1        THE COURT:  I'll look for it when we take a break.
2   I'm not going to give you any more time at this point because
3   I have gone over the transcript of yesterday's witnesses and
4   the arguments that were made at the beginning of the
5   proceeding.  And I have to go back and consider what role, if
6   any, the testimony of Mr. Bogié bears on any of the other
7   issues that were presented by the briefing and by the issues
8   in the case.

9        I do appreciate the fact that both you and Mr. Holmes
10  were able to get a point brief on the question of the utility
11  of Rule 68 as it might relate to settlements and the role of
12  1415, the statutory provision.

13        So what I'm going to do now is I am going to take a
14  recess.  I'll ask that you stick around.  Because I reviewed
15  everything that occurred yesterday.  Once I get this
16  straightened out as to the role of this particular testimony
17  and the factual information that was presented, I intend to
18  come back in and, under the provisions of the Federal Rules of
19  Civil Procedure 52(a), I'm going to read to you what my
20  findings of fact and conclusions of law are.

21        So you'll just have to be on hold.  I'll work as
22  quickly as I can.  But I'll have the clerk get ahold of you
23  when we're ready to come back in to court.  So we'll be in
24  recess.

25        MS. MARCUS:  Your Honor.  I'm sorry.  But there was

1  one thing that was stated yesterday in opening by Mr. Holmes

2  that is misleading that I would like you to just consider

3  before you go.  Which is to calculate the initial due process,

4  the percentage of prevailing -- or the rate of -- the amount

5  that -- or the prevailing based upon the original due process

6  complaint would be completely in error here because the

7  hearing that this fees matter is about was six months later

8  and only contained two issues and only --

9          THE COURT:  I think I have that figured out.

10         MS. MARCUS:  Okay.  Thank you, Your Honor.

11         THE COURT:  Thank you.  We will be in recess.

12         MR. HOLMES:  Thank you, Your Honor.

13         MS. MARCUS:  Thank you.

14     (Recess.)

15         THE COURT:  All right.  Before I begin complying with

16 the Rule 52(a), I want to thank counsel for their civility in

17 this matter.

18         And I am now in the case of ▮▮▮▮▮ versus Tehachapi

19 Unified School District, pursuant to Rule 52(a), enter the

20 following findings of fact and conclusions of law.

21         One.  On May 19th, 2015, the plaintiff ▮▮▮▮▮▮▮▮▮▮

22 on behalf of her son, R.Q. (collectively the "student" or

23 "plaintiff") filed a due process hearing request (the

24 complaint) with the Office of Administrative Hearings, the

25 State of California, pursuant to the Individuals With

1   Disabilities in Education Act, the IDEA.

2           The complaint raised six claims against the Tehachapi

3   Unified School District, referred to as "the District."

4   That's in the administrative record, pages 1 through 13.

5           The student sought a one-to-one aide, compensatory

6   education, the establishment of injury reporting procedures

7   and cameras placed in classrooms.  That's the administrative

8   record 11 to 12.

9           Two.  R.Q. is a six-year old boy suffering from

10  spinal bifida, hydrocephalus, Arnold-Chiari malformation and

11  bilateral club foot.  Administrative record at 529.

12          Prior to filing the complaint, the district offered

13  settlement on May 9th, 2015, and renewed that offer on October

14  16th, 2015.  That's Exhibits 101 and 102.  Those settlement

15  offers were sent to counsel Andréa Marcus and did not provide

16  for fees and costs already accrued, including attorneys' fees.

17  By the time the May 4th -- or the May offer was made, counsel

18  Marcus had expended 26.1 hours on the case.

19          Four.  In the settlement offer, the district offered,

20  among other things, (a), to fund independent education

21  evaluations in the areas of psychoeducational, speech and

22  language, adaptive physical education, occupational therapy

23  and assistive technology assessments in the amount of $8,000;

24          (b), to fund compensatory education for up to $10,000

25  to be provided in any educational area of student's mother's

1    choosing to be provided by a non-public agency until August 1,

2    2018, mileage and costs to be paid by the mother;

3          (c), fund compensatory education in the area of

4    adaptive physical education for up to 22 hours until August 1,

5    2018, mileage and costs to be paid by the mother;

6          (d), fund compensatory education in the area of

7    physical therapy for up to 10 hours until August 1, 2018.

8    Again, mileage and costs to be paid by the mother;

9          (e), place the student in first grade general

10   education class for 2015/2016 school year with one-on-one

11   aide;

12         (f), place the student in extended school year

13   program with an aide.

14         Five.  Because compensatory education in Kern County

15   costs approximately $70 each hour -- that's Exhibit 107 in the

16   Holmes declaration -- the district's offer was functionally

17   for 142 hours of general compensatory education in addition to

18   the specific hour allotments discussed above, or a total of

19   174 hours of compensatory education.  The offers were not

20   accepted.

21         Six.  The administrative hearing on the

22   student's -- what happened to the sound?  This

23   microphone -- can you hear me?

24         MS. MARCUS:  It just came back.

25         MR. HOLMES:  We can now.  It faded out.

1       THE COURT:  All right.  The administrative hearing on

2   the student's due process complaint was held on November 17th,

3   18th and 19th and December 1st, 2015 in Tehachapi, California.

4   That's the administrative record at 627.  Which is located in

5   the Eastern District of California.

6       Seven.  The hearing addressed only two of the six

7   issues raised by plaintiff's administrative complaint.

8       Issue one.  Did district deny student a free and

9   appropriate public education by failing to offer home hospital

10   instruction when student was home recuperating from surgeries

11   from a) October 10, 2013 through December 5, 2013, and b)

12   September 10, 2014 through January 10, 2014?

13       Issue 2.  Did district deny student a free and

14   appropriate public education by failing to provide appropriate

15   accommodations and supports in student's 2013-2014 and

16   2014-2015 individual education plans for his mobility needs

17   regarding: (i) campus access; (ii) changing table access;

18   (iii) time accommodation and appropriate staff support for

19   school bus access; (iv) classroom access; and (v) playground

20   access?

21       Eight.  Plaintiff voluntarily withdrew the remaining

22   four issues of the complaint prior to the hearing.  That's the

23   administrative record 583, issues 1 and 2; administrative

24   record 589, issue 4; and administrative record 597, issue 6.

25       On January 19th, 2016, the administrative law judge

1    issued a decision concluding that the student prevailed on

2    issues 1a and 1b.  That's the administrative record 547.  The

3    district prevailed on issue 2.  Again, the administrative

4    record 547.

5            Ten.   The administrative law judge award states:

6            "As compensatory education, district shall provide 105

7            hours of academic tutoring to be provided by either a

8            district special education teacher or by a certified

9            non-public agency of mother's choosing.  If available,

10           student may use the services when school is not in

11           session.  Unused services shall expire on June 23,

12           2017.  District shall reimburse mother for round-trip

13           mileage at the then current federal rate of

14           reimbursement if district elects to provide the

15           service through a non-public agency."

16           That's the administrative record at 546.

17           Eleven.  During the administrative matter and in the

18   present case, plaintiff was represented by the Law Offices of

19   Andréa Marcus, specifically counsel Andréa Marcus and Kelly

20   Kaeser.  Representation was based on a contingency fee.

21           Twelve.  Counsel Marcus billed 173.7 hours and Kaeser

22   spilled 87.5 hours in the administrative matter.  Paralegal

23   Vikki Rice billed six hours.

24           13.  Costs for the administrative matter, based on

25   the IRS business rate for per diem and lodging, amounted to

1   $1,850.  That would be $925 each for each of the lawyers for
2   five days.

3        Andréa Marcus -- 14.  Andréa Marcus billed 146 and a
4   half -- 146.5 hours and Kelly Kaeser billed 55.3 hours on the
5   present litigation over attorneys' fees.  Another attorney,
6   Monique Fierro billed 2.2 hours on the litigation over
7   attorneys' fees.

8        Costs in the present matter, the litigation over
9   attorneys' fees, total $955, including $555 for the
10  preliminary pretrial conference and the filing fee of $400.

11       Qualified and experienced attorneys in the area of
12  special education law are limited, especially in the rural
13  geographic areas of the Eastern District of California and
14  generally in the State of California.  See Exhibits 2, 3 and
15  4.  Those are the articles that were admitted into evidence.

16       17.  Witnesses ████  ████  and ████  ████
17  Tehachapi residents that sought IDEA representation for their
18  respective children, testified to their difficulty in finding
19  and retaining competent counsel to represent them in IDEA
20  matters.  Ms. ████  specifically recounted retaining an
21  attorney that required an initial expensive retainer and the
22  attorney then requested an additional $20,000 retainer for a
23  due process hearing.  The attorney did not travel to Tehachapi
24  and contact was limited to telephone and video conferencing.
25  I find the testimony of ████  ████  and ████  ████  is

1    credible.

2           The plaintiff was required to go outside of the

3    immediate area of their residence in order to get qualified,

4    competent and available representation.  The references here

5    and the basis of that factual determination are not only the

6    testimony of ████ and ████████ but the ██████ declaration,

7    which is Exhibit 7; Exhibit 12, the Grey declaration; Exhibit

8    13, the Durali declaration; Exhibit 15, the Padilla

9    declaration; Exhibit 24, which pertains to the attorney bar

10   information, indicating a majority of lawyers on the

11   district's list are from outside the Eastern District.  And

12   then, as I mentioned, the testimony of ██████ and ████████

13          The prevailing rate for attorneys that practice in

14   this area of law is from $250 to $650.

15          Exhibit 12, which is the Grey declaration, stating

16   he's been paid $400 to $500 for these cases.

17          Exhibit 13, the Durali declaration, indicating a

18   range depending on experience.

19          Exhibit 8, the Woodsmall declaration, indicating he

20   charges $425 per hour and has 12 years experience with special

21   education law.

22          Exhibit 9, the Rudderman declaration, indicating over

23   20 years of experience with special education law and charges

24   $550 in the Sacramento Eastern District area.

25          Exhibit 10, the Shaw declaration, indicating ten

1  years experience in the area and charges $375 per hour.

2       While the testimony of Darren Bogié as to the

3  prevailing rates in the Eastern District that he is aware of

4  was credible and is, in part, consistent with the other

5  evidence before the Court, it is important to note that he is

6  part of the legal organization representing the district in

7  this matter and is reflected as counsel in the case on the

8  docket.  As a result, Mr. Bogié has an interest in the outcome

9  of the case.

10      At the time of the administrative hearing, counsel

11  Marcus had practiced for 19 years, 17 years exclusively in

12  special education litigation.  That's Exhibit 14.  Counsel

13  Kaeser had nearly 13 years of experience, only two of which

14  was practicing in special education law.  That's Exhibits 11

15  and 18.

16      My conclusions of law are as follows:

17      One.  The plaintiff, as prevailing party in an

18  administrative proceeding, has the right to recover attorneys'

19  fees and costs.  That is Title 20 of the United States Code,

20  Section 1415(i)(3)BD).

21      With respect to the settlement offers, the

22  IDEA -- under the IDEA, attorneys' fees may not be reimbursed

23  in any proceeding for services performed subsequent to the

24  time of a written offer of settlement if the offer is made

25  more than ten days before the proceeding begins; two, the

1    offer is not accepted within ten days; and three, the Court or

2    administrative hearing officer finds that the relief obtained

3    is not more favorable than the offer of settlement.  Title 20,

4    US Code, Section 1415(i)(3)(D)(i)(I-III).

5         Three.  Section 1415 -- excuse me.  Section 1415

6    (i)(3)(E) provides, however, that, quote, "Notwithstanding

7              subparagraph (D), an award of attorneys' fees and

8              related costs may be made to a parent who is the

9              prevailing party and who is substantially justified in

10             rejecting the settlement offer."  Close quote.

11        Four.  Plaintiff's reliance on the principles guiding

12   Rule 68 to argue that the settlement offers were not valid is

13   unpersuasive given the independent statutory grounds provided

14   above.  Case law, see *J.C. versus Vacaville Unified School*

15   *District*, 2007 Westlaw 112138 at 3.  That's January 10th,

16   2007.  A case rejecting the plaintiff's attempts to read 68's

17   judgment requirements into Section 1415(i)(3)(D).

18        By the time the offer was made, a complaint had not

19   been filed, so judgment could not be entered and approval of

20   the governing board of the district is a practical reality of

21   these kinds of offers and ultimately, if accepted,

22   settlements.

23        Five.  As to the question of whether the relief

24   obtained at the hearing was more favorable, because the

25   district's offer not only included more overall hours of

1   compensatory education but also one-on-one aide, the relief of

2   105 hours of academic tutoring obtained through the

3   administrative hearing by the plaintiff was not more

4   favorable.

5           Six.  However, the plaintiff was substantially

6   justified in rejecting the settlement offer because it did not

7   provide for already accrued fees and costs.  The case is see

8   *Hawkins versus Berkeley Unified School District*, 2008 US

9   District LEXIS 94673 at 63.  That's a Northern District of

10  California, November 20th, 2008 case that concluded the

11  plaintiff's decision to turn down a settlement offer was

12  substantially justified where it included only $500 in

13  attorneys' fees and she'd already incurred over $9,000 of

14  accrued fees.

15          Also *Adams versus Compton Unified School District*,

16  215 Westlaw 12748005 at 5.  That's the Central District of

17  California, July of 2015.

18          And *Daniel versus District of Columbia*, 174 Fed Supp

19  3d 532 at 545 and 46.  That's a 2016 case.

20          And *Brighthaupt*, B-R-I-G-H-T-H-A-U-P-T, *versus

21  District of Columbia*, 36 Fed Supp 3d 1 at pages 8 through 10.

22  That's a 2014 case which held "Plaintiffs were...substantially

23              justified in rejecting the settlement offer based

24              solely on the fact that the defendant only offered

25              $300 in attorneys' fees for counsel's 15.4 hours of

1    work."

2         *Davis versus District of Columbia*, 71 Fed Supp 3d 141

3    at 151.  A 2014 case that concluded the plaintiff's rejection

4    of a settlement offer was justified in part because there was

5    a failure to provide attorneys' fees even though less than 20

6    hours had been spent on the case.  While the district insists

7    that offers do not include fees and costs because not everyone

8    is represented by counsel, in this case it sent the offer

9    letters to counsel Marcus indicating that the district was

10   aware that the plaintiff was represented and likely accruing

11   costs and attorneys' fees for that representation.

12        The district's May 9, 2015 and October 16th, 2015

13   settlement offers do not bar the plaintiff's recovery of costs

14   and fees incurred after those dates because neither of the

15   offers included an offer of attorneys' fees and costs.

16        The reasonable rate.  Courts calculate a reasonable

17   amount of attorneys' fees by following a two-step process.

18   First, the Court determines the lodestar calculation.  That

19   is, quote, "the number of hours expended on the litigation

20   multiplied by a reasonable hourly rate." *Hensley versus*

21   *Eckerhart*, 461 US 424 at 433, a 1983 case.  *Jordan versus*

22   *Multnomah County*, 815 Fed 2d, 1258 at 1262, a 1987 Ninth

23   Circuit case.

24        And then secondly, a court may adjust the lodestar

25   figure, quote, "pursuant to a variety of factors."  That's

1    *Gonzalez versus City of Maywood*, 729 Fed 3d 1196 at 1209, a
2    2013 Ninth Circuit case.

3         Paragraph 9.  Fees awarded under the IDEA must be
4    based on rates prevailing in the community in which the action
5    or proceeding arose for the kind and quality of services
6    furnished.  Title 20, US Code, Section 1415 (i)(3)(C).  "A
7    reasonable rate is typically based upon the prevailing market
8    rate in the community for 'similar work performed by attorneys
9    of comparable skill, experience and reputation.'"

10        *Ontiveros versus Zamora*, that's O-N-T-I-V-E-R-O-S.
11   303 FRD 356 at 373 and 374.  That's an Eastern District of
12   California 2014 case that quotes *Chalmers versus City of Los
13   Angeles*, 796 Fed 2d 1205 at 1210 and 11, a 1986 Ninth Circuit
14   case.  And 20 USC Section 1415(i)(3)(F)(ii).  Quote, "The
15   relevant community is generally the forum in which the court
16   sits," end quote.  And that is the Ontiveros case citing
17   *Barjon*, B-A-R-J-O-N, *versus Dalton*, 132 Fed 3d at 496, 500, a
18   1997 Ninth Circuit case.

19        The burden is on the fee applicant to produce
20   satisfactory evidence of the prevailing market rates.  *Blum
21   versus Stenson*, 465 US 886 at 895, a 1984 US Supreme Court
22   case.  That case noted, quote, "District courts may consider
23   the fees awarded by others in the same locality for similar
24   cases."  Close quote.

25        Courts may also use their, quote, "own knowledge of

1    customary rates and their experience concerning reasonable and

2    proper fees." That's *Ingram versus Oroudjian*,

3    O-R-O-U-D-J-I-A-N, which is a Ninth Circuit 2011 case reported

4    at 647 -- and that must be Fed 3d 925 at 928.

5           Paragraph ten.  Courts have awarded fees ranging from

6    $220 to $475 based on the relative experience of counsel and

7    the location of the action.  That is *K.M. ex rel. Bright*

8    *versus Tustin Unified School District*, 78 Fed Supp 3d 1289

9    reported at 1304, a 2015 Central District case awarding $475

10   an hour.

11          *Adams versus Compton Unified School District*, 215

12   Westlaw 12748005, a 2015 Central District of California case

13   awarding $410 for an attorney with 20 years experience and

14   over ten years of special education law.

15          *Y.L. versus Manteca Unified School District*, that's

16   an Eastern District case of November 8, 2016 reported at 2016

17   US District Lexis 155068.  That awarded $220 for an attorney

18   with two years of experience.

19          *Levine versus Sleep Train, Inc.*, reported at 216

20   Westlaw 4368107, pages 2 and 3.  Another Eastern District of

21   California case, August of 2016, awarding $260 per hour in a

22   disability case with counsel who had over 20 years experience.

23          *S.A. versus Patterson Jt. Unified School District*,

24   210 Westlaw 3069204.  That's an Eastern District case, August

25   of 2010, that awarded $275 to $220 to attorneys with six and

1  two years of legal experience respectively.

2         Paragraph 11.  Given the limited availability of

3  competent and qualified special education lawyers in

4  Tehachapi, the complicated and complex nature of IDEA

5  litigation and the extensive experience of plaintiff's

6  counsel, a reasonable rate for counsel Marcus is $450 for the

7  administrative matter and a reasonable rate for Kaeser is $225

8  for the entirety of his work.

9         The rate is a reflection of the matters stated above

10  as well as the risk that there would be no recovery in the

11  administrative proceeding and the lack of access to counsel of

12  Ms. Marcus' qualification and experience.

13         As outlined in the OAH reports, which I judicially

14  noted, there is a 40 percent risk of outright loss in the

15  administrative proceedings.  There's a 46 percent loss rate

16  for the plaintiff in -- excuse me.  There's a 40 percent -- 46

17  percent chance of a split result.  And that could mean, if

18  it's only a procedural victory for the plaintiff, there would

19  be no attorneys' fees.  And there's only a 14 percent chance

20  of complete prevailing by the plaintiff in the IDEA cases as

21  reflected in the OAH reports.

22         Consequently, there -- for the administrative

23  process, there is a significant risk when an attorney accepts

24  a case with an IDEA claim on a contingent basis as Ms. Marcus

25  did in this instance.

1          Okay.  Paragraph 12.  The rate for litigating the

2     fees below is different and it is lower.  A reasonable rate

3     for counsel Marcus in the present matter is $350 an hour.

4     This is, in part, due to the fact that there is no risk to the

5     attorney of not recovering fees.  Attorneys' fees are

6     essentially guaranteed once the client prevails on a -- in the

7     substantive IDEA claim below.

8          The tension then becomes as to how should the award

9     be adjusted.  The longer and more difficult the dispute

10     continues over attorneys' fees when there is no risk of not

11     being paid, the greater the ultimate fee.  This is an

12     incentive to prolong the litigation.

13          On the other hand, the district's unwillingness to

14     pay a reasonable fee as set forth above puts the risk on the

15     parents and their counsel, possibly incentivizing the district

16     to refuse to pay ordinary rates when out-of-district lawyers

17     are the source of representation.

18          Balancing these concerns and taking into account the

19     factors discussed above, a rate of $350 per hour is thus a

20     reasonable rate for Ms. Marcus' efforts in the fee litigation.

21          Paragraph 13.  In determining reasonable hours,

22     counsel bears the burden of submitting detailed time records

23     justifying the hours claimed to have been expended.  That's

24     *Hensley*, 461 US at 429.

25          In this case, the parties do not dispute the time

1    spent by plaintiff's counsel and agree that it was reasonable.

2    Counsel Marcus billed 173.7 hours in the administrative matter

3    and 146.5 hours in the attorneys' fees litigation, this

4    matter.  Counsel Kaeser billed 87.5 hours in the

5    administrative matter and 55.3 hours in the fee litigation.

6        Accordingly, the lodestar calculation is as follows:

7    For Ms. Marcus, for the administrative matter, the fees are

8    $78,165.  That is 173.7 hours at $450 an hour.  For this

9    litigation, the fees are $54,937.50, that's 146 and a half

10   hours at $350 an hour.  For a total of $133,102.50.

11       For Mr. Kaeser, for the administrative matter, 87.5

12   hours at $225 an hour is $19,687.50.  For this litigation, it

13   is $12,442.50.  That's 55.3 hours.  For a total of $32,130.

14       The total of both counsel representing the plaintiff

15   is $97,852.50 for the administrative matter and $67,380 for

16   the fee litigation for a total, before adjustment, of

17   $165,232.50.

18       Because the plaintiff presented no evidence as to the

19   qualifications or experience of either paralegal Vikki Rice or

20   counsel Monique Fierro, fees will not be awarded for their

21   work.

22       Now, the degree of success.  While the lodestar

23   figure is presumptively reasonable, courts may adjust that

24   figure based upon factors listed in *Kerr versus Screen Extras*

25   *Guild, Inc.*, 526 Fed 2d 67 at 69 through 70, a Ninth Circuit

1    case of 1975.  And *Intel Corporation versus Terabyte*

2    *International, Inc.*, 6 Fed 3d 614 at 622, Ninth Circuit, 1993

3    case.

4          Quote, "The Court need not consider all twelve

5    factors, but only those called into question by the case at

6    hand and necessary to support the reasonableness of the fee

7    award."  Close quote.  That is *Kessler versus Associates*

8    *Financial Services Company of Hawaii*, 639 Fed 2d 498 at page

9    500 and note 1.  That's a 1981 Ninth Circuit case.

10          16.  The lodestar amount may be reduced to account

11    for limited success on the merits.  *Hensley*, 461 US at 433.

12    "To be compensated for a claim on which they were not

13    successful, plaintiffs must show that 'work on the

14    unsuccessful claim is related to the work on a successful

15    claim.'"  *Medina the District of Columbia*, 864 Fed Supp 2d at

16    13, page 16.  That's a DC Circuit -- or DC District Court,

17    2016.

18          "The fee award, of course, should not reimburse the

19    plaintiff for work performed on claims that bore no relation

20    to the grant of relief.  Such work cannot be deemed to have

21    been expended in pursuit of the result achieved."  *Fox versus*

22    *Vice*, 56 US 826.  I think that must be a wrong citation.  56.

23    I left out one of the numbers.  I'll correct it.  It's

24    reported at 826, 834.  It's a 2011 case quoting *Hensley*.

25          Paragraph 18.  In this case, because the plaintiff

1    student prevailed on only one of two issues in the

2    administrative proceeding and received only 105 hours of

3    academic tutoring, despite seeking 16 different forms of

4    relief in the due process complaint, a reduction of the fee

5    award is appropriate.  Only as it relates to the

6    administrative matter.

7            Although the relief awarded is undoubtedly

8    significant to the young boy, that is the plaintiff, it is

9    diminished by the context of the relief originally sought.

10   That said, it is not diminished to the extent of the 50

11   percent reduction suggested and requested by the district.

12   That would be inappropriate.  The district will still pay more

13   in attorneys' fees than had it agreed to pay counsel following

14   the administrative proceeding.  In that way the district's

15   position in this litigation appears somewhat

16   counterproductive.

17           Paragraph 19.  The plaintiff's attorneys' fees

18   request for the administrative proceeding is reduced by 30

19   percent to reflect her degree of success below.  That's *Adams*

20   at 13.  The award of $165,232.50 is reduced to 135,876.75.

21           The Clerk is directed to enter judgment pursuant to

22   Rule 58, awarding attorneys' fees in the amount of $135,876.75

23   and costs in the amount of $2,805 by separate document.

24           That is the findings of fact and conclusions of law

25   in this case.  And of course, I should have noted the Court

1  has jurisdiction over this matter as it is a matter arising

2  under federal law and state law.

3       So thank you, counsel.  And the clerk will enter

4  judgment separately, in a separate document.  And we will be

5  in recess.  Thank you.

6       MS. MARCUS:  Thank you, Your Honor.

7     (The proceedings were concluded at 12:21 p.m.)

8

9       I, KAREN HOOVEN, Official Reporter, do hereby certify

10 that the foregoing transcript as true and correct.

11

12 DATED:  5th of June, 2017          /s/  Karen Hooven
                                      KAREN HOOVEN, RMR-CRR
13

14

15

16

17

18

19

20

21

22

23

24

25