# Improving Civil Justice in Rural California

A Report of
**The California Commission on Access to Justice**

September 2010



California Commission on Access to Justice

**Hon. Ronald Robie**
Chair
Associate Justice,
Court of Appeal,
Third Appellate District

**Kenneth W. Babcock**
Vice-Chair
Executive Director &
General Counsel,
Public Law Center

**Mary Lavery Flynn**
Director
Office of Legal Services
State Bar of California

Available at **www.calbar.ca.gov/rural**

The California Commission on Access to Justice
gratefully acknowledges the California Bar Foundation
for their support of the Commission's work and their
assistance in the production of this report.
The Commission also wishes to thank the members
of the Rural Task Force for their many hours of
work on this project, as well as Chris Zupanovich,
Theresa Mesa, and Frank Monti of the State Bar Office
of Legal Services.

**Other publications of the Commission
on Access to Justice**

*The Path to Equal Justice – A Five-Year Status Report on
Access to Justice in California* (2002)

*Language Barriers to Justice in California* (2005)

*Action Plan for Justice* (2007)

 The State Bar of California | Office of Legal Services

# Improving Civil Justice
# in Rural California

A Report of
**The California Commission on Access to Justice**

September  2010



This report is dedicated to
**Chief Justice of California
Ronald M. George**,
whose visionary efforts to
expand access to justice during
his tenure as Chief Justice
have made a difference
for millions of Californians.

# Improving Civil Justice in Rural California

A Report of
**The California Commission on Access to Justice**
September 2010

## California Commission on Access to Justice Appointing Entities

**Governor of the State of California**

**California Attorney General**

**President Pro Tem of the Senate**

**Speaker of the Assembly**

**Judicial Council of California**

**California Judges Association**

**State Bar of California**

**California Chamber of Commerce**

**California Council of Churches**

**California Labor Federation**

**California League of Women Voters**

**Consumer Attorneys of California**

**Council of California County Law Librarians**

**Legal Aid Association of California**

# Table of Contents

# List of Charts, Graphs and Maps

**EXECUTIVE SUMMARY**
5      **Legal Issues Facing Low Income Rural Californians**
10     **Overview of Recommendations**

**PART I**
17  **The Lack of Access to Civil Justice in Rural California**

19   Chapter 1   Rural California: Facing the Challenges

25   Chapter 2   Legal Needs of Low-Income Rural Californians

31   Chapter 3   Profile of Rural Legal Assistance Delivery System

41   Chapter 4   Involving the Courts, Self Help Centers, and Other Community Agencies

45   Chapter 5   Pro Bono: The Role of Lawyers, Bar Associations, and the Law School Community

**PART II**
51  **Recommendations and Strategies for Achieving Adequate Resources for Rural Legal Services**

56   Conclusion

57   End Notes

**APPENDICES**

60   A   Legal Services Funding per Indigent Person by County Population Density Category

61   B   Annotated List of Key Resources

65   C   Full Bibliography

68   D   Distribution Formulas for Legal Services Trust Fund Program

69   E   Office of Legal Services at the State Bar of California

70   F   California IOLTA Funded Programs

71   G   Map of Partnership Grant Self Help Centers in California

72   H   The California Commission on Access to Justice – Appointing Entities and Members

8    Map of California Attorney Density

18   Map of California Urban, Rural, and Frontier Medical Service Study Areas

21   Federal Poverty Guidelines

29   Urban/Rural Percentages of Retired, Disabled and Impoverished

33   Disparities in Urban/ Rural Legal Services Spending



" As a judge whose court serves a large rural area,
I am keenly aware of the lack of legal help available for
low-income rural families facing critical life issues.
We must find a solution to this justice gap."

*Justice Ron Robie*
*Court of Appeal, 3rd Appellate District*

# EXECUTIVE SUMMARY

Low-income Californians throughout the state have difficulty accessing legal services, but those in rural areas face additional challenges.

" Rural America lags behind the rest of the nation in nearly every measure of success – housing, employment, pay, educational opportunity and access to healthcare."

*Dee Davis, President, The Center for Rural Strategies*

Access to legal services is one of the most important and often overlooked ways in which rural areas lag behind the rest of the nation. This report is intended to raise awareness about and provide recommendations for increasing legal services to rural Californians to ensure their access to fair and impartial justice.

Legal aid offices throughout California provide civil legal aid without charge for low-income and underserved families. Clients are of all ages, races, and ethnicities, and they include veterans, seniors, juveniles, people with disabilities, and parents on behalf of their children. Legal aid clients face difficulties obtaining services for veterans, and obtaining pension and unemployment benefits. These clients also face domestic violence, child custody battles, evictions, foreclosures, and difficulties getting school services they need and deserve.[1]

Each year at least one third of low-income rural people need legal services for basic human needs.[2]  However, the availability of legal aid is extremely sparse in rural areas and legal aid programs often are only able to provide partial assistance. In addition to the paucity of legal services, rural California has more inadequate housing, higher unemployment, lower pay, lower average educational levels, and less access to health care and transportation, compared to urban California. Those problems are compounded by the fact that a larger percentage of rural than urban Californians are impoverished, elderly, or living with disabilities,[3] and so more likely to qualify for legal services.

There is a startling resource disparity between urban and rural areas of California, and one of the long-term goals of the California Commission on Access to Justice has been to "increase resources in rural areas [and] establish minimum access guidelines to be used as a baseline for funding considerations"[4] in order to achieve true access to justice for *all* Californians. Both local and statewide collaboration is needed to improve legal services in rural areas, including the pursuit of the goal of statewide parity in funding. Achieving these goals is a shared responsibility. Since no legal aid program has adequate resources, initiatives to address the severe lack of resources in rural areas should be pursued in a way that does not unnecessarily undermine urban legal programs. However, there should be at least a minimum level of access for every region of the state.

## Definition of Rural and Profile of Rural California

California's rural population comprises more than seven percent of the total state population and is scattered through most counties in the state.[5]  The sum of rural California is so large -- a total of 124,800 square miles, or more than 76 percent of the state -- that if it were a separate state, it would be the fourth largest in the union.

| STATE | SQUARE MILES |
|---|---|
| Alaska | 663, 267 |
| Texas | 268, 581 |
| <California (total area) | 163,696> |
| Montana | 147,042 |
| Rural California | 124,800 |

Rural California looks different today than it did in the early twentieth century. The state's population has shifted from 75 percent living in rural areas in 1900,[6] to only seven percent living in rural areas today, a twentieth century phenomenon known as "metropolitanization."  The work of rural communities has shifted, too, with 96 percent of rural income from non-farm sources, and only 1.1 percent of Californians working on farms or in work closely related to farming.[7]  At the same time, rural towns are no longer miniature cities, and they do not provide their previous range of services.[8]

        There are several ways that social scientists and demographers define what constitutes a rural area, among which are sparseness of population, presence of agriculture, and geographic remoteness. California has many large, non-homogeneous counties, so a county-based definition of rural is not appropriate. With a county-based assessment, a county with vast rural areas might not be considered "rural" at all because it also includes a large, densely-populated area.

        The most helpful approach to defining "rural" for purposes of this report is the approach developed by the medical community, which uses sub-county areas. Therefore the "rural" areas discussed in this report are areas that meet the definition of "rural" or "frontier" that the medical community uses to analyze the availability of medical services. That analysis is comparable to an analysis of the availability of legal services. A rural Medical Service Study Area (MSSA) as defined by California law[ix] "…has a population density of less than 250 persons per square mile…and no census defined place within the area with a population in excess of 50,000".[10]

Using this definition, demographers can divide California into sub-county areas, with census tracts aggregated to represent urban, frontier, and rural areas. In this report the term "rural" includes both "rural" and "frontier" areas (frontier areas have fewer than 11 people per square mile), unless otherwise noted.

Wherever recommendations in this report address specific goals, such as establishing minimum access in rural areas, it is intended that an MSSA-based definition of rural be used in implementing that recommendation. However, other urban/rural discussions in this report use the more general urban/rural county descriptions because some solutions can only be implemented at the county level, and also because that is how much of the available research is organized.

*Average total funding by county ranges from $18.56 per poor person annually in California's 28 rural counties to a mean of $44.83 per poor person in the seven urban counties of the state.*

## A Population in Need

Low-income people in California's rural areas face the same kinds of legal problems that low-income people across the country face – problems that threaten their health and safety, undermine their family structure, and put at risk their housing and employment. Both urban and rural low-income communities face language barriers, low literacy, and cultural differences. However, rural residents also have needs that are distinct from residents of urban areas. For example, migrant workers, reservation residents, and rural battered women present far different issues of access and legal need than are usually seen in urban areas. The additional challenges of living in rural areas make these critical legal issues even more difficult to address. (See the description of legal issues facing low income Californians in sidebars on pages 8 and 9)

Low-income Californians throughout the state have difficulty accessing legal services, but those in rural areas face additional challenges. There are fewer legal aid lawyers in rural areas than in urban areas and few private lawyers to fill the gaps. Inadequate or unavailable public transportation makes it difficult to access legal services, especially with the large distances between legal aid offices that are typical of rural areas.

Because of low wages and limited employment opportunities, rural communities have higher rates of poverty than their urban counterparts. In part due to fewer educational institutions and a "brain drain" to urban areas, rural areas lag far behind urban areas in the average educational level of their population.[11]

Over 5 million Californians live in rural areas, and approximately 1.6 million of them are eligible for legal aid services.[12]  Legal aid guidelines allow services to most seniors and persons with disabilities, as well as to individuals whose income is below 125 percent of the poverty line. Federally defined poverty levels are quite low, as the federal guideline poverty chart below indicates. For example, $22,050 is the maximum annual income for a family of four to be classified as impoverished.[13]

## SCARCITY OF LEGAL SERVICES IN RURAL AREAS

Legal aid nonprofit providers in rural areas form the cornerstone of a coordinated – but understaffed and underfunded – legal service delivery system. The network of services also includes court-based self-help centers, county law libraries, volunteers from the private bar, and community organizations. Coordination among all of these entities is particularly important because resources are so scarce and the geographic areas to be covered are so vast.

# Legal Issues for Low Income Rural Californians

The following examples provide an overview of some legal issues that are important to low-income people in California's rural areas:

## Housing
The housing issues faced by rural Californians living in poverty differ in some ways from housing issues faced by impoverished people in urban areas: there is a greater percentage of manufactured housing, there are a significant number of seasonal workers who need temporary housing, and more living units are in disrepair. Two problems stand out with which rural legal services can help:

## Foreclosures
There have been many recent foreclosures on rural homes, in part because lenders issued a greater percentage of subprime loans in rural areas than in urban areas between 2005 and 2008.[i] Statistics on rural home foreclosures do not reflect all of the homes that were lost, because they do not include foreclosures on manufactured housing,[ii] which comprises a significant percentage of rural housing. Low-income homeowners who are in danger of losing their homes need legal assistance for loan modifications and to inform them of their rights in the foreclosure process. Low-income renters also need legal assistance because they are affected by foreclosures when lenders evict them, and there is anecdotal evidence that many lenders are not complying with the federal and state laws that protect tenants.[iii]

## Migrant Housing
Migrant agricultural workers often live in substandard housing: 44 percent of mobile homes inhabited by farm workers are substandard, as are 33 percent of other farm worker housing units,[iv] because of housing and safety code violations. Many are now settling in "colonias" surrounding California's farms without access to running water, sewer systems or other modern amenities. According to HUD, 85 percent of colonias residents are U.S. citizens.[v]

## Labor Violations
There is great need for education about and enforcement of labor laws and health and safety laws in rural areas. Many seasonal agricultural and food processing workers are unaware of their rights or unable to enforce them without assistance. Regulatory agencies such as CalOSHA, the Department of Pesticide Regulation, the Agricultural Labor Relations Board, and the Department of Labor have limited resources, so that the enforcement of safety and wage and hour regulations is limited. Workplace injuries are more common in rural than in urban areas[vi] and minimum wage violations are common in seasonal workplaces.

## Domestic Violence
Domestic violence is exacerbated during times of economic uncertainty, and rural areas are subject to higher unemployment rates and lower wages than are urban areas. Rural domestic violence victims are more often seriously injured,[vii] yet have fewer services available, and the few resources that exist are physically hard to reach because of geographic and transportation barriers. Rural communities are often less aware of the victims among them because of geographic isolation and the

Legal aid programs face particular challenges serving large numbers of clients because they have few local resources. There are no large law firms that can be a source of pro bono services, as well as fewer law schools, corporate headquarters, and foundations.

The State Bar's Legal Services Trust Fund Program (LSTFP) funds nearly 100 legal aid programs and support centers. These programs cover the entire state, but their resources are stretched thin. And while there are not enough resources to provide assistance to eligible urban clients, resources are even scarcer in the rural regions of California. For example, while Los Angeles County has about

paucity of services that could observe and report likely victims.[viii]

## Access to Health Care and Services

Low-income rural residents need assistance with and enforcement of rights to state and federal benefits, Food Stamps, and General Assistance. A lower percentage of rural poor receive Food Stamps, State Children's Health Insurance Program (SCHIP), and Temporary Assistance to Needy Families (TANF) than their urban counterparts.[ix]  Healthcare services are sparser in rural than in urban areas: there are fewer specialists, including pediatricians, per rural resident, despite the fact that rural children have health insurance at nearly the same rate as urban children.[x]

## Legal Problems Facing the Elderly and Persons with Disabilities

California's rural poor are more likely to be elderly or to be living with disabilities than are the urban poor: 28 percent of the rural poor are retired, compared to 23 percent of urban poor, and 31 percent of the nonworking rural poor have disabilities, compared to 26 percent of the urban poor.[xi]  Despite these numbers, there are fewer services accessible to the elderly and people with disabilities in rural communities. Geographic isolation, language barriers, and lack of legal aid services make it much more difficult for rural seniors and persons with disabilities to receive the services they need, including services to avoid consumer fraud and to maintain their independence.

## Language Assistance

The growing number of languages spoken in rural California has significantly increased the need for language assistance both in legal aid offices and in court, where there is no established right to an interpreter in a civil proceeding. Some adults ask their children to translate, but since they have neither legal vocabulary nor an understanding of legal concepts, children do not provide adequate assistance. Language barriers also complicate the already difficult process of outreach and delivery of legal services in rural areas. Interpreters of some languages are scarce and they must spend part of their workdays traveling to remote areas, but there is neither adequate funding nor training available to increase the number of interpreters.

## Tribal Peoples

More Native Americans live in the state of California than live in any other state in the union. There are 109 federally recognized tribes, 20 tribes that are awaiting recognition, and several other tribes that do not have official federal status. Most California reservations are in rural areas and there are more than 63,000[xii] Natives in residence, many in the most remote rural areas of the state, and several reservations straddle state or national borders. [xiii]  While several reservations have tribal courts, reservation residents are still subject to and protected by state and federal laws, so residents must also interact with state courts.[xiv] Rural legal aid offices and self- help centers encounter many challenges in serving tribal peoples because lawyers must know how state and tribal laws impact and intersect with regard to people's rights and responsibilities. The remoteness of some reservations presents another challenge: for example, in Inyo County one reservation is a four-hour drive from the nearest court self-help center.



## Density of California Attorneys 2004

**Number of Attorneys per Square Mile by Zip Code**

- 0
- Less than 1
- 1 - 5
- 6 - 25
- 26 - 50
- 51 - 100
- 101 - 500
- Greater than 500

Interstate
County Boundary
Water

This map was developed solely for the purpose of determining whether mapping is useful for making management decisions.

Source: Number of Attorneys - State Bar of California (2004)

LSC
Office of Inspector General

0   25   50
Miles

22 programs and the City and County of San Francisco has approximately 13, one legal aid program – Legal Services of Northern California (LSNC) – is the general legal services provider serving 23 counties in the northern part of the state, an area larger than the state of Ohio. (A handful of other programs provide some assistance in those counties: clients with specific legal needs get long-distance help from Disability Rights California, California Indian Legal Services and California Advocates for Nursing Home Reform [CANHR], as well as a few programs not funded by IOLTA.)[14]

There is a large disparity in legal aid funding per poor person between urban and rural areas. In 2008, legal aid funding per poor person by county ranged from a mean of $18.56 per poor person in California's 28 rural counties to a mean of $44.83 per poor person in the seven urban counties of the state, nearly two and one half times the rural rate. (See Appendix A for list of counties included in each category.)

The two main legal aid funding sources, the federal Legal Services Corporation (LSC) and the State Bar's Trust Fund Program, use funding distribution mechanisms that are prescribed by statute. LSC's funding for local legal aid programs is allocated evenly based on the number of poor people in the service area. Similarly, State Bar Trust Fund monies are allocated to the counties based on the number of indigent people in each county; within the county, the funds are distributed based on the amount each program has spent during the prior year providing free civil legal services to the indigent. (See Appendix D for a more detailed explanation of this distribution mechanism).

While intended to be a fair system, for rural programs the sparse population results in their receiving inadequate funding to staff the immense geographic areas they need to serve. When the lack of funding is coupled with the challenges of serving a rural population, these programs are particularly hard-pressed to offer the level of services that they know their clients need.



**Senior's sole income saved by legal aid**

Dan, a senior living in the rural Sierra foothills, was unable to respond timely to a notice of levy on his bank account because of inclement weather. He had to drive to another county to make his case to the bank. He had an automatic right to exemption from the claim because his Social Security retirement payments were his only income, but his bank was going to process the claim because it did not have proof that his income was protected. After being referred to legal services by his senior center, he filed a claim of exemption. His bank now has proof of his right to automatic exemption in order to avoid this problem in the future.

## Other Rural Challenges for Legal Aid Providers

In addition to the lack of resources, rural legal aid providers have an increased likelihood of conflicts of interest because the legal aid office is often the sole legal services provider in the area, leaving no other legal representation for a second party in a legal action.[15] Moreover, local pro bono attorneys often have conflicts that keep them from volunteering.

In order to provide needed services to underserved rural residents, legal aid advocates sometimes must overcome both a lack of awareness of legal aid and a reluctance to seek legal assistance because of rural culture, distrust of newcomers to the community, or concerns about immigration status.

Greater travel requirements for assistance and representation mean either longer days for staff and volunteers, or fewer clients who are able to receive services. Technology to bridge the distance is both limited in availability and more expensive than it is in urban areas.

Managers of rural legal aid programs identify attorney recruitment and retention as their biggest challenge. It can be difficult to recruit both recent graduates and experienced practitioners to move to isolated areas, where there is little professional support and few urban amenities.[16] Attorney turnover generally is high for legal aid organizations, but turnover is higher in counties that are predominantly rural.[17] Low pay is the most common reason that attorneys give for leaving legal aid jobs.[18]

## Courts, Self-Help Centers, and the Private Bar are Key Justice System Partners

Because rural courts are often the first place individuals go when they encounter legal problems and do not know where else to turn, it is vitally important that all rural courts and their self help centers be considered part of the broader delivery system. Appropriate referrals can be made from those self help centers to leverage resources and help individuals receive the assistance they need.

The Judicial Council's support for access to justice and its commitment to the network of Self-Help Centers across the state have made the Council an invaluable partner to the legal services community in working to provide access to justice for the poor. There are now 110 court-based Self-Help Centers in California, covering each of California's 58 counties,[19] and many of those centers are located in rural areas. These centers are located in or near courthouses, and are staffed by attorneys who direct non-attorney staff members and volunteers. Self-help centers often provide assistance to people whom legal aid cannot help. Since more than half of those appearing in California courts do not have an attorney, the California Court Self-Help Centers and on-line self-help resources are a critical component of the delivery system.[20]

The private bar is also a key partner, providing support to underfunded legal aid providers, offering pro bono support, and representing moderate income clients through a sliding-fee scale, so that representation is affordable. However, it is critical that urban law firms and bar associations, and the state's law schools, partner with their rural colleagues to help address the need. There are a limited number of attorneys in rural areas, and many of them are solo practitioners who

already provide some free or low-cost services, while struggling to maintain a profitable practice.[21]  Also, many rural attorneys work for government entities and so may be precluded or perceived as being precluded from representing clients,[22] although there are many other ways for them to help otherwise unrepresented individuals. The solution to this attorney shortage must be a coordinated statewide effort to match some urban resources with rural clients who would otherwise go unrepresented.

## Launching a Coordinated Effort to Achieve Parity

The California Commission on Access to Justice hopes that this report helps to launch a major coordinated effort to address the many challenges that legal aid organizations and rural courts encounter when they seek to provide access to justice for rural Californians. It is the Commission's intention that implementation of the recommendations in this report will achieve much of what is needed in terms of increased funding and volunteer support, as well as improved collaboration between urban and rural areas of the state. At the same time, the Commission recognizes that local stakeholders are in the best position to set local priorities and develop local action plans that are designed to truly improve access to justice. The Commission stands ready to help in any way that it can to achieve these important goals.



## Disabled man's social security reinstated

Bob, a disabled man living in a remote area of the American River Canyon without mail service, learned of his termination from Social Security when he tried to buy groceries.  He "hitched" a one hour ride into town, and found that his sole income, had been terminated because he was deemed "over resource." Bob held title to a mobile home that he had abandoned when he could not afford to fix it.  Social Security Administration (SSA) determined that since he did not live in his mobile home, it was a non-exempt resource worth over $20,000, and alleged that the client received rental income from a tenant living in the mobile home.

Bob contacted legal aid and they discovered that he abandoned his home because he could neither heat it nor repair it.  He had moved into an old trailer in an isolated area, reachable only by 4-wheel drive vehicle and on foot, with no phone service.  Legal aid learned that someone was living in Bob's abandoned mobile home, with tarps on the roof and water diverted from a mobile home park connection.  The "tenant" was afraid of losing his housing but was willing to declare that he did not pay rent to Bob, SSA reinstated his SSI.

# Overview of Recommendations and Strategies for Achieving Adequate Resources for Rural Legal Services

This Report is intended to assist all key institutions and stakeholders concerned about the administration of justice in California in both urban and rural areas – the State Bar, local bar associations, and individual attorneys and law firms; the Judicial Council, local courts and individual judges; legal services programs; other "justice partners" such as county law libraries, other service providers, and the Access to Justice Commission itself. While the focus of the report is on "rural California" in general, the Commission understands that each of the state's rural communities is unique and each has unique needs and priorities. The Commission intends that implementation of these recommendations will be tailored so that local solutions are developed, where appropriate, but that all justice system stakeholders across the state become involved in achieving these important goals.

## 1. Pursue Geographic Equality

All Californians should have access to justice, and the amount and type of legal assistance available to low and moderate income Californians should not depend on where those individuals reside.

## 2. Expand Funding for Rural Legal Services

The significant lack of funding for California's rural legal aid programs must be addressed. All legal aid programs face the challenge of inadequate resources, including programs in urban as well as in rural areas; therefore any initiative to address the severe lack of resources in rural areas should not be developed in a way that unnecessarily undermines urban programs. The goal is to increase the total resources available for all legal services programs across the state, not merely to reallocate existing resources.

## 3. Develop Minimum Access Guidelines

Minimum access guidelines should be developed as a baseline for funding considerations so that, wherever feasible, funding can be allocated with the goal of moving toward parity across the state. These guidelines are particularly appropriate for the allocation of new funding because all legal aid programs, whether urban or rural, face the challenge of inadequate resources. The California Commission on Access to Justice should develop these minimum access guidelines in coordination with the State Bar's Legal Services Trust Fund Program, Legal Aid Association of California (LAAC), legal service providers, and other stakeholders.

4.   **Establish Statewide "Friends of Rural Legal Aid" Committee**

A statewide rural legal services Support Committee should be established to support the work of nonprofit rural legal aid providers. The Support Committee should work to ensure adequate resources and improve pro bono services. The committee should include key rural leaders as well as representatives of urban law firms, corporate counsel, and other community leaders from urban areas. The California Commission on Access to Justice should work with rural legal services programs to establish this Support Committee.

5.   **Fulfill Pro Bono Responsibility by Helping Rural Californians**

California lawyers should consider ways to include service for under-served rural Californians when they are fulfilling their 50-hour pro bono responsibility. Because rural areas have fewer lawyers, law schools, and economic resources, urban bar associations and lawyers should consider partnering with rural organizations, being mindful that impoverished urban Californians are also underrepresented and need pro bono help as well. Attorneys who are precluded by ethics rules from representing some individuals should be made aware of all of the options for meeting the recommendation, such as devoting time or money to legal aid programs or otherwise furthering access to justice.

6.   **Develop Innovative Ways to Use Technology to Bridge the Urban/Rural Divide**

Effective use of technology can help address many of the barriers experienced by those serving the legal needs of low-income rural Californians. While technology alone is not a panacea, online resources can significantly help self-represented litigants; video-conferencing can connect a rural resident with an urban volunteer lawyer; and telephonic appearances and e-filing can help legal aid lawyers and volunteers to avoid unnecessary travel.

7.   **Convene Local Rural Access Task Forces to Coordinate and Strengthen All Components of Rural Legal Services Delivery System**

Local stakeholders in rural communities throughout the state should be encouraged to convene local Rural Access Task Forces to evaluate and begin addressing the priorities unique to each community to increase access to civil justice. These local task forces might include representatives from legal aid providers, self-help centers, the local bar associations, and county law libraries, as well as other partners who also assist impoverished clients. One of the first projects for these Task Forces should be to identify gaps and target services for isolated, underserved groups, and to expand the availability of legal aid services locally. It is also important to improve language access and develop methods to effectively use urban resources, including pro bono attorneys and interpreters, and to use innovative technological solutions where appropriate.



Looking at the problems involved with the lack of access to justice in California rural communities requires a definition that is sensitive to geopolitical boundaries and jurisdictions of the state.

**PART 1**

# The Lack of Access to Civil Justice in Rural California

Low-income rural Californians face a complex set of barriers and challenges when they seek to address critical legal needs, yet legal services programs lack adequate resources to offer the services that are needed so desperately in these communities.

The California Commission on Access to Justice presents this Report and Recommendations on ways to expand the availability of legal services to Californians living in rural communities throughout the state. The report will:

- Provide a working definition of "rural" and an overview of California's rural demographics;
- Examine the barriers faced by low-income Californians in rural areas that restrict their access to justice;
- Describe the legal help available in California's rural communities; and
- Focus attention on the opportunities and recommendations that will result in more fully serving the legal needs of California's rural communities.

For some time, representatives of urban and rural legal services organizations, local bars, court administrators, and other stakeholders have worked together to address these challenges. Rural legal services programs have identified some of the gaps in justice in rural areas and have tried to meet the needs of as many rural residents as they are able to. Volunteers from local bar associations have assisted legal services organizations in limited ways, and have provided some free and low cost legal services to low income and moderate income clients. The California Commission on Access to Justice hopes to continue its collaborative efforts with these groups in an expanded and coordinated way.

The purpose of this publication is to 1) analyze the nature and extent of the problem, 2) review the good work of those individuals and organizations devoted to the elimination of barriers to justice in rural communities, and 3) recommend ways these efforts can be improved and utilized to address and work towards a solution to this chronic problem within the California civil justice system.

For further background information, please refer to the annotated bibliography in the appendix.

# California Medical Service Study Areas
## Urban, Rural and Frontier Defined Areas



Legend:
- Frontier (56)
- Rural (186)
- Urban (299)
- Counties

Scale 1:4,800,000

0   50   100   150  Miles

osbpd
Office of Statewide Health Planning & Development

Western states, like California, often have very large counties that have very large land areas that are both urban and rural in nature.

# CHAPTER 1
# Rural California: Facing The Challenges

## Definition of Rural

There are many ways of defining "rural", and researchers, policy makers, and government agencies take a variety of approaches in selecting definitions.[23] There is no single best definition, but the definition used should be dictated by the problem being addressed. Looking at the problems involved with the lack of access to justice in California rural communities requires a definition that is sensitive to geopolitical boundaries and jurisdictions of the state. In addition, policy recommendations require a definition that has been standardized for addressing similar problems in the state.

While many federal government agencies define rural in terms of rural and urban counties, this is clearly inappropriate in California. A county-based definition might work for eastern states that are comprised of a large number of homogeneous counties, but western states, like California, often have very large counties that contain land areas that are both rural and urban in nature. For example San Bernardino, Riverside, and San Diego counties have both urban and rural areas. This suggests that a definition based on census tracts or some aggregation of census tracts at the sub-county level would be most appropriate.

Legal services are not the only social service that encounters problems at the rural level. Both medical and legal services have delivery difficulties in rural communities, both share problems of client access to services because of distances to central facilities such as hospitals and courts, and both have the problem of few professionals residing in areas of low population density. Unlike legal services, the problem of access to medical services in rural areas has received more policy attention by the state and more development in defining what is and is not rural.

Medical Service Study Areas (MSSA) are the geographic unit of analysis used by the Office of Statewide Health Planning and Development and are based on census tracts that have been aggregated to represent urban, rural, and frontier areas. The legislative authority for this definition is based in the Song Brown Family Physician Training Act (1973)[24] which requires the division of the state into sub-county areas to determine areas that have unmet medical needs. This also makes MSSAs a useful approach for determining levels of unmet legal need and differences among urban and rural areas. See the appendix for a map of California MSSAs.

MSSA guidelines require the following:
· Each MSSA contains one or more census tracts.
· MSSAs do not cross county boundaries.
· All the census-defined places within the MSSA are, where practicable, within 30 minutes travel time to the largest population center within the MSSA.
· An area standing alone that meets both the definition of an MSSA and a rural MSSA should not be part of an urban MSSA.

- Any urban MSSA that has a population greater than 200,000 should be divided into multiple areas.
- Urban MSSAs should have a population range of 75,000 to 125,000 but cannot be smaller than five square miles. The population of an MSSA may exceed 125,000 if removing any census tracts on the perimeter of the area would cause the area to become less than five square miles.
- MSSAs should follow community and neighborhood boundaries and take into account income level and ethnicity.
- Rural Definition: MSSA that has a population density of less than 250 persons per square mile and that has no census defined place within the area with a population in excess of 50,000.
- Frontier Definition: MSSA that has a population density of less than 11 persons per square mile.

This report collapses the categories of rural and frontier into a single rural category. When the report makes specific recommendations as to resource allocation to rural areas it is using the definitions above. However, many of the resources used for this report do not use such a rigorous and specific definition of rural, and many of the strategies and recommendations in this report would be addressed at a county level.

## Demographics

In order to address the legal services needs of California's rural population it is important to recognize the experience of low-income individuals living in low-income areas. While California is the most populous state in the nation, its population is both concentrated and unevenly distributed. California's rural population makes up 7.26 percent of the total state population, and it has grown over the last few years.[26]



13 percent of rural seniors have incomes below the poverty line, compared with nine percent of urban seniors.

There are several demographic differences between rural and urban Californians that are related to their needs for legal services:

**A larger percentage of rural than urban Californians are elderly:**
Elderly rural Californians not only comprise a larger percentage of their communities (20 percent rural vs. 15 percent urban),[27] but they are more likely to be retired than their urban counterparts.[28] Among the reasons for their greater presence in rural areas are: 1) the paucity of rural job prospects and educational opportunities drives away young adults, and 2) a small percentage of seniors retire to rural areas from urban or suburban areas.

**A larger percentage of rural than urban Californians are living with disabilities:**
More than 20 percent of rural Californians have disabilities,[29] compared to 17 percent of the urban population, and fewer rural Californians with disabilities are employed than are their urban counterparts.[30]  Also, a larger percentage of rural than urban Californians collect Social Security Disability Insurance (SSDI): 3.5 percent vs. 1.8 percent. There are several explanations for these statistics: 1) employment-related injuries, some of which are disabling, are more common in rural areas,[31] 2) the higher cost of housing in many urban communities might be a deterrent for people with disabilities who are on fixed incomes, 3) 41 percent of the elderly have disabilities, so any community with a large percentage of seniors is likely to have a concomitantly larger percentage of people with disabilities, although seniors have little effect on the SSDI figures, since that benefit is generally for the working age population.

**A larger percentage of rural than urban Californians are low income:**
Rural Californians are less prosperous than their urban counterparts. A smaller proportion of rural county residents have an annual household income in excess of $75,000 compared to urban residents: 28 percent of rural residents have a household income over $75,000 compared with 39 percent of urban residents.[32]  A greater proportion of residents of rural counties have incomes below the Federal Poverty Level (FPL), 15 percent compared to 12 percent.[33] Average per capita income in the largely rural Central Valley was $29,790 in 2007, while the statewide average was $41,805.

| Federal Poverty Level Income Guidelines 2010[13] | HOUSEHOLD SIZE | ANNUAL INCOME |
|---|---|---|
| | one | $10,830 |
| | two | $14,570 |
| | three | $18,310 |
| | four | $22,050 |
| | five | $25,790 |
| | six | $29,530 |

A larger proportion
of rural than urban
children live in poverty.

More rural seniors are retired than are urban seniors, and 13 percent
of rural seniors have incomes below the poverty line, compared with nine
percent of urban seniors.[34]  Of rural seniors over the age of 85, 20 percent live
in poverty. A larger proportion of rural than urban children live in poverty,
too, with 22 percent of children living below the poverty line in rural areas,
compared to 19 percent in urban areas, yet rural families below the poverty
line are more likely to be working. Rural families are less likely to receive
Temporary Assistance to Needy Families (TANF), State Children's Health
Insurance Program (SCHIP), or Supplemental Security Income (SSI), despite
their eligibility for these programs.[35]

**A smaller percentage of rural than urban Californians
are college educated:**
Eighteen percent of the rural population has a college degree, compared to 32
percent of the urban population.[36]  This statistic has been partly explained
as a rural "brain drain", where rural youth who leave to pursue an education
do not return.[37]  There are fewer higher education opportunities for those
who remain in their rural communities, fewer job possibilities, and fewer jobs
that require a college degree.[38]  In some rural areas of California the "drain"
has accelerated in recent years: between 1995 and 2000 South San Joaquin
County, much of which is rural, added 13,000 adults without a high school
diploma and lost 3,000 adults with college degrees.[39]  Also, immigrants to
rural areas generally are less educated than immigrants to urban areas.[40]

**Rural youth have fewer options:**
Rural youth, too, have some different issues from urban youth, and the issues
seem to be related to the lack of opportunity that they perceive in their rural
communities. A larger percentage of them live in poverty than their urban
counterparts,[41] and they are less likely to be employed or in school.[42]  Small
rural high schools rarely feature advanced coursework or modern equipment
because small rural school districts have small budgets.[43]  In addition to
fewer educational opportunities, rural youth are less likely to value or to be
able to afford higher level education.[44]

Contrary to stereotypes about urban youth, rural youth are more likely
to sell drugs and to engage in substance abuse than are their urban peers.[45]
While adult alcohol use is the same in rural and urban communities, rural
seventh graders outpace urban seventh graders in their use of drugs, tobacco
and alcohol. Rural youth use drugs and alcohol most between 3 and 6 p.m.,
saying that they have "nothing else to do".[46]  The drugs that are used at a
higher rate include cocaine and methamphetamines, as well as prescription
drugs. While this is a criminal problem, and not in the purview of civil legal
aid, there are community ramifications in terms of services needed by these
young people and their families.

Rural youth are also overrepresented in enlistment and death rates in
the current conflicts in Iraq and Afghanistan,[47] and many enlistees say that
they joined the military because there were no jobs in their communities.
Rural areas have a higher percentage of injured veterans than the country

Rural youth are less
likely to be employed
or in school.



Rural Californians have less access to computers, the Internet, broadband access, and cellular phones than do urban Californians.

as a whole, and a significant percentage need legal assistance to obtain the disability benefits that they have earned. Legislators have sought to address an acknowledged lack of services for rural veterans by increasing funding for legal services for veterans.[48]

**Rural access to technology is limited:**
Technological advances have allowed people to bridge long distances and connect with information, educational opportunities and government sites, but rural Californians have less access to computers, the Internet, broadband access, and cellular phones than do urban Californians. Cell phone and broadband access are nonexistent or extremely expensive in remote areas, while rural incomes are lower and public libraries are farther apart than in urban areas. While 63 percent of urban Californians have access to the Internet in their homes, 58 percent of rural Californians do. Urban home broadband access is at 56 percent compared to 51 percent in rural homes. Lower average rural income is part of the equation: There is Internet access in 47 percent of state households with incomes under $40,000 and in 94 percent where income is over $80,000.[49]

## The Rural Economy

Lower per capita income is only one aspect of what is economically distinct about rural California; the sources and distribution of income also shape communities. Rural Californians receive a smaller share of federal money, yet it accounts for a greater percentage of household income. The rural job market is weak, and it neither grew as fast as the urban job market, nor declined as steeply over the last decade, although rural California recently experienced sharper declines than other rural areas.[50] Other recent economic occurrences have resonated differently in rural than in urban areas, too, including higher rates of manufacturing job loss and subprime mortgages, for example.[51]

The paucity of rural job prospects and educational opportunities drives away young adults.

A greater percentage of rural income than urban income is derived from Social Security payments: 8.3 percent of the income in California's rural counties is from Social Security checks, compared to 3.7 percent of urban county income. Despite the fact that rural communities receive a larger proportional share of Social Security, Medicare dollars and farm subsidies, total federal spending is lower per capita in rural areas than it is in urban areas: $7,000 rural vs. $7,300 urban.[52]

A weak job market is one of the structural causes of rural poverty. Many traditional rural jobs have been eliminated by globalization and modernization: natural resource extraction and manufacturing both have largely disappeared, and both accounted for a large number of non-agricultural rural jobs in years past.[53]  The mechanization of agriculture means that fewer than 15 percent of rural Californians work on farms or in jobs closely related to farming.[54]  There is less mobility between classes in rural areas and a "deep class divide" in rural communities.[55] This is, in part, a reflection of the lack of educational and employment opportunities in rural communities.

Because rural California did not share in the 1990s job boom, the recession there has been more muted so far than it has been in urban areas.[56]  For instance, while the average official unemployment rate in the Central Valley was 4.2 percent higher than unemployment in the rest of California in 2007, it is now only 2.6 percent higher. However, in several rural areas in California the unemployment rate is above 20 percent.[57]

Other recent economic trends have impacted rural communities more than urban communities. The large increase in gasoline prices has meant a bigger income loss for rural residents who have less access to public transportation and who travel longer distances for work, school, and services.[58] The financial crisis has affected partially rural California counties where agricultural land was cleared for new housing over the last decade, and the housing now stands unfinished or unoccupied because of foreclosures. There have been school closures in rural areas where there are too few children to qualify for needed state money, and not enough of a tax base to keep the schools open for the children who remain.[59]



Recent economic occurrences have resonated differently in rural than in urban areas including higher rates of manufacturing job loss and higher rates of subprime mortgages.

# CHAPTER 2
# Legal Needs of Low-Income Rural Californians

California's low-income, rural population has legal problems that impact their health, safety, family structure, housing, and employment. The additional challenges of living in rural areas make these critical legal issues even more difficult to address. The following examples provide an overview of some important legal issues for low-income people in California's rural areas:

## Housing
Low income rural residents experience some housing issues that are very different from issues of their urban counterparts. Demand for rural housing far exceeds the supply,[60] and there is a greater percentage of manufactured housing in rural areas,[61] a significant number of seasonal workers, and more housing in need of repair.[62]  For those without housing, there are few shelters and little temporary housing available.[63]  These following two areas are examples of housing issues that affect rural legal needs:

### Foreclosures:
Rural California has been unevenly impacted by foreclosures because of subprime lending, differences in geography, recent construction, and local economies. A larger percentage of rural than urban conventional loans were high cost loans (28 percent vs. 24 percent).[64]  The largest percentages of subprime loans were made just before the recession in rural areas[65] and foreclosures increased sharply in 2009 in California's rural areas. Foreclosures on manufactured housing are not counted in most foreclosure statistics, but manufactured housing comprises a significant proportion of rural housing. Low-income renters evicted from foreclosed properties in rural areas have increased the need for legal assistance with housing over the last few years.

Changes in financing for the housing market have had other impacts on rural California as well. Developers who purchased and cleared agricultural land in several partially rural California counties have left some housing unfinished or unoccupied because of foreclosures. Rural jobs and income were lost when tens of thousands of acres of Central Valley farmland were cleared over the last decade, and the expected new residents are not occupying that land.[66]

### Migrant Housing:
There is an acute need for enforcement of state and federal laws regarding housing and zoning in rural areas. Agricultural workers often face discrimination in housing and substandard living conditions in rental and grower-provided housing. It is estimated that 44 percent of farmworkers do not migrate because of California's long growing season, but large numbers of "settled out" farmworkers live in crowded, substandard conditions, paying a high proportion of their income for housing. At least one-third of farmworker housing is substandard, and more than one-quarter of it is adjacent to fields where pesticides are applied.[67]  Most growers do not provide

---

**Evicted tenant keeps possessions**

Teresa, a tenant living in a remote area of the Central Valley was served with an eviction notice because the owner of her rental had defaulted on his property loan. When the owner abandoned the property, he took the appliances, and the tenant had to purchase her own.

The mortgage company insisted on keeping the appliances when they served her with the eviction notice. She attempted to negotiate on her own with the mortgage company, but she was unable to convince them that the appliances belonged to her.

The local legal aid program helped the client oppose the eviction and the seizure of her possessions. Teresa was awarded $7,000 for relocation expenses and was able to keep her appliances.

## Farmworker is compensated for injury

Gilda injured her lower back while picking grapes and lifting heavy buckets in the fields of the Central Coast. Like many other agricultural workers, she was unfamiliar with her right to workers' compensation, afraid of retaliation, and hesitant to report the injury to her employer.

When she reported the injury, her employer refused to file a workers' compensation claim, and instead directed her to a non-medical practitioner. Two weeks later she requested real medical treatment, but her employer again refused, saying it was too late to file a claim.

Gilda then sought assistance from the local legal services program, which provided her with an attorney who filed a claim against her employer, and she received proper medical treatment and related workers' compensation benefits.

housing, so migrant workers have the additional difficulty of renting within the regular rental market, which often requires a six-month commitment and a substantial deposit up front; therefore, the market within which farmworkers are able to rent is limited.[68]  As is typical of rural homelessness, many migrant agricultural workers live in their vehicles for at least part of the year.[69]

An expanding community of migrant workers who live outside of traditional housing needs a different kind of assistance. Low-paid migrant workers who once traveled between seasonal jobs in California and Mexico and other Latin American countries are now settling in "colonias" surrounding California's farms. Colonias are unofficial towns, some of which resemble labor camps, and residents live without running water, sewer systems, or other modern amenities. The populations of colonias surge during the harvest season, yet 85 percent of the residents are U.S. citizens.[70]

## Labor Violations

A significant number of indigent rural Californians work in agriculture or employment related to agriculture: in addition to farmworkers, there are loggers, cannery workers, fruit packers, and meat processors.[71]  Much of this work is seasonal and not well regulated. Rural workers are injured at a higher rate than their urban counterparts,[72] and there are more reported incidents of child labor law violations and many complaints about sub-minimum wages.[73]  Approximately half of the farmworker population is undocumented,[74] and many do not read or know enough Spanish or English to read information about their legal rights or potential workplace dangers. [75] Regulatory agencies such as CalOSHA, the Department of Pesticide Regulation, the Agricultural Labor Relations Board, and the Department of Labor have limited resources, so that both inspection and enforcement are limited.

Legal services offices report finding many illegal employment practices: wage and hour violations, retaliatory firings after people complain about violations or invoke their rights, extremely unsafe working conditions, and fraudulent recruitment and payroll activities. Employers of seasonal workers have paid sub-minimum wages, not paid overtime wages, refused to provide itemized paystubs, paid late, and made excessive and illegal deductions for transportation, toilets, and other necessary items. Some employers have illegally fired workers for complaining about being sprayed with pesticides or using unsafe equipment, or for taking pregnancy leave. Workers face potentially lethal practices, such as the use of unsafe vehicles in the fields or as transport vehicles, deadly exposures to pesticides with no follow-up medical care, and increase speeds that increase injury. Other illegal employer practices include long-outlawed practices like child labor, the use of the short-handled hoe, and egregious sexual harassment.[76]

Unemployment is high in rural areas and job choices are few, so the possibility of job loss is likely a deterrent to reporting illegal workplace practices. Also, many of the people who work in the lowest paid, most dangerous jobs are fearful because of their immigration status or lack of knowledge about their rights. Rural legal services offices can educate people about their rights and assist with their enforcement through civil cases, but distance, worker migration, a dearth of translators, and small legal staffs make the work difficult.

## Domestic Violence

The geography and culture of rural California create unique challenges for victims of domestic violence. Lawyers can help diminish or stop domestic violence through temporary restraining orders, legal separations, and divorce, but victims must navigate distant courthouses, a lack of public transportation, and potential conflicts in the small legal community. Legal conflicts are of particular concern in domestic violence cases because the alleged batterer might seek assistance from legal aid before the battered spouse is able to do so. California's rural communities are also multilingual, with more languages spoken by potential victims than there are qualified translators.

It is difficult to compare the incidence of domestic violence in rural and urban areas because domestic crimes are often unreported and police responses to those crimes can be uneven. Nationally there are higher arrest rates for family violence in small towns and rural areas, and the violence is more extreme. Recent comparisons have revealed that there are more serious injuries and homicides as a result of domestic violence outside of urban areas. Rural perpetrators were more likely to use weapons and rural victims were twice as likely to suffer severe physical injuries.[77]  Domestic violence tracks economic woes,[78] and California's rural communities have lower rates of employment and lower average wages than urban areas of the state have.[79]

The nature of domestic violence exposes rural domestic violence victims to unique problems. The isolation and control that batterers often inflict is compounded when the only means of transportation is a car to which the victim is denied access. While batterers frequently seek to isolate their victims from family and friends, rural housing can mean that no neighbors are close enough to be aware of the situation or assist the victim.[80]  Undocumented victims are particularly vulnerable: a study of rural domestic violence found that some batterers threaten exposure of their victim's immigration status to authorities if the victim seeks help.[81]

Experts cite rural culture, together with geographic barriers,[82] as a reason that victims do not get legal help. Besides the logistical problems that victims encounter, including limited transportation, lower access to phone lines,[83] and few battered women's services, the lack of anonymity in rural communities and the expectation that one should solve one's own problems might deter early reporting.[84]

## Access to Health Care and Services

Rural residents who live in poverty need assistance with and enforcement of rights regarding state and federal benefits, Food Stamps, and General Assistance. A lower percentage of rural poor receive Food Stamps, SCHIP, and TANF than their urban counterparts.[85]  There is evidence that this is due to lack of information and difficulties with applying for these programs.

Healthcare services are sparser than in urban areas and there are fewer specialists per rural resident, at one-tenth the number per capita that there are in urban areas. There is one-sixth the number of pediatricians in rural California, despite the fact that rural children are insured at close to the same percentage as urban children.[86]  However, a larger percentage of rural than urban children

**Violations against farm laborers are cited**

A farm labor contractor recruited approximately 180 workers to work in California's farmlands for six months on H-2A temporary visas, promising wages of up to $100 a day for 8 to 10 hours of work.

The laborers arose daily at 4:00 a.m. to be picked up for work, but only a few were taken to the harvest areas, to work as little as a few hours a day. Even when they did not work, the laborers were required to pay $10 a day for meals that consisted of a small amount of beans and eggs, and they were housed in decrepit labor camps with torn, bloodstained mattresses.

When the local legal assistance program learned that the workers had never received a written contract of rights and terms of employment as is required by federal law, an attorney filed a lawsuit demanding unpaid minimum wages and reimbursement of visa fees and other costs that H-2A employers must cover. The attorney contacted the state Department of Housing to inspect the living quarters and the DOH issued 11 citations for violations by the employers.

**Senior client saved from foreclosure**

Christine, a 62 year-old woman who had lived for 35 years in her home in rural northern California, contacted a legal services hotline when her house was sold at foreclosure.

A foreclosure counselor from the local legal aid program negotiated with the lender to rescind the sale of the property and place it back into the owner's name. He also successfully negotiated a loan modification decreasing the principal balance, reducing the interest rate, and increasing the loan term.

The lender waived many accumulated charges, and Christine was able to stay in her home, with monthly payments reduced by 70 percent.

are insured through public health insurance.[87]  Also, the cost of health care is 20 percent higher in rural areas, despite the fact that wages are lower.[88]

Other related services are far less available in rural areas than in urban areas. There is less public transit for traveling to medical care, less paratransit for the elderly or people with disabilities to see health practitioners, and fewer facilities for seniors who can no longer live independently.

## Legal Problems Facing the Elderly and Persons with Disabilities

A large proportion of the rural population is over 65,[89] but there is not a correspondingly large number of needed services available to them. Geographic isolation, language barriers, and lack of legal aid services make it difficult for low-income seniors to get access to legal aid to obtain the benefits that they need, to maintain their independence. Although rural communities have a larger proportion of seniors than do urban communities, there are fewer services to address the legal problems of the elderly, such as senior centers, and assisted living and skilled nursing facilities.[90]  Also, rural elderly are older, on average, than their urban counterparts, more likely to live alone after the age of 75, and more likely to have incomes below the poverty line.[91]

Attorneys can protect seniors from elder abuse, ameliorate consumer fraud, help plan for assistive care, and publicize senior rights, but the few attorneys in rural communities are often at a prohibitive distance from where isolated elderly live.[92]

There are a larger proportion of people over 65 in rural communities, in part because younger populations move away for education and/or employment.[93]  In California, the extremely high housing costs of the last decade also have pulled retirees to rural areas to find more affordable housing.[94]  There is a trend toward retirement migration to rural areas by seniors with social or familial ties to the area, who are seeking a less stressful as well as a less costly life.[95]

In addition to the low number of service providers, limited public transportation is also a barrier to addressing the legal needs of the elderly in rural communities. Rural public transportation is scarce, and bus schedules are based on typical work hours. In the past rural seniors depended on adult children for protection, advice, and transportation,[96] but since many of the younger generation have moved away for education or employment, seniors' need for transportation and assistance is compounded. Although a substantial percentage of rural residents qualify for government-subsidized transportation, there is not enough paratransit in rural areas to meet the need.[97] Researchers have gathered anecdotal evidence of seniors with severe impairments continuing to drive because it is the only way that they can take care of themselves or remain independent.

Rural communities have a higher percentage of persons with disabilities than do urban communities: more than 20 percent of the national rural population has a disability, compared to 17 percent of the general population.[98]  A larger percentage of rural Californians receive Social Security disability insurance compared to urban residents,[99] and persons over the age of 65 are more likely to have disabilities than are younger residents.[100]

Rural adults with disabilities experience many of the same problems with geographic isolation as do the rural elderly. They are further isolated by the sparseness of paratransit in most rural communities, in addition to inadequate public transportation. Children with disabilities do best in school systems that address their needs and small, underfunded schools are unlikely to be able to address their needs well. Lawyers can push schools to do what the law requires, but with few legal service lawyers and a small legal community, parents likely do not know what additional help their children could get from the school system.



**Urban/Rural Percentages of Retirees, People with Disabilities, and People Living in Poverty**

*See Joliffe* [101]

## Language Assistance

Languages that are new to rural California have significantly complicated and increased the need for language assistance both in the provision of legal services and in court settings, where there is no established right to an interpreter in a civil proceeding. The "new" languages include Thai, Hmong, Mien, and many Oaxacan languages, and interpreters of these languages are scarce and must spend part of their workdays traveling to remote areas. There is neither adequate funding nor training available to increase the number of interpreters. Language barriers also complicate the already difficult process of outreach and delivery of legal services in rural areas.

For example, few translators know the 17 Oaxacan languages, which are indigenous Mexican languages, yet the fastest growing farmworker population in California is Oaxacan. It is estimated that at least 50,000 Oaxacan immigrants live in California's rural areas. The latest Oaxacan immigrants are not likely to be fluent in Spanish because they are not stopping in Northern Mexico to work before crossing the border, as Oaxacans did in previous decades.[102]

Languages that are new to rural California have significantly complicated and increased the need for language assistance both in the provision of legal services and in court settings.

**Child reassessed for special needs**

Joey, a ten year old resident of the rural Inland Empire suffered severe depression because of a trauma and was sent to a continuation school with high school students, despite his mother's request for an assessment for special education services. His mother then requested an independent assessment, but the school district filed for a due process hearing against her, in order to avoid the high cost of the assessment.

The mother sought assistance from a legal services program for disability rights. The program worked with a pro bono attorney to represent the boy before a special education administrative hearing, and they obtained the independent assessment needed to determine eligibility for special education and related services.

The U.S. District Court noted that because the Defendants did not expect that the Plaintiff would be represented by leading practitioners in disability rights law, they downplayed the risk of an adverse decision, but the Plaintiff prevailed. The Court also noted that this case may serve to alter the cost-benefit analysis undertaken by Defendants in the future.

## Legal Problems Facing Tribal Peoples

More Native Americans live in the state of California than live in any other state in the union. There are 109 federally recognized tribes, 20 tribes that are awaiting recognition, and several other tribes that do not have official federal status. Most California reservations are in rural areas, and many are in the most remote rural areas of the state.[103]

Native Americans living in rural areas experience many of the same barriers to access to justice that other rural Californians do, but other factors create additional barriers. Reservation residents have unique legal status, they are often extremely remote from courts and legal services, a larger percentage of Natives are poor compared to average rural statistics, and they have less access to the technology that can help to bridge the distances. California Indian Legal Services provides legal assistance to both urban and rural Native Americans from four statewide offices, as do many rural legal services offices and Court Self-Help Centers in several rural counties.

As is true of other rural Californians, reservation residents experience geographic, cultural, and language barriers to accessing justice. Many reservations are not easily accessible by major roads and they can be hundreds of miles from urban centers. Reservation communities are reportedly insular and slow to trust outsiders, so that legal services outreach must be more extensive.[104] Seven percent of Native households speak a language other than English exclusively in the home and 25 percent of Native households speak English and another language in the home.

Tribal law governs reservation residents, but residents can invoke or might be subject to other state and federal laws, too. Federally-recognized tribes have the right to participate in state court proceedings involving their children under the Indian Child Welfare Act. The federal Violence Against Women Act has a full faith and credit provision for custody, visitation, and support provisions in protective orders, so that California courts and agencies must enforce tribal orders, and tribal courts and police must enforce state orders. Because several reservations straddle state borders and a few straddle the border with Mexico, legal service providers often must know more than even California and tribal law.

The remoteness of some reservations presents another barrier that miles do not properly measure. In Inyo County one reservation is 124 miles from the Court Self-Help Center, but the road is such that it requires a four hour drive each way. A day of legal assistance per month on the reservation requires an additional day's worth of staff travel.

Rural poverty demographics are higher overall than urban poverty numbers, but Native American statistics are even higher. One-half of California Native Americans live below the poverty line with one-third of Native children and 20 percent of Native seniors below the poverty line. Median earnings are $8,000 less annually for men and $4,000 less for women, compared to the non-Native population. Native Americans are also less educated, with a high school graduation rate 12 percent lower than non-Natives. The Native population is younger on average than other rural populations, but that is, in part, because of their shorter average life span. [105]

Technology cannot bridge the distances described above, since only 20 percent of Native households have Internet access, compared to 58 percent of other rural households and 63 percent of urban households.

# CHAPTER 3
# Profile of the Rural Legal Aid Delivery System: Addressing Needs With Inadequate Resources

The network of agencies dedicated to ensuring access to justice for rural Californians includes many different types of organizations. Legal aid nonprofit providers form the cornerstone of this coordinated delivery system, and they work closely with their justice system partners including court-based self-help centers, county law libraries, the private bar, and community organizations.

By coordinating among all entities that play some role in addressing the legal needs of the low-income community, they avoid unnecessary duplication of effort, which is particularly important when resources are so scarce and the geographic areas to be covered are so vast.

## Overview of Rural Legal Aid Programs

To meet the legal needs of the poor in California, there is a statewide, coordinated network of 96 nonprofit legal aid programs funded by the State Bar's Legal Services Trust Fund Program (LSTFP).[106] These programs cover the entire state, and coordinate in many ways to be as efficient and effective as possible.

Of the total number of legal aid programs, 73 are field programs that cover certain geographic areas or specific legal issues or types of clients. Each field program regularly reviews its services to determine the types of legal issues that are of the highest priority for them to offer, and they set their priorities in consultation with clients, the local legal community, and other local stakeholders. Typical priority areas include landlord/tenant and affordable housing issues, health care, education, public benefits, community economic development, domestic violence, and other family law issues. Besides direct representation and assistance, field programs have created drop-in clinics, legal hotlines, self-help videos, and online help guides to reach clients in remote places.

The other 23 legal aid nonprofits are support centers, which exist to provide litigation and training support to advocates in the field programs.

## Legal Services Funding Mechanisms

Legal services nonprofits obtain funding from the State Bar's Legal Services Trust Fund Program, in addition to several other sources.
- Nine of the state's 96 programs receive federal Legal Services Corporation (LSC) funding to provide services in all 58 counties in the state.
  The LSC-funded programs are often the primary legal aid providers in the counties they serve.
- Other funding sources include various federal agencies, foundation and corporation grants, individual attorney donors, and funding from events, attorneys' fees, and other sources.

Besides direct representation and assistance, field programs have created drop-in clinics, legal hotlines, self-help videos, and online help guides to reach clients in remote places.

The problem encountered by rural programs is that the sparse population generates inadequate funding to staff the immense geographic areas they must serve.

Both LSC and the Trust Fund Program use statutory distribution mechanisms. For LSC, their funding for field programs is allocated evenly based on the number of poor people in the service area. Similarly, State Bar Trust Fund monies are allocated to the counties based on the number of indigent people in each county; within the county, the funds are distributed based on the amount each program spent during the prior year providing free civil legal services.

While intended to be a fair system, the distribution system does not always work perfectly. The problem encountered by rural programs is that the sparse population generates inadequate funding to staff the immense geographic areas they need to serve. When the lack of funding is coupled with the challenges of serving a rural population, it is especially challenging to offer the level of services the clients need.

### Urban/Rural Funding Disparity

Disparities in legal aid funding per poor person between urban and rural areas are extreme.

Of the total of 96 California nonprofit legal aid programs, only 27 serve rural areas. The fact that these rural legal aid programs participate in a statewide network of coordinated programs means that they are able to help expand their resources and take advantage of training, brief banks (through which attorneys can share their writing and research), and other benefits of a coordinated network. However, these rural programs are significantly underfunded compared with their urban counterparts, as is shown in more detail below.

The need for civil legal assistance among low-income Californians far exceeds the current level of resources provided by government, private charities, and other sources. While there are not enough resources to provide assistance to eligible urban clients, resources are even scarcer in the rural regions of California. For example, while there are around 22 legal aid programs serving Los Angeles County and approximately 13 for the City and County of San Francisco, only a few programs serve the 23 northern counties of California. Legal Services of Northern California (LSNC) is the general legal services provider for those counties, covering an area larger than the state of Ohio. There are a few other legal aid providers for the area: California Indian Legal Services (CILS) serves reservation residents and other Native Americans in the area; Disability Rights California has several offices in the area, providing legal services to individuals with disabilities and training for legal aid providers; and California Advocates for Nursing Home Reform (CANHR) provides telephone assistance to seniors and their families.

Disparities in legal aid funding per poor person between urban and rural areas are extreme. Mean total funding by county ranges from $18.56 per poor person annually in California's 28 rural counties to a mean of $44.83 per poor person in the seven urban counties of the state, nearly two and one half times more.[107]  In fact, 26 of the 28 rural counties are below the state average county funding of $24.85. This is despite the fact that providing legal services in rural areas is actually more costly per person, because there are no economies of scale and distances between clients and offices are large.[108]  Greater travel requirements for assistance and representation mean either longer staff days or fewer clients served.



Disparities in Urban/Rural Legal Services Spending per Poor Person

| | | |
|---|---|---|
| 28 counties Rural/Frontier — $18.56 | 23 counties Mixed Urban/Rural — $26.43 | 7 counties Urban — $44.83 |

*Based on information submitted to LSTFP [109]*

## Unique Challenges for Rural Legal Aid Programs

All legal services providers face the dual challenge of inadequate funding and a high need for their services, but rural legal services providers also face additional challenges such as large distances between residents and services, higher rates of poverty, lower educational levels, a higher likelihood of conflicts of interest in legal representation, the difficulties of serving diverse needs without economies of scale, and difficulties with recruitment and retention of attorneys. Rural communities have neither the breadth of services nor the kind of legal community that urban communities have, both of which can help to meet the need for legal services.

Geography is the first challenge. Rural communities are widely dispersed with large distances between them. For clients, long distances mean that some never get the assistance they need. Clients who must travel more than 25 miles for legal assistance are six times less likely to have their needs met and half as likely to know about available assistance. [110]  Public transportation in most rural communities is limited or nonexistent, [111] so that a potential client's ability to get to a legal services office or a courthouse is limited by their access to a car or a ride. Migrant workers and their families move frequently and often live long distances from services.

Rural legal services providers also face additional challenges such as large distances between residents and services, higher rates of poverty, lower educational levels, a higher likelihood of conflicts of interest in legal representation, the difficulties of serving diverse needs without economies of scale, and difficulties with recruitment and retention of attorneys.

For rural legal aid providers, access and travel issues render provision of services much more challenging and expensive. The vast distances to remote areas that they must cover create high costs in terms of staff hours required, and strain the already limited staff in these areas. There are higher costs per client where population density is lower because attorneys must travel long distances to participate in mediation sessions with clients, attend court hearings, or meet with administrative agencies.[112]

Rural areas also lack the technology that urban areas have. As such, additional staff hours are required to reach potential clients, since some innovative, Internet-based outreach strategies are ineffective where broadband access and computer ownership are low. Still, outreach is important, since many residents in rural areas do not know what their legal rights are and what resources are available to them. Time spent on outreach puts an additional burden on legal services providers, particularly since outreach in rural areas requires contacting as many community groups as possible, because the population and means of sharing information are sparser than in urban areas.

Rural legal services providers have an increased likelihood of conflicts of interest and there are often no other providers to whom they can refer other parties.



A significant percentage of rural residents qualify for legal aid, because rural demographics differ from urban demographics. The average rural household is poorer than the average urban household, and nearly every subgroup of the rural poor comprises a larger percentage of the rural population than their urban counterparts:

- there is a larger percentage of rural elderly and they are poorer, especially elderly women;[113]
- children in rural areas are poorer;[114]
- there is a larger percentage of female-headed households, which are poorer;[115] and
- a lower percentage of rural people with disabilities are employed than their urban counterparts.[116]

Despite the vast need, it is difficult for rural attorneys to provide specialized legal help, especially since rural legal services offices are so understaffed.[117]

## Potential Conflicts of Interest

A significant challenge for rural legal services providers is that they have an increased likelihood of conflicts because legal aid offices cannot serve clients where the adverse party has been or is their client. Providers are precluded from serving both parties, yet the legal aid office is likely the sole legal services provider in the area, leaving no other legal representation for the second party. Private attorneys can be "conflicted out" in two ways: 1) the attorney or someone in their firm has represented someone who is a party in the conflict, or 2) the other party is an attorney's social friend. In small communities there is little anonymity and many interconnected acquaintances, especially in the legal community.

## Few Pro Bono Resources

Urban legal aid work is supplemented by extensive pro bono efforts by private attorneys and other supporters that help to fill the representation gap. Rural legal aid offices have fewer local resources from which to draw. There are no large law firms (which could be a source of pro bono services), fewer law schools, fewer corporate headquarters, and fewer foundations. "Large firms" in the Central Valley, for example, have 20 attorneys, rather than the hundreds of attorneys found in large urban law firms. Some rural areas have no lawyers, or lawyers with a limited range of experience and expertise. Thirty percent of rural attorneys are government lawyers, and they are often precluded from doing pro bono work.[118] Surveys show that rural solo attorneys already do some low fee work and provide free legal services to low and moderate income people.[119] The few corporate headquarters in rural areas often involve an industry that may be at odds with legal services clients, and the small number of foundations means that fewer local charitable dollars from corporations or foundations are available for legal aid.



### Resistance to Seeking Help

There is a distinct culture in many rural communities, in which people experience shame in asking for help, and fear of being stigmatized for not being able to take care of problems on their own.[120]  Residents of smaller communities are likely to know of each other's activities, so they might require extra encouragement to seek legal help. New immigrants in rural California work in agriculture, logging, production, and the service sector, and those who do not have proper documentation are often fearful to seek legal assistance, despite the fact that they have legal needs and some rights. Shame and fear create barriers that legal services providers must overcome. At the same time, these legal services providers must work just to inform rural residents of the existence or purpose of legal aid.

*Lower literacy and education levels inhibit awareness of legal rights and obligations, so that outreach by legal services agencies must be enhanced.*

### Lower Literacy and Education Levels

Rural educational attainment is lower on average because of fewer educational opportunities, and because of a "brain drain" to urban areas. Immigrants to rural California are, on average, less educated than those who immigrate to urban California. In 2007, 37 percent of immigrants to the Metropolitan Statistical Area (MSA) of San Bernardino and Riverside County were high school dropouts and 14 percent were college graduates, while at the same time 17 percent of immigrants to the MSA of San Jose were high school dropouts and 45 percent were college graduates.[121]  Lower literacy and education levels inhibit awareness of legal rights and obligations, so that outreach by legal services agencies must be enhanced.

## Recruitment and Retention Challenges

Managers of rural legal aid offices list attorney recruitment and retention as some of their biggest problems. Experienced attorneys are critical to providing good legal assistance. Attorneys who are most effective in rural communities have become members of those communities and are no longer regarded as outsiders.[122] Longevity is essential in developing expertise and breadth of knowledge in the legal issues that are unique to rural communities, especially since rural legal aid staffing is low.

> Recruitment can be stymied by lawyers' reluctance to practice in areas where there are few other professionals to offer support and collegiality.

Recruitment can be stymied by lawyers' reluctance to practice in areas where there are few other professionals to offer support and collegiality. It is difficult to recruit experienced practitioners to move to isolated areas of the state where they expect a lack of professional support and few amenities of urban life. The situation has worsened in recent years for all legal services programs, in part because the wage gap between legal aid compensation and the salaries of other lawyers has widened.

Surveys of rural attorneys have demonstrated the need for both supportive contact with peers and increased salaries -- one survey showed that attorneys felt supported and part of a community when they were provided training and phone or e-mail contact with peers,[123] and another survey reported that the biggest reason for California rural legal aid attorney turnover was low pay, with most leaving to work as government attorneys.[124]  For example, in Sacramento County, county attorney starting salaries are nearly $80,000 annually, compared with $45,250 for legal aid lawyers in that county.[125]  This discrepancy in salary levels especially impacts rural programs since the combination of lower salaries and isolated locations results in fewer attorneys willing to practice in very rural areas.

A National Legal Aid and Defender Association (NLADA) survey of legal aid advocates conducted in 2006 included 100 California responses, both urban and rural. Over one-half of the respondents under the age of 35 said they would leave their legal aid programs within three years. One-quarter of the respondents said they would leave within one year. The results indicated that California's legal aid programs are losing new attorneys at the three to five year level, and again at the seven to ten year level. Starker results were found in rural areas where initial recruitment is an additional issue.[126]



> Attorneys who are most effective in rural communities have become members of those communities and are no longer regarded as outsiders.

## Inadequate Technology Infrastructure

In addition to the fact that there are limited legal services attorneys, a major problem for rural programs is the vast geographic areas that need coverage, a problem that technology could help address. However, the technology infrastructure is extremely weak, with many areas lacking broadband access. Even where there are computers or where video-conference equipment is available, programs often lack the staff necessary to help clients take advantage of this technology. Despite the lack of up-to-date technology, creative use can be made of the tools that already exist. For instance, Watsonville Law Center reports that they work with remote volunteer attorneys by telephone and fax to provide client services.[127]

Many rural areas have technology resources that are years behind and miles away from those taken for granted in urban and suburban areas. For example, at the Inyo County Courthouse, the only place one can get cell phone reception is under a single tree outside the county courthouse.[128]  In parts of Mendocino County, fax machines are not available within an hour's drive of many clients' residences.[129]

Where technology is not an issue, there are other barriers to outreach and communication. Legal services' target audiences have high illiteracy rates, even in their first languages. This precludes written outreach or information and makes person-to-person contact the most effective means of communication.

Technology can be an important part of the solution. Many innovative projects have proven to be effective and cost-efficient. Some might require accompanying procedural changes by courts or legal services programs to facilitate the effectiveness of technology. These innovations should be explored by courts, legal aid programs, and community services to reduce the need for face-to-face interactions with parties, attorneys, court personnel, and service providers.

There are examples of technological innovations in legal services that could be emulated and used more broadly:

> **SHARP** (Self Help Assistance and Referral Program) is a tri-county collaboration between Butte, Glenn and Tehama Superior Courts and the Administrative Office of the Courts. One attorney addresses three different court sites at the same time by video-conference to educate self-represented litigants on family law, restraining orders, and unlawful detention. Legal aid attorneys can then reach more people without the time and expense of travel, and clients receive training in how to represent themselves.[130]

> **EZLegalFile** is a Superior Court program that is available on-line through TurboCourt.com, and it enables remote filing of documents, so that clients need not file them in person. The site "interviews" the computer user, gives instructions for completing the appropriate forms (as identified in the interview), then assists the user in e-filing the form, saving a trip to the court and a trip to get legal advice. The service is available to residents of all counties for filing child support claims, and it is available to residents of most counties for e-filing family law, small claims, unlawful detainer, domestic violence, and guardianship documents.[131]

*Many rural areas have technology resources that are years behind and miles away from those taken for granted in urban and suburban areas.*

Technology can be
an important part of
the solution.

**ICAN!** is a free, easy to use web-based system that allows individuals to fill out and print court documents. The legal version is available through self-help centers and legal services offices and their web sites.[132]  Legal Aid Society of Orange County employs the system to increase their client community's access to justice and to reduce the burden on the judicial system created by self-represented litigants who need assistance in creating appropriate documents. ICAN!'s modules produce forms and pleadings that conform to Judicial Council standards and offer instructions in English, Vietnamese, and Spanish.

## Rural Collaborations

As a way to overcome the many challenges described above, legal aid programs in rural California take advantage of two types of collaborative efforts. First, they work with all of the legal aid programs in the state to coordinate services, including the following:

· **Legal Aid Association of California** (LAAC) is a membership organization of legal services programs from across the state, working to help legal services programs through the following programs.
  · Directors of Litigation and Advocacy (DoLA) – this organization brings together the directors of litigation of legal aid programs across the state to share information and resources, conduct training, and address shared concerns.
    This coordination is invaluable to otherwise isolated rural programs.
  · Travelling trainings – LAAC coordinates trainings in rural areas using Support Center experts. These trainings often result in ongoing collaborations between the participants and the Support Centers.
  · Webinars – LAAC provides interactive training to remote locations through on-line seminars that have received high marks for their content and efficiency.
· **Public Interest Clearinghouse** (PIC) provides support, technical assistance, and coordination for over one hundred nonprofit legal aid programs in California that deliver civil legal assistance to low-income and other under-served Californians.
· **LawHelpCalifornia.org** is a collaborative project of PIC, the State Bar of California, the Administrative Office of the Courts, and all IOLTA-funded legal services programs throughout the state. LawHelpCalifornia. org provides online legal self-help resources and referrals to legal aid organizations, court-based programs, and State Bar-certified Lawyer Referral Services.
· Some coordinated services, such as the **Health Consumer Alliance** are very effective. Beginning in 2000, 11 legal aid programs, including Legal Services of Northern California, jointly secured funding to offer legal services to eligible clients who had difficulty obtaining health care. More than 56,000 clients have received service through this collaboration. This kind of collaborative funding has resulted in significant services in rural California that would not otherwise have been available.



California legal aid programs make use of two kinds of collaborations – they work with other legal aid programs to coordinate services and they work with other community-based organizations.

Rural legal aid programs also set up rural-specific collaborations – sometimes with other legal services providers – and with other community based organizations such as the courts. In California they collaborate with Continuum of Care entities to prevent homelessness, and have worked jointly with adult protective services and community agencies on disability advocacy projects. Specific examples of collaboration include the following:

- **Self-Help Assistance and Small Claims Advisor Projects With Courts**
  Inland County Legal Services (ICLS) has partnership agreements with the Riverside County and San Bernardino County Courts to provide self-help assistance. Because San Bernardino is the largest county in the U.S., and Riverside County is also very large, ICLS provides self-help assistance over the vast area through several programs, including an ICLS staffed bilingual program two days per week in Victorville and a Family Law Partnership Project in Indio two days per week.

- **Community Economic Development Projects** – Both California Rural Legal Assistance Foundation and LSNC worked with community-based organizations to develop affordable housing. LSNC collaborated with the Sacramento Valley Organizing Committee and the local Catholic Diocese to build affordable farmworker housing.

- **Earned-Income Tax Credit Collaborative Projects** – LSNC realized through Geographic Information System (GIS) mapping that many poor communities were not applying for their Earned Income Tax Credit when they filed their tax forms. Through outreach and education, they networked with community groups to help communities file for and save or invest some of that income for community or family needs.

# CHAPTER 4

# Involving The Courts, Self-Help Centers and Other Community Partners

Rural courts are often the first place individuals go when they encounter legal problems and do not know where else to turn. It is therefore of vital importance that all rural courts be considered part of the broader delivery system so that appropriate referrals can be made, thus avoiding duplication while leveraging resources and helping individuals receive the assistance they desperately need.

In order to enhance public confidence in the courts, the Judicial Council launched Community-Focused Court Planning in 1997 to encourage the courts to form planning teams and to open direct and responsive dialogues with the communities they serve. A 2001 outside evaluation concluded that the project's overall goal of creating more community-focused courts has been achieved, because they had established a process for developing, reviewing, and updating community-focused strategies and were helping Californians better understand the role of courts and judges in our government. These efforts are one of the models for Recommendation 7 in this report, which envisions local task forces involving the courts, as well as representatives of legal aid providers, self-help centers, county law libraries, local bar associations, and other community service providers.

Many courts are making changes that ease court accessibility for low-income people in rural areas. For example, courts are starting to work together to allow residents of remote areas who live closer to the courthouse in an adjacent county to use the closer court facilities for certain purposes. Nevada County Superior Court is sharing staff with smaller Alpine County so that residents of the latter also can have access to an Alternative Dispute Resolution program, a family law facilitator, and a child custody mediator. Another accommodation being considered is to start some calendars later in the morning and end earlier in the day to accommodate self-represented litigants and jurors who must travel long distances where public transit is sparse. This flexibility would also save in court rescheduling costs.

## Self-Help Centers as Key Justice System Partners

The Judicial Council's support for access to justice and commitment to the network of self-help centers across the state have made the Council an invaluable partner to the legal services community in working to provide access to justice for the poor. There are now 110 court-based self-help centers in California, covering every one of the 58 counties, and many of those centers are located in rural areas. They are funded primarily by the Administrative Office of the Courts, although the State Bar's Legal Services Trust Fund Program also funds legal aid programs to run court-based self-help centers through their Equal Access Fund Partnership Grants described in Chapter 3.

> Rural courts are often the first place individuals go when they encounter legal problems and do not know where else to turn.

**The network of court-based self-help centers provides services to over 450,000 self-represented litigants every year.**

These centers are located in or near courthouses, and are staffed by attorneys who direct non-attorney staff members and volunteers. Their charge is "to provide information and education to self-represented litigants about the justice process and to work with the court to provide effective management of cases involving self-represented litigants". Self-help centers often provide assistance to people who legal aid cannot help. The network of court-based self-help centers provides services to over 450,000 self-represented litigants every year.[133]

The Centers and on-line self-help resources like http://www.courtinfo.ca.gov/selfhelp are a critical component of the delivery system. While the website doesn't encourage people to represent themselves in court, it contains step-by-step guidance for those who proceed without representation. The website includes tools, resources, and links for legal assistance in the areas of divorce, domestic violence, child custody and support, traffic, and small claims, because they are the areas in which litigants most frequently represent themselves.

The Judicial Council's institutional commitment to programs for self represented litigants includes sponsoring annual conferences, during which staff persons that assist self-represented litigants can get training and share information. The Council also maintains a *Statewide Action Plan for Serving Self-Represented Litigants*[134] as well as detailed rules and guidelines for serving the nearly 50 percent of Californians who appear in court without counsel.

The rural court-based Self-Help Centers are tremendous examples of how rural courts play an integral part in the continuum of services for low-income Californians. Court-based Self-Help Centers play a key role in assisting unrepresented parties and in referring them to the variety of other services available, as appropriate. Self-Help Centers in rural areas have created innovative programs like the following:

**Collaborative Delivery of Legal Services**
Until 2003, Calaveras County, with a population of 35,000 residents, received legal services by telephone and through infrequent visits from a Legal Services of Northern California advocate to the local community resource center. In 2003, the Calaveras County Superior Court sponsored a pilot project, a legal assistance one-stop center, where the different components of self-help services, equipment, and materials were made available to those in need of legal services. The Calaveras and Amador County Courts' Self-Help programs were combined and recently brought under the umbrella of the Legal Assistance Center.[135]

**Language Access Program**
The Self-Help Center of the Santa Cruz County Superior Court is collaborating with the Watsonville Law Center to enhance language access for Spanish speakers. The Watsonville Law Center, with financing from a State Bar IOLTA Partnership Grant, initiated a program to conduct outreach and education about legal rights to Spanish-speaking residents and to fund bilingual paralegals to be present at the Self-Help Center.

### Justice Corps

The Justice Corps is a court-sponsored program that trains college students to assist and translate for self-represented litigants in court Self-Help Centers.[136]  The program has been effective in providing assistance to clients, through bilingual students who aspire to legal careers. The first rural Justice Corps program commenced in three northern counties recently, with support from Sacramento State and U.C. Davis.

### Reedley Satellite Program

The Fresno County Court Self-Help Center operates a program with advocates from a domestic violence shelter in Reedley, from which clients can fax information for restraining orders to the Fresno court, where it is reviewed and faxed back to be conformed to local court protocols, and then delivered to law enforcement within a day.[137]

### Mobile Self Help Centers

Lassen Superior Court's Mobile Access Center (MAC) takes court services as far as one and one half hours from the court house on a regular basis. The technology that MAC uses provides an instant connection to court systems, so that there is real time entry of case information. MAC travels to four towns and to large employers in the county on a regular basis. At these locations, court staff offer legal information to self represented litigants, receive filings, accept payments for fines, and provide scheduled mediation services and appointments with a family law facilitator or self help attorney.

Ventura County Court's Self-Help Center had "Winnebago of Justice", a mobile self-help center that traveled several times a month to make their services available. The vehicle parked adjacent to partner programs, so that people in rural areas could avail themselves of the Center's services without traveling far.[138]  Fresno County Court's Self-Help Center operated the Mobile Access Project (MAP), which made weekly visits to different communities within the county. The program operated from the courthouse or a municipal building in some communities, but in others they offered assistance from the MAP vehicle.[139]  Both Ventura and Fresno's services were successful, but they have been suspended because of funding cuts.

## Other Community Partners

Community partners in rural areas, including medical, social services, community colleges, libraries, and other community agencies can assist in reaching low-income residents and can help expand the availability of legal services. The Truckee model below is a successful strategy involving coordination with a partner that is not part of the legal community. The Fresno community forum creates the kind of relationships that foster collaboration and cooperation to enhance or supplement rural legal services programs.

Medical, social services, community colleges, libraries, and other community agencies can assist in reaching low-income residents and can help expand the availability of legal services.

### Legal Services Program Within Social Services Agency

In Truckee a small legal services program operates within an existing social services agency. Most rural areas are not large enough to sustain the costs associated with maintaining legal aid offices, but an office can operate efficiently by working as part of an existing social services program.[140]  Locating a legal services program in a Family Resource Center allows the community easy, one-stop access to a wide variety of services. Community members are already accustomed to looking to the Center for assistance, and the legal clinic's ability to offer clinic-based legal consultations in wage claims, landlord/tenant law, small claims court issues, and other matters ensures that more community members have easy access to legal services.

### Fresno Collaborative Effort

The Commission on Access to Justice worked with partners in Fresno County to hold a community forum in 1999. The Forum included judges, lawyers, Self-Help Center staff, Court staff, local government representatives, medical professionals, business professionals, and community organizers working with low-income residents through community-based and faith-based organizations. The purpose of the Forum was to discuss gaps in legal services and challenges that need to be overcome. An informal coalition was formed as a result of the Forum and they continue to address challenges to access to justice through regular conference calls.[141]

The success of a collaborative effort depends on achieving the commitment of its civic members and leaders. Effective efforts require co-sponsorship and participation from interested local sectors including representatives from legal services and their client community, local bar associations, educational institutions, community-based organizations, and the local business and labor community, as well as law enforcement and other public officials (both elected and appointed). The goal is to bring these groups together to heighten awareness and promote understanding of the societal implications of a lack of access to legal services and other resources.

The goal is to bring groups together
to heighten awareness and promote
understanding of the societal implications
of a lack of access to legal services.





Urban bar associations and lawyers should consider launching pro bono partnership efforts with rural bar associations and rural legal aid providers.

## CHAPTER 5
# Pro Bono: The Role of Lawyers, Bar Associations and the Law School Community

The private bar is an important partner in providing support to underfunded legal aid providers and their clients. Both the monetary support and the pro bono support that the private bar can contribute are important to closing the resource gap that legal aid experiences.

There are a limited number of attorneys in rural areas who can provide pro bono services. A large percentage of rural attorneys are government attorneys who may be precluded from representing clients,[142] although recent efforts to expand self-help clinics and the adoption of ethics rules to limit conflicts in clinic settings can enable government attorneys to fulfill their pro bono commitment.[143] State Bar Minimum Continuing Legal Education (MCLE) rules exempt government attorneys from MCLE requirements, if they only practice law outside of work to "provide pro bono legal services through a qualified legal services project or a qualified support center",[144] to ease and encourage their participation in pro bono work.

In addition, there are few law schools or large firms in rural areas, and many private rural attorneys are solo practitioners who already provide some free or low cost services, while struggling to maintain a profitable practice in the challenging rural environment.[145] One area of promise is the presence of recently retired attorneys in rural areas. Those attorneys should be encouraged to register with the State Bar's Pro Bono Practice Program, described at number 5 below, that will provide them with active status to do pro bono work.[146]

In order to assure that rural legal services programs enjoy as high a level of private bar assistance as possible, urban bar associations and lawyers should consider launching pro bono partnership efforts with rural bar associations and rural legal aid providers. Examples of some successful partnership efforts are described below.

## Bar Associations Can Help Increase Pro Bono

The organized bar, including both local and specialty bar associations, can play a significant role in helping legal aid providers and their clients:

1. Take advantage of state and regional events to promote the importance of doing pro bono, focus attention on the pro bono resolutions of the Judicial Council and State Bar, publicize rural pro bono needs, and suggest specific ways that attorneys can help;

2. Co-sponsor training events on rural legal issues, involving judges wherever possible, and allowing pro bono attorneys to participate free of charge;

3. Offer access to video-conference equipment, computers with cameras, and other resources to help connect pro bono attorneys with their clients, particularly those in urban areas who are helping clients in remote rural areas;

4. Assist out-of-area volunteers in understanding local court rules and personnel, and support the efforts of urban volunteers to learn any special local procedures that can help them be more effective advocates for their low-income rural clients;

5. Expand the use of retired attorneys through involvement in the State Bar's Pro Bono Practice Program (previously known as the Emeritus Attorney Pro Bono Program);[147]

6. Conduct outreach and education efforts to improve the support and resources available for rural attorneys to allow them to expand their practices efficiently, competently, and creatively, in order to serve more low-income clients. Offer training on limited scope legal assistance (described below), on participating in lawyer referral service panels, on sliding fee systems for moderate income clients; and

7. Disseminate best practices for involving urban and rural attorneys in pro bono work. Urban bar associations can institutionalize their commitment to rural pro bono assistance by establishing partnerships with rural legal services organizations. These partnerships can provide a framework for volunteer urban attorneys to staff rural clinics, take individual cases, and assist with fundraising. For example, Bet Tzedek Legal Services has organized urban attorneys to provide pro bono assistance to a remote area in a program that can be an example for bar associations:

> **Wills on Wheels:** Bet Tzedek Legal Services in Los Angeles worked with a law firm to provide pro bono legal services to seniors in Lancaster, a remote corner of Los Angeles County. A legal services attorney travels with two private attorneys once a month to several senior centers to provide simple legal services.[148]

Partnerships between urban bar associations and rural legal services can provide a framework for volunteer urban attorneys to staff rural clinics, take individual cases, and assist with fundraising.

## The Role of the Law School Community

Law students across the state should be encouraged to volunteer for pro bono projects to enhance their awareness of rural legal issues, and professors should be encouraged to participate in these coordinated efforts. The American Bar Association (ABA) requires that law schools "offer substantial opportunities for student participation in pro bono activities"[149] in order to be accredited. This requirement should provide adequate support for those seeking to create partnerships between California's law schools and rural legal aid programs.

Internships and externships at rural legal aid programs foster familiarity with rural issues and legal aid programs, and make students aware of future employment opportunities in rural areas. Law students who are well trained and supported can provide valuable assistance to legal aid clients. Because there are few law schools near California's rural areas, urban law students must be involved in these efforts. Some creative models currently operating in California are described below.



Law students who are well trained and supported can provide valuable assistance to rural legal aid clients.

### Rural Education and Access to the Law (REAL) Project

The Public Interest Clearinghouse (PIC) created the REAL Project to cultivate law student commitment to pro bono work and create awareness about rural legal issues. Since 2007, the REAL Project has connected a few hundred law students with nine rural programs and assisted nearly 1000 clients and their families. Through the REAL Program, PIC coordinates both service learning trips and a research service.[150]

**Justice Bus™ Project**: PIC organizes Justice Bus™ trips, which take urban law students to rural areas to volunteer at free legal clinics for low-income people. PIC partners with rural legal services organizations and court-based programs for these clinics. Law student volunteers conduct legal intake, assist with creating legal documents, and provide self-help information at court-based programs. With two staff or volunteer attorneys and several law students, a Bus clinic can provide legal assistance to at least 25 households. These clinics bring assistance to rural clients and provide law students with beneficial legal experience. Urban law firms help ensure that the clinics continue in the summer, with summer associates and attorneys partnering with PIC.

**Research Service:** To provide ongoing support for rural legal services programs, PIC created the REAL Research Service, which connects urban law students to research projects from rural legal services programs. PIC staff coordinates research projects and monitors law students' work. This service expands the resources of rural programs, while providing law students with valuable research experience.

### Santa Clara University Law School / Watsonville Law Center

Students from Santa Clara University Law School travel 50 miles to work with attorneys at the Watsonville Law Center to assist low income clients, as part of a program organized by the Law School. The students provide assistance at clinics in Watsonville and the surrounding farming communities under the supervision of Law Center lawyers. After being exposed to the practice in law school, several students have gone to work at the Law Center after graduation.



## Affordable Legal Services

Private legal services can be made affordable for moderate income Californians in rural areas in a number of ways.

### Limited Scope Legal Assistance

One key approach is to limit the scope of the representation that attorneys offer. In limited scope legal assistance, otherwise known as "unbundling", an attorney and a person seeking legal services agree that the scope of the legal services will be limited to the defined tasks that the person asks the attorney to perform. The attorney can provide any of the following services to the client: advice and counsel, limited court or administrative appearances, or assistance with documents and pleadings. Limited scope assistance does not limit attorney liability or the duties of competence, confidentiality, or avoidance of conflicts. It may not be appropriate for everyone and the attorney should receive specialized training before undertaking this type of delivery of legal services. There are training materials available for free on the Practising Law Institute website at www.pli.edu. Court rules and court forms are available at www.courtinfo.ca.gov.

Limited scope legal assistance has been an accepted practice for many years, particularly in bankruptcy and corporate law, and it has recently expanded substantially in the area of family law. Family law limited scope materials are available at: http://www.calbar.ca.gov/AboutUs/CenteronAccesstoJustice.aspx.

### Lawyer Referral Services

The State Bar has certified Lawyer Referral Services since 1996, and these Services provide consumers with assistance in finding legal services at a reasonable cost. As a result, clients can receive free or low-cost thirty minute consultations with panel members of certified lawyer referral services in specific topics, aided by a telephone consultant who screens the call. To locate the nearest State Bar Certified lawyer referral service, one can call 866-442-2529 or 866-44-CA-LAW or get information online at http://www.calbar.ca.gov/Public/LawyerReferralServicesLRS.aspx .

#### Sliding Scale Fees for Moderate Income Clients

Some certified lawyer referral services have created special income-eligible panels (typically in family law) that are designed for moderate income or modest means clients. Clients must ask if the referral services have these panels available and if there is a maximum income limit to qualify.



Geographic status should not determine who is
or is not served, and geographic equality is the
fundamental goal on which all other recommendations
in this report are based.

The work of bringing rural legal services toward parity with urban legal services must be part of a statewide plan.

**PART 2**

# Recommendations and Strategies for Achieving Adequate Resources for Rural Legal Services

The following recommendations are designed to significantly improve access to justice in rural areas, and are also designed to be achievable goals. The Access to Justice Commission stands ready to work with all appropriate stakeholders to implement the following seven recommendations.

### Pursue Geographic Equality (Recommendation Number 1)

All Californians should have access to justice, and the amount and type of legal assistance available to low and moderate income Californians should not depend on where those individuals reside.

The level of funding that is available for civil legal assistance across the state does not permit legal aid programs to meet all of the critical legal needs of Californians in poverty, but the Commission on Access to Justice recommends that steps be taken so that a whole category of clients – those in rural areas – is not excluded from participation in the justice system. Geographic status should not determine who is or is not served, and geographic equality is the fundamental goal on which all other recommendations in this report are based.

To pursue statewide parity in access to legal services for *all* Californians, it is critical that key leaders in the legal system, the judicial system, and the law school community support and promote statewide collaboration, responsibility, and accountability for the entire delivery system. Although total parity might never be achieved because of resource disparity, there should at least be a coordinated effort to pursue a more equitable distribution of resources.

### Expand Funding for Rural Legal Services (Recommendation Number 2)

The significant lack of funding for California's rural legal aid programs must be addressed. All legal aid programs face the challenge of inadequate resources, including programs in urban as well as in rural areas; therefore any initiative to address the severe lack of resources in rural areas should not be developed in a way that unnecessarily undermines urban programs. The goal is to increase the total resources available for legal services programs across the state, not merely to reallocate existing resources.

*Recruitment and retention efforts should include access to mentoring and training as well as the establishment of rural salary goals.*

Funding must be increased for California's legal aid programs that serve rural areas. The work of bringing rural legal services toward parity with urban legal services must be part of a statewide plan to analyze and allocate resource distribution in a thoughtful fair way, but also one that moves us toward parity over time (See Recommendation 3). The task of obtaining funding and attention for rural legal services must not be one pursued solely by rural advocates, but should be pursued with the help of legal services supporters across the state, collaborating as part of a new "Friends of Rural Legal Services" entity. (see Recommendation 4). Increasing legal services funding also should not be a zero-sum game, but rather part of a program that increases justice for all low income Californians.

**Support Recruitment and Retention Efforts:** In increasing legal services for California's rural population it is important to support efforts to recruit both experienced and novice legal practitioners to rural legal services offices and to retain experienced attorneys. Recruitment and retention efforts should include access to mentoring and training[151] as well as the establishment of rural salary goals that are in parity with rural government agency lawyers, wherever feasible. While urban attorneys can help close the gap, as recommended below, attorneys are most effective when they become part of the community in which they practice.[152]

### Develop Minimum Access Guidelines (Recommendation Number 3)

Minimum access guidelines should be developed as a baseline for funding considerations so that, wherever feasible, funding can be allocated with the goal of moving toward parity across the state. These guidelines are particularly appropriate for the allocation of new funding because all legal aid programs, whether urban or rural, face the challenge of inadequate resources. The California Commission on Access to Justice should develop these minimum access guidelines in coordination with the State Bar's Legal Services Trust Fund Program, Legal Aid Association of California (LAAC), legal services providers, and other stakeholders.

Most legal services programs rely on ongoing "core funding" to support their basic operations. Core funding includes funding from the federal Legal Services Corporation (LSC) and the State Bar's Interest on Lawyer Trust Accounts (IOLTA) Funding. This funding is distributed on a formula basis, with the funding allocation based, in part, on the number of indigent persons in their service areas. (See Chapter 3 for a more detailed explanation of these funding distribution mechanisms.) However, for sparsely populated areas, per capita funding distribution methods do not bring in adequate levels of support to provide a minimum level of legal services.

*For sparsely populated areas, per capita funding distribution methods do not bring in adequate levels of support to provide a minimum level of legal services.*

Rural areas are particularly challenging to serve, because not only is there an inadequate base of funding to support a local office, but the eligible client population is spread out geographically so that it is challenging and expensive to reach those communities to provide services.

The California Commission on Access to Justice should take the lead to analyze this problem and recommend minimum access guidelines that can ensure a base level of funding for rural areas. Because no program, urban or rural, receives more funding than it needs, the approach to achieving minimum access must be conducted in a way that does not unduly undermine funding for urban programs. There are several ways that such a goal could be developed and implemented:

· **Minimum Level of Eligible Clients per Lawyer**. Minimum access guidelines could be based on a formula of recommended lawyers per poor person statewide: for example, two lawyers for every 10,000 poor people, which is the longstanding goal for federal funding and the goal used to expand legal services to those counties without adequate services.[153]

· **"Fill Up the Cup" Model**. The Commission should study the experience of the Legal Services Corporation when they equalized funding across the country in the 1990s. Because of historic variations in the level of funding for legal services programs, there was a wide disparity in funding for individual programs. A thoughtful, in-depth process resulted in the "fill up the cup" initiative that allocated a specific percentage of new funding to move toward parity.[154]  A similar approach could be suggested for California: an increased allocation to rural areas could be a priority for parts of any new funding source or increased statewide legal services funding.

· **Supplemental Funding**. The Access Commission should also study other supplemental funding allocations, such as the Legal Services Trust Fund Program's 10 percent pro bono allocation which is provided in those counties where there are programs whose primary method of service is pro bono, or the Partnership Grants which involve discretionary grants to legal services programs to run court-based self-help centers using ten percent of the Equal Access Fund each year.

· **Self-Help Funding Minimum Grants**. The Judicial Council allocated a base level of funding for self-help centers to all courts in order to provide a basic level of legal services funding for each geographic area that should be an accepted minimum. This could be a model for funding legal services programs.

The expertise of the Access Commission, the Legal Services Trust Fund Commission, the Legal Aid Association of California (LAAC), and other stakeholders will be invaluable in developing and implementing these guidelines for California. When such minimum funding is in place, it will go a long way toward addressing the many other challenges identified in this report.

With a statewide fundraising support board, rural legal services can benefit from the abilities of fundraising leaders who might not be rural or local, but who are concerned with justice.

### Establish Statewide "Friends of Rural Legal Aid" Committee. (Recommendation 4)

A statewide rural legal services support committee should be established to support the work of nonprofit rural legal aid providers. The Support Committee should work to ensure adequate resources and improve pro bono services. The committee should include key rural leaders as well as representatives of urban law firms, corporate counsel, and other community leaders from urban areas. The California Commission on Access to Justice should work with rural legal services programs to establish this support committee.

One key way to achieve the goal of increased funding for rural legal aid programs, in addition to building minimum access goals into the allocation system, is to establish a statewide "Friends of Rural Legal Aid" entity. The chief role of this statewide committee would be to raise funds for legal aid programs, pursuing the goal of parity statewide. This group would be established by a collaborative effort of rural legal aid programs with other stakeholders. The membership of this group must include leaders in the urban and rural legal communities, as well as other leaders of the corporate, civic, and business communities.

Similar "friends of legal aid boards" raise funds for urban legal services, but rural communities alone do not have the critical mass of leaders with the ability to fundraise on the scale that urban legal services can. With a statewide fundraising support board, rural legal services can benefit from the abilities of fundraising leaders who might not be rural or local, but who are concerned with justice and can see that funds raised are allocated appropriately throughout rural California. A statewide fundraising effort can benefit from economies of scale that are unavailable to small rural legal services programs, so that the fruits of the fundraising process are maximized.

### Develop Innovative Ways to Use Technology to Bridge the Urban/Rural Divide (Recommendation Number 5)

Effective use of technology can help address many of the barriers experienced by those serving the legal needs of low-income rural Californians. While technology alone is not a panacea, online resources can significantly help self-represented litigants; video-conferencing can connect a rural resident with an urban volunteer lawyer; and telephonic appearances and e-filing can help legal aid lawyers and volunteers avoid unnecessary travel.

In addition to the fact that there are a limited number of legal services providers, a major problem for rural access is the problem of distance requiring time and transportation resources. Technology and procedural changes should be explored by courts, community services, and attorneys to reduce the need for face to face interactions with parties, attorneys, court personnel, and service providers.

Effective use of technology can help address many of the barriers experienced by those serving the legal needs of low-income rural Californians.

## Fulfill Pro Bono Responsibility by Helping Rural Californians. (Recommendation Number 6)

California lawyers should consider ways to include service for underserved rural Californians when they are fulfilling their 50-hour pro bono responsibility. Urban bar associations and lawyers should consider partnering with rural organizations, being mindful that impoverished urban Californians are also underrepresented and need pro bono help as well, because rural areas have fewer lawyers, law schools, and economic resources. Attorneys who are precluded by ethics rules from representing some individuals should be made aware of all of the options for meeting the recommendation, such as devoting time or money to legal aid programs or otherwise furthering access to justice.

Providing some kinds of pro bono legal assistance to rural clients does not require sustained presence in a rural area, so that urban bar associations and urban lawyers can be effective partners with rural organizations in providing legal counsel and litigation support. There are examples in Chapter 5 of urban legal assistance to rural areas, where attorneys can provide assistance during a short trip to the rural area, or where they continue their involvement long distance, by phone, fax, e-mail, or other electronic means.

## Convene Local Rural Access Task Forces to Coordinate and Strengthen All Components of Rural Legal Services Delivery System. (Recommendation Number 7)

Local stakeholders in rural communities throughout the state should be encouraged to convene local Rural Access Task Forces to evaluate and begin addressing the priorities unique to each community to increase access to civil justice. These local Task Forces might include representatives from legal aid providers, self-help centers, the local bar associations, and county law libraries, as well as other partners who also assist impoverished clients. One of the first projects for these Task Forces should be to identify gaps and target services for isolated, underserved groups, and to expand the availability of legal aid services locally. It is also important to plan for improved language access and development of methods to effectively use urban resources, including pro bono attorneys and interpreters and the use of innovative technological solutions where appropriate.

> Expanding access to justice in rural areas requires a coordinated community effort of all key stakeholders.

Expanding access to justice in rural areas requires a coordinated community effort of all key stakeholders – legal services programs, the courts, county law libraries, and all other justice partners. The goal of these collaborative efforts is to identify gaps in service, avoid duplication of effort, and ensure a seamless continuum of services. Because resources are limited in rural areas, it is critical to continue to work with all possible "justice partners."

A Task Force could take the lead to hear from the community about their needs and prioritize the tasks to be undertaken. The Task Force could also help establish clear referral protocols and clarify expectations among all participants. The goal should be a clear "continuum of service," using all resources effectively and efficiently to benefit low-income rural Californians.

The Commission recognizes that there are challenges to creating partnerships in rural communities because there are fewer resources and potential partners available. The avenues for partnerships in urban areas are often unavailable: some rural communities have neither staffed bar associations nor lawyer referral services, and judges and court staff might cover multiple jurisdictions.

## Conclusion

Each year approximately 36 percent of the rural poor need legal services[155] to maintain their housing, income, and safety, and to exercise other legal rights, but legal services are extremely sparse in rural areas and cannot provide even a minimal level of assistance to two-thirds of the poor who need their services.[156]  Because a larger percentage of rural than urban Californians have disabilities, are impoverished or are elderly, there is a real need for adequate rural legal services. Rural Californians live with a higher percentage of substandard housing, higher unemployment, lower pay, lower average educational levels, and less access to health care than urban Californians do.

The California Commission on Access to Justice recommends that rural legal services be expanded in order to move toward statewide geographic equality in legal assistance, so that geographic status does not determine who is or is not served. To achieve this, funding for rural legal services must be increased. However, urban-rural parity should not be developed in a way that unnecessarily undermines urban programs, because urban legal aid offices currently cannot serve even a majority of the indigent with legal needs in their communities. The Commission will work with the Legal Services Trust Fund Program, the Legal Aid Association of California (LAAC), legal services providers, and other stakeholders to establish minimum access guidelines for funding legal services in California.

In order to increase funding to meet the minimum guidelines, the Commission will work with rural legal services providers to establish a statewide Friends of Rural Legal Services Support Committee that will raise funds for the work of nonprofit rural legal aid providers. The Support Committee should work to ensure adequate resources and improve pro bono services and should include key rural leaders as well as representatives of urban law firms, corporate counsel, and other key civic leaders.

The Commission recognizes that in addition to increasing funding, some innovations can maximize available resources. Pro bono assistance from private lawyers can increase the number of rural clients who are served; technology can bring some urban resources to rural areas, collaborating with local rural stakeholders to determine priorities for service. Urban bar associations and lawyers can partner with rural organizations to fulfill their 50-hour annual pro bono responsibility, because rural areas have fewer lawyers and law schools to help assist clients. Convening local Rural Access Task Forces can help prioritize and address appropriate ways to increase access to civil justice in each unique community. Task forces might include representatives from legal aid providers, self-help centers, the local bar associations, and county law libraries, as well as non-traditional partners who also assist impoverished clients. They can determine how to improve language access and effectively use urban resources, and innovative technological solutions where appropriate. Creative uses of technology can help address some of the barriers experienced by those serving the legal needs of low-income rural Californians: online resources can significantly help self-represented litigants, e-filing can help legal aid offices avoid time consuming travel, and video-conferencing can connect urban and rural offices.

The Commission makes these recommendations to assist key institutions and stakeholders that are concerned about the administration of justice in California so that *all* Californians might have access to justice, regardless of where they live and work.

i. U.S. Department of Agriculture, Economic Research Service, *Rural America at a Glance* (Washington D.C.: USDA, 2009), 1, http://www.ers.usda.gov/publications/eib59/

ii. Housing Assistance Council, *What is the Housing Foreclosure Situation in Rural America?* (Washington D.C.: Housing Assistance Council, 2009), 17, http://www.ruralhome.org/storage/documents/foreclosure09.pdf

iii. Housing Assistance Council, *Migrant and Seasonal Farmworker Housing Information Sheet* (Washington D.C.: Housing Assistance Council, 2003), http://www.ruralhome.org/storage/documents/farmworkers.pdf

iv. U.S. Department of Health and Human Services, *Facts About Farmworkers and Colonias* (Washington D.C.: USDHHS, 2008), http://www.hud.gov/groups/farmwkercolonia.cfm

v. Ibid.

vi. Institute for America's Future *California's Rural Communities Rely on Social Security More than Twice as Much as Urban Communities* (Washington D.C.: Institute for america's Future, 2005), 5

vii. Lisa Pruitt, "Place Matters: Domestic Violence and Rural Difference," *Wisconsin Journal of Law, Gender & Society* 23 (2008), 349, http://works.bepress.com/cgi/viewcontent.cgi?article=1007&context=lisa_pruitt

viii. Rhonda Johnson, *Rural Health Response to Domestic Violence* (Washington D.C.: U.S. Department of Health and Human Services, 2003), http://ruralhealth.hrsa.gov/pub/domviol.htm

ix. William O'Hare and Kenneth Johnson, *Child Poverty in Rural America* (Washington D.C.: Population Reference Bureau, 2004), 16, http://www.prb.org/pdf04/ChildPovertyRuralAmerica.pdf

x. Ibid.

xi. Dean Jolliffe, "Beyond Poverty Rates: Why Depth and Severity of Poverty Matter When Comparing Urban and Rural Poverty," *Perspectives* 1(2003): 5, http://www.rupri.org/Forms/Perspectivesvol1n2.pdf

xii. 2000 U.S. Census Tribal Areas Count

xiii. Chief Justice Ronald George has appointed a group to enhance tribal court/state court relationships. See Amy Yarbrough, "New Coalition Formed," *Daily Journal*, May 21, 2010

xiv. In May 1010, Chief Justice Ronald George appointed the California Tribal Court/State Court Coalition to study and make recommendations on jurisdictional issues. The coalition includes tribal judges and state court judges.

1. See http://www.lsc.gov/about/factsheet_rural.php - 1 of 3, 10

2. Larry R. Spain, "Public Interest Law: Improving Access to the Opportunities and Challenges of Providing Equal Access to Justice in Rural Communities," *William Mitchell Law Review* 28 (2001): 372

3. Dean Jolliffe, "Beyond Poverty Rates: Why Depth and Severity of Poverty Matter When Comparing Urban and Rural Poverty," *Perspectives* 1(2003): 5 http://www.rupri.org/Forms/Perspectivesvol1n2.pdf

4 California Commission on Access to Justice, *Action Plan for Justice: Report of the California Commission on Access to Justice* (State Bar of California, 2007), 56-57, http://www.calbar.ca.gov/AboutUs/CenteronAccesstoJustice.aspx

5 See http://www.oshpd.ca.gov/rhpc/

6. U.S. Department of Agriculture. Rural Development-California, *Rural Housing at the Crossroads* (Davis: USDA, 2006), 6, http://www.rurdev.usda.gov/ca/pdf%20files%20and%20documents/RURAL%20HOUSING%20CROSSROADS.pdf

7. Ibid., 10

8. Ibid., 2

9. The legislative authority for MSSAs is the Song Brown Family Physician Training Act (1973) that created the California Health Manpower Policy Commission (CHMPC), which divides state into sub-city and sub-county areas to determine areas of unmet need for physicians. Garamendi Rural Health Services Act (1976) requires the Commission to determine which areas of the state are rural, and which areas are deficient in medical services. http://www.oshpd.ca.gov/hwdd/Song_Brown_Prog.html

10. See http://www.oshpd.ca.gov/RHPC/About_Us/definitions.html

11. Matthew Cooper et al., "Invisible Clients": The Delivery of Legal Services to the Rural Poor" (paper for class, Harvard, 2005), 7

12. Estimates from California Statistical Abstract and State Bar Legal Services Trust Fund

13. Federal Poverty Guidelines are established annually by the Department of Health and Human Services.

14. California Indian Legal Services (CILS) serves rural and urban Native American communities statewide, including the 109 reservations, most of which are rural, and California Advocates for Nursing Home Reform (CANHR) serves seniors statewide by telephone from their San Francisco office.

15. See Rule 3-300 see rule 1-650 at http://rules.calbar.ca.gov/Rules/RulesofProfessionalConduct.aspx

16. Carmody and Associates, *Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California* (San Francisco: Legal Aid Association of California, 2010), 44

17. See http://www.courtinfo.ca.gov/selfhelp/

18. Ibid, 2

19. See http://www.courtinfo.ca.gov/selfhelp/

20. See http://www.courtinfo.ca.gov/selfhelp/pressroom/

21. Most rural attorneys are in small or solo practices, and the rate of pro bono participation is very high. ABA Standing Committee on Pro Bono and Public Service, *Supporting Justice II* (Chicago: ABA, 2009), 12

22. Matthew Cooper et al., "Invisible Clients": The Delivery of Legal Services to the Rural Poor" (paper for class, Harvard, 2005), 23

23. " The use of different definitions of rural by Federal agencies reflects the multidimensional qualities of rural America," John Cromatie and Shawn Bucholtz, "Defining the "Rural" in Rural America," *Amber Waves: The Economics of Food, Farming, Natural Resources and Rural America* 6:3 (2008): 28 or online at http://www.ers.usda.gov/AmberWaves/June08/Features/RuralAmerica.htm

24. See http://www.oshpd.ca.gov/HWDD/pdfs/health_safetycodes_rev.pdf

25. See http://www.oshpd.ca.gov/RHPC/About_Us/definitions.html

26. Between 2007 and 2008, California's rural population grew from 5,168,801 to 5,239,290, a 1.36 percent increase. California State Department of Finance (rural county cities greater than 49,999 move to the urban category)

27. 15% v 12% over 65 nationally, William O'Hare and Kenneth Johnson, *Child Poverty in Rural America* (Washington D.C.: Population Reference Bureau, 2004), 1, http://www.prb.org/pdf04/ChildPovertyRuralAmerica.pdf

28. Dean Jolliffe, "Beyond Poverty Rates: Why Depth and Severity of Poverty Matter When Comparing Urban and Rural Poverty," *Perspectives* 1(2003): 3 http://www.rupri.org/Forms/Perspectivesvol1n2.pdf

29. Institute for America's Future *California's Rural Communities Rely on Social Security More than Twice as Much as Urban Communities* (Washington D.C.: Institute for America's Future, 2005), 5

30. Dean Jolliffe, "Beyond Poverty Rates: Why Depth and Severity of Poverty Matter When Comparing Urban and Rural Poverty," *Perspectives* 1(2003): 3 http://www.rupri.org/Forms/Perspectivesvol1n2.pdf

31. Institute for America's Future *California's Rural Communities Rely on Social Security More than Twice as Much as Urban Communities* (Washington D.C.: Institute for America's Future, 2005), 5

32. See California Behavioral Risk Factor Survey 2007 http://www.dhcs.ca.gov/services/rural/Documents/2008%20California%20Rural%20Health%20Update%2012_3_08.pdf

33. See http://www.ruralnationalhomeless.org/factsheets/rural.html ; or 13.4 vs. 10.8 per John Cromatie and Shawn Bucholtz, "Defining the "Rural" in Rural American," *Amber Waves: The Economics of Food, Farming, Natural Resources and Rural America*, 6:3 (2008): 28

34. Dean Jolliffe, "Beyond Poverty Rates: Why Depth and Severity of Poverty Matter When Comparing Urban and Rural Poverty," *Perspectives* 1(2003): 3 http://www.rupri.org/Forms/Perspectivesvol1n2.pdf

35. William O'Hare and Kenneth Johnson, *Child Poverty in Rural America* (Washington D.C.: Population Reference Bureau, 2004), 16, http://www.prb.org/pdf04/ChildPovertyRuralAmerica.pdf

36. William O'Hare and Kenneth Johnson, *Child Poverty in Rural America* (Washington D.C.: Population Reference Bureau, 2004), 14. The 2000 census figures for California adults over 25 with college degrees are 27% urban and 18% rural. See http://www.ers.usda.gov/statefacts/ca.htm

37. John Cromatie and Shawn Bucholtz, "Defining the "Rural" in Rural America," *Amber Waves: The Economics of Food, Farming, Natural Resources and Rural America*, 6:3 (2008): 7, http://www.ers.usda.gov/AmberWaves/June08/Features/RuralAmerica.htm

38. U.S. Department of Agriculture Economic Research Service, *Rural Employment at a Glance* (Washington D.C.: USDA, 2006) http://www.ers.usda.gov/publications/eib21/eib21.pdf

39. Public Policy Institute of California, "Coastal Californians Driving Central Valley Growth," press release (San Francisco: PPIC, 2004)

40. Sarah Bohn, New *Patterns of Immigrant Settlement in California* (San Francisco: Public Policy Institute of California, 2008), 25, http://www.ppic.org/content/pubs/report/R_709SBR.pdf

41. William O'Hare, *The Forgotten Fifth: Child Poverty in Rural America*, Carsey Institute (Durham: University of New Hampshire, 2009), 3, http://www.carseyinstitute.unh.edu/publications/Report-OHare-ForgottenFifth.pdf

42. Lisa R. Pruitt, **"The Forgotten Fifth: Rural Youth and Substance Abuse,"** *Stanford Law & Policy Review* 20 (2009), 368

43. Alliance for Excellent Education, *Current Challenges and Opportunities in Preparing Rural High School Students for Success in College and Careers* (Washington D.C. Alliance for Excellent Education, 2010), 10 http://www.all4ed.org/files/RuralHSReportChallengesOpps.pdf ; see also Graham, Suzanne *Students in Rural Schools Have Limited Access to Advanced Mathematics Courses,* Carsey Institute; (Durham: University of New Hampshire, 2009)

44. Lisa R. Pruitt, "The Forgotten Fifth: Rural Youth and Substance Abuse," *Stanford Law & Policy Review* 20 (2009), 364

45. Ibid., 372

46. Ibid, 386

47. William O'Hare and Bill Bishop, *U.S. Rural Soldiers Account for a Disproportionately High Share of Casualties in Iraq and Afghanistan*, Carsey Institute; (Durham: University of New Hampshire, 2006), at http://www.carseyinstitute.unh.edu/publications/FS_ruralsoldiers_06.pdf .

48. See http://capito.house.gov/i 2 (accessed 5/2010)

49. Public Policy Institute of California, "More Shop, Get News Online, Yet Digital Divide Widens: As Californians Broaden Use of Web, Latino and Low-income Residents Left Behind," press release (San Francisco: PPIC, 2008) http://www.ppic.org/main/pressrelease.asp?i=851

50. U.S. Department of Agriculture, Economic Research Service *Rural America at a Glance* (Washington D.C.: USDA, 2009), 2, http://www.ers.usda.gov/publications/eib59/

51. Ibid

52. U.S. Department of Agriculture, Economic Research Service *Rural America at a Glance* (Washington D.C.: USDA, 2008), 5, http://www.ers.usda.gov/Publications/EIB40/

53. John Cromatie and Shawn Bucholtz, "Defining the "Rural" in Rural American," *Amber Waves: The Economics of Food, Farming, Natural Resources and Rural America*, 6:3 (2008): 6, http://www.ers.usda.gov/AmberWaves/June08/Features/RuralAmerica.htm

54. 2000 U.S. Census

55. Matthew Cooper et al., "Invisible Clients": The Delivery of Legal Services to the Rural Poor" (paper for class, Harvard, 2005), 6

56. U.S. Department of Agriculture, Economic Research Service *Rural America at a Glance* (Washington D.C.: USDA, 2008), 2, http://www.ers.usda.gov/Publications/EIB40/

57. Amy Moffat, *The State of the Great Central Valley of California* (Modesto: Great Valley Center, 2009), 14

58. In 2001, when gas prices were lower than in 2010, rural households spent $1,000 on average more than their urban counterparts. U.S. Department of Agriculture, Economic Research Service *Rural Transportation at a Glance*, Agriculture Information Bulletin 795 (2005), 3, http://www.ers.usda.gov/publications/aib795/aib795_lowres.pdf

59. William O'Hare and Kenneth Johnson, *Child Poverty in Rural America* (Washington D.C.: Population Reference Bureau, 2004), 18, http://www.prb.org/pdf04/ChildPovertyRuralAmerica.pdf

60. [illegible reference about Department of Agriculture Rural Housing] *Rural Housing at the Crossroads* (Davis: USDA, 2006), 2, http://www.rurdev.usda.gov/ca/pdf%20files%20and%20documents/RURAL%20HOUSING%20CROSSROADS.pdf

61. Housing Assistance Council, *What is the Housing Foreclosure Situation in Rural America?* (Washington D.C.: Housing Assistance Council, 2009), 2, http://www.ruralhome.org/storage/documents/foreclosure09.pdf

62. Housing Assistance Council, *Poverty in Rural America* (Washington D.C.: Housing Assistance Council, 2006), 3, http://www.ruralhome.org/storage/documents/povertyruralamerica.pdf

63. Housing Assistance Council, *Rural Homelessness* (Washington D.C.: Housing Assistance Council, 2008), 1, http://www.ruralhome.org/storage/documents/homelessnessinfosheet.pdf

64. U.S. Department of Agriculture, Economic Research Service, *Rural America at a Glance* (Washington D.C.: USDA, 2009), 1, http://www.ers.usda.gov/publications/eib59/

65. Ibid

66. Amy Moffat, *The State of the Great Central Valley of California* (Modesto: Great Valley Center, 2009), 21

67. Housing Assistance Council, *Migrant and Seasonal Farmworker Housing* (Washington D.C.: Housing Assistance Council, 2003), http://www.ruralhome.org/storage/documents/farmworkers.pdf

68. Kathy Tyler, "Farmworker Housing Summit Inspires Collaboration," *Rural Voices* (Washington D.C.: Housing Assistance Council, 2005), 7, http://www.ruralhome.org/storage/documents/voicessummer2005.pdf

69. Ibid

70. U.S. Department of Health and Human Services, *Facts About Farmworkers and Colonias* (Washington D.C.: USDHHS, 2008)

71. Sarah Bohn, New *Patterns of Immigrant Settlement in California* (San Francisco: Public Policy Institute of California, 2008), 21, http://www.ppic.org/content/pubs/report/R_709SBR.pdf

72. Institute for America's Future, *California's Rural Communities Rely on Social Security More than Twice as Much as Urban Communities* (Washington D.C.: Institute for America's Future, 2005), 5

73. See California Rural Legal Assistance Newsletters at www.crla.org

74. Approximately half of the farmworker population is undocumented. Housing Assistance Council, *Migrant and Seasonal Farmworker Housing* (Washington D.C.: Housing Assistance Council, 2003) The 1997-1998 National Agricultural Worker Survey found that 22% of farmworkers are citizens and 24% are in the U.S. legally.

75. [illegible] Communities in California: An Overview (Davis: California Institute for Rural Studies, 2007), 1 and reports from legal services providers at June 3, 2010 "Connecting the Dots" LAAC Legal Services Stakeholders Meeting

76. Mark S. Schact, *Farm Labor Contractor Abuses in California* (Sacramento: California Rural Legal Assistance Foundation: 2000), 3-4

77. Lisa Pruitt, "Place Matters: Domestic Violence and Rural Difference," *Wisconsin Journal of Law, Gender & Society* 23 (2008), 348-350, http://works.bepress.com/cgi/viewcontent.cgi?article=1007&context=lisa_pruitt

78. Rhonda M. Johnson, *Rural Health Response to Domestic Violence* (Washington D.C.: U.S. Department of Health and Human Services, 2003) http://ruralhealth.hrsa.gov/pub/domviol.htm

79. Rural Policy Research Institute, *California: RUPRI State Demographic & Economic Profiles* (Columbia: Rural Policy Research Institute, 2008), 2 http://www.rupri.org/Forms/California.pdf

80. Lisa Pruitt, "Place Matters: Domestic Violence and Rural Difference," *Wisconsin Journal of Law, Gender & Society* 23 (2008), 360, http://works.bepress.com/cgi/viewcontent.cgi?article=1007&context=lisa_pruitt

81. Satya P. Krishnan et al, *Understanding Domestic Violence in Multi Ethnic Rural Communities* (Rockville: National Criminal Justice Reference Service, 2002), 30, http://www.ncjrs.gov/pdffiles1/nij/grants/191863.pdf

82. Rhonda M. Johnson, *Rural Health Response to Domestic Violence* (Washington D.C.: U.S. Department of Health and Human Services, 2003) http://ruralhealth.hrsa.gov/pub/domviol.htm

83. Four percent of rural California homes have no telephone.

84. Lisa Pruitt, "Place Matters: Domestic Violence and Rural Difference," *Wisconsin Journal of Law, Gender & Society* 23 (2008), 363, http://works.bepress.com/cgi/viewcontent.cgi?article=1007&context=lisa_pruitt

85. Daniel P. Lichter and Martha L. Crowley, Poverty Rates Vary Widely Across the U.S. (Washington D.C.: Population Reference Bureau, 2002), http://www.prb.org/Articles/2002/PovertyRatesVaryWidelyAcrosstheUnitedStates.aspx

86. In California 89.2% of children have health insurance statewide, compared to 85.3% of rural children; 59.9% have private insurance, compared to 50% of rural children. Mattingly, Marybeth J. and Michelle L. Stransky, *Rural and Urban Children Have Lower Rates of Health Insurance Coverage and are More Often Covered by Public Plans*, Carsey Institute (Durham: University of New Hampshire, 2009), 2

87. [illegible] preference of public health insurance is partly related to their parents' tendency to work in small companies, which are more common in rural areas." William O'Hare, *The Forgotten Fifth: Child Poverty in Rural America*, Carsey Institute (Durham: University of New Hampshire, 2009), 20, http://www.carseyinstitute.unh.edu/publications/Report-OHare-ForgottenFifth.pdf

88. Ibid, 5

89. The elderly make up about 15 percent of the rural population, compared with 12 percent in metropolitan areas. Elderly households are 26% of rural households compared with 20% of urban households. Housing Assistance Council, *Rural Seniors and Their Homes* (Washington D.C.: Housing Assistance Council, 2004), 5, http://www.ruralhome.org/storage/documents/ruralseniors.pdf

90. Ibid., 18-19

91. Ibid, 9-11

92. LAAC, the Senior Legal Hotline and the California Department of Aging have received a three year federal "Model Approaches" grant to help improve access to legal services for seniors; one of the foci is on rural and remote seniors.

93. William O'Hare and Bill Bishop, *U.S. Rural Soldiers Account for a Disproportionately High Share of Casualties in Iraq and Afghanistan*, Carsey Institute (Durham: University of New Hampshire, 2006), http://www.carseyinstitute.unh.edu/publications/FS_ruralsoldiers_06.pdf

94. U.S. Department of Agriculture, Rural Development, *Rural Housing at the Crossroads* (Davis: USDA, 2006), 2, http://www.rurdev.usda.gov/ca/pdf%20files%20and%20documents/RURAL%20HOUSING%20CROSSROADS.pdf

95. Housing Assistance Council, *Rural Seniors and Their Homes* (Washington D.C.: Housing Assistance Council, 2004), 22, http://www.ruralhome.org/storage/documents/ruralseniors.pdf

96. Ibid, 18 & 22

97. Housing Assistance Council, *Housing for Persons with Disabilities in Rural Areas* (Washington D.C.: Housing Assistance Council, 2004) http://ruralhome.org/information-and-publications/information-sheets/21-demographics-high-need-areas-and-special-populat/83-housing-for-persons-with-disabilities-in-rural-areas

98. Institute for America's Future, *California's Rural Communities Rely on Social Security More than Twice as Much as Urban Communities* (Washington D.C.: Institute for America's Future, 2005), 5 Also, 20 percent of farmers, ranchers, and other agricultural workers have disabilities. AgraAbility Project, *AgraAbility Project Helps Farmers with Disabilities Succeed in Agriculture: Fact Sheet* (Madison: 2002)

99. Institute for America's Future, *California's Rural Communities Rely on Social Security More than Twice as Much as Urban Communities* (Washington D.C.: Institute for America's Future, 2005), 5

100. According to the U.S. Census, in California 41 percent of persons over 65 have disabilities, while only 11 percent of 21 to 64 year olds and 5 percent of 5 to 20 year olds have disabilities.

101. Chart based on information from Dean Jolliffe, "Beyond Poverty Rates: Why Depth and Severity of Poverty Matter When Comparing Urban and Rural Poverty," *Perspectives* 1(2003): 5, http://www.rupri.org/Forms/Perspectivesvol1n2.pdf

102. Lisa Kresge, *Indigenous Oaxacan Communities in California: An Overview* (Davis: California Institute for Rural Studies, 2007), 12 footnote 10, http://www.cirsinc.org/Documents/Pub1107.1.pdf

103. See http://www.epa.gov/region9/air/maps/ca_tribe.html

104. *Legal Needs and Services in Indian Country: NAILS Update to Dahlstrom-Barnhouse's 1998 Report to the Legal Services Corporation*, National Association of Indian Legal Services: January 2008, Legal Services Corporation, 11

105. Ibid, 8

106. LSTFP funding includes both IOLTA (Interest on Lawyers' Trust Accounts) grants and Equal Access Fund Grants. The Equal Access Fund was established by California Legislature, and is a Judicial Council program.

107. Funding amounts reported to Legal Services Trust Fund at State Bar of California. See Appendix A for county lists.

108. Matthew Cooper et al., "Invisible Clients": The Delivery of Legal Services to the Rural Poor" (paper for class, Harvard, 2005), 24

109. Chart is based on information submitted by Legal Services Trust Fund grantees to the LSTF office.

110. Larry R. Spain, "Public Interest Law: Improving Access to Justice: the Opportunities and Challenges of Providing Equal Access to Justice in Rural Communities," *William Mitchell Law Review* 28 (2001): 367

111. Housing Assistance Council, *Rural Seniors and Their Homes* (Washington D.C.: Housing Assistance Council, 2004), 15, http://www.ruralhome.org/storage/documents/ruralseniors.pdf

112. Matthew Cooper et al., "Invisible Clients": The Delivery of Legal Services to the Rural Poor" (paper for class, Harvard, 2005), 24

113. Institute for America's Future, *California's Rural Communities Rely on Social Security More than Twice as Much as Urban Communities* (D.C.: Institute for America's Future, 2005), 3-4

114. William O'Hare and Kenneth Johnson, *Child Poverty in Rural America* (Washington D.C.: Population Reference Bureau, 2004), 6-7, http://www.prb.org/pdf04/ChildPovertyRuralAmerica.pdf

115. Ibid, 11

116. Dean Jolliffe, "Beyond Poverty Rates: Why Depth and Severity of Poverty Matter When Comparing Urban and Rural Poverty," *Perspectives* 1(2003): 5, http://www.rupri.org/Forms/Perspectivesvol1n2.pdf

117. Matthew Cooper et al., "Invisible Clients": The Delivery of Legal Services to the Rural Poor" (paper for class, Harvard, 2005), 24

118. Ibid., 9 see footnote

119. Report to Commission on Access and Fairness.

120. Matthew Cooper et al., "Invisible Clients": The Delivery of Legal Services to the Rural Poor" (paper for class, Harvard, 2005), 25

121. Sarah Bohn, *New Patterns of Immigrant Settlement in California* (San Francisco: Public Policy Institute of California, 2008), 25, http://www.ppic.org/content/pubs/report/R_709SBR.pdf

122. Larry R. Spain, "Public Interest Law: Improving Access to Justice: the Opportunities and Challenges of Providing Equal Access to Justice in Rural Communities," *William Mitchell Law Review* 28 (2001): 378

123. Beth M. Henschen, *Lessons from the Country* (Chicago: American Judicature Society, 2002), 27, http://www.ajs.org/prose/pdfs/Lessons_1.pdf

124. Carmody and Associates, *Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California* (San Francisco: Legal Aid Association of California, 2010), 34, http://www.calegaladvocates.org/about/item.2010-LAAC_Retention_and_Recruitment_Report

125. Ibid

126. Ibid, 10

127. Dori Rose Inda, at June 3, 2010 "Connecting the Dots" LAAC Legal Services Stakeholders Meeting

128. From discussion June 3, 2010 at "Connecting the Dots" LAAC Legal Services Stakeholders Meeting

129. Ibid

130. Report from Rural Task Force

131. see www.turbocourt.com

132. See James W. Meeker and Richard Utman *I-CAN!: Accessing Rights Through Technology: Report to the Legal Aid Society of Orange County* (Irvine: University of California, 2002)

133. See http://www.courtinfo.ca.gov/reference/documents/factsheets/proper.pdf

134. See http://www.courtinfo.ca.gov/programs/cfcc/resources/publications/actionplanfinal.htm

135. Report from Legal Services of Northern California.

136. See http://www.courtinfo.ca.gov/programs/justicecorps/jcorps_about.htm

137. Report from Roxanne Severin-Diaz, Central California Legal Services, April 2010

138. From a 2009 interview by Salena Copeland, PIC, with Tina Rasnow, formerly of the Ventura County Self-Help Center.

139. Report to Commission on Access to Justice

140. Report from Laura Ferree, Managing Attorney, Community Legal Program Family Resource Center of Truckee

141. Report of California Commission on Access to Justice

142. Matthew Cooper et al., "Invisible Clients": The Delivery of Legal Services to the Rural Poor" (paper for class, Harvard, 2005), 9 (footnote 28)

143. See rule 1-650 at http://rules.calbar.ca.gov/Rules/RulesofProfessionalConduct.aspx

144. See http://rules.calbar.ca.gov/Portals/10/documents/Rules_Title2_Div4-MCLE.pdf Rule 2.54

145. Report to Commission on Access and Fairness.

146. http://cc.calbar.ca.gov/LinkClick.aspx?fileticket=3E-v01IqlU4%3d&tabid=1195

147. See http://calbar.ca.gov/calbar/pdfs/comcom/PB-Practice-Prog_FAQs.pdf

148. February 2009 interview by Salena Copeland, Public Interest Clearinghouse (PIC), with Jo Bloomfield, Bet Tzedek

149. ABA Standards for Accreditation, Curriculum, 302 (b) (2)

150. Report from Salena Copeland and Julie Mercer, PIC

151. Attorneys reported that they did not feel isolated where there were frequent trainings and distant colleagues were available by phone and e-mail. Beth M. Henschen, *Lessons from the Country* (Chicago: American Judicature Society, 2002), 27, http://www.ajs.org/prose/pdfs/Lessons_1.pdf

152. Larry R. Spain, "Public Interest Law: Improving Access to Justice: the Opportunities and Challenges of Providing Equal Access to Justice in Rural Communities," *William Mitchell Law Review* 28 (2001): 378

153. Congressional Budget Office, *The Legal Services Corporation—Budgetary Issues And Alternative Federal Approaches* (Washington DC: CBO, 1977), xii http://www.cbo.gov/ftpdocs/101xx/doc10135/77doc563.pdf

154. See Legal Services Corporation 1994 Resolution http://www.lsc.gov/pdfs/1994-21.PDF

155. Larry R. Spain, "Public Interest Law: Improving Access to Justice: the Opportunities and Challenges of Providing Equal Access to Justice in Rural Communities," *William Mitchell Law Review* 28 (2001): 372

156. According to the *Action Plan for Justice*, "legal aid programs are still not able to provide even a minimum level of legal advice for 67 percent of the legal needs of California's poor." California Commission on Access to Justice, *Action Plan for Justice: Report of the California Commission on Access to Justice* (State Bar of California, 2007), 9

Photo on page 48 from PIC is of McGeorge Law School Students and Central California Legal Services in front of a Justice Bus ™.

# Appendices

## APPENDIX A
## Legal Services Funding per Indigent Person by Population Density Category

Average spending per indigent person by county:

**Urban Counties**
**$44.83 per person**

Alameda
Contra Costa
Los Angeles
Orange
Sacramento
San Francisco
Santa Clara

**Mixed Urban/Rural**
**$26.43 per person**

Butte
El Dorado
Fresno
Kern
Marin
Merced
Monterey
Napa
Placer
Riverside
San Bernardino
San Diego
San Joaquin
San Mateo
Santa Barbara
Santa Cruz
Shasta
Solano
Sonoma
Stanislaus
Tulare
Ventura
Yolo

**Rural Counties**
**$18.56 per person**

Alpine
Amador
Calaveras
Colusa
Del Norte
Glenn
Humboldt
Imperial
Inyo
Kings
Lake
Lassen
Madera
Mariposa
Mendocino
Modoc
Mono
Nevada
Plumas
San Benito
San Luis Obispo
Sierra
Siskiyou
Sutter
Tehama
Trinity
Tuolumne
Yuba

# APPENDIX B
# Annotated List of Key Resources

The resources listed below were selected to assist readers who are interested in exploring these topics more fully. The subject areas included are as follows:

Overview of Rural Legal Services Issues          Persons with Disabilities
Domestic Violence in Rural Areas                 Statistics
Elderly                                          Technology
Housing                                          Veterans
Immigrants                                       Youth
Legal Services Challenges

## OVERVIEW

American Bar Association. Rural Pro Bono Delivery: *A Guide to Pro Bono Legal Services in Rural Areas.* Chicago: ABA, 2003. http://www.abanet.org/legalservices/probono/aba_rural_book.pdf Describes barriers encountered by rural legal services, and provides details about seven innovative pro bono delivery initiatives from around the country.

*Legal Services Corporation. A Report on Rural Issues and Delivery and the LSC-sponsored Symposium October 31 – November 2, 2002, Nebraska City.* Washington D.C.: LSC, 2003. http://www.lri.lsc.gov/pdf/03/RIDS_rprt042403.pdf  Provides some demographics about rural poverty and the challenges encountered by rural legal services providers, in addition to describing several national legal services policies and projects.

## DOMESTIC VIOLENCE

Johnson, Rhonda M. "Rural Health Response to Domestic Violence: Policy and Practice Issues: Emerging Public Policy Issues and Best Practices." Rockville: Health Resources and Services Administration, U.S. Department of Health and Human Services, 2000. http://ruralhealth.hrsa.gov/pub/domviol.htm In this brief overview of the scant literature about rural domestic violence, Johnson discusses the aspects of rural life that can exacerbate the problems of battered women.

Pruitt, Lisa R. "Place Matters: Domestic Violence and Rural Difference"> *Wisconsin Journal of Law, Gender & Socie*ty 23(2008): 347-416. http://works.bepress.com/cgi/viewcontent.cgi?article=1007&context=lisa_pruitt Pruitt's article describes how rurality impacts the "occurrence, investigation, prosecution, and judicial decision-making" of domestic violence. It also delineates the social setting: "the social isolation and lack of anonymity it fosters; severe economic disadvantage; … and legal actors who are often ill-informed about domestic violence".

## RURAL ELDERLY

Johnson, Kirk. "For Rural Elderly, Times are Distinctly Harder." *New York Times*, December 10, 2009. http://www.nytimes.com/2009/12/10/us/10rural.html?fta=y  This front page article describes the isolation and difficulties in the daily lives of rural elderly people, in areas that youth are leaving.

Housing Assistance Council. *Rural Seniors and Their Homes.* Washington D.C.: HAC, 2003. http://ruralhome.org/storage/documents/ruralseniors.pdf  HAC provides information on seniors in rural communities, statistics on rural seniors' housing and information on the incomes and housing costs of rural seniors. The report discusses the amenities and services that urban seniors need and lack in many rural areas

## RURAL EMPLOYMENT

Glasmeier, Amy, and Priscilla Salant. *Low-Skill Workers in Rural America Face Permanent Job Loss.* Durham: Carsey Institute, 2006. http://www.carseyinstitute.unh.edu/publications/ PB_displacedworkers_06.pdf  This short paper provides data regarding the fact that "[i]ncreases in productivity and international competition are changing the nature of work in rural America…reliance on a low-skill economy has resulted in significant job loss in many of the nation's rural communities".

United States Department of Agriculture Economic Research Service. *Rural Employment at a Glance.* Washington D.C.: USDA ERS Economic Information Bulletin 21, 2006. http:// www.ers.usda.gov/publications/eib21/eib21.pdf  This overview makes clear that only a small percentage of rural work is agricultural, that most employment is in the manufacturing sector, and that manufacturing is declining. There is data regarding the large and expanding earnings gap between urban and rural areas, and about the fact that employment has grown in rural counties with recreational areas.

## HOUSING

United States Department of Agriculture *Rural Development-California. Rural Housing at the Crossroads.* Davis: USDA RD, 2006. http://www.rurdev.usda.gov/ca/pdf%20files%20and%20 documents/RURAL%20HOUSING%20CROSSROADS.pdf  This policy brief discusses the increased cost of and need for land and housing in rural California, and includes general data on rural economics.

### HOUSING COLONIAS

Baer, Susan E. "Colonias: California's Forgotten Communities?" Paper presented at the annual meeting of the Western Political Science Association, Portland, Oregon, 2004. www.allacademic. com/meta/p88203_index.html  An examination of two of Imperial County's 15 colonias, their histories and the problems that they face. One of the colonias examined is in a city and the other in an unincorporated rural part of the county.

U.S. Department of Health and Human Services. *Facts About Farmworkers and Colonias.* Washington D.C.: USDHHS, 2008. http://www.hud.gov/groups/farmwkercolonia.cfm This single-page fact sheet includes data about the colonias that provide substandard housing in U.S. border communities, and data about the living conditions of migrant farmworkers.

Housing Assistance Council. *Housing in the Colonias.* Washington DC: HAC, 2005. http://www.ruralhome.org/storage/documents/colonias_infosheet.pdf  This two-page fact sheet recounts the history and characteristics of the colonias of the Southwest border.

### HOUSING HOMELESSNESS

National Coalition for the Homeless. *Rural Homelessness.* Washington D.C.: NCH, 2009. http:// www.nationalhomeless.org/factsheets/Rural.pdf  This fact sheet provides basic information about rural homeless. "There are far fewer shelters in rural areas than in urban areas; therefore, people experiencing homelessness are less likely to live on the street or in a shelter and more likely to live in a car or camper, or with relatives in overcrowded or substandard housing."

### HOUSING MIGRANT/SEASONAL FARMWORKER

Housing Assistance Council. *Migrant and Seasonal Farmworker Housing.* Washington D.C.: HAC, 2003. http://www.ruralhome.org/storage/documents/farmworkers.pdf  This information sheet includes facts that dispel some myths about farmworkers, for example, 44 percent do not migrate and nearly half are in the U.S. legally. It also includes many details about the characteristics of migrant housing.

## IMMIGRANTS

Bohn, Sarah. *New Patterns of Immigrant Settlement in California.* San Francisco: Public Policy Institute of California, 2009. http://www.ppic.org/content/pubs/report/R_709SBR.pdf This paper looks at patterns of immigration to California and analyzes both where immigrants settle and why. The author looks at the educational backgrounds, work opportunities and countries of origin of the California's most recent immigrants, compared to earlier immigration to California.

## LEGAL SERVICES CHALLENGES

Cooper, Matthew; Brian Fletcher, Jonathan Lin, and Megan Wernke. *"Invisible Clients": The Delivery of Legal Services to the Rural Poor.* An unpublished paper for Professor Jeanne Charn's Harvard Law class, 2005. This very comprehensive paper describes how "the need for legal services in rural areas is both more urgent and less adequately addressed" because of "misperceptions that rural residents have no legal problems". The bibliography is extensive, and the paper provides a good overview of the issues.

Henschen, Beth M. *Lessons from the Country: Serving Self-Represented Litigants in Rural Jurisdictions.* Chicago: American Judicature Society, 2002. http://www.ajs.org/prose/pdfs/ Lessons_1.pdf This paper looks at 25 rural pro se assistance programs across the U.S. The sections on staffing and the use of technology in remote areas were helpful for this report, but the entire report is instructive for setting up or evaluating pro se assistance programs.

Spain, Larry. "Public Interest Law: Improving Access to Justice: The Opportunities and Challenges of Providing Equal Access to Justice in Rural Communities". *William Mitchell Law Review 28* (2001): 367-381. Makes the case that " the goal of universal access to a lawyer in civil cases may not be realistic, (but) we should, at the very least, make certain that no identifiable group, such as the rural poor, are systematically excluded from access to legal services." Spain also describes the challenges that rural legal service organizations face, makes recommendations, and argues that community presence is best for effective advocacy.

## PERSONS WITH DISABILITIES

Housing Assistance Council, *Housing for Persons with Disabilities in Rural Areas.* Washington DC: HAC, 2001. http://ruralhome.org/information-and-publications/information-sheets/ 21-demographics-high-need-areas-and-special-populat/83-housing-for-persons-with-disabilities-in-rural-areas  This information sheet provides information to make the case that because a larger percentage of rural than urban persons have disabilities, there should be more home and workplace accommodations and programs than there are.

AgrAbility Project, *National Consensus Conference on Disability in Agriculture and Rural America Summary,* May 21-22, 2002, Salem,VA: AgrAbility Project, 2002 http://www.agrability.ext.vt.edu/ Papers/Consensus_Conf_Final_Report.pdf  This report summarizes the discussion and strategies developed for meeting disability-related challenges confronting rural communities, individuals and families, at a conference of two-dozen national organizations and federal agencies. Conference organizations and agencies represented agriculture, disability, and rural health and development interests.

## STATISTICS

**United States Department of Agriculture Economic Research Service,** *Rural America at a Glance 2008.* **Washington D.C.: USDA ERS, Economic Information Bulletin 40, 2008. http://www.ers. usda.gov/publications/eib40/eib40.pdf**  This summary includes statistical information on rural unemployment, the effect of energy prices and credit tightening on rural communities, information on rural children's health and welfare, population loss in rural areas, the deceleration of minority population growth in rural areas, and federal funding.

**United States Department of Agriculture Economic Research Service,** *Rural America at a Glance 2009.* **Washington D.C.: USDA ERS, Economic Information Bulletin 59, 2009. http://www.ers. usda.gov/Publications/EIB59/EIB59.pdf**  This summary documents 2008 declines in housing construction, increases in energy costs, and a rise in both rural unemployment and poverty rates. It also includes housing market trends, details about child poverty, and facts about the decrease in migration from urban areas to rural areas.

## TECHNOLOGY

**Meeker, James W., and Richard Utman,** *I-CAN!: Accessing Rights Through Technology,* **Irvine: University of California and Legal Services Corporation, 2002, http://www.legal-aid.com/ I-CAN/I-CANEval.pdf** This evaluation includes interviews and surveys regarding the efficacy of a technological innovation in addressing client needs without added staff.

**Public Policy Institute of California. "More Shop, Get News Online, Yet Digital Divide Widens: As Californians Broaden Use of Web, Latino and Low-income Residents Left Behind." press release, San Francisco: PPIC, 2008. http://www.ppic.org/main/pressrelease.asp?i=851** This brief press release includes many statistics about computer and internet use and access in urban and rural California. It also breaks out statistics by region, income and ethnicity.

## VETERANS

**O'Hare, William, and Bill Bishop. U.S. Rural Soldiers account for a** *Disproportionately High Share of Casualties* **in Iraq and Afghanistan. Fact Sheet No. 3, Durham: The Carsey Institute, 2006. http://www.carseyinstitute.unh.edu/publications/FS_ruralsoldiers_06.pdf**  This fact sheet includes data on the enlistment and casualty rates for urban and rural youth by state, and includes some information on the reasons for their overrepresentation in the military.

## YOUTH

**O'Hare, William.** *The Forgotten Fifth: Child Poverty in Rural America,* **Durham: The Carsey Institute, 2009. http://www.carseyinstitute.unh.edu/publications/Report-OHare-ForgottenFifth. pdf**  The image of child poverty in the U.S. is usually urban, despite higher poverty rates in rural areas, and this paper dispels that myth and recounts poverty trends. In the 70s and 80s the poverty gap between urban and rural children narrowed, but it has widened since 1990. Rural children are further disadvantaged because of their isolation and limited access to support services.

**Pruitt, Lisa R. "The Forgotten Fifth: Rural Youth and Substance Abuse."** *Stanford Law & Policy Review* **20 (2009): 359-404.** This article reveals that substance abuse is a significant problem in the rural U.S. Statistics in the article show that the emphasis on urban substance abuse is misplaced, since a larger percentage of rural youth use drugs, drink and smoke in early adolescence

**United States Department of Agriculture Economic Research Service.** *Rural Children at a Glance.* **Washington D.C.: USDA ERS, Economic Information Bulletin 1, 2005. http://www.ers.usda.gov/ publications/eib1/eib1.pdf**  This bulletin includes national "indicators of the demographic, social, and economic well-being of rural children for use in developing rural policies…", although most statistics are from before the current economic situation.

# APPENDIX C
# Full Bibliography
## (includes items in Annotated Bibliography)

American Bar Association. *Rural Pro Bono Delivery: A Guide to Pro Bono Legal Services in Rural Areas.* Chicago: ABA, 2003. http://www.abanet.org/legalservices/probono/aba_rural_book.pdf

AgrAbility Project. *National Consensus Conference on Disability in Agriculture and Rural America Summary, May 21-22, 2002.* Salem, VA: AgrAbility Project, 2002. http://www.agrability.ext.vt.edu/ Papers/Consensus_Conf_Final_Report.pdf

Alliance for Excellent Education. *Current Challenges and Opportunities in Preparing Rural High School Students for Success in College and Careers.* Washington DC: Alliance for Excellent Education, 2010. http://www.all4ed.org/files/RuralHSReportChallengesOpps.pdf

Baer, Susan E. "Colonias: California's Forgotten Communities?" Paper presented at the annual meeting of the Western Political Science Association, Portland, Oregon, 2004. www.allacademic.com/ meta/p88203_index.html

Bohn, Sarah. *New Patterns of Immigrant Settlement in California.* San Francisco: Public Policy Institute of California, 2009. http://www.ppic.org/content/pubs/report/R_709SBR.pdf

California Commission on Access to Justice. *Action Plan for Justice: Report of the California Commission on Access to Justice.* San Francisco: State Bar of California, 2007. http://calbar.ca.gov/ calbar/pdfs/reports/2007_Action-Plan-Justice.pdf

Cooper, Matthew; Brian Fletcher, Jonathan Lin, and Megan Wernke. "*Invisible Clients*": The Delivery of Legal Services to the Rural Poor. Unpublished paper for Prof. Jeanne Charn's Harvard Law class, 2005.

Cromatie, John, and Shawn Bucholtz. "Defining the 'Rural' in Rural American: The use of different definitions of rural by Federal agencies reflects the multidimensional qualities of rural America." *Amber Waves: The Economics of Food, Farming, Natural Resources and Rural America* 6 (2008): 28-34. http://www.ers.usda.gov/AmberWaves/June08/Features/RuralAmerica.htm

Glasmeier, Amy, and Priscilla Salant. *Low-Skill Workers in Rural America Face Permanent Job Loss.* Durham: Carsey Institute, 2006. http://www.carseyinstitute.unh.edu/publications/PB_ displacedworkers_06.pdf

Hadfield, Gillian. "Higher Demand, Lower Supply? A Comparative Assessment of the Legal Landscape for Ordinary Americans." *Fordham Urban Law Journal.* 37 (2010): 129-155 http://works. bepress.com/cgi/viewcontent.cgi?article=1030&context=ghadfield

Henschen, Beth M. *Lessons from the Country: Serving Self-Represented Litigants in Rural Jurisdictions.* Chicago: American Judicature Society, 2002. http://www.ajs.org/prose/pdfs/Lessons_1.pdf

Housing Assistance Council, *Housing for Persons with Disabilities in Rural Areas.* Washington DC: HAC, 2001. http://www.ruralhome.org/information-and-publications/information-sheets/21-demographics-high-need-areas-and-special-populat/83-housing-for-persons-with-disabilities-in-rural-areas

Housing Assistance Council. *Housing in the Colonias.* Washington DC: HAC, 2005. http://www. ruralhome.org/storage/documents/colonias_infosheet.pdf

Housing Assistance Council. *Migrant and Seasonal Farmworker Housing.* Washington D.C.: HAC, 2003. http://www.ruralhome.org/storage/documents/farmworkers.pdf

Housing Assistance Council. *Poverty in Rural America.* Washington DC: HAC, 2006. http://www. ruralhome.org/storage/documents/povertyruralamerica.pdf

Housing Assistance Council. *Rural Seniors and Their Homes.* Washington D.C.: HAC, 2003. http://ruralhome.org/storage/documents/ruralseniors.pdf

Housing Assistance Council. *Taking Stock or What is the Housing Foreclosure Situation in Rural America?* Washington DC: HAC, 2009.

Institute for America's Future. *California's Rural Communities Rely on Social Security Income More Than TWICE as Much as Non Rural Communities.* Washington DC: Institute for America's Future, 2005.

Johnson, Kirk. "For Rural Elderly, Times are Distinctly Harder." *New York Times*, December 10, 2009. http://www.nytimes.com/2009/12/10/us/10rural.html?fta=y

Johnson, Rhonda M. "Rural Health Response to Domestic Violence: Policy and Practice Issues: Emerging Public Policy Issues and Best Practices." Rockville: Health Resources and Services Administration, U.S. Department of Health and Human Services, 2000. http://ruralhealth.hrsa.gov/pub/domviol.htm

Joliffe, Dean. "Beyond Poverty Rates: Why Depth and Severity of Poverty Matter When Comparing Urban and Rural Poverty." *Perspectives* 1 (1999) 2, Columbia: RUPRI, Rural Poverty Research Center http://www.rupri.org/Forms/Perspectivesvol1n2.pdf

Kresge, Lisa. *Indigenous Oaxacan Communities in California: An Overview.* Davis: California Institute for Rural Studies, 2007. http://www.cirsinc.org/Documents/Pub1107.1.pdf

Krishnan, Satya P., Judith C. Hilbert, and Keith McNeil. *Understanding Domestic Violence in Multi Ethnic Rural Communities: A Focus on Collaborations Among the Courts, the Law Enforcement Agencies and the Shelters.* Rockville: National Criminal Justice Reference Service, 2002. http://www.ncjrs.gov/pdffiles1/nij/grants/191863.pdf

Legal Services Corporation. *A Report on Rural Issues and Delivery and the LSC-sponsored Symposium October 31 – November 2, 2002, Nebraska City.* Washington D.C.: LSC, 2003. http://www.lri.lsc.gov/pdf/03/RIDS_rprt042403.pdf

Legal Services Corporation. *Documenting the Justice Gap in America: The Current Unmet Civil Legal Needs of Low-Income Americans.* Washington DC: LSC, 2009. http://www.lsc.gov/pdfs/documenting_the_justice_gap_in_america_2009.pdf

Lichter, Daniel P., and Martha L. Crowley. *Poverty Rates Vary Widely Across the U.S.* Washington D.C.: Population Reference Bureau, 2002. http://www.prb.org/Articles/2002/PovertyRatesVaryWidelyAcrosstheUnitedStates.aspx

Meeker, James W., and Richard Utman. *I-CAN!: Accessing Rights Through Technology.* Irvine: University of California and Legal Services Corporation, 2002. http://www.legal-aid.com/I-CAN/I-CANEval.pdf

Moffat, Amy. *The State of the Great Central Valley of California: Assessing the Region Via Indicators: The Economy.* Modesto: The Great Valley Center, 2009.

National Association of Indian Legal Services. *Legal Needs and Services in Indian Country: NAILS Update to Dahlstrom-Barnhouse's 1998 Report to the Legal Services Corporation.* Washington D.C.: Legal Services Corporation, 2008.

National Coalition for the Homeless. *Rural Homelessness.* Washington D.C.: NCH, 2009. http://www.nationalhomeless.org/factsheets/Rural.pdf

O'Hare, William. *The Forgotten Fifth: Child Poverty in Rural America,* Durham: The Carsey Institute, 2009. http://www.carseyinstitute.unh.edu/publications/Report-OHare-ForgottenFifth.pdf

O'Hare, William, and Bill Bishop. *U.S. Rural Soldiers account for a Disproportionately High Share of Casualties in Iraq and Afghanistan.* Fact Sheet No. 3, Durham: The Carsey Institute, 2006. http://www.carseyinstitute.unh.edu/publications/FS_ruralsoldiers_06.pdf

O'Hare, William, and Kenneth M. Johnson. "Child Poverty in Rural America." *Reports On America*. Washington D.C., Population Reference Bureau, 4:1 (2004). http://www.prb.org/pdf04/ChildPovertyRuralAmerica.pdf

Pruitt, Lisa R. "The Forgotten Fifth: Rural Youth and Substance Abuse." *Stanford Law & Policy Review* 20 (2009): 359-404.

Pruitt, Lisa R. "Place Matters: Domestic Violence and Rural Difference." *Wisconsin Journal of Law, Gender & Society* 23 (2008): 347-416

Public Policy Institute of California. "Coastal Californians Driving Central Valley Growth". press release, San Francisco: PPIC, 2004. http://www.ppic.org/main/pressrelease.asp?1=526

Public Policy Institute of California. "More Shop, Get News Online, Yet Digital Divide Widens: As Californians Broaden Use of Web, Latino and Low-income Residents Left Behind." press release, San Francisco: PPIC, 2008. http://www.ppic.org/main/pressrelease.asp?i=851

Rural Policy Research Institute. *California RUPRI State Demographic & Economic Profiles*, Columbia: RUPRI, 2009. http://www.rupri.org/Profiles/California2.pdf

Schact, Mark S. *Farm Labor Contractor Abuses in California*. Sacramento: California Rural Legal Assistance Foundation, 2000. http://www.globalexchange.org/countries/americas/unitedstates/farmworkers/crlaf_farm_violation.pdf

Spain, Larry. "Public Interest Law: Improving Access to Justice: The Opportunities and Challenges of Providing Equal Access to Justice in Rural Communities." *William Mitchell Law Review* 28 (2001): 367-381.

Tyler, Kathy. "Farmworker Housing Summit Inspires Collaboration." *Rural Voices* 10 (2005): 7-9. http://www.ruralhome.org/storage/documents/voicessummer2005.pdf .

United States Department of Agriculture Economic Research Service. *Rural Transportation at a Glance*. Washington D.C.: USDA ERS, Agriculture Information Bulletin 795, 2005. http://www.ers.usda.gov/publications/AIB795/AIB795_lowres.pdf

United States Department of Agriculture Economic Research Service. *Rural America at a Glance 2008*. Washington D.C.: USDA ERS, Economic Information Bulletin 40, 2008. http://www.ers.usda.gov/publications/eib40/eib40.pdf

United States Department of Agriculture Economic Research Service. *Rural America at a Glance 2009*. Washington D.C.: USDA ERS, Economic Information Bulletin 59, 2009. http://www.ers.usda.gov/Publications/EIB59/EIB59.pdf

United States Department of Agriculture Economic Research Service. *Rural Children at a Glance*. Washington D.C.: USDA ERS, Economic Information Bulletin 1, 2005.

United States Department of Agriculture Economic Research Service. *Rural Employment at a Glance*. Washington D.C.: USDA ERS Economic Information Bulletin 21, 2006. http://www.ers.usda.gov/publications/eib21/eib21.pdf

United States Department of Agriculture Rural Development-California. *Rural Housing at the Crossroads*, Davis: USDA RD, 2006. http://www.rurdev.usda.gov/ca/pdf%20files%20and%20documents/RURAL%20HOUSING%20CROSSROADS.pdf

United States Department of Health and Human Services. *Facts About Farmworkers and Colonias*. Washington D.C.: USDHHS, 2008.

United States Department of Housing and Urban Development. *Facts About Farmworkers and Colonias*. Washington DC: HUD, 2008. http://www.hud.gov/groups/farmwkercolonia.cfm

# APPENDIX D
# Overview of Distribution Formulas for State Bar's Legal Services Trust Fund Program

California law and State Bar regulations set out specific guidelines for distribution of IOLTA, the Equal Access Fund, and the Justice Gap Fund. In general, the total funds available for distribution are allocated to each county, based on the poverty population in each county; within counties, the funds are granted to individual programs based on a statutory formula that is tied to each program's previous year expenditures providing free civil legal services to the poor. The distribution details for each of the three funds are explained further below.

**Background on IOLTA – Interest on Lawyers Trust Accounts**
IOLTA stands for "Interest on Lawyers' Trust Accounts", and there are IOLTA programs in every state. Attorneys hold clients' money in trust accounts, and if the amount is large or the funds are to be held for a long period of time, the attorney must place the money at interest for the benefit of the individual client. However, if client funds are not capable of earning income for the client in excess of the costs of securing such income, then those funds are pooled in a single account for ultimate distribution to programs providing free civil legal services to indigent and low-income people, seniors and persons with disabilities.

**IOLTA Distribution Formula**
The first 85 percent of the funds available for distribution each year are allocated to counties based upon their share of the state's more than six million indigent persons. Within the counties, 10 percent of the money is reserved for projects that use pro bono attorneys (attorneys who volunteer their services without pay) as their principal means of delivering legal services.

Money not distributed to pro bono projects is divided among all other "qualified legal services projects" in that county, according to a statutory formula that is tied to each program's previous year expenditures. In order to be a "qualified legal services project," an organization applying for money must be a nonprofit corporation and must, as its primary purpose, provide civil legal services without charge to persons who are indigent. Qualified legal services projects provide legal aid in a range of substantive areas: housing, healthcare, education, public benefits, consumer law, disability rights, and more.

The remaining 15 percent of available funds (the portion that is not divided among the counties) is distributed to "qualified support centers," meaning organizations that, without charge and as their primary purpose, provide training, technical and advocacy assistance on cases, and other support to attorneys and paralegals employed by qualified legal services projects, as well as private attorneys who have accepted pro bono referrals from a legal services project.

These funds are distributed equally to eligible support centers that serve programs around the state. During 2010-2011, 23 support centers shared these funds.

**Equal Access Fund**
The Equal Access Fund consists of an annual state appropriation to the Judicial Council as well as income from civil court filing fees. The State Bar's Legal Services Trust Fund Program administers the Equal Access Fund under contract with the Judicial Council and the Administrative Office of the Courts.

Distribution of the Equal Access Fund follows the same formula as the IOLTA distribution, with the exception that 10% of the available funds are set aside for discretionary grants to legal services programs for collaborative projects with their local courts to offer court-based self-help services.

**Justice Gap Fund**
The Justice Gap Fund implements AB 2301 (2006) which authorizes the State Bar to collect contributions from its members to support legal services for low-income Californians. Contributions are voluntary and encouraged from all California lawyers. The suggested contribution of $100 can be made annually through the State Bar member fee statement or at any time through the State Bar's website at: http://www.calbar.ca.gov/AboutUs/LegalAidGrants/JusticeGapFund.aspx ; more than $2.5 million has been raised since the Fund was launched in 2008.

According to a distribution policy adopted by the State Bar's Board of Governors, based on recommendations from the Justice Gap Fund Advisory Committee, these funds are included with each year's distribution of IOLTA funds, and follow the same statutory distribution formula as the IOLTA grants, described above.

# APPENDIX E
# Office of Legal Services at the State Bar of California

**Office of Legal Services, The State Bar of California**
The goal of the Office of Legal Services is to expand, support and improve the delivery of legal services to low and moderate income Californians. The Office has two components: **the Center on Access to Justice, and the Legal Services Trust Fund Program.**

> **The Center on Access to Justice** works to increase access to justice through expanded pro bono, increased funding for legal services programs, and heightened attention to initiatives that can improve access, including administration of the **Lawyer Referral Service Certification Program** and staff support for two volunteer entities: **the California Commission on Access to Justice** and **the Standing Committee on the Delivery of Legal Services**, as well as joint efforts with **the Legal Services Coordinating Committee**.

> **The California Commission on Access to Justice** collaborative effort involving all three branches of government including judges, lawyers, professors, and business, labor, and other civic leaders. It is dedicated to finding long-term solutions to the chronic lack of legal assistance available for low-income, vulnerable Californians.

> **The Standing Committee on the Delivery of Legal Services** is an advisory committee that identifies and supports improvements in the delivery of civil and criminal legal services to low and moderate income Californians. It presents educational programs to improve the delivery of legal services, works to encourage pro bono participation in California, and serves as a resource to the State Bar Board on Governors on legal services issues.

> **The Certified Lawyer Referral Service Program** certifies organizations that engage in attorney referral activity and seeks to expand modest means panels and panels offering limited scope legal assistance.

> **The Legal Services Coordinating Committee** includes representatives of all components of the State Justice Community. It sponsors the annual Statewide Legal Services Stakeholder Meeting and seeks to achieve an integrated, effective and efficient legal services delivery system.

**The Legal Services Trust Fund Program** is the grant-making arm of the Office of Legal Services. It administers revenue from Interest on Lawyers' Trust Accounts, the Equal Access Fund, and the Justice Gap Fund. The Equal Access Fund is a general appropriation for legal services that is included in the California court budget. The Justice Gap Fund collects contributions to support legal assistance to low-income Californians in order to bridge the "justice gap".

> **The Legal Services Trust Fund Commission** includes attorney and public members and administers the Interest on Lawyer Trust Fund Accounts Program and the Equal Access Fund. The Commission also jointly administers the Justice Gap Fund with the California Commission on Access to Justice.

# APPENDIX F
# California IOLTA Funded Programs

Affordable Housing Advocates
AIDS Legal Referral Panel
Alameda County Bar
    Volunteer Legal Services
Alameda County Homeless Action Center
Alliance for Children's Rights
Asian Law Caucus
Asian Pacific American Legal Center
Asian Pacific Islander Legal Outreach
Bay Area Legal Aid  **
Benchmark Institute
Bet Tzedek Legal Services
California Advocates for
    Nursing Home Reform
California Indian Legal Services  **
California Rural Legal
    Assistance Foundation
California Rural Legal Assistance, Inc. **
California Women's Law Center
Casa Cornelia Law Center
Center for Health Care Rights
Center for Human Rights and
    Constitutional Law
Central California Legal Services  **
Centro Legal de la Raza
Chapman University School of Law Clinics
Child Care Law Center
Children's Rights Clinic
Coalition of California Welfare Rights Orgs.
Community Legal Services in East Palo Alto
Contra Costa Senior Legal Services
Disability Rights California
Disability Rights Education and
    Defense Fund
Disability Rights Legal Center
East Bay Community Law Center
Elder Law & Advocacy
Family Violence Law Center
Greater Bakersfield Legal Assistance  **
HALSA
Harriett Buhai Center for Family Law
Immigrant Legal Resource Center
Inland Counties Legal Services  **
Inland Empire Latino Lawyers Legal Aid
Inner City Law Center
Insight Center
La Raza Centro Legal
Law Center for Families
Law Foundation of Silicon Valley
Lawyers' Committee for Civil Rights
Learning Rights Law Center
Legal Aid Foundation of Los Angeles  **
Legal Aid Foundation of Santa Barbara
Legal Aid of Marin
Legal Aid of Napa Valley

Legal Aid of Sonoma County
Legal Aid Society -
    Employment Law Center
Legal Aid Society of Orange County  **
Legal Aid Society of San Bernardino
Legal Aid Society of San Diego  **
Legal Aid Society of San Mateo County
Legal Assistance for Seniors
Legal Assistance to the Elderly
Legal Services for Children
Legal Services for Prisoners with Children
Legal Services for Seniors
Legal Services of Northern California  **
Los Angeles Center for Law and Justice
Los Angeles Co. Bar Association Projects
McGeorge Community Legal Services
Mental Health Advocacy Services
National Center for Youth Law
National Health Law Program
National Housing Law Project
National Immigration Law Center
National Senior Citizens Law Center
Neighborhood Legal Services
    Los Angeles County**
Prison Law Office
Pro Bono Project Silicon Valley
Public Advocates
Public Counsel
Public Interest Clearinghouse
Public Interest Law Project
Public Law Center
Public Service Law Corp. of Riverside
San Diego Volunteer Lawyer Program
San Francisco Bar
    Volunteer Legal Services
Santa Clara County Asian Law Alliance
Santa Clara University
    Alexander Law Center
Senior Adults Legal Assistance
Senior Citizens' Legal Services
Senior Law Project
The Impact Fund
The Watsonville Law Center
UC Davis School of Law Legal Clinics
USC Law School Litigation Clinics
USD School of Law Legal Clinics
Voluntary Legal Services of
    Northern California
Western Center on Law and Poverty
Worksafe Inc.
Youth Law Center
Yuba-Sutter Legal Center for Seniors

***Legal Services Corporation Funded Program*

# APPENDIX G
# Map of Partnership Grant Self Help Centers in California



2009–2010 PARTNERSHIP GRANT SELF–HELP CENTERS

revised 8-3-10 dp

# APPENDIX H
# Appointing Entities And Members

## GOVERNOR, STATE OF CALIFORNIA

**Honorable
Andrew J. Guilford**
United States District Judge
Central District of California
Santa Ana

**Edwin K. Prather**
Law Offices of Edwin K.
Prather
San Francisco

## PRESIDENT PRO TEM OF THE SENATE

**Rozenia Cummings**
California State
Automobile Association
San Francisco

## SPEAKER OF THE ASSEMBLY

**Edward Thomas Unterman**
Rustic Canyon Partners
Santa Monica

## CALIFORNIA ATTORNEY GENERAL

**Ramon Alvarez**
President/CEO
Alvarez Lincoln/Mercury/
Jaguar
Riverside

## JUDICIAL COUNCIL OF CALIFORNIA

**Honorable Steven K. Austin**
Superior Court of
Contra Costa County
Pittsburg

**Honorable Ronald Robie**
2010 Chair
Third Appellate District
Sacramento

## CALIFORNIA JUDGES ASSOCIATION

**Honorable James Herman**
Superior Court of
Santa Barbara County
Santa Maria

## STATE BAR OF CALIFORNIA

**Kenneth W. Babcock**
2010 Vice Chair
Public Law Center
Santa Ana

**Michelle Manzo**
McDermott, Will & Emery LLP
Los Angeles

**James Brosnahan**
Morrison & Flerster, LLP
San Francisco

**Honorable Douglas P. Miller**
Court of Appeal
Fourth Appellate District
Riverside

**Sheila Calabro**
Judicial Council of California
Burbank

**Hon. Nho Trong Nguyen**
Superior Court, Orange
County
Westminster

**Joanne E. Caruso**
Howrey LLP
Los Angeles

**Paul Tepper**
Western Center on
Law & Poverty
Los Angeles

**Mary E. Kelly**
California Unemployment
Insurance
Appeals Board
Los Angeles

**Eric Wayne Wright**
Santa Clara University
School of Law

## LEGAL AID ASSOCIATION OF CALIFORNIA

**David J. Pasternak**
Pasternak, Pasternak & Patton
Los Angeles

## COUNCIL OF CALIFORNIA COUNTY LAW LIBRARIANS

**Marcia Bell**
Director
San Francisco Law Library

## CALIFORNIA COUNCIL OF CHURCHES

**Robin Clinton Crawford**
Pacifica

## LEAGUE OF WOMEN VOTERS OF CALIFORNIA

**Sylvia Martin-James**
Retired Educator
Riverside

## CALIFORNIA CHAMBER OF COMMERCE

**Erika C. Frank**
General Counsel –
California Chamber of
Commerce
Sacramento

## CALIFORNIA LABOR FEDERATION
Vacant

## CONSUMER ATTORNEYS OF CALIFORNIA

**David N. Bigelow**
Girardi & Keese
Los Angeles

## EX OFFICIO MEMBERS

**Kathryn Eppright**
Andre Morris & Buttery LLP
San Luis Obispo

**Tony L. Richardson**
Reed Smith LLP
Los Angeles

**Honorable Terry J. Hatter, Jr.**
Chief Judge Emeritus
United States District Court
Los Angeles

**Geoffrey L. Robinson**
Bingham McCutchen
Walnut Creek

**Honorable Earl Johnson, Jr.**
Retired Associate Justice
Scholar-in-Residence
Western Center on Law & Poverty
Los Angeles

**Toby J. Rothschild**
General Counsel
Legal Aid Foundation of
Los Angeles

**Honorable James R. Lambden**
Associate Justice,
Court of Appeal
First Appellate District
San Francisco

**Hon. Ronald L. Taylor (Ret.)**
Superior Court of Riverside
County
Riverside

**Jack W. Londen**
Morrison & Foerster
San Francisco

**Honorable Laurie D. Zelon**
Court of Appeal
Second Appellate District
Los Angeles

**Professor James Meeker**
School of Social Ecology
University of California, Irvine

# Rural Advisory Committee

**Kathryn Eppright**
(Co-Chair)
Andre Morris & Buttery
San Luis Obispo

**Herb Whitaker**
(Co-Chair)
Managing Attorney
Legal Services of
Northern California
Auburn

**Marcia Bell**
Director
San Francisco
Public Law Library

**Joseph L. Chairez**
Baker & Hostetler LLP
Costa Mesa

**Salena Copeland**
Program Attorney
Legal Aid Association
of California
San Francisco

**Robin C. Crawford**
Law Office of Robin Crawford
Pacifica

**James Meeker**
Associate Dean
School of Social Ecology
Criminology Law & Society
University of California,
Irvine

**Paul Carter Mullen**
Family Law Facilitator
Superior Court of California,
Fresno County
(Formerly Central California
Legal Services)

**Tony L. Richardson**
Reed Smith LLP
Los Angeles

**Geoffrey L. Robinson**
Bingham McCutchen
San Francisco

**Gary Smith**
Executive Director
Legal Services of
Northern California
Sacramento

**Agnes A. Williams**
Associate Managing Attorney
Disability Rights California
Fresno

**Pantea Yashar**
Ervin Cohen & Jessup LLP
Beverly Hills

**Julie Mercer-Ingram**
Equal Justice Works
AmeriCorps Legal Fellow
Public Interest Clearinghouse
San Francisco

**Mary Lavery Flynn**
Director
Office of Legal Services
State Bar of California

**Chris Zupanovich**
Program Coordinator
Office of Legal Services
State Bar of California

**Mary-Ellen Lewis**
Esq.
Report Consultant
Templeton

**Theresa Mesa**
Program Developer
Report Editor
Office of Legal Services
State Bar of California

**Frank Monti**
Senior Administrative
Assistant
Office of Legal Services
State Bar of California

ART DIRECTION +
DESIGN

**Zaldy Serrano**