# Shaping the Future of Justice:

# Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

Prepared for the Legal Aid Association of California

April 2010
Carmody and Associates

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

# Index

Preface

Supporters and Acknowledgements

Executive Summary...................................................................................................................1

Introduction..............................................................................................................................6

Who Has Been Hired?...............................................................................................................6

Who Has Left?...........................................................................................................................8

Who Are the Current Legal Aid Attorneys?...........................................................................11

Who May Leave Soon? ...........................................................................................................15

Why May They Leave?............................................................................................................17

Salaries Are The Number One Reason ...................................................................................17

Educational Debt is Crushing .................................................................................................25

Do the Insurance and Retirement Benefits Make Up for the Low Salaries?..........................31

Who is the Competition and What are Their Salaries and Benefits? ......................................33

Burn-Out/Lack of Professional Development and Advancement............................................37

Why Do Attorneys Stay in Legal Aid?...................................................................................41

Recruitment of Attorneys........................................................................................................44

Conclusions and Recommendations........................................................................................47

   Appendix 1:  Study Methodology ..................................................................................53

   Appendix 2:  Current Legal Aid Attorneys' Race/Ethnicity Compared with Employment Start Year.57

   Appendix 3:  Possible Starting Compensation for Attorneys with Bilingual Supplement and LRAP ..58

   Appendix 4:  Law School Minority Enrollment .............................................................59

   Appendix 5:  Tables, Charts and Graphs........................................................................60

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

# Preface

In late 2007, the Legal Aid Association of California (LAAC) and the California Legal Services Trust Fund Program convened a series of three statewide strategic planning meetings on legal services issues. California had just successfully passed its Interest on Lawyer Trust Accounts (IOLTA) comparability bill, AB 1723, and the legal aid community was expecting significant increases in IOLTA funding as banks began to offer comparable interest rates on IOLTA accounts. Some members of the community even projected increases to IOLTA grants as early as January 2009.

The 2007 strategic planning meetings focused on setting the state's top priorities for the expenditure of these IOLTA increases, and at all three meetings the highest priority was addressing the problems in retaining and recruiting legal services attorneys. IOLTA-funded organizations repeatedly provided anecdotal evidence of committed legal services attorneys under financial pressure being forced to leave their legal aid jobs for government and other positions, attorneys leaving predictably at years 3-5 and years 7-10 of their legal services careers, and difficulties recruiting attorneys, particularly attorneys of diverse backgrounds or attorneys to work at programs serving rural areas of the state.

LAAC's member organizations asked LAAC to commission a study on the retention and recruitment of civil legal services attorneys in California so the legal aid nonprofits could use the projected IOLTA increases to create tailored and effective responses. Legal services programs around the state provided funds to help cover the costs of the study, as did the American Bar Association, Legal Services Trust Fund Program, foundations, and other key legal aid supporters. With strategic input from the Trust Fund Program and Administrative Office of the Courts, LAAC commissioned this study and report, with data collection starting mid-2008.

Then, just a few months later, the economic recession began, the federal funds rate (which determines IOLTA account interest rates) dropped precipitously, and the state budget fell into a multi-million dollar deficit. Suddenly, instead of looking forward to funding increases, California legal services programs found themselves facing cuts in IOLTA funding, elimination of state and county grants, and drops in many other sources of funding. As the federal funds rate hovers close to zero, California's IOLTA grants were cut by 10 percent for FY10 and 15 percent for FY11. Instead of being able to design targeted salary and benefits increases, professional development programs, and new hiring practices, many legal services nonprofits were forced to freeze salaries and take other personnel cost cutting measures.  At the time of this study's release, many legal aid organizations struggle to maintain services for clients—whose needs continue to escalate—at a time of dramatically decreased funding.

LAAC understands that implementing the study's recommendations of increases in salaries and other benefits may not be possible in the short term for organizations struggling with the effects of the recession. LAAC offers the study's recommendations regarding attorney compensation for consideration, discussion, and planning for when the economy and funding levels rebound and the legal services community once again has the financial resources necessary to invest in the future of access to justice in California.

Simultaneously, LAAC acknowledges that the new attorneys joining legal services nonprofits bring vital perspectives, skills, understanding of technology, and innovative ideas to the statewide delivery system. Indeed, they are the future leaders of the individual organizations and the entire legal services nonprofit sector. It also acknowledges the hundreds of attorneys who have dedicated years to legal aid. The study's recommendations regarding changes to management, supervision, professional development, and hiring practices can—and should be--implemented separately from compensation increases and within existing financial resources.

LAAC thanks the organizations listed on the next page for their financial support for the study and report, as well as the Administrative Office of the Courts (AOC) for their participation in the statewide meetings that led to the commissioning of this report and their guidance throughout the process.

*Board of Directors of Legal Aid Association of California*
*April 2010*

# Supporters

AIDS Legal Referral Panel
Alliance for Children's Rights
American Bar Association
Asian Law Alliance
Bay Area Legal Aid
Bet Tzedek Legal Services
California Advocates for Nursing Home Reform
California Bar Foundation
California Indian Legal Services, Inc.
California Rural Legal Assistance
California Rural Legal Assistance Foundation
Central California Legal Services, Inc.
Child Care Law Center
Disability Rights Legal Center
Equal Justice Works
Family Violence Law Center, Inc.
Greater Bakersfield Legal Assistance, Inc
Harriett Buhai Center for Family Law
Immigrant Legal Resource Center
Impact Fund
Inland Counties Legal Services
Inner City Law Center
Insight Center for Community Economic Development
Law Foundation of Silicon Valley
Legal Aid Foundation of Los Angeles
Legal Aid foundation of Santa Barbara County
Legal Aid Society - Employment Law Center
Legal Aid Society of San Bernardino
Legal Aid Society of San Diego, Inc.
Legal Aid Society of San Mateo County
Legal Assistance to the Elderly, Inc.
Legal Services of Northern California, Inc
National Center for Youth Law
National Senior Citizens Law Center
Neighborhood Legal Services of Los Angele
Pro Bono Project Silicon Valley
Protection & Advocacy, Inc.
Public Advocates, Inc.
Public Counsel Law Center
Public Interest Clearinghouse
Public Interest Law Project
Public Law Center
San Diego Volunteer Lawyer Program
Senior Law Project, Inc.
State Bar of California, Legal Services Trust Fund Program
van Löben Sels/RembeRock Foundation
Voluntary Legal Services Program of Northern California
Volunteer Legal Services Program, Bar Association of San Francisco
Western Center on Law and Poverty, Inc.

**Study Director and Report Author**
*Kelly Carmody*

**Report Editor, Data Manager and Researcher**
*Bob Gross*

**Report Format and Graphics**
*Jessica Fierro*

**Researcher**
*Andrea Mayfield*

**Provided assistance during the Study**
*Julia R. Wilson*
*Salena Copeland*
*Vivian Chen*
*Chris Moulton*

**Many thanks to the hundreds of legal aid attorneys in California who took the time to complete surveys, be interviewed, and participate in focus groups. This report would not have been possible without their dedicated participation and honesty.**

# Executive Summary

*"Keep us. Please work on it...We leave because we have to, not because we want to."* That is the plea from an attorney who soon will have to leave her attorney position in legal aid in California because she cannot pay her bills on her salary.

She is one of hundreds of attorneys who were interviewed for this Study, commissioned by the Legal Aid Association of California, to explore the causes, effects and possible solutions to why legal aid organizations in California are having an increasingly difficult time recruiting and retaining quality attorneys.

The story that unfolded during the Study and told in this Report is one of inadequate salaries and loan repayment assistance for legal aid attorneys and the need to address these challenges to ensure that quality attorneys can do the work that is needed and they love—provide legal assistance to low-income clients—without sacrificing their financial lives.

## Significant Hiring, but Many Attorneys Left

California legal aid organizations have been hiring significant numbers of new attorneys and can be expected to do so again when the economy improves.  However, they have also been losing attorneys at a fast rate.

More than one-third of all of the attorneys who were working for the organizations on July 1, 2005 were no longer working for them three years later. Half of the attorneys had only been with their organizations 2.5 years before they left.

During the three year period examined in the Study (July 1, 2005 – June 30, 2008), the organizations hired 373 attorneys. If the newly hired attorneys leave at the same rate as those of whom many of them replaced, the organizations will be saddled for years with the high cost of turnover.

## A Diverse and Primarily Female Workforce

The organizations have done an exceptional job recruiting a racially/ethnically diverse work force. More than half of the attorneys hired during the three-year period examined in the Study were Hispanic/Latino, Asian/Pacific Islander, African American/Black or in other racial or ethnic groups besides White. On July 1, 2008, 44 percent of the attorneys working for the organizations were in racial/ethnic groups other than White. This racial/ethnic diversity is extraordinary when compared to all members of the State Bar.

## Recession's Effect on Personnel Decisions

Since this Report was written in the fall of 2009, the recession has continued to adversely affect the legal aid organizations in the Study. The Legal Services Trust Fund of California reduced the funding that the organizations receive from Interest On Lawyer Trust Accounts (IOLTA) by ten percent for FY10 and will reduce the grants by an additional 15 percent for FY11. Other sources of private and public funding have been reduced as well. One bright spot was from a significant source of funding for ten of the larger organizations—the federally-funded Legal Services Corporation increased its grants by eight percent in 2010.

The Legal Aid Association of California conducted a short survey in April 2010 to update information about the personnel actions the organizations have taken since data was collected from them in June 2009. Two-thirds of the Study's organizations responded.

A mixed picture was found. Nearly two-thirds (seventeen) of the 26 organizations reported they took some action to reduce personnel costs. The most prevalent actions were freezing staff salaries, laying off staff and eliminating vacant positions. Three organizations implemented furloughs or reduced hours. Only one organization reduced salaries.

Seven of the seventeen organizations that took action to reduce personnel costs also took actions that positively affected personnel and increased their costs. They, along with six other organizations—for a total of 13 organizations or half of those reporting—raised attorney salaries (through cost of living adjustments, step or salary scale increases) or gave bonuses.

This survey demonstrates that for many of the legal aid organizations, addressing the challenges identified in this Report will be more difficult than anticipated, and for some, meeting these challenges will need to be delayed. However, it is notable that when difficult decisions had to be made during the recession, nearly all the organizations maintained or raised attorney salaries, rather than reducing salaries even further, which would have increased their challenges.

1

> **Nearly half of the legal aid attorneys (44 percent) are in ethnic or racial groups other than White.**

Seven in ten of the attorneys hired during the three year period were female, and on July 1, 2008, over two-thirds of the attorneys were women.

Female attorneys and attorneys of color left their organizations at approximately the same rates at which they were hired.

Many of the organizations have prioritized hiring bilingual attorneys, as well, and overall, 43 percent of the attorneys employed on July 1, 2008) spoke at least one other language in addition to English. Three-fourths of these attorneys spoke Spanish and nine percent spoke an Asian or Pacific Islander language.

> **One-half of the legal aid attorneys think they will leave their current employment in the next three years.**

## More Attorneys Are Going to Leave

This Report is being published during a recession that includes a level of unemployment that has made most people stay at their jobs, if they have one. Although this may have altered the recruitment and retention situation in legal aid in California temporarily, the Report's authors and the legal aid organizations believe that the turnover issues the organizations faced before the recession will return and possibly worsen when the job picture is better. Many legal aid attorneys who think they will leave cited the poor economy and their fear of being jobless as a reason that keeps them in their job for now.

The attorneys working for the Study's organizations in early 2009 were asked to complete a survey that provided the Study with information about their personal financial situations and their legal aid jobs. The survey had a response rate that made it representative of all of the organizations' attorneys. When asked if they thought they would leave their job in the next three years, half said they did think they will leave.

> **The median entry-level salary is $46,000, and more than half of the attorneys have salaries of less than $50,000 after more than three years in legal aid.**

## Salaries Are the Number One Reason for Leaving

The attorneys who think they will leave give a variety of reasons, but the predominant one is they need more income. When asked to rate the importance of 17 possible reasons why they may leave, the three financial options were among the top five reasons given.

> **Top Five Reasons (in order) Attorneys Think They Will Leave**
>
> - Financial pressure due to low salary
> - Financial pressure due to other extraordinary expense
> - Personal reason
> - Burn-out
> - Financial pressure due to student loans

Those who think they will leave make approximately $15,000 less than the attorneys who do not think they will leave. They have a median salary in the range of $50,000 - $54,999 while the attorneys who do not think they will leave have a median salary in the range of $65,000 - $69,999.

The median salary of all of the attorneys employed by the organizations on July 1, 2008 was $62,572.  Attorneys who are not managers or supervisors had a median salary of $55,000.

When starting salary information was collected in June 2009, the median starting salary was $46,000. Some of the organizations provide salary supplements for bilingual skills, but even with these, the vast majority of starting salaries are still under $50,000.

Overall, the salaries are not adequate for many attorneys to make it, particularly if they do not have another source of income, like a partner or parents.

> **"If I was not married, I would have to live with my parents."**

## Educational Debt is Crushing

More than half of the attorneys who responded to the survey have educational debt. Their median debt level is between $60,000 and $69,999. However, the amount of debt increases with almost every year of law school graduates. The median educational debt for the attorneys who graduated with debt in 2008 is $120,000 to $129,999.

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys

About half of the attorneys with educational debt receive some assistance with their payments from Loan Repayment Assistance Programs (LRAPs) sponsored by their law school or employer, but for many it is not enough. The attorneys who receive no assistance are really struggling, and many will have to leave for higher paying jobs.

> *"[My educational debt] is terrible, it keeps me up at night worrying how I can stay at legal aid and survive. I pay over one-fourth of my salary to student loans a month, and I am paying interest only."*

## Many Will Leave for Government Jobs

The organizations report that many of the attorneys who left their legal aid jobs because they need more money take government jobs. The attorneys who think they will leave in the next three years also name government jobs most often as the ones they will take.

The salary and retirement benefit comparison tells why. Many of the salaries are set in each county, so a few examples are given here. A Deputy Public Defender, Deputy District Attorney, Deputy County Counsel, and Deputy City Attorney in Sacramento make right under $80,000 to start. In the legal aid organizations in and around Sacramento, the median starting salary is $46,250.

Some of the legal aid organizations' attorneys that have family law experience go to work for the Superior Court system as Family Law Facilitators or Self Help Center Attorneys. The Self Help Center positions in San Francisco start new attorneys with no experience at between $80,179 and $97,457. The median starting salary for a legal aid attorney in the San Francisco area is $44,000. Los Angeles County requires five years of experience for its Self–Help attorneys and starts them at between $80,683 and $111,720.

In addition to these major salary differences, the government positions are eligible for the California Public Employees' Retirement System where a Deputy Public Defender who retires at age 65 in 2019 after 30 years of service will receive an average pension of $107,800. Only one of the Study's organizations has a defined benefit pension, and it is not available for employees who started with the organization after 2007. The other organizations primarily have retirement plans into which they contribute generally three to five percent of the attorneys' salary, resulting in most legal aid attorneys having inadequate retirement savings.

> *"I have been an attorney for almost 10 years. I was offered a position at the public defender's office which would have paid me three times what I make now."*

| County | Starting Salary of Deputy Public Defenders | Median Starting Salary of Legal Aid in Region | Difference |
|---|---|---|---|
| Fresno | $48-120 - $61,428 | $47,916 | $204 - $13,512 |
| Los Angeles | $55,466-$72,749 | $46,200 | $9,266 - $26,549 |
| Riverside | $64,320 - $81,890 | $44,100 | $20,220 - $37,790 |
| Sacramento | $79,866 | $46,250 | $33,616 |
| San Francisco* | $98,514 - $103,454 | $44,000 | $54,514 - $59,454 |
| Santa Barbara | $68,351 - $83,443 | $43,414 | $24,937 - $40,029 |

*Two years of experience are required for an entry level position as a Deputy Public Defender in San Francisco. The salary for an attorney with two years of experience at Bay Area Legal Aid, the largest general legal aid provider in the Bay Area is $46,750, making the difference still more than $50,000.

## Other Findings

Many of the attorneys expressed their desire for further professional development and advancement opportunities. Both those who think they will stay and those who think they will leave (sometimes for a combination of salary and professional development reasons) want to improve and expand their skill sets. Many would like a career ladder within their organization—not necessarily a ladder to management, but a ladder to increased responsibility and use of skills.

The younger attorneys, in particular, put a priority on a good work/life balance. To achieve this balance, many attorneys want flexibility in when they do their work. In fact, this is a major reason that many attorneys stay in their positions, particularly those who have children. Many of the organizations provide this flexibility, others do not.

## Deep Commitment to Poor People

There are many important findings in this Study. One, in particular, must not be overlooked. There is a remarkable level of commitment in the attorneys and the organizations to providing free legal assistance to low income persons.

This deep commitment was expressed directly by almost every attorney who was interviewed. Many of the attorneys who completed the survey articulated their commitment as well, describing how much they love helping low income people. Some talked about how they want their jobs to change, but all believe deeply in the missions of their organizations.

> *"I love my work.  It is extremely rewarding. I work with and work for excellent people that I admire and respect."*

The attorneys' commitment is shown indirectly by their working for significantly lower salaries than almost any other publicly funded or private attorneys and by many of them sacrificing their financial security to work in legal aid.

The commitment of the executive directors was obvious as well. Most have worked in civil legal aid for their entire careers—some for more than 30 years. The executive directors are deeply concerned about how their organizations can best provide the most legal assistance to the most low-income individuals—how they can have the largest impact.

To have the largest impact, however, this commitment must now include an emphasis on the attorneys who provide the legal assistance. Their needs must be prioritized in order to maximize the organizations' work to effectively carry out their missions.

## Bold Action is Needed

Some of the executive directors said they do not have a choice when it comes to increasing salaries, and they were not saying this because of the effects of the recession. They feel they have no choice because they are under internal and external pressure to make sure that as many low income individuals as possible receive legal assistance.

Many of the executive directors want to increase salaries and make the other changes necessary to make legal aid a financially-sound decision for attorney employment. They want to be competitive with government employers so they can recruit and retain the best attorneys for the jobs. Some of the legal aid organizations have taken positive steps to increase salaries.

Changing the legal aid paradigm and addressing the challenges identified in this Report will take bold steps, but not just on the part of the executive directors. Staff and management, including the Boards of Directors, have to help make and support the difficult decisions required. Salaries and other financial needs of attorneys must be addressed through increased funding, staff attrition, and/or reductions in expenses, including, if necessary, reductions in staff.

In organizations where staff attorneys are members of a union, it is essential that union leadership work with management on these issues. The difficulty of representing all members of a union that includes different job positions on issues that do not affect all members the same is acknowledged, but unions must ensure that attorneys can continue to work in legal aid.

Nearly 100 attorney positions were added to these organizations in a span of three years—at a time when low salaries and high educational debt were critical challenges. Using new funding to increase the number of attorney positions can no longer be the norm. New funding, when not restricted, should be used for increasing attorney salaries.

Large amounts of new funding may be less prevalent in the foreseeable future as the economy recovers. Therefore, reducing expenses, and particularly staff positions, is an option that may need to be utilized by many of the organizations. For those organizations that have been forced to eliminate or leave positions vacant, new funds should be used to the extent possible to increase attorney salaries rather than fill or restore positions. Although these actions will mean reduced services to clients, it is critical that attorneys be recruited and retained who can provide the highest quality legal assistance now and into the future.

Funding for legal aid organizations is often made up of diversified grants and contracts. Much of the funding is project-driven. Funders need to make funding streams available that can be used to increase attorney salaries so funding distribution is not a barrier to an organization addressing the attorney salary challenge. Legal aid organizations must be clear about the true cost of providing legal services, and funders have to recognize and accept that if increased funding is given to an organization, it cannot always provide more services. Adequately supporting the actual cost of attorneys today must be the first priority of legal aid's funders.

The funders and other supporters of legal aid, as well as the unions that represent legal aid attorneys and other staff, must be the leaders and supporters of the hard decisions needed to address the salary and other needs of the attorneys who are needed to provide quality legal assistance to low-income Californians.

> *"It has become acceptable for civil legal aid attorneys to be paid significantly less than all other attorneys, and government and private funders have become accustomed to it, and come to rely on it."*

## Recommendations

These recommendations address the major issues identified in the Report. Most are made for the individual organizations, although some, particularly for LRAPs, will need cooperative effort. Organizations are encouraged to review the report for smaller changes that can be made as well.

**Salaries.** Government employers are the primary financial competition for recruiting new attorneys to legal aid and retaining attorneys who want to continue to do public interest work. The salaries paid by government employers, detailed in this Report, exceed the legal aid attorneys by large amounts. Therefore, a short-term and long-term recommendation is made for bringing legal aid salaries in line with the salaries paid to government attorneys.

- The short-term recommendation is for all organizations to increase their starting salaries by $10,000 to $15,000 over the next three to five years. Salary scales should be increased for experienced attorneys as well. Ten thousand dollars is the median amount that attorneys who think they will leave soon said would make a difference in their decision to leave, and $15,000 is the difference in salaries between those attorneys who think they will leave soon and those who do not.

  Those legal aid organizations in areas with higher costs of living should consider higher salary goals in order to compete more quickly with government employers and to increase the number of legal aid attorneys who can afford to work in these higher cost areas.

- Ultimately, legal aid attorney salaries should be comparable to those paid by the government employers. In five of the six regions, the maximum starting salaries of deputy public defenders are $25,000 to $50,000 more than the current starting salaries of legal aid attorneys. To achieve comparability will take sustained action over a longer period of time. It is recommended that organizations develop a ten-year plan to increase attorney salaries to achieve parity with deputy public defenders in the same geographic areas.

**Loan Repayment Assistance Programs.** Multiple approaches to increase assistance with payment of the attorneys' student loans should be undertaken.

- Eliminate LRAP waiting periods and time limits, and increase assistance levels of existing employer LRAPs.
- Develop LRAPs in organizations that do not have them.
- Work with the California law schools to improve their LRAPs by increasing income caps (to ensure increased salaries do not result in decreased LRAP assistance), eliminating the counting of spousal income, and increasing assistance levels.
- Develop a statewide LRAP, in partnership with funders of legal aid, which provides loan repayment assistance that is not taxable to the attorney.
- Provide technical assistance to the attorneys about the possible use of the Public Service Loan Forgiveness Program for forgiveness of their federal loans.

**Retirement Benefits.** The legal aid organizations should increase their contributions to employees' retirement plans to assist attorneys, both young and old, in meeting their financial needs for retirement.

**Flexibility.** The legal aid organizations should develop or expand schedule flexibility that meets the needs of the attorneys as much as possible, while providing good access to services for clients.

**Professional Development and Advancement.** Increased opportunities for advancement within the legal aid organizations should be developed, as well as implementation of professional development plans that help attorneys take advantage of these opportunities.

**Recruitment and Hiring Practices.** The legal aid organizations should prioritize the recruitment and hiring process by developing a staff committee, with significant membership of and input from newly hired attorneys, to recommend and implement specific improvements.

**Funders and Supporters.** Funders of legal aid organizations must ensure that their funding can be used to increase attorney salaries and implement the other needed changes identified in this Report. Funders and other supporters of legal aid should be leaders in the efforts needed for effective recruitment and retention of legal aid attorneys.

## Conclusion

Legal aid organizations in California have incredibly dedicated attorneys working for them. They also have incredibly dedicated executive directors leading them. Together, along with their Boards of Directors, funders, and other supporters, they need to improve attorney compensation and workplace practices to ensure that attorneys are able to effectively serve low-income clients while maintaining a financially stable lifestyle and a rewarding career.

# Introduction

## Purpose of the Study

Civil legal aid organizations in California have found it increasingly difficult to recruit and retain high quality attorneys to provide legal assistance for low-income individuals. This Report presents the findings from a study that examined a variety of factors affecting either recruitment or retention of attorneys and recommendations for how to improve both.

## Study's Scope and Methodology

Thirty-seven organizations that provide civil legal aid in California participated in the Study. These organizations constitute approximately half of the 70 organizations that receive funding from the Legal Services Trust Fund Commission of the State Bar of California to provide legal assistance directly to low income individuals.

The 37 participating organizations are a representative mix of civil legal aid providers from all areas of the state. They employ approximately 70 percent of California's legal aid attorneys.

Factors that affect attorney recruitment and retention were compared by regions of the state, number of attorneys in the organization, budget size of the organization, and whether the organization receives funding from the federally-funded Legal Services Corporation (LSC).

More about the participating organizations and the methodology used in the Study can be found in Appendix 1.

## Changed Conditions

The Study began in August 2008 with the gathering of data about the attorneys employed by the organizations on July 1, 2008 (referred to in the Study as "current legal aid attorneys"). Data was also collected about attorneys who had left in the previous three years—July 1, 2005 through June 30, 2008 (referred to in the Study as "former attorneys").

The next month—September 2008—the economic crisis in the United States began and the U.S. economy plunged into a deep recession. As lay-offs began affecting millions of Americans, most employed individuals became very thankful just to have and keep a job. In addition, the sharp decline in the stock market resulted in most individuals losing thousands of dollars in their retirement funds. Many employees realized they were going to have to keep working longer than expected to make up for the losses.

These economic changes altered the immediate legal aid recruitment and retention environment—the growth in hiring described within has

slowed, as has turnover. The authors and the organizations' executive directors believe, however, that unaddressed, recruitment and retention issues, if lessened for the time being, will return when employees once again feel safe to take new jobs. Accordingly, the Study utilizes the prerecession data in its analysis and addresses the changed context in its recommendations.[1]

# Who Has Been Hired?

Overall the organizations hired 373 attorneys during the three year period reviewed for hiring and turnover (July 1, 2005 – June 30, 2008).

**A large number and percentage of new hires.** This is a large amount of hiring. Given that the total number of attorneys employed at the end of the three years was 608, 373 new hires means that six out of ten current legal aid attorneys (61 percent) were hired during this period.

**Even more attorneys than before.** Overall the organizations increased the number of attorney positions. Ninety-four more attorneys worked for the organizations on July 1, 2008 than did three years earlier. This is an eighteen percent increase—from 514 attorneys to 608.[2]

Looking at the individual organizations, 25 increased the number of attorneys, six decreased, and six stayed the same. The increases ranged from one to fourteen in the number of attorneys and four percent in one large organization to 200 percent in a small and a very small organization.

**Variety of levels of experience.** Some organizations report explicitly only hiring attorneys with no experience, while others recruit attorneys with experience but have difficulty hiring them. However, attorneys at all experience levels were hired by the organizations during the three year period.[3] In fact, more than one-fifth of the hires (22 percent) graduated from law school in 1999 or earlier. See Graph 1.

---

[1] For this reason, when conducting focus groups and interviews in the spring and summer of 2009, participants were asked to comment based on their job and/or organization prior to September 2008.
[2] This upward trend continued into at least May 2009 when the organizations reported 659.5 attorney positions filled and 15 vacant. This is another nine percent increase from July 1, 2008. The increase in positions likely occurred before the economic downturn in the fall of 2008.
[3] Law school graduation years are used as approximations of experience levels because reliable data about actual legal years of experience was unavailable.

**Graph 1: Law School Graduation Year of Attorneys Hired between 7/1/05 and 7/1/08**
(Data for 97 percent of the recently hired attorneys)



**Increasingly and primarily female.** More than seven in ten (71 percent) of the recently hired attorneys were female. Data was unavailable to compare this gender composition with all attorneys hired prior to July 1, 2005, but of the attorneys who were hired earlier and were still working for the organizations on July 1, 2008 (current legal aid attorneys), 66 percent were female.

Females make up less than half (47 percent) of law school graduates nationally. Although the recently hired attorneys are not all new graduates, the organizations report increasing percentages of female attorneys applying for positions and being hired in California legal aid.

**Increasing racial and ethnic diversity.** The attorneys hired during the three year period were exceptionally ethnically and racially diverse. Over half (51 percent) were attorneys of color. See Chart 1.

**Chart 1: Race/Ethnicity of Attorneys Hired between July 1, 2005 and July 1, 2008**
(Data for 95 percent of recently hired attorneys)



Data was unavailable to compare the racial/ethnic composition of these attorneys with those hired prior to July 1, 2005, but this racial/ethnic composition is more diverse than the composition of attorneys employed by the organizations on July 1, 2008 ("current legal aid attorneys"). The percentage of attorneys of color of all attorneys hired was seven percent more than their proportion of current legal aid attorneys (51% compared to 44%).[4]

The increasing percentage of attorneys of color hired is reflected in Graph 2.

**Graph 2: Percent Attorneys of Color of Total Number of Attorneys Started by Year**
(Data for 98 percent of current legal aid attorneys)



The racial/ethnic diversity of law school graduates nationally has generally been increasing over the years. Students of color made up nearly a quarter (24 percent) of law students nationwide in 2008-2009—the highest ever.[5]

California law schools are more racially/ethnically diverse with a minority enrollment of 31 percent.[6] In the Study's organizations, most newly recruited attorneys and most current legal aid attorneys graduated from a law school in California. The top five law schools they graduated from have minority enrollments of 30 to 39 percent. See Table 22 in Appendix 4 for a list of the ABA-accredited law schools in California and their percentage of minority students.

---

[4] Broken down by group, the percent of attorneys of Asian Pacific Islander descent of all attorneys hired was five percent more than their percent of current attorneys. Hispanic/Latinos hired were two percent more than their percent of current attorneys, and Black/African American attorneys hired were close to one percent more than their portion of current attorneys. Other attorneys of color were a little less (-0.6 percent) while the percent of White/Caucasian attorneys of current attorneys hired was seven percent less. See Graph 6, *infra* for the racial/ethnic composition of the current attorneys.
[5] http://www.abanet.org/legaled/statistics/stats.html
[6] *Official Guide to ABA-approved Law Schools*, Law School Admission Council and American Bar Association, 2008, http://officialguide.lsac.org.

# Who Has Left?

During the period of July 1, 2005 through June 30, 2008, 279 attorneys left 33 of the 37 participating organizations. The other four organizations did not have any attorneys leave.

## Characteristics of Former Attorneys

**Attorneys of color left at the same high rate as they were hired**. Attorneys of color left during the three year period at about the same rate as they were hired. Overall, 51 percent of the attorneys recruited were attorneys of color, and they comprised 50 percent of the attorneys who left.

Hispanic/Latino attorneys left at slightly higher rates than at which they were hired; they accounted for 19 percent of the hires, and were 21 percent of the attorneys who left. Similarly attorneys of Asian Pacific Islander descent were 18 percent of those hired and 21 percent of those who left. Black/African American attorneys left at the same rate as they were hired—both five percent. See Chart 2.

**Chart 2: Race/Ethnicity of Former Attorneys**
(Data for 96 percent of former attorneys)



**Primarily female.** Female attorneys left somewhat disproportionately compared to their hiring. Seventy-six percent of the attorneys who left were female, whereas the percentage hired during the same time period was 71 percent.

**Most were Gen X.** Nearly two-thirds of the attorneys (63 percent) who left were 31 to 45 years old—in Generation X. A comparison with the ages of hired attorneys was not made, but a comparison with

current legal aid attorneys finds that this percentage of Generation X leaving is disproportionate to the age make-up of the current attorneys, where they are less than half (45 percent). The former and current legal aid attorneys who are in Gen Y (less than 31 years) are at similar percentages—17 and 19 percent, respectively. The bigger difference in the Generation X attorneys leaving is counter-balanced by the Boomer Plus Generation (older than 45) not leaving. Although they comprise 36 percent of the current legal aid attorneys, they are only 20 percent of the attorneys who left. See Chart 3 as compared to Chart 4.

**Chart 3: Generations of Former Attorneys**
(Data for 92 percent of former attorneys)



**All ranges of experience levels.** Like the finding reported in the previous section that attorneys of all ranges of experience levels (measured by law school graduation dates) were hired during the three year period, attorneys in all ranges of experience also left during the time period. In fact, the attorneys who left had the same percentages of experience levels as those who were hired during the three year period and virtually the same as those who were employed on 7/1/08.

The attorneys who left in the largest percentages were those who graduated from law school in 2000 – 2004. They could have had anywhere from less than one year of experience to eight years of experience. See Graph 3.

**Graph 3: Graduation Years of Former Attorneys**
(Data for 91 percent of the former attorneys)



# Turnover Rates and Length of Employment

The Study's data provides information about the characteristics of the attorneys who left, but not information about their reasons for leaving.

Some attorneys may have left for some of the same reasons identified by the current attorneys who think they will leave soon, including low financial compensation or professional dissatisfaction with the legal aid organization.

However, not all turnover is "bad." Some departures may have been for personal reasons, such as retiring or leaving the work force to have a baby or moving to another city with a partner, or may have been for professional reasons that have nothing to do with the legal aid job they left. Other departures may have been involuntary, with reasons including such things as a loss of funding for the attorney's position or a failure of the attorney to meet minimum performance standards or. Many of the organization's executive directors acknowledged that they are not always good at letting under-performing attorneys go, and in fact, may need additional turnover of these attorneys. Some of the current legal aid attorneys brought this up as something that affects their morale—working hard while they perceive another attorney may not be.

The following data is provided with the acknowledgement that the reasons are unknown for the turnover of the former attorneys. Turnover, however, generally has some negative consequences for an organization, such as increased training and supervision needs.

**Average annual turnover and three-year average turnover.** The three-year period reviewed for turnover was July 1, 2005 through June 30, 2008. The average annual turnover rate during the period for all the California organizations combined was **14 percent.**[7] The total three-year average turnover was **37 percent** for the Study's organizations.[8] This means nearly four in ten attorneys left the organizations during the three-year period.

> **More than one-third of the attorneys left between July 1, 2005 and June 30, 2008.**

**Half who left did so within 2.5 years.** The median length of time the attorneys had been employed by the organizations was 2.5 years.

---

Nearly one-fourth of the attorneys who left had been employed by the organizations for less than a year, and three-fourths had been employed for less than five years. See Graph 4 for the lengths of employment.

**Graph 4: Former Attorneys' Length of Employment**



The attorneys who left after a short period of time were not just the recent graduates. Some attorneys at all experience levels, except for those who graduated in the 1970's, left within one year of employment. See Table 1.

| Table 1: Graduation Years and Length of Employment of Former Attorneys | | | | |
|---|---|---|---|---|
| (Data for 91 percent of former attorneys) | | | | |
| | Attorneys Who Left 7/1/05 – 6/30/08 | | Length of Time with Organization | |
| Graduation Year | Number | Percent | Median Years | Range of Years |
| 1971-1979 | 6 | 2% | 5.0 | 1.9 – 27.9 |
| 1980-1989 | 23 | 9% | 5.0 | 0.4 – 26.0 |
| 1990-1999 | 81 | 32% | 4.7 | 0.4 – 17.2 |
| 2000-2004 | 105 | 42% | 2.3 | 0.2 – 7.4 |
| 2005 | 24 | 9% | 1.2 | 0.0 – 3.0 |
| 2006 | 12 | 5% | 1.1 | 0.1 – 1.8 |
| 2007 | 2 | 1% | 0.7 | 0.7 – 0.8 |
| Total/Median | 253 | 100% | 2.5 | 0.0 – 27.9 |

**Comparison with other legal aid organizations.** Limited data is available to compare with California's turnover rates. A recent study in Florida found an average annual turnover rate of 20 percent and a total five-year average of 61 percent—which is expected to be higher since it is a five year period. The median tenure was 23 months.

> **Attorneys of color were 51 percent of the attorneys hired and 50 percent of the attorneys who left.**

---

[7] Annual turnover is calculated as the ratio of individual attorneys who were employed by an organization on July 1st or after of a year and not employed on July 1st of the following year. For example, if two attorneys left on August 1, 2005 and November 1, 2005 from an organization that employs ten attorneys during that 12 month period, the turnover rate for the first Study year would be 20 percent. A three-year average for the Study period was then calculated to arrive at the average annual turnover.

[8] Total three-year average turnover is the turnover rate of the attorneys who were employed by an organization on July 1, 2005 and *not* employed by the same organization on June 30, 2008.

**Organizational size variations.** The rates were compared by the size of the organization (measured by the number of attorneys).[9] However, the smaller the organization the larger the turnover rate will be if one attorney leaves. That noted, the average annual rates were fairly similar among the different-sized organizations, with a range of 12 to 22 percent.

The largest overall turnover rate for the period was in the medium-sized organizations at 52 percent. More than half of the attorneys in those organizations left between July 1, 2005 and June 30, 2008.

When the length of employment for those organizations with turnover was analyzed by the size of the organization, the large organizations had the longest median length of employment—3.1 years, and the very small organizations had the shortest—1.7 years. The medium and small organizations were between these levels, but not in order. See Table 2.

| Table 2: Average Annual Turnover Rates (July 1, 2005 – June 30, 2008) | | | |
|---|---|---|---|
| Organization | Average Annual Turnover | Overall Turnover for the Period | Median Years |
| **All** | 14 percent | 37 percent | 2.5 |
| **Very Small** (1 to 5 attorneys) | 22 percent | 32 percent | 1.7 |
| **Small** (6 to 9 attorneys) | 14 percent | 42 percent | 2.9 |
| **Medium** (10 to 24 attorneys) | 18 percent | 52 percent | 2.3 |
| **Large** (25 or more attorneys) | 12 percent | 34 percent | 3.1 |

**Regional differences.** The San Joaquin Valley and Central California Region (a largely rural region) had the highest turnover at 22 percent for an average annual rate and 56 percent for the overall rate. This means that more than one out of two attorneys left during the three-year period.

The Inland Empire and Imperial Valley Region (also a region with large rural areas) has a high overall turnover rate of 43 percent for the three-year period.

The other regions' average annual rates are close to the median of 14 percent with a range of 12 to 17 percent, and their total turnover rates are below the median of 37 percent.

In terms of tenure of the attorneys that left, the Central Coast region (another region with rural areas, but also areas with very high costs of living) had the shortest median length of employment at 1.9 years. The two large urban regions (Bay Area and Southern California) had the least turnover and the longest tenures of the attorneys who left. See Table 3.

The differences in turnover rates do not correlate with the proportion of large, medium, small or very small programs within the regions.

| Table 3: Turnover and Former Attorneys' Length of Employment by Region (July 1, 2005 – June 30, 2008) (Data for 99 percent of former attorneys) | | | |
|---|---|---|---|
| Region | Average Annual Turnover | Overall Turnover for the Period | Median Years |
| **All** | 14 percent | 37 percent | 2.5 |
| **Bay Area** | 12 percent | 34 percent | 2.7 |
| **Central Coast** | 15 percent | 32 percent | 1.9 |
| **Inland Empire and Imperial** | 17 percent | 43 percent | 2.0 |
| **Sacramento and Northern California** | 12 percent | 29 percent | 2.2 |
| **San Joaquin Valley and Central California** | 22 percent | 56 percent | 2.3 |
| **Southern California** | 14 percent | 36 percent | 2.7 |

## Post-Departure Employment

The organizations provided post-departure employment information for about 35 percent of the former attorneys. It is not known whether the data is representative of all of the former attorneys' employment. The data on the 98 former attorneys reveals that the largest number (38) took a job as a private attorney. The second largest number (34) marked "other." Thirty-two attorneys went to work for the government, including in a public defender's office. The fourth largest category (31) went to work for a different civil legal aid organization. Thirteen took jobs as corporate counsel or in private business. Another 13 attorneys took jobs in academia, social services or a judicial clerkship. Fifteen left the work force, but did not retire (possibly to have children), and five retired.

Of the 39 former attorneys who responded to the Study's survey question about post-departure employment, the largest number (16) had gone to work for the government, including public defender offices and the Court.

---

[9] Four organizations had no attorneys leave during the three-year period. Three of these organizations are very small and one is small.

# Who Are the Current Legal Aid Attorneys?

The thirty-seven organizations had 608 attorneys working for them on July 1, 2008. These attorneys are referred to as current legal aid attorneys in the Report. As noted earlier, this number has increased significantly over the past few years. The number of attorneys in each organization ranges from three organizations with one attorney to two organizations with more than 60 attorneys.

**Positions.** Two-thirds of the attorneys are staff or senior attorneys. Thirty percent are in management or supervision positions, and three percent are in other positions.

**Full-time/part-time status.** Eighty-eight percent of the attorneys are full-time and twelve percent are part-time.

**Largely female.** Two-thirds (67 percent) of the current legal aid attorneys are female. As noted in the earlier sections, even a higher percentage of female attorneys (71 percent) were hired recently, but a disproportionate percentage of them (76 percent) also left, leaving 67 percent working for the organizations on July 1, 2008.

Nationally, the 137 non-profit organizations across the country that receive funding from the Legal Services Corporation (LSC), had 63 percent female attorneys in 2008, so the California organizations had a slightly higher percentage of female attorneys than other civil legal aid organizations in the country.[10]

However, the legal aid attorneys' gender composition is the opposite of the composition of all attorneys in California. Members of the State Bar of California in 2006 were made up of 34 percent female attorneys and 66 percent male attorneys.[11] See Graph 5.

> **Two-thirds of the legal aid attorneys are female, while one-third of all California Bar members are women.**

Graph 5: Gender of Current Legal Aid Attorneys Compared to All California Attorneys



**Racially/ethnically diverse.** The racial/ethnic make-up of the current legal aid attorneys is extraordinarily diverse. Forty-four percent of the attorneys are in a racial or ethnic group other than White (not of Hispanic origin). More than one-third are either Asian/Pacific Islander (18 percent) or Hispanic/Latino (16 percent). Five percent are Black (not of Hispanic origin) and five percent are in other groups.

Nationally, the attorneys employed by a LSC-funded organization are less diverse with the following composition:

- 71 percent White
- 12 percent Black
- 11 percent Hispanic
- 4 percent Asian/Pacific Islander
- 2 percent Other[12]

Legal aid attorneys are far more diverse than the other members of the State Bar of California. Attorneys in California have a racial make-up of 84 percent White, five percent Asian/Pacific Islander, four percent Hispanic/Latino, two percent African American, and five percent Other.[13] See Graph 6.

> **One of the attorneys who had worked in a private firm said of her legal aid organization, "The staff is one of the most diverse you'll ever see!"**

---

[10] *Fact Book 2008*, Legal Services Corporation, August 2008. Attorneys who worked less than 90 percent time are not included in this data.
[11] *Final Report of Results, Member Services Survey*, The State Bar of California, February 2006.

[12] *Fact Book 2008*, Legal Services Corporation, August 2008. Attorneys who worked less than 90 percent time are not included in this data.
[13] *Final Report of Results, Member Services Survey*, The State Bar of California, February 2006.

Shaping the Future of Justice:  Effective Recruitment and Retention of Civil Legal Aid Attorneys

**Graph 6:  Race/Ethnicity of Current Legal Aid Attorneys compared to All California Attorneys**

(Data for 99 percent of current legal aid attorneys)



As noted in the "Who Has Been Hired?" section earlier, the newly recruited legal aid attorneys are more diverse overall than the current attorneys who began their employment with the organizations prior to July 1, 2005. For a complete breakdown of current legal aid attorneys by race/ethnicity, see Table 20 in Appendix 2.

One of the benefits of having a racially/ethnically diverse group of attorneys is to have attorneys who may have come from a background similar to the clients that legal aid serves. A direct comparison cannot be made between the make-up of the current legal aid attorneys and the individuals who live in poverty in California because of the difference in the data collected, but in general, the overall percentage of White individuals is similar.[14] It appears the largest difference is in Hispanic/Latino individuals. (See Table 4.)

In 2008, the eleven LSC-funded organizations in California provided legal assistance to a diverse population of clients, and again Hispanic/Latinos have the largest difference between the current legal aid attorneys and the clients served. (See Table 4.)

| Table 4: Race/Ethnicity of Current Legal Aid Attorneys Compared with California Poverty Population & Clients Served by LSC-funded Organizations[15] | | | | | |
|---|---|---|---|---|---|
| | **White** | **Other** | **Asian** | **Black** | **Hispanic origin** |
| **Current Attorneys** | 56% | 5% | 18% | 5% | 16% |
| **Poverty Population** | 53% | 30% | 9% | 8% | 42% |
| **Clients Served by LSC-funded[16]** | 31% | 18% | 6% | 18% | 38% |

**Multiple language speakers.**   Many of the organizations have prioritized hiring bilingual attorneys, and the numbers demonstrate it. Thirty of the 37 organizations have at least one attorney who speaks a language in addition to English. Twenty-eight organizations have Spanish language capacity and 17 have some type of Asian/Pacific Islander (API) capacity. Fifteen organizations have both.

Of the seven organizations who do not have any attorneys who speak another language, five are very small (measured by number of attorneys), one is small and one is medium.

In total, California legal aid attorneys speak more than 22 different languages.[17] Forty-three percent of the current attorneys speak one language in addition to English.  Of these 262 attorneys, 29 speak two languages in addition to English and six attorneys speak three languages in addition to English. See Graph 7.

> **Forty-three percent of the attorneys speak at least one language in addition to English. Together, they speak a total of more than 22 different languages.**

[14] In the U.S. Census data, individuals of Hispanic origin may be of any race. Hence, people who identified themselves as Spanish, Hispanic or Latino may include people who also identified themselves as White, Black, Asian or Other.  Since the data from the Study's organizations put Hispanic attorneys into only the Hispanic category, there is not an exact correlation between the census and organizations' data.

[15] 2000 Census of Population and Housing. Summary File 3. Tables P-159A-G; LSC Program/Grantee Profiles.

[16] http://www.rin.lsc.gov/Scripts/LSC/grantpro/pgp2.asp.

[17] The languages are American Sign Language, Arabic, Armenian, Bengali, Cantonese, Chinese, Farsi, French, German, Hindi, Italian, Japanese, Khmer, Korean, Mandarin, Portuguese, Russian, Spanish, Tagalog, Yiddish Thai, Vietnamese, and Other (not delineated).

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys

**Graph 7: Current Legal Aid Attorneys Who Speak Another Language**



The increased availability of bilingual attorneys and emphasis on hiring bilingual attorneys is demonstrated by Graph 8. Eighty percent of the bilingual attorneys were hired in the last eight years, and over half (53%) since 2005.

**Graph 8: Year Multilingual Attorneys Began Employment with Present Employer**



*Includes first six months of 2008

In 2000, 39 percent of Californian adults spoke a language other than English and twelve percent spoke English "not well" or "not at all." Most of these individuals have Spanish or an API language as their first language.[18] The percentages may be higher among lower income individuals. With close to one-third of the attorneys speaking Spanish and nearly ten percent speaking an API language, the organizations as

a whole are doing an increasingly good job of having language capacity.

One of the executive directors said that an attorney being bilingual in one of their client community's languages is almost mandatory now. Rarely is an attorney hired without a second language. Many of the organizations are showing a strong commitment to language access for clients. This is particularly true of those that provide a salary supplement to attorneys who speak and/or write a second language that they can use in their work. See Appendix 3 for more information about the bilingual supplements.

**All generations.** No generation makes up the majority of the current legal aid attorneys. Generation X attorneys (31 – 45 years of age) are somewhat less than the majority at 45 percent. Next is the Baby Boomer and Veterans' generation (46 – 70+ years of age) at slightly more than one-third, and Gen Y attorneys are almost 20 percent of the attorneys. See Chart 4.

This diversity in ages is different than the California State Bar membership. The older generations—Baby Boomers and Veterans—are 64 percent of California's attorneys—nearly 30 percent more than legal aid's age composition.[19]

**Chart 4: Generations of Current Legal Aid Attorneys**
(Data for 93 percent of current legal aid attorneys)



**Experience levels.** Using law school graduation year as an approximation of experience level, the current legal aid attorneys' experience levels span zero to 39 years. The largest percentage (46 percent) graduated since 2000, with the majority graduating from 1969 to 1999, meaning the majority of attorneys have at least ten years of experience. See Graph 9.

---

[18] Census 2000 PHC-T-37. Table 6b. California -- Ability to Speak English by Language Spoken at Home for the Population 18 Years and Over: 2000 Internet Release date: October 29, 2004 (revised February 2006).

[19] *Final Report of Results, Member Services Survey,* The State Bar of California, February 2006. Note that the data was collected two years before the Study data, and the age categories had a year's difference, so it is not a perfect comparison.

Shaping the Future of Justice:  Effective Recruitment and Retention of Civil Legal Aid Attorneys

**Graph 9: Current Legal Aid Attorneys' Law School Graduation Year**
(Data for 99.7 percent of current legal aid attorneys)



**Personal financial and living circumstances.** Additional data about personal financial and living circumstances was collected through the survey of current legal aid attorneys. See Table 5. As noted earlier, 70 percent of the current attorneys responded to the survey.[20] Factors that may affect what attorneys may leave their organizations soon are analyzed below.

**1. Marital status.** Married individuals (50 percent) and single individuals living as a couple (13 percent) comprise nearly two-thirds of the current legal aid attorneys, while single attorneys are slightly more than one-third (37 percent). Median ages of these groups differ—the median age range for single attorney respondents is 30-34, while the median for the other two groups is 35-39.

**2. Living with others.** Current attorneys were asked if they lived with anyone other than a romantic partner.  Forty-three percent of the single attorneys live with at least one other adult who is not their romantic partner.  One-third of these single attorneys (32 percent) live with their parents, one third (33 percent) live with other family members, and nearly half (45 percent) have a roommate.[21]

The rate at which single attorneys live with other adults is 4.3 times higher than the rate—one in ten—of attorneys who are married or living as a couple.

**3. Primary breadwinner.**  Less than a majority of married attorneys (43 percent) and single attorneys living as a couple (39 percent) are the primary breadwinner for their families. By contrast, 80 percent of the single attorneys are the primary breadwinner in their family.

Breadwinners are disproportionately single. Even though 37 percent of all attorneys are single, 53 percent of the breadwinners are single. Of the female breadwinners, 58 percent are single; whereas, 44 percent of the male breadwinners are single. Single female breadwinners are twice as likely to have children in their home as single male breadwinners—19 percent as compared to nine percent.

**4. Ability to own a home.**  Three-fourths of the married attorneys own their home. Nearly half (45 percent) of the single attorneys who live as a couple own, while only 37 percent of the single attorneys do.

Nearly three-fourths (71 percent) of all of the attorneys who own their home have two earners in the household. With only one-third of the single attorneys having more than one earner in the household, it is likely more difficult for single attorneys to buy a home.

Only 53 percent of the attorneys who own their homes are the primary breadwinner in their family.

Thirty percent of the single attorneys who own their home have children under the age of 22, which may mean that some purchased homes while they were previously married or living with someone.

**5. Need for second job.**  More than one in five of the single attorneys (22 percent) have a second job.  This percentage is much higher than that for married attorneys (13 percent) and single attorneys living as a couple (12 percent). There is also a difference in why these attorneys have a second job. Of the single attorneys, 84 percent said they had a second job because they needed the income; whereas, 50 percent of the married attorneys and 43 percent of the single attorneys living as a couple gave this reason.

> **More than one in five of the single attorneys have a second job—84 percent of them because they need the income.**

---

[20] See Appendix 1 for a detailed table that shows why this data is generally representative of all of the current attorneys.
[21] The total is more than 100 percent because some single attorneys live with individuals in more than one category.

| Table 5:  Current Legal Aid Attorney Respondents' Personal Demographics | | | | | | |
|---|---|---|---|---|---|---|
| Marital Status | Female | Male | Single | Single, but Couple | Married | All |
| Married | 48% | 56% | | | | 50% |
| Single but living as couple | 14% | 11% | | | | 13% |
| Single | 39% | 33% | | | | 37% |
| | | | | | | |
| Primary Breadwinner for the Family | 50% | 71% | 80% | 39% | 43% | 56% |
| | | | | | | |
| # of Adult Earners in the Household | | | | | | |
| One | 32% | 37% | 67% | 21% | 13% | 33% |
| Two | 62% | 57% | 20% | 75% | 85% | 61% |
| More than two | 7% | 6% | 13% | 4% | 2% | 6% |
| | | | | | | |
| Live with Adult other than Partner | 22% | 22% | 43% | 10% | 10% | 22% |
| | | | | | | |
| Own Home | 56% | 64% | 37% | 48% | 75% | 59% |
| | | | | | | |
| Second Job | 15% | 18% | 22% | 12% | 13% | 16% |
| | | | | | | |
| Number of Children Under 22 Years of Age | | | | | | |
| 0 | 68% | 66% | 87% | 90% | 43% | 67% |
| 1 | 14% | 18% | 9% | 4% | 23% | 15% |
| 2 | 16% | 11% | 4% | 4% | 26% | 14% |
| 3-5 | 3% | 6% | 0% | 2% | 8% | 4% |

*The number of respondents for each question ranged between 404 and 414, with the exception of primary breadwinners with only 317 respondents.*

## Who May Leave Soon?

The survey of the current legal aid attorneys asked if the respondents thought they would leave their organization in the next three years.

**Half of the attorneys.**  Half of the respondents (195 of 390 attorneys who answered the question) answered "yes."  When these attorneys were then asked within how many years they thought they would leave, 186 answered the question and were fairly divided among the three years.  See Graph 10.

**Graph 10: Attorneys Who Think They Will Leave in Next Three Years and Within How Many Years**
(195 Respondents)



Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

**Widespread among the organizations and the state.** At least one attorney from 33 of the 37 organizations responded that they think they will leave. (Two of the organizations did not have any attorneys fill out the survey.) The attorneys who completed the survey work in a total of 57 cities, and those who said they thought they would leave work in 45 of these cities—in all regions of the state.

The largest number of attorneys in any one organization who think they will leave is 21, in one of the large organizations. The percentages in the organizations range from zero to 100 percent, with a median of 50 percent.

**Largely staff attorneys.** Eighty percent of the attorneys who think they will leave are staff attorneys. The other 20 percent is made up of managers and supervisors (17 percent) and attorneys in other positions (3 percent). Staff attorneys are 67 percent of the current legal aid attorneys, so a disproportionate percentage of them think they will leave. See Graph 11.

The part-time attorneys, who comprise 12 percent of the current attorneys, make up 11 percent of the attorneys who think they will leave.

**Graph 11: Positions of Attorneys Who Think They Will Leave**



**Disproportionately female.** While exactly half of the respondents said they will leave, a higher percentage of the female respondents (52 percent) said they think they will leave than the male respondents (44 percent). Female attorneys comprise 67 percent of the current legal aid attorneys, yet they are 76 percent of the attorneys who think they will leave. Some of this difference may be due to more female attorneys responding to the survey than their percentage of current attorneys—73 percent compared to 67 percent. See Graph 12.

**Graph 12: Gender of Attorneys Who Think They Will Leave**



**More attorneys of color and bilingual attorneys.** Forty-nine percent of the attorneys who think they will leave are attorneys of color. Since they make up 44 percent of the current legal aid attorneys, they may leave at a disproportionate rate.

Of the attorneys who think they will leave, 74 percent speak Spanish, which is more than twice the percentage as that of the current bilingual attorneys who speak Spanish. The attorneys who think they will leave and speak other languages are also disproportionate to the percentage of current attorneys who speak those languages. See Graph 13.

**Graph 13: Languages Spoken by Current Legal Aid Attorneys Compared with Attorneys Who Think They Will Leave**



**Lower salaries and less experience.** There is a $15,000 differential in the median salaries between the attorneys who think they will leave and those who do not. The median salary of those who think they will leave is in the range of $50,000 - $54,999, while the attorneys who do not think they will leave have a median salary in the range of $65,000 - $69,999.

16

*Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California*

The salary differential is likely due to the difference in positions and the level of experience. The median graduation year of those who think they will leave is 2003, while the median graduation year for those who do not think they will leave is in the range of 1995-1999.[22] The median graduation year for all of the respondents is 2001 and for all current legal aid attorneys, 1999, meaning that attorneys with less experience are more likely to leave. However, the range of graduation dates for the attorneys who think they will leave is from pre-1970 to 2008.

**Other demographics.** The other demographics—marital status, the number of earners in the household, primary breadwinner, and whether an attorney has a roommate—are similar between those who think they will leave and those who do not.

# Why May They Leave?

The attorneys who think they will leave give a variety of reasons, but the predominant one is they need more income. When asked to rate the importance of 17 possible reasons why they may leave, the three financial options were among the top five reasons given.

> **Top Five Reasons (in order) Attorneys Think They Will Leave**
>
> - Financial pressure due to low salary
> - Financial pressure due to other extraordinary expense
> - Personal reason
> - Burn-out
> - Financial pressure due to student loans

Personal reasons, also in the top five, may include taking time off to have children, moving with a partner, moving to take care of parents, etc. Employees leaving for personal reasons are to be expected in any workplace, and so personal reasons are not explored here.

The other reasons—financial and burn-out—are explored in the following sections.

# Salaries Are the Number One Reason

Of the respondents who think they will leave soon and say a salary increase will make a difference in their decision about whether to leave, the minimum salary increase that will make a difference ranges

[22] Data was collected for five year ranges prior to 2000 and for individual years for 2000 and later.

from $1,000 to more than $20,000. The minimum median amount that respondents say will make a difference is $10,000. The respondents' experience and salary levels are not related to how much of a salary increase they said will make a difference.

## What are the salaries?

**Median salaries of all attorneys.** The salaries of all attorneys were analyzed as of July 1, 2008. The median salaries were:

- **$55,000** for staff attorneys (including senior attorneys);
- **$83,110** for supervisors of attorneys; and
- **$62,572** for all attorneys (including a few in other positions).

Generally, it takes an attorney four years to have a base salary of more than $50,000.

See Table 6 for salary information of the current legal aid attorneys by position and law school graduation year.

**Lower salaries for attorneys who left.** The salaries of the current legal aid attorneys in Table 6 are as of July 1, 2008. The data for the attorneys who left is from the three prior years—July 1, 2005 – June 30, 2008. The median salary of the attorneys who left during that time period was nearly $10,000 less than those there on July 1, 2008— $53,329 as compared to $62,572. Some of this difference may be due to the difference in timing. However, of those *hired* during the three-year period, the attorneys who also left during the time period had a median salary of $46,200 as compared to $51,845 for those attorneys who were hired and stayed during the three years.

**Graph 14: Median Salaries of Attorneys Who Left Compared with Salaries of Attorneys Who Stayed**



> **The median salary for all staff attorneys (including senior attorneys) is $55,000.**

| Table 6: California Civil Legal Aid Median Attorney Salaries | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Law School Graduation Year | # of All Attorneys | Overall Median Salary | # of Staff Attorneys | Median Staff Attorney Salary | # of Supervising Attorneys | Median Supervising Attorney Salary | # of Other Attorneys | Median Other Attorney Salary |
| 1969 -1975 | 30 | $91,144 | 6 | $76,740 | 23 | $94,650 | 1 | * |
| 1976 | 9 | $85,896 | 2 | $50,094 | 7 | $96,516 | 0 | N/A |
| 1977 | 7 | $92,400 | 1 | * | 5 | $92,400 | 1 | * |
| 1978 | 6 | $70,080 | 5 | $67,800 | 1 | * | 0 | N/A |
| 1979 | 11 | $91,891 | 2 | $78,844 | 9 | $97,920 | 0 | N/A |
| 1980 | 13 | $77,506 | 9 | $77,506 | 4 | $82,446 | 0 | N/A |
| 1981 | 11 | $87,891 | 5 | $69,032 | 6 | $97,155 | 0 | N/A |
| 1982 | 6 | $72,054 | 2 | $66,700 | 4 | $84,760 | 0 | N/A |
| 1983 | 10 | $92,120 | 3 | $56,529 | 7 | $93,240 | 0 | N/A |
| 1984 | 7 | $70,224 | 2 | $65,112 | 5 | $82,400 | 0 | N/A |
| 1985 | 12 | $84,248 | 6 | $74,417 | 6 | $106,093 | 0 | N/A |
| 1986 | 15 | $90,132 | 2 | $68,000 | 12 | $91,822 | 1 | * |
| 1987 | 10 | $68,420 | 6 | $64,782 | 4 | $75,758 | 0 | N/A |
| 1988 | 11 | $77,500 | 6 | $67,008 | 5 | $84,552 | 0 | N/A |
| 1989 | 5 | $88,800 | 1 | * | 4 | $98,584 | 0 | N/A |
| 1990 | 4 | $91,800 | 1 | * | 3 | $94,800 | 0 | N/A |
| 1991 | 14 | $84,448 | 4 | $63,032 | 10 | $88,490 | 0 | N/A |
| 1992 | 12 | $80,660 | 4 | $75,743 | 8 | $87,054 | 0 | N/A |
| 1993 | 19 | $76,680 | 11 | $76,000 | 8 | $83,888 | 0 | N/A |
| 1994 | 15 | $70,648 | 9 | $58,493 | 6 | $74,260 | 0 | N/A |
| 1995 | 11 | $80,158 | 4 | $65,411 | 6 | $85,291 | 1 | * |
| 1996 | 18 | $74,480 | 12 | $72,660 | 6 | $81,280 | 0 | N/A |
| 1997 | 18 | $71,400 | 11 | $65,400 | 6 | $97,200 | 1 | * |
| 1998 | 20 | $74,840 | 8 | $66,663 | 10 | $62,323 | 2 | $56,000 |
| 1999 | 24 | $63,779 | 15 | $56,011 | 7 | $70,908 | 2 | $72,590 |
| 2000 | 18 | $62,726 | 9 | $55,960 | 8 | $65,950 | 1 | * |
| 2001 | 33 | $60,000 | 23 | $55,326 | 10 | $72,462 | 0 | N/A |
| 2002 | 32 | $56,506 | 25 | $56,011 | 7 | $57,763 | 0 | N/A |
| 2003 | 34 | $57,946 | 28 | $58,280 | 6 | $62,012 | 0 | N/A |
| 2004 | 36 | $53,658 | 30 | $53,658 | 6 | $52,589 | 0 | N/A |
| 2005 | 48 | $49,807 | 39 | $50,000 | 8 | $54,000 | 1 | * |
| 2006 | 43 | $48,510 | 39 | $48,510 | 1 | * | 3 | $48,000 |
| 2007 | 36 | $48,206 | 32 | $48,672 | 1 | * | 3 | $32,500 |
| 2008 | 3 | $48,600 | 3 | $48,600 | 0 | N/A | 0 | N/A |
| **Total** | **601** | | **365** | | **219** | | **17** | |
| **Median** | **Grad. Year 1999** | **Salary $62,572** | **Grad. Year 2002** | **Salary $55,000** | **Grad. Year 1991** | **Salary $83,110** | **Grad. Year 1999** | **Salary $50,064** |

*When only one attorney is in a category, the salary is not listed to protect anonymity.

**Current starting salaries.** In June 2009, the organizations were asked the amount of their starting salaries. Ten organizations had increased their starting salary since July 1, 2008. The median starting salary for a licensed attorney with no experience ranges from $32,500 to $60,000—nearly a $30,000 difference. The median salary is **$46,000**.[23] See Table 10 for a list of starting salaries.

> **The median starting salary for attorneys is $46,000.**

**Salary scales.** Twenty-six of the organizations have a salary scale for their attorney salaries. The median starting salaries of the two groups of organizations are similar—$45,500 for the organizations with a salary scale and $46,000 for those without. However, the range of the starting salaries is different. The lowest starting salary for an attorney in an organization without a salary scale is $40,000. The lowest starting salary for those with a scale is $7,500 less at $32,500. The highest starting salary is also higher for those without a salary scale—$60,000 compared to $55,728. See Graph 15.

**Graph 15: Starting Salaries for Attorneys**



The majority (15 of 26) of the organizations with salary scales increased their scale in 2008, and about the same percentage (6 of 11) of the organizations without salary scales increased their starting salary in 2008. One organization has not increased its starting salary since 2004 and four organizations have not increased their salary scales since 2006. See Graph 16.

---

[23] One organization did not report a starting salary. Twenty-four of the organizations hire law graduates before they have passed the bar exam. The salaries for this position range from $34,112 to $50,000, with a median of $42,000. Only the starting salary for licensed attorneys is analyzed in this Report.

**Graph 16: Year of Most Recent Increase in Salary Scale or Starting Salary for Attorneys**



■ Organizations with a salary scale   ■ Organizations without a salary scale

**Unions.** Nine organizations' staff, including attorneys, belongs to a union. These organizations range in size (measured by number of attorneys) with six large, one medium and two very small. They all have salary scales, and the median starting salary is $46,000, the same median as that for all organizations. The organization with the lowest starting salary ($32,500) is unionized.

**Funding size and type.** The median starting salaries generally increase by the funding size of the organization. The very small organizations' median starting salary of $43,214 is more than $4,700 less than the large organizations' median of $47,916. The small and medium organizations are within $500 of each other—$46,000 and $45,500 respectively. See Table 7.

The median starting salary of the eleven organizations that are funded by the Legal Services Corporation (LSC) is the same as the large organizations and nearly $3,000 more than those organizations not funded by LSC—$47,916 compared to $45,000.

| Table 7:  Organizations' Starting Salaries for Attorneys Compared to Funding Size | | | |
|---|---|---|---|
| Funding Size | Number of Organizations | Median | Range |
| Large--Over $5 Million | 11 | $47,916 | $38,520 - $51,816 |
| Medium--$2-5 Million | 8 | $45,500 | $41,000 - $60,000 |
| Small--$1-2 Million | 9 | $46,000 | $40,000 - $50,000 |
| Very Small---Under $1 Million | 8* | $43,214 | $32,500 - $55,000 |

*One very small program has not determined a salary for licensed attorneys with no experience.

**Regions.** The median starting salary in the regions ranges from a low of $43,414 in the Central Coast region to a high of $47,916 in the San Joaquin Valley/Central California region. Along with the Central Coast region, two other regions (Bay Area and Inland Empire/Imperial Valley) and the organizations that have offices in all the regions (Statewide) have median starting salaries below the median of $46,000 for all the organizations. See Graph 17.

19

**Graph 17: Starting Salaries for Attorneys by Region**



**Bilingual salary supplements.** Thirteen of the organizations (35 percent) provide a salary supplement for attorneys who are bilingual in a language that they use in their work. The supplement amounts range from $300/year to $2,400/year. See Table 21 in Appendix 3 for a description of the organizations' bilingual policies and supplemental amounts.

**Potential starting compensation with bilingual supplement and LRAP.** The total starting financial compensation is higher in those organizations that provide a bilingual supplement and/or educational loan repayment assistance. (The organizations' loan repayment assistance is detailed in the next section.) These supplements increase the financial compensation by $300 to $8,000, depending on whether an attorney speaks another language and has educational debt. The highest a starting salary could increase to is $58,000 in one organization in Southern California. See Table 21 in Appendix 3.

**Other salary supplements.** A few of the organizations have other supplements for additional work or expertise. Examples include the following:

- Preparation of grant reports
- Coordination of outreach
- Specialized area of practice
- Computer Responsible Person

**Salary caps.** Fifteen of the organizations (42 percent) have salary caps on attorney salaries. The lowest cap is at a very small organization where a staff attorney maxes out at $51,000 after 19-20 years. The second lowest maximum is at one of the large organizations—$64,000 for staff attorneys who have been admitted to the bar for 18 or more years.

## What are the organizations' recent salary actions?

In June 2009, the organizations provided information about the actions they took regarding attorney salaries (1) during the three-year period that was reviewed for turnover—July 1, 2005 through June 30, 2008; (2) since July 1, 2008; and (3) anticipated in 2009 and 2010.

During the three-year period, all organizations took at least one action to increase attorney salaries. Most used step increases, some used Cost of Living Adjustments (COLAs), and some used a combination. Some organizations gave bonuses. See Graph 18.

**Graph 18: Number of Times Attorney Salaries Increased between July 1, 2005–June 30, 2008**



**Salary actions after July 1, 2008.** The time period between July 2008 and June 2009 saw a mix of action because it was pre-and post-economic downturn. The action taken by the most organizations (21) was giving step increases to some or all of their attorneys. Eleven, including some of the 21 organizations, also gave COLA increases to some or all of the attorneys, and two gave merit increases.

Eight of the organizations increased their salary scale and two organizations without salary scales increased their entry level salary. Four organizations froze salaries, and five organizations reduced salaries or required or allowed furloughs.

**Anticipated salary actions.** When asked what salary actions the organizations thought they would take during the remainder of 2009 and 2010, a mix of measures was identified. Twenty-one of the organizations anticipated providing either a step or COLA increase. One organization believes it will give bonuses.

Three organizations know or believe their attorney salary scale will be increased, and one organization without a scale believes it will increase its entry level salary.

Eleven organizations believe salaries will be frozen. Six organizations anticipate reducing salaries or requiring furloughs.

## What do the executive directors think about the salaries?

The organization's executive directors were asked if they think their organization needs to increase attorney salaries.

**Almost all believe salaries should be raised.** The vast majority of the organization's executive directors believe that attorney salaries should be increased. Thirty-three said yes, three said no, and one did not answer.

**In order to compete.** When asked why attorney salaries should be increased, many commented that in order to recruit and retain attorneys, their organizations need to have salaries that compete with government attorney salaries—the employers that most executive directors see as their primary competition for attorneys.

Others see their competition as the other civil legal aid organizations in California, and feel they need to raise their salaries to compete with them.

> "The salaries need to be competitive with other public interest government lawyers and court lawyers...our salaries are $30,000-$40,000 below the State attorneys, public defenders, court research attorneys, family law facilitators and others."

**To encourage and reward their attorneys and enable them to have a decent living.** Many of the organization's executive directors' comments went beyond the competition issue to acknowledging that legal aid attorneys have trouble living on their salaries and that they believe they deserve to make more.

- "Because it's too low to survive in the Bay Area, because student loan debt is huge, because they should be able to live on what they're paid..."
- "They can barely live on what we pay them..."
- "To be able to pay loans and live in Silicon Valley."
- "Because it's hard for our staff to make it in the Bay Area on the salaries that [they] make..."

> "...we have some of the best, creative aggressive attorneys and we don't pay them enough. We must remain competitive and currently we simply are not with the government sector. Besides, they deserve it."

- "...to contribute to morale for a dedicated, hardworking staff."
- "Need to reward excellent, hard work and increasing responsibility and let attorneys see potential for doing this work long term."

**A few think salaries do not need to be raised.** When the three that answered "no" to raising attorneys salaries were asked why, their responses included that they think their salaries are competitive with other similar organizations and that paying higher salaries would mean they would be unable to hire as many staff persons.

**Low salaries are the biggest barrier to successful recruitment.** The Executive Directors identify the low salaries as their organization's number one challenge for recruiting quality attorneys. While many noted that recruitment and retention is easier now because of the recession, they acknowledged their continuing problems and that these problems will grow again when the economy improves.

- "We only can attract attorneys interested and able to accept salary levels way below that of government or private practice. Given that, the pool is finite..."
- "...we continue having problems recruiting at the management level when we cannot promote from within."
- "The reason we began to look at comparability with governmental sector attorney jobs is because we had great difficulty in recruiting attorneys, particularly at the management level in our southern California offices."

> "We have definitely interviewed great applicants who have declined the job because of how low our salaries are. In fact, now we screen all good applicants first by phone about the salary alone, because that is such a big factor."

- "The starting salary level of $42,000 for an attorney graduating with extremely high educational debt in California is inadequate. The effect has included rejections of offers of employment and resignations after two or three years."
- "...when [the organization] recruits for attorneys it does not generate a high amount of interest and those that express interest do not have significant experience. Once they develop their lawyering skills they tend to leave for higher paying jobs."
- "...the more qualified applicants tend to apply for positions that provide better compensation."
- "It's increasingly difficult to get remarkable people."
- "Being able to recruit attorneys of color is difficult."

**It is very difficult to retain the lawyers we want.** The executive directors reported great difficulty in retaining attorneys because of the low salaries.

> "We cannot retain lawyers. As soon as another opportunity arises, they leave for higher pay and benefits."

21

- *"We tend to get excellent applicants for attorney positions. Retention risk is greatest for attorneys who have spent a few years at [the organization] and feel that they must leave in order to make a higher salary to contribute their fair share to the support of their families."*

**Attorneys subsidizing legal aid.** Some of the executive directors acknowledge that many of the attorneys are making a personal sacrifice by working at such low salaries and are subsidizing the organization's services.

- *"It has become acceptable for civil legal aid attorneys to be paid significantly less than all other attorneys, and government and private funders have become accustomed to it, and come to rely on it."*

- *"We're asking the attorneys to subsidize the provision of legal services. The funders should be subsidizing."*

- *"The biggest donors to the organizations are the attorneys who give up what they could make somewhere else."*

> *"It takes people who put other people's well-being above their own right now…it is not a religious order."*

**Hard to make it alone.** Many of the executive directors describe how the attorney salaries are not enough for many individuals to make it without family assistance.

- *"If you have a family, you can't stay…one lawyer is subsidized by her family…another lawyer lives with her parents."*

- *"People on their own have a harder struggle."* (All the attorneys who left this organization in the last three years were single.)

- *"I think and many people I know feel as though you have to be married to a spouse that makes a higher income or have to be independently wealthy to be able to make a career out of public interest work."*

## What do the attorneys think of the salaries?

The attorneys were asked what they thought about their salaries. The responses were similar among attorneys who think they will leave and those who do not. Comments like those below were widespread.

**Embarrassing and demoralizing.** Many attorneys feel their salary is so low that it is embarrassing. Some, along with some of the executive directors feel this can or has contributed negatively to morale.

- *"I feel fortunate relative to just about anyone in the world or society, but sometimes, I can't believe that I make the same amount as a 2nd year associate at a firm when I have been an attorney and a dedicated and fairly accomplished one for nearly 20 years."*

- *"[It] offends my sense of professionalism…just because I choose to specialize in [area of] law instead of patent law doesn't mean I should have to have a wealthy spouse."*

- *"My salary is embarrassingly low given my years of experience."*

- *"It's pitiful."*

- *"It is embarrassing. When I told my son, who does not have an undergraduate degree, what I make, [he] was shocked as he makes more than I do!"*

- *"I think my salary is ridiculous. It's almost an insult. To see at what level my work is quantified is demoralizing."*

- *"Pathetic."*

- *"Outrageous… I love helping other people but I have a family too. The sad thing is in all my efforts to help others no one has an interest in helping me."*

- *"You become more frustrated living paycheck to paycheck. I feel hopeless because I'll never be out of debt. I'll be so poor…I think I need to get another job. I can't keep living like this, but I want to keep doing what I do."*

- *"I took this job knowing the salary is low, and knowing that this would be an amazing job. It is! That said, it is the lowest salary I have seen for any attorney position anywhere. I think it results in low recruiting, extremely high turnover, and sometimes resentment, which is all detrimental to the effectiveness of our services."*

**Takes a partner with an income.** Attorneys with a partner acknowledge they would not and/or could not work as a legal aid attorneys without their partner's financial support.

- *"It is not enough to meet the current standard of living in the Bay Area. I could not afford to live off of it were it not for the additional income of my partner."*

- *"It is low considering the level of education and experience I have. If it were not for my spouse's salary I would not be able to continue working for [legal aid]"*

- *"If my husband weren't employed in the private sector, I would definitely need to find another job to support our family."*

- *"I'm glad my partner is supportive. Without my partner, I'd have to have a roommate."*

- *"If I was not married, I would have to live with my parents."*

- *"My husband is our primary breadwinner - I am here for the experience and the reward, not the salary. I make about one-third what I made in private practice."*

- *"I would not be able to afford this job if I were single."*

- *"Overall, I'm very happy, but the long-term financial outlook is not that promising…It's not sustainable…If you want a 10 – 20 year career, you have to have a partner with a significant income…Personal circumstances determine whether you can stay."*

**Takes parental support.** Some attorneys make ends meet by accepting money from their parents or their partner's parents.

- I am unable to pay all of my bills every month and make regular debt payments. I often have to turn to my parents for help with rent.

- "My salary (and the salary of anyone who does real work) should be enough to 1) own my own home, 2) pay for child care, and 3) save for retirement. It's not, and because my partner doesn't earn

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

a huge income…, we would not have been able to do #1 and #2 without financial assistance from both our parents. Forget about #3."

> "…It also helps that I live with my mother who charges a lower rent. There is a running joke in [our organization] that most new attorneys live with their parents."

**Forced to live with parents and roommates.** Sharing living expenses with either family or roommates is another way that attorneys live on their salaries.

- *"I just moved back in with my parents."*
- *"I am able to get by on my salary because I'm single and share a house with several other people to keep rent low…"*
- *"It's very hard to live on this salary…I have to have a roommate."*

> "…it's embarrassing. I make less than what I made at another non-profit before I started law school."

**Cannot raise a family.** Some attorneys report difficulties supporting children on their salaries, while others acknowledge they will need to leave their job when they decide to have children.

- *"It is hardly possible to provide for a family in the Bay Area on a legal services salary; it would be nice to think the choice between public and private sectors were not so stark. My salary serves almost exclusively to pay for childcare."*
- *"I can't imagine myself working for this salary for more than 1-2 years because I hope to have a family or buy a home and cannot do so on less than $40K a year"*
- *"I can't afford to have a child."*
- *"This is the hardest part of my job. I left my job as a public defender after my maternity leave, and was very enthusiastic about this new work. However, I took a pay cut of over 50%! My family and I operate on a deficit each month, and use our savings to maintain basic expenses."*

**Cannot pay debt.** The next section of the Report details the high level of educational debt many of the attorneys have, and that they cannot afford their student loan payments without additional financial compensation, including a higher salary.

> "I went to law school with the understanding that the cost of an education would pay for itself. I have not found this to be true."

**Cannot buy a home.** Many attorneys commented that they cannot afford to buy a house. This issue was brought up often in the focus groups that were held in Los Angeles and the Bay Area.

**Quality affected.** In addition to echoing the executive directors' comments that the low salaries affect the quality of attorney applicants, some attorneys acknowledge that the quality of the services is not at the level it could be because it is difficult to recruit and retain attorneys with experience.

- *"…There seems to be an accepted premise that it is okay for legal aid lawyers to be paid less and that not only diminishes the important work that is done by legal aid lawyers but it also is not keeping in step with the high demands that young attorneys have regarding loans so I see less quality people joining legal aid."*
- *"I think that the low salaries decrease our overall quality as a law firm because we hire attorneys right out of law school (the only ones who apply, generally), and they generally leave after only a few years."*

**Lower than other attorneys and occupations.** The attorneys often commented on the differences between their salaries and those of government attorneys—the employment they, along with the executive directors, see as the primary competition.

They also commented on the inequities of making less than many occupations that require less education. Often the attorneys would bring up teachers they know who make more than them, even though teachers are usually acknowledged to be underpaid. In fact, the average teacher salary in primary and secondary schools in California in 2008 was $65,808. Forty districts in 15 counties in five of the Study's six regions have average teacher salaries over $75,000, with the highest at more than $93,000.

- *"Recently, I had a job opening for an attorney position and contacted one of my former students, who also worked in our office as a paralegal before he got his law license. He very politely turned me down and let me know that he was earning more than me at his job with the District Attorney's office, where he had been about 6 years."*
- *"The current legal aid pay scale for attorneys is much lower than it should be. Given my level of legal expertise and education, I should earn more than someone who works in public transportation or department of corrections. All are honorable jobs, but as a legal aid attorney, there is not greater financial compensation to account for the advanced education and job skills that the position demands. Also, the discrepancy between what an attorney makes as an attorney in the private sector vs. in legal aid is ridiculously large."*
- *"I have been an attorney for almost 10 years. I was offered a position at the public defender's office which would have paid me 3 times what I make now."*

> "I was a teacher before going to law school and I made more in my third year of teaching in a low income public school than I do right now. And now I have [a large amount] of law school debt to pay off as well."

**No choice.** Some believe the organizations have no choice but to pay low salaries because there is not enough funding for higher salaries.

- *"Our organization cannot afford to pay more, and we all understand that. There is a great deal of transparency re our budget, which keeps morale high."*

- *"It is not the organization's fault. There simply isn't the $ to pay nonprofit attorneys adequately."*

- *"I feel the salary is adequate and fair given the financial resources of my employer. Certainly it would be nice to earn a salary equivalent to public defenders or county counsel with similar years of experience, but this is not going to happen with my employer."*

- *"I think my salary is fair and definitely on par with what others in my position earn across the state. I just wish--like everyone else-- that legal aid/civil legal services attorneys were paid more. It's hard to believe that first-year associates make up to three times as much as first-year legal aid attorneys do when we come in with similar experience levels. But I understand that that's the way the system works and I'm grateful for the opportunity I have."*

- *"My salary is too low, but so is my ED's and everyone else's at this agency."*

- *"[The Board and executive director] fully appreciate [the low salaries]. In a heartbeat, they'd increase our salaries, but the money's not there."*

- *"I understand there is no choice."*

- *"It's not employer's fault that salary is low. Legal aid is notoriously underfunded."*

- *"There isn't enough funding to provide adequate salaries compared to public defenders and other state wide attorneys."*

- *"I am very satisfied with my salary, given that I choose to work in a legal aid firm."*

- *"I feel fortunate I'm making more than people in the community."*

> **"I would like to start a family and it is not possible with my current income and debt."**

## Primary Reason Many Will Leave

Attorneys who think they will leave were asked the primary reason they will leave. Most gave financial reasons.

- *"Financial, financial, financial."*

- *"Having kids, need more $$$"*

- *"Can't afford to have a family (children) with my current salary and expenses."*

- *"FINANCIAL PRESSURE (start family)."*

- *"Financial - I love the work."*

- *"Salary to pay off student loan."*

- *"Salary / Student loans / Mortgage"*

- *"More money – I need to make more money to afford student loans, car payments and ONE day purchase a home!"*

- *"I am 45 and have zero retirement and a low salary and too much stress."*

- *"College costs for two children."*

- *"I'm running a deficit of $200 to $300 per month."*

- *"I now need to consider retirement, so I need to earn a lot more money, soon."*

> **"Low pay is putting a strain on my finances and family. I love legal services but there comes a time when you have to put your family first."**

When the attorneys who think they will leave were asked what they expect to gain by leaving their position, many listed more money and more financial security.

- *"A chance to earn sufficient money to meet my financial obligation and not live paycheck-to-paycheck"*

- *"Higher pay, ability to have a more secure lifestyle, ability to save money for the future, professional respect"*

- *"The ability to afford having a family"*

- *"Money and not being overworked all the time"*

- *"Hoping to gain increased salary and thereby reduce chronic stress; may also save some money spent on car travel"*

- *"Financial relief"*

- *"At least $20,000 a year"*

- *"Much higher salary and retirement benefits OR flex-time and ability to work from home"*

- *"Higher salary and retirement benefits"*

- *"Less financial stress, more professional development"*

## Further Consequences of Low Salaries for the Attorneys

The above comments describe some of the consequences the low salaries have on the attorneys and the organizations. In the focus groups and interviews, the attorneys were asked about further ramifications beyond not being able to pay student loans or have children or buy a house.

**Other expenditures unaffordable.** The attorneys talked about other big expenditures they struggle with, but also other smaller expenses they have to forego.

- Pay child care of $600 to $1,000/month
- Live in a 400 square foot apartment that is 120 degrees in the summer
- Cannot afford uncovered medical expenses
- Support parents, some of whom are chronically ill
- Have no disposable income
- Can take no or limited trips and vacations
- Have old cars that are not gas efficient and break down
- Cannot buy new clothes for court
- Cannot go out to dinner with friends

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

**Partner relationships.** Some talked about the effect their low salary has on their relationship with their partner. It "causes internal pressure" is the way one attorney put it. Many talked about feeling like they are not pulling their financial weight in the relationship. One attorney said, *"My husband makes good money. I'm able to do this because of him. We can't buy a house or have a lot of extra stuff. I feel a lot of guilt. It's what's keeping us from having kids right now."*

**Family relationships, especially for immigrants or first generation Americans.** Some attorneys talked about their families' views of their salaries. One attorney from a middle class family said, *"My family is crazy with the guilt and the pressure, always dropping comments about me needing to get another job. They wonder why I wouldn't make more money."*

Many attorneys who are immigrants or children of immigrants feel particular pressure from their families to make money. The attorneys talked personally about these cultural pressures, and some executive directors talked about seeing the effect, such as one organization that had three attorneys of Asian descent apply for a job, and all three applicants took jobs with better pay. Sometimes the pressure is to make more money because that is what is supposed to happen in the U.S., but this can also be combined with an expectation that the child who is an attorney will help to support his/her extended family. An attorney of Asian descent who had worked in a law firm before legal aid said she used to give half of her salary to her parents to put her brothers and sisters through school.

**Still feel poor.** Two attorneys who grew up poor shared their feelings about continuing to be financially insecure. *"I lived my entire life so deprived. I think I should have more money now."* and *"I'm a refugee and I grew up poor. I swore I'd never be poor again."*

**Thoughts of a second job.** When one of the attorneys in a focus group shared that she is "*always thinking about getting a second job, but my workload is too heavy,*" others agreed.

**Poor credit score.** An attorney who made $45,000 when she started in legal aid got way behind on her student loan payments, which then destroyed her credit. She asked for and received a significant raise, but she knows that when she goes to buy a new car she will have a higher interest rate on her car loan because of her low credit score.

---

## Educational Debt is Crushing

The attorneys were asked in the survey to comment about their educational debt or other attorneys' educational debt. Their responses commonly used words like crushing, suffocating, and brutal.

**A crushing burden that will never end**

- *"It is CRUSHING…"*
- *"It's brutal."*

> *"[My educational debt] is terrible, it keeps me up at night worrying how I can stay at legal aid and survive. I pay over one-fourth of my salary to student loans a month, and I am paying interest only."*

- *"It will never, ever, end at the salary of a legal aid attorney."*
- *"My loans are a mortgage."*
- *"It is exorbitant and suffocating. A day does not go by where I don't think about it. I love my job and am professionally satisfied. But, I cannot see the light at the end of the tunnel with regard to my law school loans. It is difficult to think that I might be 25 years out of school, with law school debt still remaining."*
- *"My educational debt and other debts associated with acquiring my license to practice law have caused me to declare bankruptcy."*
- *"My debt is daunting and it would be impossible for me to live the life I do on one income. I could not work at this job or support my child. Over 1/6 of my gross income last year was spent on INTEREST on my student loans."*
- *"My debt is about equal to my colleagues working in the private sector. The key difference is that they can afford to pay theirs off, and I anticipate paying my debt until I die or retire."*
- *"It gets so much worse once you get to the place where you have children."*
- *"My kids are two, and I will still be paying off my debt when they're in college."*

> *"For the first two years out of law school, the idea of my debt would crush me. I'm living with it now, like a tumor."*

**Have to leave legal aid**

- *"The debt burden of attending law school is suffocating, and I simply cannot sustain it at my current level of compensation. In order to comply with my scheduled loan payments, I would need to be earning about $20,000 more annually than I do now. I am unable to make these payments and am slowly watching the principal owed increase because of repeated deferments. I would love to continue working as an attorney in the public interest, but my debt will soon compel me to work elsewhere."*
- *"It is impossible. I have to seriously consider finding another, much less rewarding job in order to keep my house."*
- *"The amount of debt is a huge deterrence for me to stay in public interest work long-term. I would like to have a family but could not afford one on my current salary."*

**Help is needed!**

- *"I need help paying off this debt! My monthly payments are nearly 1/2 of my paycheck. I love the work I do and I want to stay in Legal Services but it is very difficult with all my loans."*
- *"HELP HELP HELP!! It's becoming impossible to work in legal services without help repaying the huge law school debts."*

> *"My debt is astronomical in comparison to my salary...I pay $13,692 annually to pay off my educational debts, and I am on a 30-year plan. I've actually gotten a sick feeling in the pit of my stomach while typing this."*

## Amount of Debt

Eighty-two percent of the attorney respondents graduated from law school with educational debt. The median range of the debt was $80,000 – $89,000, and the highest amount was $180,000 - $189,999.

Of those who have paid off their debt—93 percent of whom graduated before 2000—most did so in five years or less, with only 13 percent of them taking more than ten years.

However, 55 percent of the attorney respondents still have educational debt. Most of these attorneys (69 percent) expect to need more than ten years to pay off their student loans. More than a third (38 percent) estimate a pay-off period of 25 to 30 years because they have put their loans on extended repayment plans to lower the payments, making them more affordable.

The median amount of debt these attorneys have is in the range of $60,000 - $69,999, but spans as high as $180,000 - $189,999. The educational debt balances generally increase steadily with each year of law graduates, with the 2008 graduates' median amount of $120,000 - $129,999 being double the amount for the attorneys as a whole. See Graphs 19 and 20.

**Graph 19: Amount of Current Educational Debt**



**Graph 20: Median Current Educational Debt by Law School Graduation Year**



26

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

> **The median educational debt of a legal aid attorney who graduated in 2008 is between $120,000 and $129,999.**

## Why the Educational Debt is High

More recent graduates have extraordinarily high debt primarily because tuition—especially law school tuition—has steadily increased. Table 8 details the 2008-2009 tuition and fees for ABA-accredited law schools in California. If the tuition and fees stayed at the 2008-2009 levels, the average cost for three years would be more than $77,000 at a California public law school and more than $99,000 at a private school. Adding in the academic year living expenses of $20,226 that are allowed for loans, the total many law school graduates need to borrow is nearly $138,000 for residents and nearly $160,000 for non-residents at public law schools in California.

However, the increases did not end in 2008-2009. California schools, like those across the country, continued to increase tuition and fees. A check of just two public law schools in California revealed increases of $8,460 and $9,011 for annual in-state tuition and fees for 2009-2010.

Of the attorney respondents, most (60 percent) went to a private law school, and three-fourths of all respondents (74 percent) graduated from law school in California.

These numbers are about law school costs. In addition to educational loans needed by attorneys for law school, many borrow for undergraduate school, a bar review course and the bar exam fees. The average borrowed by all undergraduate students in 2007 in California was $17,215[24]. A full bar review course for the July 2009 California exam was $4,300 to $6,000.[25]  In addition, most law graduates borrow to cover their living expenses while they study for the bar exam.

> **"The only reason you would not have [educational] debt now is someone helped you."**

| Table 8:  Tuition for California ABA-Accredited Law Schools | | | |
|---|---|---|---|
| **Law School** | **In-state Tuition & Fees** | **Out-of-state Tuition & Fees** | **Three Year Total for In-state Tuition & Fees** |
| University of California, Berkeley, School of Law | $26,896 | $39,141 | $80,688 |
| University of California, Davis School of Law (King Hall) | $25,489 | $37,734 | $76,467 |
| University of California, Hastings College of the Law | $24,120 | $35,345 | $72,360 |
| University of California at Los Angeles (UCLA) School of Law | $26,855 | $37,648 | $80,565 |
| **Law School** | **In-state and Out-of-state Tuition and Fees** | | **Three Year Total for Tuition & Fees** |
| California Western School of Law | $34,300 | | $87,900 |
| Chapman University School of Law | $34,518 | | $86,820 |
| Golden Gate University School of Law | $32,940 | | $86,040 |
| University of La Verne College of Law | $32,370 | | $87,720 |
| Loyola Law School, Loyola Marymount University | $36,058 | | $83,520 |
| University of the Pacific, McGeorge School of Law | $34,547 | | $103,956 |
| Pepperdine University School of Law | $35,520 | | $106,560 |
| University of San Diego—School of Law | $37,704 | | $113,112 |
| University of San Francisco School of Law | $33,870 | | $101,610 |
| Santa Clara University School of Law | $35,250 | | $105,750 |
| University of Southern California, Gould School of Law | $42,640 | | $127,920 |
| Southwestern Law School | $33,410 | | $100,230 |
| Stanford University Law School | $39,916 | | $119,748 |
| Thomas Jefferson School of Law | $31,770 | | $95,310 |
| Western State University—College of Law | $29,770 | | $89,310 |
| Whittier Law School | $31,750 | | $95,250 |

*Official Guide to ABA-approved Law Schools,* Law School Admissions Council and American Bar Association, 2008, 2009, http://officialguide.lsac.org.

---

[24] http://projectonstudentdebt.org/state_by_state-data.php
[25] Amounts from the websites of *Bar Passers, Bar None Review, BarBri,* and *Celebration Bar Exam Review.*

# Loan Repayment Assistance Programs

For some attorneys, their educational burden is lightened with funding from one or more Loan Repayment Assistance Programs (LRAPs).

**Employer LRAPs.** One-fourth of the organizations (nine of 37) have an LRAP for their attorneys. All of the organizations with LRAPs have budgets that are defined as "large" by the Study and are funded by LSC. Two of the large budget organizations do not have an LRAP. Seven of nine are large in terms of the number of attorneys and two are medium-sized.

The employer LRAPs provide assistance to 157 attorneys, which is approximately one-fourth of the current attorneys. As stated earlier, 55 percent of the attorney respondents have educational debt, so it is likely that less than half of the attorneys with debt are receiving employer LRAP assistance. Forty-two percent of the attorney survey respondents reported receiving employer LRAP assistance.

The annual amount of assistance given to the employer LRAP participants ranges from $1,800 to $6,000. The assistance is taxable income because it is received from the employer. Other details of the employer LRAPs are in Table 9.

**Law school LRAPs.** Eleven California law schools have an LRAP. They vary greatly in the number of graduates who receive assistance and the amount of assistance given. The income limitations of the programs can make many attorneys ineligible, sometimes from their own salaries and sometimes from their partner's salary, if counted. During the period of June 2007 – May 2008, 340 California law school graduates received slightly more than $2.5 million. However, more than $1.1 million of the assistance provided to 128 participants was from one law school.[26] Anecdotal information suggests that some of the schools have increased their income limitations and funding recently. Some of the legal aid attorneys are receiving full payments from their California law school.

Many of the law schools around the country have LRAPs, but most are not funded at a level that provides assistance to a large number of participants and/or assistance in large amounts, except for some of the Ivy League schools. A larger percentage of out-of-state attorney respondents (36 percent) receive LRAP assistance from their law schools than in-state law graduates (23 percent).  Overall one-fourth (27 percent) of the attorney respondents who have educational debt receive LRAP assistance from their law school.

Assistance from almost all law school LRAPs is not taxable income to the attorney because the programs are set up to comply with Sec. 108(f) of the federal tax code, which allows for this type of assistance to be non-taxable.

**Total LRAP coverage.** Slightly more than half (53 percent) of the survey respondents with educational debt receive LRAP assistance. The primary source is from their employers. The second source is from their law schools. Some attorneys also receive LRAP assistance from their fellowship sponsors, and a few from the Legal Services Corporation's LRAP.

**Federal Public Service Loan Forgiveness.** Although many legal aid attorneys may be eligible for forgiveness of their federal loans after they work in public interest employment for ten years under the new federal Public Service Loan Forgiveness, they still need to make the payments on both their federal loans (for the ten years) and on their private loans. Also, many attorneys are not eligible for federal loan forgiveness because of their income or their spouse's income.

**The critical need for adequate LRAPs for the current attorneys.** The attorneys describe the difference LRAPs make for them.

- "It feels overwhelming in some respects; I definitely wouldn't be able to do it without LRAP."
- "But for [law school]'s program, I could not work at [the organization]."
- "I absolutely could not do it without the [law school] LRAP."
- "[The organization's] loan repayment program was definitely one reason I took the job."
- Without LRAP assistance, I would not have been able to choose working in legal aid.
- "I came into law in order to do public interest, but it would be impossible for me without LRAP assistance. I appreciate the new CCRAA legislation that will help with public loans, but I have a significant amount of private loans from law school that are not covered by that and which I will continue to need LRAP assistance for."

> **"It would be impossible to manage on my salary without LRAP."**

---

[26] *Equal Justice Works Guide to Law Schools*, 2009.

| Table 9: Employer Loan Repayment Assistance Programs | | | | | |
|---|---|---|---|---|---|
| Organization | Waiting period | Time Limit | Maximum Annual Benefit | Number of Participants | LRAP Budget |
| Employer #1 | No | 10 years after graduation | $3,000 | 24 | $69,000 |
| Employer #2 | No | Step 10 on salary scale or 10 years after Bar admission | $4,000 | 25 | $49,000 |
| Employer #3 | No | 10 years | $3,600 | 4 | $18,000 |
| Employer #4 | 90 days | No | $4,000 | 14 | $50,000 |
| Employer #5 | No | No | $1,800 | 26 | $46,800 |
| Employer #6 | No | No | $1,800 | 9 | $16,200 |
| Employer #7 | No | No | $6,000 | 15 | $57,574 |
| Employer #8 | CA Bar admission required | 20 years | $3,600 | 18 | $64,800 |
| Employer #9 | 180 days | No | $3,600 | 22 | $90,600 |

However, some LRAPs are not extensive enough.

- *"After my employer's contribution through the LRAP program, I spend 25% of my after tax income to service my educational debts."*
- *"The $150 per month we receive is certainly helpful, however it does not come close to covering my loan repayment expenses. I was able to consolidate my loans, which made it possible for me to work in the public interest sector and pay my loans, but unfortunately the only program I could afford was the 30 year plan. That means I'll be paying my law school loans until I'm 61 years old."*

*"I would not be able to do public interest work without LRAP from BOTH law school and my employer."*

**The critical need for LRAPs for wider recruitment.** Many of the current attorneys express how educational debt makes some attorneys take higher paying jobs when they would rather be public interest attorneys.

- *"It [educational debt] is the number one barrier identified by law students I went to school with and speak to now preventing them from pursuing a public interest legal career."*
- *"Educational debt is the primary reason that my fellow law school classmates who initially wanted to do legal aid work are now in private practice. It's very difficult to pay the bills, save, and pay off law school loans on a civil legal aid salary."*
- *"The excessive amount of debt with which law students graduate is the primary factor that keeps them from choosing public interest work and forces them to work for law firms. Then, once they start in law firms, it is highly unlikely that they will later choose the huge pay cut it would be for them to go into public interest work."*
- *"I am very lucky to have had a scholarship in law school. I think a lot of attorneys I know feel that they are forced to get a high paying job in order to pay educational debt and other expenses – that they had to 'sell out' rather than get the kind of job or practice an area of law they originally really wanted to do."*

- *"I was fortunate to have family support for my higher education. Without such support, it seems nearly impossible for attorneys to practice public interest law. I have mentored many aspiring public interest law students and lawyers who cannot even think of a career in anything but a firm, given their staggering loan payments."*

*"...Despite the hard work that law schools and organizations like [ours] have put to try to address the crushing debt that most law students graduate with, there are still far, far too few programs to counteract the crushing feeling of many law students that they need to take a private corporate law firm job in order to pay off their debts."*

**Burden recognized by those without debt.** Many of the attorneys who never had or no longer have educational debt describe the difference between going to law school years ago and now—the level of debt and its effect on the more recent law graduates. This is a difference in attitude from previous surveys the Report's primary author has conducted. There is a new recognition that the educational debt burden is so much larger and is an issue that must be dealt with if legal aid is going to have a diverse and quality attorney work force.

- *"I am lucky not to have any [educational debt], but for other attorneys I know, especially in legal aid/public interest, it is an ongoing source of stress and difficulty."*

*"I graduated from law school at a time when the cost was reasonable. My loans were at what was then an acceptable rate of interest. The cost of law school today would prevent me from being a lawyer."*

- *"I was on financial aid in law school but my parents helped me pay it off after I graduated. I am extremely lucky. If it were not for their willingness to make sacrifices on my behalf and help me, I would have had a much more difficult time financially."*
- *"It was affordable 30 years ago, it is not now."*
- *"...we old folks have it easy. It is impossible for young people now."*
- *"I feel extremely fortunate to not be burdened by debt. This was only possible because I received a full-tuition scholarship from my law school...I see how debt worries my colleagues and makes it difficult for many public interest attorneys to save for their futures. I believe that most LRAP programs are not generous enough."*
- *"I can't imagine carrying the debt load my younger colleagues do."*
- *"There was no repayment program when I graduated law school. I don't recall the amount of my debt, but I did receive the maximum available at the time in Federally Insured Student Loans and I do recall what a burden the payments were. For several years I was a single parent and I needed to take a second job grading bar exams at night in order to try to make ends meet. I think a loan forgiveness or assistance program for attorneys who do poverty law is essential to enable programs to attract a well qualified and diverse staff."*
- *"I feel fortunate to have no debt. I think the amount of debt with which most people graduate makes it very difficult to take a public interest job, unless your employer or law school has a good LRAP program."*

> **"It's like having a house mortgage without the house."**

- *"I had relatively little law school debt because I worked between law school and college to save more for tuition and I worked at nights during law school, and earned money during law school "coops" with legal agencies. Even with relatively little debt it was hard to pay the loans back ...I really feel for young attorneys coming out of school now with a $100,000 or more in debt. It feels crippling."*
- *"I worked at 2 law firms for a total of six years to pay off my student loans. I could not take my first public interest job...but for the fact that I had paid off my loans. Even then, I had to think long and hard before taking the job. When I hire new attorneys with huge debts, I wonder how long they can stay. Indeed, many family law attorneys whom I have trained have gone to work for the courts because they pay more and have a real pension plan. We need to pay our legal aid attorneys more and help them with loan repayment."*

**Executive directors' recognition of the burden.** Nearly all of the executive directors recognize that attorneys with the levels of debt that most new graduates have now are unable to work in legal aid without assistance from an LRAP. However, it is not clear that they all truly understand the immensity and the ramifications of the debt. When asked about the issue, responses varied.

Organizations with an LRAP:

- *"I have found that LRAP is very symbolic. Even when it is a smaller amount, it matters to people."*
- *"Job applicants bring up their loans all the time. Our LRAP has been helpful in recruiting."*
- When asked if a single person can make it on their organization's salary: *"It depends on the amount of debt."*

Organizations without an LRAP:

- *"We can't compete for someone who has $100,000 in debt."*
- *"I have not heard about it from anyone."* (An executive director was asked whether educational debt is an issue, and did not know if the organization's attorneys receive assistance from an LRAP. The majority of the organization's attorneys have educational debt and only one receives assistance.
- *"LRAP is key."* (All the organization's attorneys get assistance from their law school.)

**How much is needed.** Attorneys with more than $100,000 of educational debt often have monthly payment amounts of more than $1,000 even when they extend their repayment over 30 years.

The attorneys who think they will leave were asked if receiving new or additional loan repayment assistance would impact their decision to leave, and if so, what the minimum annual amount is that would impact their decision. Slightly more than one-third (35 percent) said additional assistance would definitely or probably affect their decision. Another 20 percent said it may. The median amount they said they would need is $6,500, with one-quarter (24 percent) saying it would take more than $10,000.

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

# Do the Insurance and Retirement Benefits Make Up for the Low Salaries?

Non-profits generally have provided comprehensive benefit packages to compensate for lower salaries. The Study reviewed the benefits provided by the legal aid organizations and found that many of them have good benefit packages, but others do not. The primary benefits provided by the organizations overall are shown in Graph 21.

**Graph 21: Primary Benefits and Supplements provided by the Organizations**



Table 10 summarizes all the benefits for individual organizations.

Generally, the larger the funding size of the organization, the better the benefit package.

**Amount spent on budget.** The amount the organizations spend on benefits varies widely. One-third (13) of the organizations spend 21 to 25 percent of their personnel budgets on benefits. Two spend more (31 to 35 percent and 36 to 40 percent); seven spend 16 to 20 percent; eleven spend 11 to 15 percent; and four spend 6 to 10 percent.

**Health insurance.** All of the organizations provide health insurance for their employees. Most of them (30) pay for the employee's full health insurance premium, but seven do not. All but one organization makes health insurance available for the employee's spouse, domestic partner and dependents. The largest number of those that do, pay a partial premium for these other individuals. See Graph 22.

Employees have varying requirements for other cost-sharing. The highest is one of the very small organizations that requires the employee to pay $3,500 in copayments that are not reimbursed by the organization.

**Graph 22: Health Insurance Premium**
(One organization did not provide information about the non-employee coverage.)



■ Full premium ■ Partial premium ■ None of premium □ Benefit not available

**Dental insurance.** Full premium dental insurance is the benefit provided by the most organizations—33. One very small organization does not provide it at all. Two organizations (one small and one large) do not pay any of the premiums for the employee, and one very small organization pays a partial premium.

**Disability insurance.** Most of the organizations do not provide short-term disability insurance; nine do, but only four of these pay the entire premium. A majority of the organizations (26) provides long-term disability insurance, and 20 of these pay the entire premium. Three of the organizations do not pay any of the premium.

**Other insurance.** Twenty-eight of the organizations provide life insurance, and 24 of them pay 100 percent of the premium. Data was not gathered about insurance for vision, acupuncture, and chiropractic benefits, but some organizations commented that they provide it.

**Mileage.** Twenty-five of the organizations reimburse employees for their work-related mileage at the IRS rate of $0.55/mile. One organization reimburses at a higher rate ($0.585/mile), and eleven at lower rates. The lowest is $0.25/mile. One organization admitted it does not advertise the mileage policy to the employees with the hope that no one submits a reimbursement request, and almost no one does.

**Comments about the insurance benefits from the attorneys and the organizations.** One HR Director likely summed up the effect of the benefits with this comment, *"Our very generous benefits package has sometimes made the difference in acceptance of a job offer. It has sometimes helped in retention at the upper levels, but has not usually been a factor when younger attorneys need to take another job because of financial considerations."*

When attorneys who were interviewed were asked if the benefits made a difference when they took the job, almost all said they had not. Many said they did not make up for the low salaries, and said the benefits should be better because of the low salaries.

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Table 10: Benefits Offered by the Organizations** | | | | | | | | | | | | | | | | |
| Funding Size | Attorneys in May 2009 | Union | LRAP | Bi-lingual Supp. | Employee's Health Insurance Premium Paid | Spouse's Health Insurance Premium Paid | Domestic Partner's Health Insurance Premium Paid | Dependents' Health Insurance Premium Paid | Employee Dental Insurance Premium Paid | Spouse's Dental Insurance Premium Paid | Domestic Partner's Dental Insurance Premium Paid | Dependents' Dental Insurance Premium Paid | Short Term Disability Insurance Offered & Premium Paid | Long Term Disability Insurance Offered & Premium Paid | Life Insurance Offered & Premium Paid | Retirement Plan and Recent Employer Contribution Made* |
| Very Small | 1 | | | | not set | 100% | 0% | 0% | 0% | 100% | 0% | 0% | 0% | | | | 0% |
| Very Small | 5 | X | | X | $32,500 | * | * | * | * | 100% | partial % | partial % | partial % | | | | 0% |
| Very Small | 2 | X | | | $34,850 | 60 - 69% | | | | partial % | | | | | | | 12% |
| Very Small | 4 | | | | $40,000 | 100% | partial % | partial % | partial % | 100% | 100% | 100% | 100% | | | | 0% |
| Very Small | 2 | | | | $42,827 | 100% | no answer | no answer | no answer | 100% | no answer | no answer | no answer | | | 0% | 2% |
| Very Small | 4 | | | | $43,600 | 100% | 0% | 0% | 0% | 100% | 0% | 0% | 0% | | | | 3% |
| Very Small | 8 | | | | $44,000 | 100% | 0% | 0% | 0% | 100% | 0% | 0% | 0% | 100% | | 100% | 0% |
| Very Small | 6 | | | | $46,000 | 100% | 0% | 0% | partial % | 100% | 0% | 0% | partial % | | 100% | 100% | 0% |
| Very Small | 3 | | | | $55,000 | 30 - 39% | 0% | 0% | 0% | | | | | % not given | % not given | % not given | 0% |
| Small | 11 | | | | $40,000 | 100% | 0% | 0% | 0% | 100% | 0% | 0% | 0% | | | | 0% |
| Small | 8 | | | | $40,000 | 100% | 0% | 0% | 100% | 100% | 0% | 0% | 100% | | 100% | | 0% |
| Small | 11 | | | X | $44,000 | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 0% | 0% | 100% | 3% |
| Small | 12 | | | | $43,000 | 80 - 89% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | | 100% | 100% | 3 - 4% |
| Small | 7 | | | | $46,000 | 100% | 0% | 0% | 0% | 100% | 0% | 0% | 0% | | 100% | | 0% |
| Small | 7 | | | | $46,000 | 100% | 0% | 0% | 0% | 100% | ** | ** | ** | | 100% | 100% | 0% |
| Small | 9 | | | | $46,000 | 100% | 100% | 100% | partial % | 100% | 100% | 100% | 100% | % not given | % not given | % not given | 0% |
| Small | 8 | | | | $47,000 | 60 - 69% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | | | 100% | 5% |
| Small | 7 | | | X | $50,000 | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | % not given | 100% | 100% | employer discretion |
| Medium | 14 | | | X | $41,000 | 80 - 89% | partial % | partial % | partial % | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 5% |
| Medium | 20 | | | X | $42,500 | 100% | 0% | 0% | 0% | 100% | 0% | 0% | 0% | | 100% | 100% | 3 - 5.4% |
| Medium | 13 | | | | $45,000 | 100% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | 100% | 100% | 100% | 3% after one year |
| Medium | 7.5 | | | | $45,000 | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | | | 5% |
| Medium | 17 | | | | $46,000 | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | 100% | 100% | 1.3 - 4.0% |
| Medium | 15 | | | X | $46,200 | 100% | 0% | 0% | 0% | 100% | 0% | 0% | 0% | 75% | 100% | 100% | 0% |
| Medium | 7 | | | | $55,728 | 100% | 0% | 0% | 0% | 100% | 0% | 0% | 0% | | 100% | 100% | 0% |
| Medium | 6 | | | | $60,000 | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | 0% | 100% | 0% |
| Large | 51 | X | X | X | $38,520 | 100% | partial % | partial % | partial % | 100% | 0% | 0% | 0% | 100% | 100% | 100% | 2 - 7% |
| Large | 61 | X | X | | $40,000 | 100% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | | 100% | 100% | $500 - $600 |
| Large | 25 | | X | | $42,000 | 100% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | | | 100% | a % after one year |
| Large | 55 | X | X | X | $46,000 | 100% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | | 0% | 100% | 2 - 4% |
| Large | 23 | X | | | $46,701 | 100% | 100% | 100% | 100% | 100% | 0% | 0% | 0% | | 100% | 100% | 4.50% |
| Large | 16 | X | X | X | $47,916 | 100% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | | 100% | 100% | 5% |
| Large | 40 | X | X | X | $48,571 | 100% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | | 100% | 100% | 3 - 9% |
| Large | 58 | X | X | X | $48,686 | 100% | partial % | partial % | partial % | 100% | 100% | 100% | 100% | | 100% | 100% | 3.5 - 9% |
| Large | 25 | X | | X | $48,899 | 100% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | | 100% | 100% | *** |
| Large | 26 | X | X | X | $50,000 | 100% | partial % | partial % | partial % | 100% | partial % | partial % | partial % | | 100% | 100% | 6% |
| Large | 65 | | | | $51,816 | 90 - 99% | partial % | partial % | partial % | 0% | 0% | 0% | 0% | varies | varies | varies | 7 - 8.5% |

Blank = benefit not offered

*The organization pays health benefits up to a cap of $700. Depending on the employee's age, number of dependents, and coverage chosen, employee contribution will vary.

**None of the premium is paid for the family until the employee has worked full-time for seven continuous years. Then 100 percent of the premium is paid.

***A defined benefit plan of 80 percent of salary after 25 years of service for employees hired before 2007.

*Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California*

Many attorneys commented they thought their benefits were ok or good, except for the mental health benefits and the retirement benefits. Many of them talked about the need for retirement benefits, and that the low retirement benefits were impacting whether they could stay.

## Retirement is Unaffordable for Many

All but one of the very small organizations offer some type of retirement plan. Most are 403(b) plans. Twenty-three of the organizations contributed to the plans in the last year—most in the range of 3 to 5 percent of the employee's salary. One organization has a defined benefit plan after 25 years of service for employees who were hired before 2007 because the organization used to be a part of a much larger organization that had the pension plan.

Attorneys in some of the focus groups were asked what they thought about their organizations' retirement benefits. Their comments varied.

- *"Retirement [benefits are] terrible. That's the thing that makes me think I shouldn't stay at [the organization] forever because I won't have a retirement."*

- *"Would be nice if my employer contributed."*

- *"I don't want to contribute to anything. I don't want anything more taken out of my paycheck."*

- *"For people who have been around a while, it makes a real difference."*

- *"It's a nice option to have."*

- *"Ours is very generous."*

- *"I can't become one of my clients some day, who's living off their Social Security check and can't [make] it."*

The interviewed attorneys talked about how they have almost nothing for retirement.

- *"I don't have anything."*

- *"I don't mind making sacrifices now, but I'm scared about retirement."*

- *"The big issue is retirement. We thought [the equity in] our houses was our retirement and now it's not...I used to think my house was a pension. I have been single throughout my career so I couldn't save for retirement."*

> *"I am realizing that the low salaries that I have earned in legal services essentially mean that I will never be able to retire. I have for 30 years put funds away in a tax savings account, but that is inadequate for retirement purposes."*

- *"I recognize that [I have] a very high salary by legal services standards. However, it is still a challenge to pay for college, aging relatives, high housing costs, and retirement on this salary. Because I have been a career legal services attorney making much less for most of my career, I am concerned about not having sufficient funds to retire on. It is still significantly lower than I would make with my level of experience in the government sector or private sector."*

The attorneys who think they will leave were asked what else it would take for them to stay (after being asked specific questions about salary and LRAPs). The answer checked by half (51 percent) of the respondents was "better retirement benefits." It was the number one answer chosen of five options.

## Who is the Competition and What are Their Salaries and Benefits?

No attorneys or executive directors expect the legal aid attorneys' salaries to be close to large private law firm salaries any time soon. However, the difference can be shocking. Nationally in 2008, the median starting salary for associates ranged from $70,000 in firms of 2 to 25 attorneys to $145,000 in firm of more than 250 attorneys. One executive director shared, *"We have a 35-year managing attorney whose daughter in her first year at a firm made twice what he did."*

As noted in an earlier section, some of the executive directors see their competition as the other legal aid organizations in California, and for some attorneys, this is true. Thirty-eight percent of the attorneys who think they will leave said they may work in other civil legal aid organizations in California after they leave. However, some attorneys who go to another legal aid organization do so not for the money, but rather for a different type of work or workplace.

A smaller percentage (14 percent) of the attorneys who think they will leave said civil legal aid organizations in other states are where they may look for employment. The median civil legal aid salaries nationally are lower than California's: $40,000 for one year or less experience, $48,000 for five years; $60,000 for 11 to 15 years; and $68,887 for more than 15 years.[27] The average salaries in LSC-funded organizations are lower as well for staff attorneys ($53,494). The salaries for supervising attorneys ($70,796) and for managing attorneys ($87,330) are calculated separately so they are not comparable, but are likely close to California's salaries.[28] The lower salaries nationally are to be expected given California's cost of living, which is the second highest in the country—behind Hawaii.[29]

---

[27] *Public Sector & Public Interest Attorney Salary Report*, NALP, 2008
[28] *Fact Book 2008*, Legal Services Corporation, August 2009
[29] http://www.costoflivingbystate.org/index.html

Far more—nearly two-thirds of the attorneys who think they will leave—checked employment with the government, including as a prosecutor or public defender, as employment they think they will take when they leave. The executive directors and the attorneys gave example after example of attorneys leaving their organizations for the money they could make in government jobs—one organization had seven attorneys leave the organization in 2007 for public defender jobs in the region because of salaries. Government employment is definitely the main competition, and a look at the salaries and pensions shows why.

> **Nearly two-thirds of the attorneys who think they will leave checked employment with government, including as a prosecutor or public [defender], as employment they think they will take when they leave.**

Tables 11-14 contain the salary information for the primary government jobs reported by the organizations as the ones that attorneys who have applied for jobs at legal aid take instead or attorneys who leave legal aid take when they leave. For the positions that have local differences in salaries, the salary levels for one county or city in each of the Study's regions were gathered. The specific counties and cities were chosen because they were the ones the majority of attorneys were perhaps most likely to work in if they remained within a region. Many of the positions differentiate between years of general practice and years of experience in a lower position in the office or other related law. The general practice requirements are abbreviated as gp in the tables and the public law requirements are abbreviated as pl.

A reminder of the median starting salaries in the regions:
- Bay Area:  $44,000
- Central Coast: $43,414
- Inland Empire and Imperial Valley: $44,100
- Sacramento and Northern California:  $46,250
- San Joaquin Valley and Central California: $47,916
- Southern California:  $46,200

# Deputy Public Defenders, Deputy District Attorneys, Deputy County Counsels, and Deputy City Attorneys

The Deputy Public Defenders (PD), the Deputy District Attorneys (DA), the Deputy County Counsels (CC), and Deputy City Attorneys are generally on the same scales within the selected counties. The positions in Fresno and Riverside counties have some slight differences, and Los Angeles County has significantly higher salaries for Deputy City Attorneys than the other positions.

The only starting salary in any of the counties that has the potential to be less than one of the legal aid organization's starting salaries is in Fresno County. The minimum starting salary for a Deputy PD with no experience is $48,120, but can be more than $61,000. The statewide organization that has a starting salary of $51,816 has an office in Fresno, so possibly a Deputy PD could be offered less when they start at the PD office.

In all the other counties, the starting salaries for the government positions are far above the organizations' starting salaries. In Sacramento County, for example, the starting salary for the four positions is right under $80,000, whereas the legal aid organizations' median starting salary in the Sacramento and Northern California region is $46,250.

With three years of related experience or four years of general practice, an attorney in one of the four government positions in Sacramento can make between $91,642 and $116,949.

> **In Sacramento County, the starting salary for the four government positions is right under $80,000, and the median starting salary for legal aid in the Sacramento and Northern California region is $46,250.**

Salary data for attorneys with more experience was generally unavailable, except San Francisco provided some figures for more experienced attorneys, including that the average salary of an attorney with ten years experience is $164,424.  In California, the median salary of the legal aid 1998 law school graduates—who generally would have 10 years experience—is $74,840. This is less than half of what the attorneys in these government positions make.

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

| Table 11: Salaries of Deputy Public Defenders and Deputy District Attorneys | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Fresno County | | | Los Angeles County | | | Riverside County | | |
| | Years Experience | Minimum | Maximum | Years Experience | Minimum | Maximum | Years Experience | Minimum | Maximum |
| Deputy Public Defender I (starting) | 0 | $48,120 | $61,428 | 0 | $55,466 | $72,749 | 0 | $64,320 | $81,890 |
| Deputy District Attorney I (starting) | | | $58,500 | | | | | | $79,728 |
| Deputy County Counsel I (starting) | | $46,452 | $56,472 | | | | | | $81,890 |
| Deputy City Attorney (starting) | | $48,120 | $58,500 | | $71,055 | $94,858 | | | $79,728 |
| Deputy Public Defender II | 1 gp | $61,536 | $78,516 | 1 PD or 2 pl or 3 gp | $75,488 | $110,347 | 1 pl or 1 gp | $78,016 | $99,282 |
| Deputy District Attorney II | | | $74,722 | 1 DA or 2 pl or 3 gp | | | | | $96,663 |
| Deputy County Counsel II | | $59,556 | $72,408 | 6 mo CC or 1 pl | | | | | $99,282 |
| Deputy City Attorney II | | $61,536 | $74,772 | 1 | $102.980 | $120,060 | | | $96,663 |
| Deputy Public Defender III | 2 gp | $73,860 | $94,272 | 1 as PD II | $96,353 | $133,415 | 2 pl or 3 gp | $91,623 | $119,748 |
| Deputy District Attorney III | | | $89,772 | 1 as DA II | | | | | |
| Deputy County Counsel III | | $71,568 | $87,012 | 1CC or 2 pl | | | | | |
| Deputy City Attorney III | | $73,360 | $89,772 | 2 | $122,148 | $145,930 | | | |
| Deputy Public Defender IV | 3 gp | $86,424 | $110,292 | 2 as PD III | $107,921 | $157,762 | 3 pl or 3 gp | $101,983 | $140,587 |
| Deputy District Attorney IV | | | | 2 as DA III | | | | | |
| Deputy County Counsel IV | | $85,488 | $103,896 | 2.5 CC or 3 pl | | | | | |
| Deputy City Attorney IV | | | | 3 | $144,469 | $167,270 | | | |

| | Sacramento County | | | San Francisco City and County* | | | Santa Barbara County | | |
|---|---|---|---|---|---|---|---|---|---|
| | Years Experience | Minimum | Maximum | Years Experience | Minimum | Maximum | Years Experience | Minimum | Maximum |
| Deputy Public Defender I (starting)<br>Deputy District Attorney I (starting)<br>Deputy County Counsel I (starting)<br>Deputy City Attorney I (starting) | 0 | $79,866 | $79,866 | 2 pl or gp | $98,514 | $103,454 | 0 | $68,351 | $83,443 |
| Deputy Public Defender II<br>Deputy District Attorney II<br>Deputy County Counsel II<br>Deputy City Attorney II | 1 pl or gp | $91,851 | $91,851 | 4 pl or gp | $105,976 | $125,710 | 1 pl or 2 gp | $75,520 | $92,196 |
| Deputy Public Defender III<br>Deputy District Attorney III<br>Deputy County Counsel III<br>Deputy City Attorney III | 2 pl or 3 gp | $83,144 | $101,038 | 6 pl or gp | $128,830 | $149,084 | 2 pl or 4 gp | $87,709 | $107,075 |
| Deputy Public Defender IV<br>Deputy District Attorney IV<br>Deputy County Counsel IV<br>Deputy City Attorney IV | 3 pl or 4 gp | $91,642 | $116,949 | 8 pl or gp | $152,750 | $172,588 | 3 pl or 6 gp | $101,496 | $144,992 |
| | | | | Average at 10 years: $164,424 | | | | | |

pl = public law
gp = general practice
*Some counties use different titles.
**San Francisco, with a combined city/county government, has one office, the City Attorney.

## California State Public Defenders and Deputy Attorneys General

The State Public Defenders (PD) and State Attorneys General (AG) make less than almost all the government attorneys described in the prior section. The two types of positions' salaries are the same in some categories, but the required experience is slightly different. The starting salary for a Legal Counsel (starting PD) is in the range of $56,088 - $61,644.   This is more than all but one legal aid organization.

Attorneys in the position of Public Defender II, which requires 3 years of related law experience or general practice, make between $76,164 and $113,736.

The Deputy Attorneys General with ten years of experience, on average, have a salary of $114,000.   Again, the median salary for attorneys at this level in legal aid is right under $75,000—this is $39,000 less than the Deputy Attorneys General. See Table 12.

## Family Law Facilitators and Court Self Help Center Attorneys

California Superior Courts have a Self Help Center in each county. These centers assist self-represented litigants. Each center has a Family Law Facilitator position and may have additional Self Help Center attorneys. The Family Law Facilitator must have at least five years experience in family law. The requirements for the Self Help Center attorneys vary, with some counties hiring attorneys with no experience and some requiring five years of experience.

Legal aid attorneys often have some of the most relevant experience for these positions because they have represented clients in many areas of family law. The organizations report that they are increasingly losing experienced family law attorneys to these positions. The salaries are far above legal aid organizations' salaries.

The minimum starting salaries for the Family Court Facilitator in each of the selected counties are far above the median salaries for legal aid attorneys with five years experience, except in Fresno County. For example, Riverside County's starting salary (with five years of experience) is between nearly $77,000 and $103,000. Two of the counties—San Francisco and Santa Barbara—have minimum starting salaries of more than $90,000—$97,452 and $94,824, respectively. A starting salary can be as high as $146,472 in San Francisco. See Table 13.

| Table 12:  Salaries of California State Public Defenders and Deputy Attorneys General | | | |
|---|---|---|---|
| | Years Experience | Minimum | Maximum |
| Legal Counsel (starting PD) | 0 | $56,088 | $61,644 |
| Deputy Attorney General A (starting) | | | $56,088 |
| Deputy Attorney General B | 1 pl or gp | $56,136 | $61,644 |
| State Public Defender I | 1 pl or gp | $67,656 | $81,816 |
| Deputy Attorney General C | 2 pl or gp | | |
| State Public Defender II | 3 pl or gp | $76,164 | $113,736 |
| Deputy Attorney General D | 4 pl or gp | | $93,936 |
| Deputy Attorneys General | **Average at 10 years:  $114,000** | | |
| pl = public law | | | |
| gp = general practice | | | |

The salaries for Court Self Help Center attorneys are far above legal aid salaries, with the exception of the minimum starting salary of $45,474 in Fresno County. For example, in Los Angeles County, an attorney with five years experience, which is the starting requirement, makes between $80,663 and $111,720. See Table 14.

> **The Family Law Facilitators are paid $30,000 to $90,000 more than legal aid attorneys with similar levels of experience.**

In some counties, the legal aid organization contracts with the Court to run the Self Help Center. As part of the contract, the Court pays the salaries of the Center's attorneys, but does not pay at near the levels it pays the attorneys it employs directly in other counties. In some cases, this may be due to union contracts, but in others it is not.

| Table 13:  Salaries of Family Law Facilitators | | | | | | |
|---|---|---|---|---|---|---|
| | | **Fresno County** | | **Los Angeles County** | | **Riverside County** |
| | Years Experience | Minimum | Maximum | Minimum | Maximum | Minimum | Maximum |
| Starting | 5 years required | $59,526 | $106,328 | $87,955 | $109,269 | $ 76,908 | $103,038 |
| | | | | | | | |
| | | **Sacramento County** | | **San Francisco County** | | **Santa Barbara County** |
| | Years Experience | Minimum | Maximum | Minimum | Maximum | Minimum | Maximum |
| Starting | 5 years required | $76,488 | $92,988 | $97,452 | $146,472 | $94,824 | $115,776 |

| Table 14:  Salaries of Court Self Help Center Attorneys | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Fresno County** | | | **Los Angeles County** | | | **Riverside County** | | |
| Position | Family Law Info Center Research Attorney | | | Family Law Attorney | | | Self Help Attorney | | |
| | Years Experience | Minimum | Maximum | Years Experience | Minimum | Maximum | Years Experience | Minimum | Maximum |
| Starting | 0 | $45,474 | $55,250 | 5 | $80,683 | $111,720 | 3 | $76,877 | $102,814 |
| | 1.5 | $58,266 | $70,850 | | | | | | |
| | 3 | $70,850 | $86,112 | | | | | | |

| | **Sacramento County** | | | **San Francisco County** | | | **Santa Barbara County** | | |
|---|---|---|---|---|---|---|---|---|---|
| Position | Contract with Legal Services of Northern California | | | Court Staff Attorney I, II | | | Contract with Legal Aid Foundation of Santa Barbara | | |
| | | | | Years Experience | Minimum | Maximum | | | |
| | | | | 0 | $80,179 | $97,457 | | | |
| | | | | 2 | $97,457 | $118,468 | | | |

## Pensions

A review was not done of the insurance benefit packages that the government employers provide with these positions, but it is safe to say that virtually all would have benefits at least comparable to the legal aid organizations', except in one area—retirement benefits.

These government positions are eligible for a pension from the California Public Employees' Retirement System (CalPERS). A couple of examples were calculated for the amount of their pensions. A 55 year old individual who retires in 2009 with 30 years of service as a Deputy Public Defender with a final salary of $100,000 would receive a pension of $89,800 annually. A individual who retires at age 65 in 2019 with 30 years of service as a Deputy Public Defender with a final salary of $120,000 would receive $107,800 annually.

Only one of the legal aid organizations has a defined benefit pension, which is 80 percent of the attorney's salary. The pension is unavailable for attorneys who became employed after 2007. No other legal aid organizations have a defined benefit pension. Most organizations

contribute three to five percent of the attorney's salary to a retirement plan annually. The CalPERS pension far exceeds these benefits.

# Burn-Out/Lack of Professional Development and Advancement

As stated earlier, financial reasons are the primary ones the attorneys give for thinking they will leave. Burn-out is in the top five reasons as well, when the reasons were rated. In addition, when survey respondents were asked what their primary reason for leaving soon would be, the issues described the second most—behind financial reasons—were a lack of opportunities for professional growth or advancement.

## Burn-Out

Burn-out was rated as one of the top five reasons attorneys think they will leave soon. Contributing to the attorneys' burn-out are the emotional demands of the clients and overwhelming workloads.

One attorney who thinks s/he will leave soon gave a lengthy, but enlightening description of the burn-out problem:

*"Burnout is also a huge issue. There is no institutional support or recognition of the emotional toll this work takes on people. There is a crushing need for services and a limited amount of resources, and quality control is also an issue. Advocates should not feel pressured to take more cases than they can handle because then the quality of representation by necessity falls and leads to burnout and potential malpractice issues. There should be clear policies in place for equitable case distribution and what to do when people are overloaded. We are confronted with a lot of traumatized clients and very emotionally trying situations, and there need to be support groups and institutionalized mechanisms in place so people can have an emotional outlet and feel supported..."*

The attorneys were asked how emotionally draining they find their job, and about one-third (32 percent) said they find it "very" emotionally draining. There was little difference between those who think they will leave and those that do not.

> **About one-third of the attorneys said they find their job "very" emotionally draining.**

**Overwhelming workloads.** When the attorneys were asked in what ways they would like their organizations to improve "quality of life" aspects of the organization, many who were leaving mentioned the need for more manageable workloads.

- *"Encourage us to take fewer cases. I am often overwhelmed by caseload..."*
- *"Create more reasonable expectations and work demands."*
- *"Recognize work load that requires more after-hours work and help adjust load."*
- *"I'd like supervisors (and management generally) to be more realistic about what I (and others) can accomplish. There's simply too much work. And too little support to do it."*
- *"Be more reasonable with the volume of work assigned and the timeframes for the completion of the work."*
- *"Although I have a generous vacation plan, I usually lose vacation and comp time because I have a hard time getting away from work obligations."*

Attorneys who do not think they will leave soon also mentioned their workload often when asked about changes needed to improve the quality of their life at the organizations.

- *"I would like my program not to have unrealistic expectations regarding the workload. I work 10 to 12 hours a day trying to get everything done and it does not seem as though it is*

*acknowledged or appreciated and it seems as though there is always a push for us to do more."*

- *"It's extremely difficult for me to balance my time between direct services to clients, public policy work,...supervising..., grant writing and reporting, etc. On the one hand, I like the diversity of my job; on the other hand, I'm pulled in a thousand directions. Two people are needed to do my job, but that's not going to happen anytime soon."*

The organizations were asked if they hire a temporary attorney when an attorney goes on leave for longer than two months. Only eight of the organizations do so, meaning that the other attorneys must often pick up this work in the organizations that do not bring in temporary attorneys.

## Lack of Professional Development and Advancement

Many attorneys who think they will leave described their desire to develop professionally and their belief that this was not possible in their current position and organization. The following responses were given to the question of the primary reason they think they will leave soon.

- *"Lack of challenging work; feel I've done all I can in the program and should move on for career development reasons."*
- *"I don't feel like there is much more room for growth/skill building within the current structure of the organization. I feel ready for more responsibility/autonomy/leadership, but don't foresee those opportunities."*
- *"No room for growth/no way to be promoted."*
- *"No ability to advance without becoming management. No recognition for skill level or expertise."*
- *"Isolation and lack of opportunity to grow and learn new skills."*
- *"Lack of professional development; lack of skill development opportunities"*
- *"I need a higher income and more diversity in my workload. I don't want to work somewhere for 5-10 years, and then realize that my practice areas/skills are poorly transferable into other areas of law/firms/programs. I want to continue to CHOOSE to work in civil legal services, not feel like I am forced to because that is the only type of work I am trained to do."*

**Job diversity wanted.** All respondents were asked if they would like their position to involve more diverse types of work or cases or challenges. Half (49 percent) of all the respondents answered yes. This is significant in and of itself, but comparing the responses of those attorneys who think they will leave and those that do not, makes this question even more noteworthy. Nearly two-thirds (62 percent) of those who think they will leave want more diverse work, as opposed to slightly more than one third (36 percent) of those who do not think they will leave.

> **Nearly two-thirds of those who think they will leave want more diverse work.**

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

Graph 23 shows the opportunities the attorneys would like in order to diversify their work. The one opportunity the majority of the attorneys who think they will leave would like is to "learn new areas of law for professional development."

This finding is in line with the differences in the attorneys who think they will leave when attorneys who practice in one area of the law are compared with attorneys who practice in more than one area of the law. Twelve percent more of the attorneys that practice in only one area think they will leave.

Nearly half of each group—attorneys who think they will leave and those that do not—would like to do more policy advocacy, and nearly half of the attorneys who think they will leave would like to work more with attorneys in other civil legal aid organizations. One of the attorneys who is leaving described how his organization encourages policy advocacy, but does not reduce the case work enough to allow for it.

**Training wanted.** Related to what attorneys want and need for professional development is the training they receive. Nearly three-fourths (73 percent) of attorneys who do *not* think they will leave said they receive the type and amount of training they would like; whereas, only half (51 percent) of the attorneys who think they will leave answered affirmatively. See Graph 24.

**Advancement wanted.** The attorneys who think they will leave are more likely to want to advance to a higher position. Two-thirds (67 percent) of those who think they will leave would like to advance, while less than half (46 percent) of those who do *not* think they will leave would like to advance.

Four in ten (39 percent) of the attorneys who think they will leave said there are positions in their organization they would like to advance to, while 32 percent of the attorneys who do *not* think they will leave answered yes.

The attorneys who believe there are positions in their organizations to which they would like to advance were asked if they feel they have the opportunity to advance. Twice as many attorneys (61 percent) who do *not* think they will leave believe they will have the opportunity to advance within their organization, while only 31 percent of those who think they will leave believe so. See Graph 24.

**Graph 23: Opportunities Attorneys Would Like to Diversify Their Work**



**Graph 24: Training and Advancement Desires and Opportunities**



The reasons attorneys do not feel they have the opportunity to advance or do not want to advance vary between the two groups as well. The primary reason given by attorneys who think they will leave is that advancement opportunities are limited, while the answer given by the largest number of attorneys who do not think they will leave is that while there are opportunities, they are only management positions, and they do not want to be a manager. See Graph 25.

One attorney who is leaving described the limited opportunities to develop substantively or for advancement by saying that most higher positions are only in management, and the litigation-related ones will not be available until he is middle-age. He summed it up with, *"For many of us who are younger attorneys, you look down the road and you don't know where you're going financially or substantively."*

When asked if a higher level position became available for them at their organization, would that impact their decision to leave, one third of the attorneys who think they will leave said it would.

Although most attorneys want to advance for professional reasons, some acknowledge that it is one way to get a higher salary. As one attorney put it, *"Moving into management allowed me to stay."*

**Graph 25: Reasons Attorneys Feel They Do Not Have the Opportunity to Advance or Do Not Want to Advance in Their Organization**



**Believe a different job will bring greater job diversity and opportunity.** When asked what they expect to gain when they leave, comments about professional development or more varied experience were prevalent, along with financial security.

- *"More overall experience as an attorney. Currently, have a lot of experience in a narrow area…[and] would potentially have difficulty in adapting to broader areas if I left at a later time."*

- *"New skills, experience, and better salary."*

- *"More professional development. Better salary and retirement benefits."*

- *"Different experiences."*

- *"Expertise in another field of law."*

- *"Learning new skill sets, more salary."*

- *"Development of legal/litigation skills; more diverse workload"*

- *"New skills and professional growth, financial security."*

- *"New and more skills. In-depth knowledge of other areas of law and more litigation skills."*

- *"More opportunity to litigate"*

- *"Greater freedom to take on different cases and to interact with different peoples/communities without certain constraints; more financial freedom."*

- *"Ability to develop my career past the staff attorney level. Ideally, taking on and directing larger policy advocacy projects."*

- *"A greater opportunity to exercise leadership in my work, resulting in greater job satisfaction and contribution to the community. Better pay."*

**Organizations' responses.** One of the attorneys who thinks they will leave said about his/her organization, "*I think we need to think critically about professional development. In a firm, most people are fighting to make partner. But in legal aid, if you don't want to be manager, it feels like you're locked into being a staff attorney or supervising attorney as long as you stick around. We need to be more creative.*"

Many of the executive directors who were interviewed acknowledged that their organization does not provide enough opportunities for job diversity and professional development and advancement**.**

Some organizations have created Senior Attorney positions, but only six percent of the current legal aid attorneys are senior attorneys. The executive director of one of the organizations that has senior attorney positions said the positions are popular because senior attorneys are given an opportunity to engage in systemic work (in an organization that does primarily direct service). Some organizations do not always use these positions for advancement, but more for hiring an experienced attorney with special expertise. Five percent of the current attorneys are project directors, another position that can be used for advancement.

One organization uses salary supplements to compensate attorneys for unique administrative responsibilities, such as grant-writing and reporting. The same organization spreads out supervisory responsibilities more than other organizations, and provides a salary supplement to recognize the additional responsibilities.

An executive director of a pro bono organization acknowledged that a pro bono organization can have more limited opportunities for professional development.

One executive director described how supervisors do not know how to incorporate less experienced attorneys into the work of the more senior attorneys. Others suggested that supervisors need training in how to develop and implement professional development plans, but that they also need freed-up time to do so.

When one executive director in an organization that has low turnover was asked what he attributes the low turnover to, among the reasons he gave is that their attorneys have very diverse practices. They are not generalists, but rather practice in a wide variety of sub-areas within a legal area.

Most of the organizations seem to want to make the attorneys' positions more diverse and create opportunities for professional development and advancement, but have not prioritized these actions.

# Why Do Attorneys Stay in Legal Aid?

## Love the Work

At the end of virtually every focus group, every interview and many of the survey responses, the attorneys would say, "but I love my work." Some would feel bad about talking about the negative aspects of their jobs, and would want to make clear that they love what they do on behalf of low-income clients.

When the survey respondents rated their satisfaction with a variety of items in their work lives, the highest rated item of 29 was "meaningful work." It received a rating of 4.36 out of 5. Also rated above a 4.0 was "relationships with co-workers," with a 4.13.

When asked on the survey, "What keeps you in your current position?" this satisfaction was described similarly by the attorneys who think they will leave and those who think they will stay.

> **"I love my work, my clients and my co-workers."**

**The work the clients, the co-workers.**

- "I love my job. I love the people I work with and I believe in what I do."

- "The work and the clients!"

- "The mission and the passion."

- "Amazingly meaningful work. Wonderful co-workers, my community."

- "I love my work and the people I work with."

- "The work is very important, the co-workers are amazing."

- "I love my work. It is extremely rewarding. I work with and work for excellent people that I admire and respect."

- "I really love all of my staff. This is the reason I applied and the reason I stay. The work is stressful but I feel like I have better moral support than in any position I have held in private practice, corporate counsel or academia."

- "Clients, compassion, colleagues"

**Impact on lives and the community is personally rewarding**

- "The impact made on my community. Giving under-served people high-quality legal representation for free... VERY rewarding."

- "The work I do is important and I find it very satisfying."

- "Enjoy helping people. Believe in what we're doing."

- "Feeling that my casework makes a difference in my client's lives, and through policy work, in the lives of other people."

- "Emotional fulfillment, interesting work, working with incredible, dedicated coworkers, and most of all having the opportunity to make a positive difference in the lives of other people."

- "I love how our work makes a big difference in the community."

- "The sense of satisfaction that I have knowing that I helped someone who was unable to help themselves."

> **"I love the work that I do. I can help a lot of people in very concrete ways every day."**

## Appreciate Professional Autonomy

A third factor that scored above a four (4.03) was professional freedom/autonomy. The attorneys commented about why this is a reason they stay in their positions.

- "[Our organization] is a great place to work. I have autonomy to make decisions, we have a team spirit and the work and clients are interesting."

- "Autonomy to get my job done. No pressure of billable hours."

- "Quality of co-workers; autonomy in my work; intellectual challenges."

- "I have a great job and I have great flexibility to pursue my interest."

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

- *"The flexibility, control over caseload make it worth it for me to stay at [the organization], especially when you get older or have family obligations."*

## Love the Schedule Flexibility

A widespread comment from the attorneys is that they love the flexibility of their jobs. It was the second highest rated job satisfaction factor out of 29—a 4.14 out of 5. Often the comments related to family-friendly policies as well, which were rated 4.02 out of 5. These two factors round out the five factors that were rated more than a 4 out of 5.

When attorneys were asked what keeps them in their position, many responses included comments about their job's flexibility.

- *"Decent flexibility and meaningful work in an area that I feel is important."*

- *"Ability to work part-time and flexibility."*

- *"Very satisfying work; good flexibility in schedule."*

- *"The flexibility of my schedule, independence, and my clients."*

- *"The clients. Flexible schedule—the ability to work [part-time]. Flexibility in the type of work I do to a certain extent. My co-workers and managing attorney."*

- *"Meaningful work, making difference in lives of clients, relative flexibility with respect to schedule (ie, have long hours but can do them whenever as long as work gets done)."*

- *"I maintain a good quality of life due to the flexibility of my employment."*

> **"If I didn't have that benefit [flexibility], I definitely wouldn't be here."**

Other attorneys often described schedule flexibility when they listed what would improve their quality of life.

- *"Flex-time. Ability to work at home at least part of the week. I realize both of these may be taken advantage of by some attorneys, but I think they would help retention, particularly among attorneys with children."*

- *"Work-at-home options, more flexible hours."*

- *"More flexibility with respect to part-time."*

- *"Flexible hours."*

- *"I would like to have telecommuting as an option. My organization should accommodate flexible schedules more."*

- *"I feel that there is not a tremendous amount of trust in staff's use of time. If I work a 12 hour day, and need to take 2 hours to go to the doctor, it would be nice to not have that docked as a half sick day."*

- *"Attorneys should be treated professionally...Management is very stuck to what they think works best for everyone and that is a very paternalistic way of thinking."*

- *"Being more flexible about time/work place issues. We can put in 3 hours of overtime without comment, but if we are 10 minutes late to the office, on some days, everything breaks loose."*

**Alternative Work Schedule Policies**

Some of the organizations use a variety of alternative work schedule policies to give attorneys flexibility. See Graph 26. Those that do usually base the availability of the alternatives on the type of work the attorney is assigned to do, the needs of the office, and, sometimes, the reason for requesting an alternative schedule.

Working part-time and working pre-approved, pre-established hours within an extended period of a work day are the two alternatives allowed by most (21) of the organizations. Telecommuting (working at home) alternatives vary, with the most prevalent policy allowing telecommuting with permission on an as needed basis (19 organizations).

An organization with a flexible work period of 80 hours in nine days, said it is a very popular benefit, with three-fourths of the attorneys usually taking advantage of it. Employees opt in or out of the alternative schedule each month. Attorneys have to agree to be available by cell phone and/or email on their day out of the office, and the designated day off may only be taken on a Monday or Friday to help minimize scheduling disruptions.

A few directors commented that although their organization's 35 hour/week or 37.5/hour work requirement is not an "alternative" work schedule, it is a plus for those that do not want to work long hours. An attorney who had practiced in a private law firm prior to her current job said, *"I have my nights and week-ends, which I didn't in the firm."*

**Graph 26: Alternative Work Schedule Policies of the Organizations**[30]



**Leave Policies**

The number of vacation, personal and sick leave days are shown in Graphs 27 and 28. After five years, the median number of vacation/personal days is more than five weeks—27 days per year. The median number of sick leave days after five years is 21 days or three weeks per year.

Some attorneys would like more vacation time to compensate for the low salaries, while others describe how they do not have time to take the leave time they are given. Some do not want to be gone because they do not want to burden their supervisor with their work.

**Graph 27: Median Number of Vacation and Personal Days Combined**[31]



**Graph 28: Median Number of Sick Leave Days**



**Additional Leave**

All of the organizations provide family leave and parental leave. Some of them provide paid leave, and some provide a combination of paid and unpaid leave. See Table 15.

One organization closes the office the week between Christmas and New Year's Day, and another closes for two weeks in December, giving the staff additional time off.

**Sabbaticals.** Twenty-five of the organizations offer sabbaticals. Two offer paid sabbaticals, 19 offer unpaid, and four a mix of paid and unpaid. One of the small organizations created a sabbatical recently as a retention strategy. All staff are given a one-month paid sabbatical every three years that they can use however they want. The executive director described it as "*very popular and helps with burn-out and morale.*"

---

[30] One of the organization's four day week option is only available once in each two week pay period—80 hours in nine days.

[31] The individual organizations may increase the leave days on a different schedule than collected for the Study. The information for two of the organizations is not included in the graphs because they have one category of leave that includes sick, vacation and personal days. One of these organizations gives 23 days before and after one year, 33 days after five years and ten years. The other gives 16.5 days before and after one year, 22.5 days after five years and 30 days after 10 years.

| Table 15:  Number of Organizations Providing Leave in Addition to Vacation, Personal and Sick Leave | | | | |
|---|---|---|---|---|
| | Paid | Combination of Paid and Unpaid | Unpaid | No Leave |
| **Family Leave** | 7 | 12 | 18 | 0 |
| **Parental Leave** | 6 | 14 | 17 | 0 |
| **Study for Bar Exam** | 5 | 21 | 7 | 4 |
| **Sabbatical** | 2 | 4 | 19 | 12 |

**Comp Time.**  About half (46 percent) of the organizations provide compensatory time for their attorneys. Many have a cap on how much can be accrued if it not used.

One large organization does not officially have comp time, but the executive director described the informal policy as *"fairly loose…If an attorney works beyond the required time, they have the flexibility to take time off…We do not officially track this time. It is at the employee's discretion. We do monitor if we think someone is abusing the system. We don't require them to take it within a certain period. It does not accrue (thus unpaid time is not paid upon departure.)"*

## Executive Directors' Comments

Many of the executive directors are very aware that one of the primary reasons some attorneys come and stay in their organization is schedule flexibility.

- *"We have generous use of leave and alternative work schedules for attorneys and it is always highlighted by our female attorneys as helpful when on maternity leave or for care of children."*

- *"Leave [is] not a big issue. Alternative & flexible work schedules have been important to attorney retention. Allows us to accommodate attorneys with eldercare, childcare and health related needs."*

- *"In my opinion these are the benefits that really affect people and that they pay attention to. (That and how many hours they actually are expected to work.)"*

- *"Flexibility helps attorneys deal with the stress."*

- *"In our judgment we are extraordinarily flexible with regard to work schedule and leave time for attorneys and that has been a significant factor in retention of some members of our attorney staff."*

- *"We are very flexible with attorneys' work hours. Attorneys are told that they can set their own schedules so long as their work is done and they are readily available should we need to contact them. Most attorneys choose to work a regular work week, but are happy to have flexibility in their schedule. Since we do not have the ability to pay more competitive salaries, we use perks like alternative work weeks to retain and recruit attorneys."*

- [Alternative work schedule policies are] *"a question of employee morale/happiness while they're at work, or at home or play."*

## Recruitment of Attorneys

As noted earlier in this Report, low salaries make attorney recruitment a significant problem for the organizations, though the contour of the problem differs among them.  While many urban organizations report little trouble recruiting less experienced attorneys, they encounter significant problems finding experienced ones. In rural and less desirable places to live, organizations report difficulty attracting both new and experienced attorneys.

Thirteen organizations said they had attorney positions open longer than they wanted before the economic downturn. When asked why, most said the primary reason was low salaries. As one executive director remarked: *"We have lost a significant number of potential new hires because our salaries are low; we have also lost a number of mid-level staff attorneys because the distinction between what they could make with us and with government positions grew significantly by the 4th or 5th year of practice."*

Other reasons given included:
- Location of the office.
- Required language ability.
- Applicants not qualified.
- Applicants not a good match for the work culture fostered.
- Decided to change the position.
- Wanted to save on salary.
- Internal hiring process takes a long time.

Some of the additional recruitment barriers organizations confront are described below. Some of them are a result of or compounded by the low salaries.

**Locations outside urban areas.** The organizations in rural or some less desired places to live generally have the biggest challenges recruiting.

One executive director said the lack of a local law school means that law students are reluctant to take a summer internship in the organization's office because they often need to pay rent for an apartment near their law school and then for the summer job, which makes the summer internship unaffordable. The organization, therefore, loses a good source of new law graduates for attorney positions. The director went on to say the somewhat rural city where the organization is located is not that attractive to new law graduates because it has *"…little or no night life for younger individuals coming from larger metropolitan cities; limited social and/or cultural activities; limited periodicals; and a small local bar association."*

One executive director believes *"People need a connection to the area in order to come here."* His organization uses current attorneys to recruit attorneys they know in the area. Another director said he recruits from attorneys who grew up in the area or have a spouse there.

44

Another executive director has also found it more effective to recruit attorneys from the area. "[It is] *very difficult to recruit attorneys to live and work in the [organization's area]. Experienced legal services attorneys generally do not apply to work in this area; [however, local] experienced attorneys who want to make a [career] change have applied, have worked out well, and are more likely to stay than less experienced attorneys.*"

Another executive director of an organization with offices in rural areas has a different hiring philosophy. The organization "*[fills] staff attorney vacancies primarily from the pool of third year law school graduates. For staff attorney positions, [the organization] does not generally attempt to draw from the larger pool of 'experienced' attorneys.*" One reason the organization does not recruit local attorneys is because they are less diverse than what the organization desires for its attorney workforce. To recruit attorneys from outside the area, the organization "*sells them on the program, not the place.*"

**Attorneys of color and male attorneys.**  Some organizations report additional difficulty when recruiting attorneys of color, and some noted that male attorneys generally do not apply.

- "*We have been less successful in recruiting and retaining minority staff than we would like.*"

- "*We have particular trouble finding attorneys of color, and those who speak Spanish or Chinese. Men are also in relatively scarce supply. We definitely rarely get resumes from experienced attorneys, except from those who are retiring. (Usually from the private sector, and then we worry about cultural competency).*"

- "*We usually do not get applicants with years and years of experience. But we also do not usually get applicants who are fresh out of law school. We rarely get male applicants. Many applicants have a partner who works and helps to subsidize the family income.*"

## Law Students

Law school career services staff who work with law students interested in public interest jobs described law students' search for jobs and gave suggestions for improving the recruitment of law students.

**How law students search for jobs.**  Law students find out about jobs in a variety of ways. One of the ways they find out about potential employers is from other students. One law school staff person emphasized that every legal employer (that is known by students) has a reputation among a law school's students. The reputations can be about a variety of things including salaries and which ones have good training and litigation opportunities. This means making every contact with a law student a positive one is important—whether it is as a summer clerk or as an attorney applicant. As one law school staff member said, "It's about word of mouth."

Obviously, most law students use the web to search for jobs. Many of them start with the website www.pslawnet.org. This website allows an organization to have a profile on the site, even if they do not have a job available. Only 57 percent of the Study's organizations use the pslawnet website for recruitment. Students also use Craigslist extensively and Idealist.org and the NLADA website.

Law students also search employers' websites, and many tell law school staff they cannot find what they are looking for on public interest organizations' websites. Most do not give descriptions of their attorneys or the work they do. Some do not post their positions on their job sites, or if they do, they are difficult to find. Also, the law students and the career services staff appreciate if a job announcement states if new graduates will be considered. The law school staff said a good website makes a big difference to students.

Some of the law schools use a database called Simplicity, in which employers pay to enter their job announcements. No organization mentioned using this.

All of the law school staff interviewed recommended that legal aid organizations come on to campus more so law students can learn about them. This can be done by participating in public interest days, speaking at a public interest workshop, or by interviewing on campus. One law school career staff person said public interest employers need to help break down the myths law students sometimes have about public interest law, such as public interest is not real law like private practice is, or that direct service work is not rewarding when compared to impact work. Another staff person noted that some law students are very focused, and need to hear how they can make a long-term difference before they will consider an employer.

One law school staff member commented, "*the easier you make it for the student, the more likely you are to get the best people.*"

**Difference in timing.**  The firms traditionally have had an earlier recruitment cycle for summer clerks and new attorneys than legal aid organizations. Firms traditionally make offers at the end of the first summer; whereas, civil legal aid traditionally makes offers during the spring of the 3rd year. The law school staff described how this timing difference can mean that legal aid organizations can lose some of the best candidates because law students have anxiety and uncertainty about whether they will get a job, and some take a job with a firm even though they would like to work for a legal aid organization.  One law school staff member said, however, that even though earlier recruitment helps an organization get good people, "*if you have a really good employment opportunity to offer, people will wait for it.*"

Some of the California law schools coordinate annual public interest job fairs in Northern California and Southern California. Most of the jobs are for summer jobs. The law schools involved in the Northern California job fair sponsored by the Public Interest Clearinghouse in February have talked about doing it earlier in the academic year to better compete with law firms.

Both the law school career services staff and the executive directors who were asked, believe it would be a good idea for the legal aid organizations to meet regularly with the public interest career services staff to discuss the best ways to educate law students about their organizations and recruit them as students and attorneys.

**Effect of low salaries.**   The law school staff confirmed what many current legal aid attorneys said—that some law students do not even consider public interest law jobs because they know they cannot make it on the salaries. One put it this way, *"Students who have families say, 'I can't make a household work on $40,000/year.'"* Another stated, *"It [the salary] weeds people out if they have families to support."* And still another said law students cannot work for legal aid *"if they are a single parent or have other debt."*

One law school staff member said law students sometimes are not aware of the actual salaries, and think they are even lower than they are. She then went on to say, *"A ton of people don't even consider a legal aid job because of the salary."*

**Educational debt.**   Law school staff encouraged legal aid organizations to market their LRAP, if they have one, because law students are very concerned about their educational debt.

> **"It [the salary] weeds people out if they have families to support."**

# Interns, Fellows, and Volunteer Attorneys

**Interns.**   Most of the organizations have law student interns. Many executive directors said this is one of their most successful recruitment tools. One director's description is the feeling of many, *"Once prospective attorneys get a taste of the work we do and our corporate culture, they want to come work for us."*

Twenty-one percent of the attorney respondents interned with their present employer during law school, and 58 percent interned with another civil legal aid organization.

The directors acknowledged and the current legal aid attorneys confirmed, however, that the organizations do not have an organized way of keeping in touch with their former interns. All directors who were asked said it is left to the intern's supervisor to keep in contact with prospective attorneys. The current attorneys said it was often up to them to see if a job was available at the organization at which they had interned.

**Fellows.**   Another way the organizations recruit attorneys is through sponsoring fellows whose salaries and expenses are paid primarily by another organization, such as Equal Justice Works, while they are fellows. The organizations often have a position that can filled by the fellow when the fellowship is over. Of the attorney respondents,

fourteen percent were former fellows. Half of the former fellows (55 percent) had been a fellow with their present employer, and the rest had done a fellowship with another organization in California or another state. Some organizations said they plan to assist more interns who would like to apply for a fellowship with the organization.

**Volunteer attorneys.**   Some of the organizations recruit from the attorneys who volunteer with them as pro bono attorneys. At times, attorneys who are working in private law firms realize that they would rather work for a legal aid organization. Others are unemployed attorneys who volunteer for the experience, and they and the organization realize they are a good match when an attorney position becomes available.

# Recruitment Policies and Practices

**Recruitment budget.**   Only eleven of the Study's organizations have a line item for recruitment in their 2009 budget, and the amounts are fairly small. Two of the large organizations have larger budgets-- $7,000 and $56,000.  Most of the budgets are used for advertising.

**Recruitment incentives.**   Few recruitment incentives are used by the organizations. Seven reimburse some applicants for their interview travel expenses; one organization reimburses (as a forgivable loan) the fee for one or more bar exams; one organization reimburses for the bar exam fee for one or more bar exams and for moving expenses (up to a cap); and one organization reimburses for the fee for a bar review course (up to a cap), for the bar exam fee, and for moving expenses (up to a cap).

Sixteen of the 24 organizations who hire unlicensed attorneys have a policy about how many times an unlicensed attorney can take the Bar exam before they have to leave or switch positions. One organization allows for one exam; ten organizations allow for two exams; four organizations allow for three exams; and one organization allows for more than three times.

**Length of process.**   Many of the current attorneys commented that the hiring process takes a long time. For the newly hired, many said that weeks or months went by after an application before they were contacted about an interview. One attorney said she did not remember that she had applied because it had been so long. Others noted that they never did hear back from some legal aid organizations after they applied for a position.

Some directors acknowledged the lengthy hiring process, and said some of the delay is due to making sure that they get the right attorney for the job.

**Prioritizing the process.**   Many of the current attorneys commented that their organization's recruitment and hiring process is not comprehensive and well-organized. One organization, however, described their recent initiative to prioritize the process. They put a member of the management team in charge. An attorney job

announcement was sent out in August 2008 to every ABA-accredited law school and every California law student group of color and disability. The organization did not know exactly what position(s) would be available in May 2009, but knew they were likely to have openings. They were pleased with the diversity of the applicant pool. The manager is also going to the Equal Justice Works Career Fair, the nation's largest public interest career fair, this year to recruit interns and attorneys.

# Conclusions and Recommendations

This Report is being published during a recession that includes a level of unemployment that has made most people stay at their jobs, if they have one. As stated earlier, although this may have altered the recruitment and retention situation in legal aid temporarily, the Report's authors and the legal aid organizations believe that the turnover issues the organizations faced before the recession will return and possibly worsen when the job picture is better. Many legal aid attorneys who think they will leave within the next three years cited the poor economy and their fear of being jobless as a reason that keeps them in their job for now.

These recommendations are made with recognition that many of the legal aid organizations will be unable to implement immediately the ones that require significant financial investments. (See the update about the effect of the recession on page 1.)  However, if the issues identified in this Report are not addressed soon, legal aid organizations in California will find themselves in an increasingly critical situation where more and more attorneys cannot even consider a job—let alone a long-term career—in legal aid.

## Deep Commitment to Poor People

One of the most important findings of this Study is the remarkable level of commitment of the attorneys and the organizations to providing free legal assistance to low income persons. This deep commitment was expressed directly by almost every attorney who was interviewed. Many of the attorneys who completed the survey articulated their commitment as well, describing how much they love helping low income people. Some talked about how they would like changes in their legal aid jobs, but all believe deeply in the missions of their organizations.

The attorneys' commitment is shown indirectly by their working for significantly lower salaries than almost any other publicly funded or private attorneys and by many of them sacrificing their financial security to work in legal aid.

The commitment of the executive directors was obvious as well. Most have worked in civil legal aid for their entire careers—some for more than 30 years. They are deeply concerned about how their organizations can best provide the most legal assistance to the most low-income individuals—how they can have the largest impact.

To have the largest impact, however, this commitment must now include an emphasis on the attorneys who provide the legal assistance. Their needs must be prioritized in order to maximize the organizations' work to effectively carry out their missions.

## The Legal Aid Paradigm

As all of the data—numbers and narrative—make obvious, the most pressing issue the organizations need to deal with to improve recruitment and retention of attorneys is the low salaries paid to attorneys. To do so will require a change in the paradigm that legal aid and its supporters have operated under for many years.

**Low salaries are believed to be a given.** The paradigm has included a belief that low attorney salaries are a given. It was striking how many attorney respondents were accepting of their low salary. Many of these attorneys may have a financial partner, but one attorney put it this way, *"We have all bought into the idea that legal aid attorneys don't get paid much, and we all accept it."* Another said, *"We're indoctrinated into low-balling ourselves."*

Legal aid organizations' deep commitment to their clients' needs has resulted in a history of low salaries for attorneys. The organizations have done their best to squeeze every dollar to deliver the most services. They often have tried to hire as many attorneys as possible to maximize how many clients can be assisted. Since attorney salaries are generally the largest line item in a legal aid budget, they have suffered the most from cutting, freezing, and less than adequate increases. Often the attorneys have gone along with this model because they believe so deeply in the mission.

When the attorneys were asked in the focus groups and in interviews if they think the number of attorney positions should be decreased in order to increase attorney salaries, many said no because the client need is so great and they believe their caseloads would increase even further with fewer attorneys. However, in one group, an attorney said, *"It's been a point of contention for me. I'm tired of training people. I've been here for nine years and keep training new people. It's ingrained in us…we are used to the low salaries. That's 'legal services.'"*

Another then added that she thought decreasing the number of positions to increase salaries would be "*a good tradeoff. We have a lot of people coming in [with] under three years [experience], and attorneys in their first year aren't very useful…For the clients, it's not even clear if we'd serve less clients if we had fewer, more experienced*

attorneys. Instead of having two [first year] attorneys, what about having one attorney with four to five years of experience?"

These two attorneys began to challenge the paradigm that attorneys must subsidize the legal aid organizations. Others, including those in management, have begun to do so as well. It is not an easy paradigm to break out of. However, economic forces, changes in the legal aid work force, and the toll the paradigm takes on the attorneys make it imperative to do so.

# Changes in the Paradigm

## Financial Changes

As this Report documents, many attorneys can no longer afford to work for legal aid. The financial sacrifices are too large and have lifetime ramifications.

Thirty years ago, legal aid attorneys may have been young, living cheaply, and believed they were involved in a movement. Now legal aid organizations have attorneys in every age group, at every stage of life.

A younger attorney in one of the focus groups while talking about her salary said, "*At the beginning, there's pride in the frugality. Your parents are there if you need them…I have everything I need, but I don't have the luxury to want anything.*" "*A few years down the road you'll feel differently.*" She went on to say that in the years ahead the younger attorney will be thinking about how to pay for a roof repair and the large expense of child care.

**Cannot afford student loans.** The amount of student loans most legal aid attorneys have to pay back after law school is staggering. With payments of more than $1,000 per month, many attorneys know they cannot apply for legal aid positions or end up leaving legal aid after a few years of struggling to make their payments. Without significant loan repayment assistance programs (LRAPs), they cannot make it financially.

**Cannot afford to be single.** When a focus group was asked what they thought a starting salary should be, the first response was, "*Married or unmarried?*" They went on to ask, "*Do you have loan repayment?*" and "*Do you live with your parents?*"

When asked if a single person could work for the organization's starting salary, an executive director said "*They'd have to be pretty committed.*" An attorney answered that question with, "*It depends on what other safety nets you have.*" Another said, "*If they don't have loans, if they have roommates, and they don't have kids.*"

One executive director, when asked how he was able to retain attorneys so well—his organization has a low turnover rate—listed a number of factors like "*have people work in the areas they want to*

work in", "make training constantly available." His list of seven factors ended with "*partner has an income.*"

All these comments re-enforce the reality that attorneys without financial support from a partner or parents have great difficulty living on a legal aid salary.

**Cannot afford a home.** Many legal aid attorneys struggle with their inability to buy a house. Not owning a house has a negative effect on retention because it can make individuals feel more transient—like they can pick up and leave easier. One of the attorneys in a rural area described the importance of the attorneys being able to buy a house as a retention strategy, "*'Homeownership anchors attorneys to the community.*"

When one focus group was asked whether a single attorney could buy a home on a legal aid salary, an attorney who had been in legal aid for more than 30 years said it took her 20 years to be able to buy a home. A younger attorney said, "*For me, I've decided I'm never going to own a home, but that's okay with me because I love what I do.* Again, the self-sacrifice.

But this self-sacrifice has other major ramifications. Legal aid attorneys who do not own a home do not build up equity, which is a retirement strategy for many Americans. Even if they do not build up equity, not having to pay rent after 30 years is one of the key ways to reduce income required after retirement. This younger attorney will likely change her attitude someday, and this may cause her to leave.

**Cannot afford children.** Having children is another life decision that is affecting whether attorneys can stay in legal aid work. Many attorneys leave when they have children because they know they need more money. As one attorney put it, "*When you have a baby, your ability to compromise changes.*"

**Cannot afford retirement.** As legal aid attorneys have aged, retirement has become a possibility for some and an impossibility for others. Even before the recent economic crisis when many Americans lost a large portion of their retirement savings, legal aid attorneys had inadequate retirement benefits. The organizations in the Study, with one exception, do not have pensions. The organizations that contribute to retirement plans usually do so on a percentage of salary basis, with most between three and five percent.

This means the low salaries have had two effects on retirement savings—the employer contribution is low because it is a percentage of salary, and many attorneys have been unable to contribute at adequate levels because they need the money now. In addition, many organizations cap the salaries of long-time attorneys, making higher retirement employee or employer contributions in later years unlikely.

It is not just the older attorneys who are looking more closely at whether they will have adequate funds to retire. The economic crisis

alerted younger people as well to the financial stakes of not having enough retirement savings, making better retirement benefits a higher priority for attorneys of all ages.

Unless increasing salaries and retirement benefits are prioritized, attorneys will either leave for employers that have better financial packages or be unable to retire. Neither is healthy for organizations.

## Work/Life Balance Changes

**No longer a movement.** Many of the younger attorneys and those newer to a legal aid career talked about how legal aid used to be a movement where attorneys worked very long hours for six or seven days a week. These newer attorneys do *not* view their legal aid work as a movement. They view it as a fulfilling job where they can help clients in need, and they would like to view it as a career.

One executive director put it this way, *"Having that work/life balance is more important to the younger generation than my generation."* One of the attorneys, when asked what would improve their quality of life responded, "*Getting rid of the office culture of working on weekends and evenings = dedication to poor people.*" Another younger attorney posited that the older attorneys think they work longer hours, but in fact younger attorneys work at home and may be more efficient at certain things.

**Flexible schedules.** To achieve better work/life balance, many attorneys want flexibility in when they do their work. In fact, this is a major reason that many attorneys stay in their positions, particularly those who have children. Many of the organizations provide this flexibility, others do not.

Law students—the future attorneys—are more attuned to lifestyle issues as well. One law school career services staff member who was interviewed noted how increasing flexibility would help the organizations compete better with private firms.

These changes in beliefs and attitudes about work and the work place require the organizations to think differently because the old paradigm is changing. As some of the attorneys said, "We are not martyrs."

# Additional Effects of Not Addressing Low Salaries

Many of the effects of not addressing the salaries have already been described by the attorneys and executive directors in this Report. Two important ones merit additional discussion and consideration by the organizations.

**Feminization of legal aid.** The disproportionate number of female attorneys in legal aid has been documented in the Report. When addressing why there is this disparity between the numbers of male and female attorneys, some attorneys feel that at least a portion of it is due to the type of work—that legal aid is a nurturing type of law practice.

However, many felt also that it is due to the low salaries. Male attorneys, generally, are not willing to make as little as legal aid attorneys do. Some of this may be due to society's expectations and cultural values and some may be due to their being the primary breadwinners in households with children.

Another reason, repeated often by the attorneys and the executive directors, is that female attorneys who have children are drawn to the organizations with schedule flexibility that allows the prioritization of children. In many families, staying home with sick children, picking them up from child care on time, and performing other responsibilities for children, fall on the mother. Many legal aid organizations accommodate these family obligations.

Regardless of all the factors that may cause the increased percentage of female attorneys, the feminization of legal aid may itself keep the salaries down. Professions that are dominated by women have traditionally been paid less, and this may have happened in legal aid.

**Less diversity of attorneys.** The organizations, overall, have done a great job of recruiting a diverse racial/ethnic mix of attorneys. However, the attorneys of color are leaving at virtually the same rate at which they are being hired. When the attorneys were asked how to recruit and retain more attorneys from a variety of racial and ethnic groups, the answer given repeatedly was increase salaries and provide LRAP assistance. Other potentially effective recruitment strategies, on a smaller scale were suggested, but the importance of a better financial package was stressed.

Many of the reasons given for this need are the same as all the other attorneys' reasons, but one was different. Attorneys of color, but also White attorneys, talked about some of the cultural and family differences that increase the importance of money.

- *"Speaking for myself only, I am the first in my family to go to law school. I am the oldest child in my family. I have an obligation to care for my parents when they get older. Money is a big deal, not because I want to buy a nice car or house, but because of family responsibilities."*

- *"It is especially important to improve salaries because many attorneys of color want to support their parents and other family members who may have struggled with poverty. There is a lot of pressure for us to sign up for big firms, not only to support ourselves and pay our debts, but to make life easier for our parents and family members who are working class."*

- *"…many folks of minority backgrounds leave school with significant financial obligations to their families who often have few resources. We can't ask people to sacrifice their family for a job. So better compensation would make a HUGE difference."*

This point was brought up as well by attorneys who grew up poor. They feel family pressure and obligations, even if they have been willing to work for less. To meet the goal of some of the organizations to have more attorneys who are from low income communities will require higher salaries and LRAPs.

As organizations begin to address the primary cause of their recruitment and retention problems—low salaries—consideration must also be give to the following.

## Loan Assistance is a Separate Issue

The debt burden that many of the attorneys are under is crushing, suffocating and brutal—the words used by the attorneys to describe it. The levels are so high that raising salaries will not be enough—at least not in the short term.

Virtually everyone agrees that is impossible for many attorneys to make it on a legal aid salary if they have debt. New graduates will be increasingly precluded from considering legal aid as a career unless they receive significant assistance.

The debt issue will need to be addressed by multiple institutions—the law schools, the employers, and the funders—to meet the need. The total LRAP that legal aid attorneys receive, whether from one or multiple sources, must assist with paying the bulk of their student loan payments.

## Professional Development Will Help

Many of the attorneys expressed their desires for further professional development and advancement opportunities. Both those who think they will stay and those who think they will leave (sometimes for a combination of salary and professional development reasons) want to improve and expand their skill sets.

Many would like a career ladder within their organization—not necessarily a ladder to management, but a ladder to increased responsibility and use of skills. Creation and expansion of senior attorney and other positions that offer these opportunities is vital to retention of attorneys who want to develop their careers.

## Recruitment Practices Are Important

Many of the organizations need to improve their recruitment practices to make sure the right candidates are applying and being hired. The attorneys and law school staff provided numerous suggestions for improvements in general recruitment and in the specific areas of recruitment of racially/ethnically diverse attorneys, interns who are good attorney candidates, and in rural locations.

Recruitment processes and practices, which are often not prioritized, are in need of a comprehensive review in each organization. A staff committee in each organization, with significant membership of and input from newly hired attorneys, would be a good means to develop the specific changes needed.

## Bold Action is Needed

Some of the executive directors said they do not have a choice when it comes to increasing salaries, and they were not saying this because of the effects of the recession. They feel they have no choice because they are under internal and external pressure to make sure that as many low income individuals as possible receive legal assistance.

One of the attorneys who is leaving said her organization's management think they are doing the best they can do, but feel their hands are tied. An attorney in another organization used the same phrase, *"My Director says 'my hands are tied.'"* An attorney in a third organization, when talking about attorneys leaving because of low salaries, said the organization's management is aware of it, but won't deal with it, *"At the top, we're stuck in the past."* One executive director said, *"The institutional mindset is that it [raising salaries] is impossible."*

It is not just executive directors who view the paradigm this way. When some focus groups were asked what they thought a starting salary should be in legal aid, one answer was *"whatever the organization can afford"* as if there are set numbers that each organization has that determines how much an attorney can be paid.

Many of the executive directors want to increase salaries and make the other changes necessary to make legal aid a financially-sound decision for attorney employment. They want to be competitive with government employers so they can recruit and retain the best attorneys for the jobs. Some of the legal aid organizations have taken steps to increase salaries, although a few were unable to get union agreement to higher attorney salaries and had to reduce their initiatives.

Changing the legal aid paradigm and addressing the challenges identified in this Report will take bold steps, but not just on the part of the executive directors. Staff and management, including the Boards of Directors, have to help make and support the difficult decisions required. Salaries and other financial needs of attorneys must be addressed through increased funding, staff attrition, and/or reductions in expenses, including, if necessary, reductions in staff.

Nearly 100 attorney positions were added to these organizations in a span of three years—at a time when low salaries and high educational debt were critical challenges. Using new funding to increase the number of attorney positions can no longer be the norm. New funding, when not restricted, should be used for increasing attorney salaries.

Large amounts of new funding may be less prevalent in the foreseeable future as the economy recovers. Therefore, reducing expenses, and particularly staff positions, is an option that may need to be utilized by many of the organizations. For those organizations that have been forced to eliminate or leave positions vacant, new funds should be used to the extent possible to increase attorney salaries rather than fill or restore positions. Although these actions will mean reduced services to clients, it is critical that attorneys be recruited and retained who can provide the highest quality legal assistance now and into the future.

In organizations where staff attorneys are members of a union, it is essential that union leadership work with management on these issues. The difficulty of representing all members of a union that includes different job positions on issues that do not affect all members the same is acknowledged, but unions must ensure that attorneys can continue to work in legal aid.

The funders, union leadership and other supporters of legal aid must be the leaders and supporters of these hard decisions. Many of them are reinforcing the old paradigm of low salaries. Legal aid organizations must be clear about the true cost of providing legal services, and funders have to recognize and accept that if increased funding is given to an organization, it cannot always provide more services. Adequately supporting the actual cost of attorneys today must be the first priority of legal aid's funders and other supporters.

# Recommendations

These recommendations address the major issues identified in the Report. Most are made for the individual organizations, although some, particularly for LRAPs, will need cooperative effort. Organizations are encouraged to review the report for smaller changes that can be made as well.

## Salaries.
Government employers are the primary financial competition for recruiting new attorneys to legal aid and retaining attorneys who want to continue to do public interest work. The salaries paid by government employers, detailed in this Report, exceed the legal aid attorneys by large amounts. Therefore, a short-term and long-term recommendation is made for bringing legal aid salaries in line with the salaries paid to government attorneys.

- The short-term recommendation is for all organizations to increase their starting salaries by $10,000 to $15,000 over the next three to five years. Salary scales should be increased for experienced attorneys as well. Ten thousand dollars is the median amount that attorneys who think they will leave soon said would make a difference in their decision to leave, and $15,000 is the difference in salaries between those attorneys who think they will leave soon and those who do not.

Those legal aid organizations in areas with higher costs of living should consider higher salary goals in order to compete more quickly with government employers and to increase the number of legal aid attorneys who can afford to work in these higher cost areas.

- Ultimately, legal aid attorney salaries should be comparable to those paid by the government employers. In five of the six regions, the maximum starting salaries of deputy public defenders are $25,000 to $50,000 more than the current starting salaries of legal aid attorneys. To achieve comparability will take sustained action over a longer period of time. The long-term recommendation is that organizations develop a ten-year plan to increase attorney salaries to achieve parity with deputy public defenders in the same geographic areas.

## Loan Repayment Assistance Programs.
Multiple approaches to increase assistance with payment of the attorneys' student loans should be undertaken.

- Eliminate LRAP waiting periods and time limits, and increase assistance levels of existing employer LRAPs.
- Develop LRAPs in organizations that do not have them.
- Work with the California law schools to improve their LRAPs by increasing income caps (to ensure increased salaries do not result in decreased LRAP assistance), eliminating the counting of spousal income, and increasing assistance levels.
- Develop a statewide LRAP, in partnership with funders of legal aid, which provides loan repayment assistance that is not taxable to the attorney.
- Provide technical assistance to the attorneys about the possible use of the Public Service Loan Forgiveness Program for forgiveness of their federal loans.

## Retirement Benefits.
The legal aid organizations should increase their contributions to employees' retirement plans to assist attorneys, both young and old, in meeting their financial needs for retirement.

## Flexibility.
The legal aid organizations should develop or expand schedule flexibility that meets the needs of the attorneys as much as possible, while providing good access to services for clients.

## Professional Development and Advancement.

Increased opportunities for advancement within the legal aid organizations should be developed, as well as implementation of professional development plans that help attorneys take advantage of these opportunities.

## Recruitment and Hiring Practices.
The legal aid organizations should prioritize the recruitment and hiring process by developing a staff committee, with significant membership of and input

from newly hired attorneys, to recommend and implement specific improvements.

**Funders and Supporters.** Funders of legal aid organizations must ensure that their funding can be used to increase attorney salaries and implement the other needed changes. Funders and other supporters of legal aid should be leaders in these efforts for effective recruitment and retention of legal aid attorneys.

## Conclusion

An attorney who thinks she will leave her legal aid job soon, pleaded, *"Keep us. Please work on it…We leave because we have to, not because we want to."*

Legal aid organizations in California have incredibly dedicated attorneys working for them. They also have incredibly dedicated executive directors leading them. Together, along with their Boards of Directors, funders, and other supporters, they need to improve attorney compensation and workplace practices to ensure that legal aid attorneys are able to effectively serve low-income clients while maintaining a financially stable lifestyle and a rewarding career.

# Appendix 1: Study Methodology

The Study was designed to take a snapshot of the attorneys[32] who were working for the 37 participating organizations on July 1, 2008 as well as those who had worked there the previous three years. Organizational policies were also reviewed and additional data was collected through surveys, interviews, and focus groups. The Study was conducted over about a year—from September 2008 to July 2009—using data from July 1, 2005 to June 2009.

## Definitions Used in the Report

**Attorneys** is used to generally describe attorneys who worked for the organizations on July 1, 2008 or sometime during the Study.

**Current Legal Aid Attorneys or Current Attorneys** is used for attorneys who were working for the organizations on July 1, 2008.

**Former Attorneys** is used to describe attorneys who left the organizations from July 1, 2005 through June 30, 2008.

**Survey Respondents** is used to describe the attorneys who were working for the organizations during the period the survey was conducted—January 15, 2009 through February 19, 2009—and responded to the survey.

**Former Attorney Survey Respondents** is specifically used when referring to attorneys who left and completed the former attorney survey.

**Experience.** Law school graduation years are used as approximations of experience levels because reliable data about actual legal years of experience was unavailable.

## Data from Organizations

The participating organizations provided extensive demographic and salary information about the 608 attorneys who were working for them on July 1, 2008 and the 279 attorneys who had left their organizations during the prior three years—July 1, 2005 through June 30, 2008. In addition, the organizations provided information about their attorney salaries, benefits and personnel policies.

If less than 100 percent of the data for attorney characteristics was received, the percentage received and analyzed is noted in the Report's graphs, charts and tables.

## Surveys

An on-line survey was conducted of the attorneys working for the participating organizations. A total of 422 attorneys responded to the survey. The survey was completed about halfway through the study, and the total number of attorneys working for the organization at that exact time is not known. However, when compared to the 608 attorneys who were working for the organizations on July 1, 2008, approximately 70 percent of the attorneys responded. Attorneys from 35 of the 37 participating organizations responded. The two organizations that did not have any respondents have one and six attorneys, respectively.

The survey respondents were remarkably similar in demographics to the current legal aid attorneys, making the survey responses representative of all of the attorneys who work for the participating organizations. See Table 18.

An on-line survey was also conducted of the attorneys who had left the organizations in the prior three years—July 1, 2005 through June 30, 2008. However, many organizations did not have e-mail addresses for these attorneys, and many organizations were not willing to share names so e-mail addresses could not be researched. Therefore, the survey was sent to only 108 of the 279 former attorneys. Of these, 43 attorneys responded to the survey, which is fifteen percent of those who left. The respondents have similar characteristics to all the former attorneys (graduation date, age, salary, etc.), but because the data is from a small percentage of the total former attorneys, only post-departure employment data is used in the Report.

## Groups and Interviews

Sixty-seven attorneys (approximately eleven percent of the current legal aid attorneys) from 28 of the organizations participated in either a focus group or interview.

Focus groups were conducted in Los Angeles and in the Bay Area in April 2009. Twenty-two attorneys from ten organizations participated in the three groups held in Los Angeles, and 19 attorneys from seven organizations participated in the three groups held in San Francisco and Oakland. The law school graduation dates of the participants ranged from 1977 to 2008 with the majority graduating in 2004 or after. Ten of the participants were supervisors.

Twenty-six attorneys were interviewed by telephone. The interviewees were from 14 organizations, primarily from areas where focus groups were not held. The majority graduated from law school in 2004 through 2007.

Eighteen executive directors of the organizations and one director of human resources were interviewed. The interviewees were from all of the geographic regions and from all sizes of organizations.

---

[32] Executive Directors who are attorneys were not included in the Study as recruitment and retention for that position has not been hampered.

Finally, four law school staff who work with students interested in public interest work were interviewed as well.

## Other Research

Salary data was gathered from the public interest employers with whom the organizations compete for attorneys. Various research was conducted on financial and non-financial factors that may affect recruitment and retention of civil legal aid attorneys.

## Classifications of Organizations

**Regions.**  California was divided into six regions to analyze whether turnover and recruitment and retention financial factors vary by regions.   Thirty organizations have offices in one region, five have offices in more than one region, and two have offices in all six regions.

### Counties in California Regions

**Region 1:  Sacramento and Northern California**:  El Dorado, Placer, Sacramento, Calaveras, Amador, Alpine, Yolo, Butte, Colusa, Del Norte, Glenn, Humboldt, Lake, Lassen, Mendocino, Modoc, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity and Yuba

**Region 2:  Bay Area**:  Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, Santa Cruz, Solano, and Sonoma

**Region 3:  Central Coast**:  Monterey, San Luis Obispo, Santa Barbara, and Ventura

**Region 4:  San Joaquin Valley and Central California**: Fresno, Kern, Tuolumne, Madera, Merced, San Joaquin, Stanislaus, Tulare Inyo, Kings, Mariposa, Mono, and San Benito

**Region 5:  Inland Empire and Imperial:** Imperial, Riverside and San Bernardino

**Region 6:  Southern California:**  Los Angeles, Orange and San Diego

**Number of attorneys.**  Organizations were classified by the number of attorneys they employed on July 1, 2008.  Those classifications were then analyzed for differences in turnover and recruitment and retention financial factors.  See Table 16.

### Table 16:  Number of Attorneys in Organization

| Study Classification | Very Small | Small | Medium | Large |
|---|---|---|---|---|
| # of Attorneys | 1-5 | 6-9 | 10-24 | 25 or more |
| # of Organizations | 9 | 10 | 9 | 9 |

**Size of budget.**  Organizations were classified by the size of their budget in 2009.  Analysis was then done to see if the size of budgets correlated with turnover and recruitment and retention financial factors.

### Table 17:  Size of Budget

| Study Classification | Very Small | Small | Medium | Large |
|---|---|---|---|---|
| Budget Amount | Under $1 Million | $1 - 2 Million | $2 - 5 Million | Over $5 Million |
| # of Organizations | 9 | 9 | 8 | 11 |

**Funded by the Legal Services Corporation.**  The federally-funded Legal Services Corporation (LSC) is the largest funder of civil legal aid in the country.  All eleven of the organizations that receive LSC funding in California participated in the study.  Analysis of turnover and recruitment and retention financial factors was conducted to see if there was a correlation with receipt of LSC funding.

| Table 18:  Comparison of Characteristics of Attorneys Employed on July 1, 2008[33] With Survey Respondents[34] | | Attorneys Employed on July 1, 2008 | Survey Respondents |
|---|---|---|---|
| **Number** | | 608 | 422 |
| **Position** | Staff Attorney<br>Managing/Supervising Attorney<br>Other | 67 percent<br>30 percent<br>3 percent | 68 percent<br>27 percent<br>4 percent |
| **Working Time** | Full-time<br>Part-time | 88 percent<br>12 percent | 89 percent<br>11 percent |
| **Gender** | Female<br>Male | 67 percent<br>33 percent | 73 percent<br>27 percent |
| **Race/Ethnicity[35]** | White/Caucasian<br>Asian/Pacific Islander<br>Hispanic/Latino<br>Other<br>Black/African American | 56 percent<br>18 percent<br>16 percent<br>5 percent<br>5 percent | 55 percent<br>18 percent<br>16 percent<br>7 percent<br>4 percent |
| **Age[36]** | 25-29<br>30 – 34<br>35 – 39<br>40 – 44<br>45 – 49<br>50 – 54<br>55 – 59<br>60 – 64<br>65 – 69<br>70+ | 13 percent<br>25 percent<br>17 percent<br>9 percent<br>6 percent<br>9 percent<br>10 percent<br>7 percent<br>2 percent<br>1 percent | 17 percent<br>26 percent<br>15 percent<br>8 percent<br>6 percent<br>8 percent<br>10 percent<br>6 percent<br>2 percent<br>1 percent |
| **Law School Graduation Year** | 1969 - 1979<br>1980 - 1989<br>1990 - 1999<br>2000 - 2004<br>2005<br>2006<br>2007<br>2008 | 10 percent<br>17 percent<br>26 percent<br>26 percent<br>8 percent<br>7 percent<br>6 percent<br>1 percent | 10 percent<br>15 percent<br>21 percent<br>27 percent<br>9 percent<br>6 percent<br>6 percent<br>4 percent |

---

[33] The percentages for attorneys employed on July 1, 2008 are from the data reported by the organizations.  Data was not provided in one or more categories for one to 41 of the attorneys, with age having the largest missing data.

[34] The Survey Respondent percentages are of those who answered the specific survey question.  Answers were not given to one or more of these questions by up to fourteen of the total 422 respondents.

[35] One organization reported a disproportionate number of attorneys (13) in the "other" race/ethnicity category and changed the categories of "White—not of Hispanic origin" (42 attorneys) and "black—not of Hispanic origin (2 attorneys) to just "White" and "Black," which may have under-counted attorneys of Hispanic origin.

[36] Information from the survey is six to eight months older than the demographic data from the organizations, so the age data is not completely comparable.

| Table 19: Participating Organizations and their Characteristics | | | | |
|---|---|---|---|---|
| Organization | Regions in which Organization has Offices | Number of Attorneys | Budget Size | LSC-funded |
| AIDS Legal Referral Panel | Bay Area | Small | Very Small | |
| Alameda County Homeless Action Center | Bay Area | Small | Small | |
| Alliance for Children's Rights | Southern California | Medium | Medium | |
| Asian Law Alliance - Santa Clara County | Bay Area | Very Small | Very Small | |
| Asian Pacific American Legal Center | Southern California; Sacramento and Northern CA; San Joaquin Valley | Medium | Medium | |
| Bay Area Legal Aid | Bay Area | Large | Large | X |
| Bet Tzedek Legal Services | Southern California | Large | Large | |
| California Indian Legal Services | Southern California; Sacramento and Northern California; Bay Area | Very Small | Medium | X |
| California Rural Legal Assistance | Statewide | Large | Large | X |
| Central California Legal Services | San Joaquin Valley and Central California | Medium | Large | X |
| Centro Legal De La Raza | Bay Area | Very Small | Very Small | |
| Contra Costa Senior Legal Services | Bay Area | Very Small | Very Small | |
| Disability Rights California | Statewide | Large | Large | |
| Disability Rights Legal Center | Southern California; Inland Empire and Imperial | Medium | Medium | |
| Elder Law & Advocacy | Southern California | Small | Small | |
| Greater Bakersfield Legal Assistance | San Joaquin Valley and Central California | Small | Medium | X |
| Harriet Buhai Center for Family Law | Southern California | Small | Small | |
| Inland Counties Legal Services | Inland Empire and Imperial | Large | Large | X |
| Inner City Law Center | Southern California | Small | Medium | |
| Legal Aid Foundation of Los Angeles | Southern California | Large | Large | X |
| Legal Aid Foundation of Santa Barbara | Central Coast | Small | Very Small | |
| Legal Aid Society - Employment Law Center | Bay Area | Medium | Medium | |
| Legal Aid Society of Orange County | Southern California | Medium | Large | X |
| Legal Aid Society of San Diego | Southern California | Large | Large | X |
| Legal Aid Society of San Mateo County | Bay Area | Medium | Small | |
| Legal Assistance to the Elderly | Bay Area | Very Small | Very Small | |
| Legal Services for Children | Bay Area | Small | Small | |
| Legal Services of Northern California | Sacramento and Northern California; Bay Area | Large | Large | X |
| Los Angeles Center for Law & Justice | Southern California | Small | Small | |
| Mental Health Advocacy Services, Inc. | Southern California | Small | Small | |
| Neighborhood Legal Services of LA County | Southern California | Large | Large | X |
| Pro Bono Project Silicon Valley | Bay Area | Very Small | Very Small | |
| Public Advocates | Bay Area; Sacramento and Northern California | Very Small | Small | |
| Public Law Center | Southern California | Medium | Small | |
| Senior Citizens Legal Services | Bay Area | Very Small | Very Small | |
| Volunteer Legal Services Program - BASF | Bay Area | Medium | Medium | |
| Watsonville Law Center | Central Coast | Very Small | Very Small | |

Shaping the Future of Justice:  Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

# Appendix 2:  Current Legal Aid Attorneys' Race/Ethnicity Compared with Employment Start Year

**Table 20:  Current Legal Aid Attorneys' Race/Ethnicity Compared with Year They Started with Organization (Data for 98 percent of the Current Attorneys)**

| Year Started | White (not of Hispanic origin) | | | Asian/Pacific Islander | | | Hispanic/Latino | | | Black (not of Hispanic origin) | | | Other | | | Total | |
| | A | B | | A | B | | A | B | | A | B | | A | B | | |
| | # | % of Current White Attorneys | Group's % of Total Current Attorneys Who Started That Year | # | % of Current API Attorneys | Group's % of Total Current Attorneys Who Started That Year | # | % of Current Hispanic Attorneys | Group's % of Total Current Attorneys Who Started That Year | # | % of Current Black Attorneys | Group's % of Total Current Attorneys Who Started That Year | # | % of Current Other Attorneys | Group's % of Total Current Attorneys Who Started That Year | Total | % Started by Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1969-1979 | 7 | 2% | 78% | 1 | 1% | 11% | 0 | 0% | 0% | 1 | 4% | 11% | 0 | 0% | 0% | 9 | 2% |
| 1980-1989 | 31 | 9% | 65% | 7 | 6% | 15% | 3 | 3% | 6% | 6 | 21% | 13% | 1 | 3% | 2% | 48 | 8% |
| 1990-1999 | 62 | 19% | 67% | 15 | 14% | 16% | 8 | 8% | 9% | 2 | 7% | 2% | 6 | 19% | 6% | 93 | 16% |
| 2000-2004 | 85 | 25% | 58% | 22 | 20% | 15% | 29 | 31% | 20% | 5 | 18% | 3% | 9 | 28% | 6% | 147 | 25% |
| 2005-2008* | 152 | 45% | 51% | 63 | 59% | 21% | 55 | 58% | 18% | 14 | 51% | 5% | 16 | 50% | 5% | 300 | 50% |
| | 337 | 100% | | 108 | 100% | | 95 | 100% | | 28 | 100% | | 32 | 100% | | 597 | 100% |
| **Yearly Figures** | | | | | | | | | | | | | | | | | |
| 2005 | 30 | 9% | 61% | 8 | 7% | 16% | 9 | 9% | 18% | 1 | 4% | 2% | 2 | 6% | 4% | 49 | 8% |
| 2006 | 34 | 10% | 50% | 12 | 11% | 18% | 14 | 15% | 21% | 5 | 18% | 7% | 3 | 9% | 4% | 68 | 11% |
| 2007 | 60 | 18% | 54% | 25 | 23% | 22% | 20 | 21% | 18% | 3 | 11% | 3% | 4 | 13% | 4% | 112 | 19% |
| 2008* | 28 | 8% | 39% | 18 | 17% | 25% | 12 | 13% | 17% | 5 | 18% | 7% | 7 | 22% | 10% | 71 | 12% |
| **Percent of Current Legal Aid Attorneys** | | | | | | | | | | | | | | | | | |
| | 56% | | | 18% | | | 16% | | | 5% | | | 5% | | | 100% | |

Column A example:  Two percent of current legal aid attorneys who are White began in 1969-1979.

Column B example:  78 percent of all current legal aid attorneys who started in 1969-1979 were White.

*First six months of 2008

# Appendix 3: Potential Starting Compensation for Attorneys with Bilingual Supplement and LRAP

| Table 21: Potential Starting Compensation for Attorneys with Bilingual Supplement and LRAP | | | | | |
|---|---|---|---|---|---|
| Organization | Starting Salary | Bilingual Policy | Annual Bilingual Supplement (many given on monthly basis) | Annual LRAP Maximum | Maximum Potential Starting Compensation with Supplements |
| Employer #1 | $32,500 | | $300 | N/A | $32,800 |
| Employer #2 | $41,000 | | $1,000 | N/A | $42,000 |
| Employer #3 | $38,520 | $1,260 (one language); $1,890 (two languages) | $1,260 - $1,890 | $3,600 | $39,780 - $44,010 |
| Employer #4 | $42,500 | $600 (not required for job); $1,200 (verbal interpretation required for job) $1,500 (translation--literate and literacy--required for job) | $600 - $1,500 | N/A | $43,100 - $44,000 |
| Employer #5 | $40,000 | | N/A | $4,000 | $44,000 |
| Employer #6 | $44,000 | | $1,000 | N/A | $45,000 |
| Employer #7 | $42,000 | | N/A | $4,000 | $46,000 |
| Employer #8 | $46,200 | | $1,000 | N/A | $47,200 |
| Employer #9 | $46,701 | | N/A | $1,800 | $48,501 |
| Employer #10 | $48,899 | $750 (oral); $750 (written); 1,020 (for those untested or grandfathered in) | $750 - $1,500 | N/A | $49,649 - $50,399 |
| Employer #11 | $46,000 | $1,200 for verbal; $1,200 for written | $1,200 - $2,400 | $3,000 | $47,200 - $51,400 |
| Employer #12 | $50,000 | | $1,500 | N/A | $51,500 |
| Employer #13 | $48,686 | $550 (oral in one language); $550 (written in one language); $1,100 (oral and written in one language); $750 (oral in two languages); $750 (written in two languages); $1,500 (interpretation and translation in two languages) | $550 - $1,500 | $1,800 | $49,236 - $51,986 |
| Employer #14 | $47,916 | $360 (speak); $360 (interpret); $360 (write); $360 (speak or write additional language); $360 (certified interpreter) | $360 - $1,400 | $3,600 | $48,276 - $52,916 |
| Employer #15 | $48,571 | | $1,200 | $3,600 | $49,771 - $53,371 |
| Employer #16 | $50,000 | two percent of salary (oral); two percent of salary (written) | $1,000 - $2,000 | $6,000 | $51,000 - $58,000 |

# Appendix 4:  Law School Minority Enrollment

| Table 22:  Law School Minority* Enrollment | | | |
|---|---|---|---|
| California Law Schools (ABA-accredited) | Total Students | Minority | Minority Percentage |
| Santa Clara University School of Law | 932 | 378 | 41% |
| University of Southern California, Gould School of Law | 605 | 238 | 39% |
| Loyola Law School, Loyola Marymount University | 1,297 | 505 | 39% |
| University of San Francisco School of Law | 702 | 252 | 36% |
| Southwestern Law School | 964 | 343 | 36% |
| Western State University—College of Law | 449 | 155 | 35% |
| University of La Verne College of Law | 265 | 89 | 34% |
| University of California, Hastings College of the Law | 1,242 | 415 | 33% |
| University of California, Davis School of Law | 582 | 192 | 33% |
| Whittier Law School | 673 | 217 | 32% |
| University of California at Los Angeles School of Law | 1,019 | 321 | 32% |
| Stanford University Law School | 534 | 168 | 31% |
| University of California, Berkeley School of Law | 879 | 264 | 30% |
| University of San Diego—School of Law | 1,035 | 302 | 29% |
| California Western School of Law | 835 | 233 | 28% |
| Chapman University School of Law | 566 | 145 | 26% |
| Golden Gate University School of Law | 759 | 183 | 24% |
| University of the Pacific, McGeorge School of Law | 1,001 | 227 | 23% |
| Thomas Jefferson School of Law | 770 | 158 | 21% |
| Pepperdine University School of Law | 639 | 112 | 18% |
| **California** | **15,748** | **4,897** | **31%** |
| | | | |
| **National** | **108,887** | **25,739** | **24%** |

\* "Minority" includes African American, American Indian, Asian American, and Hispanic.

*Official Guide to ABA-approved Law Schools*, Law School Admission Council and American Bar Association, http://officialguide.lsac.org, 2008.

# Appendix 5:  Tables, Charts and Graphs

## Tables
**Page**

Table 1:   Graduation Years and Length of Employment of Former Attorneys   9
Table 2:   Average Annual Turnover Rates   10
Table 3:   Turnover and Former Attorneys' Length of Employment by Region
(July 1, 2005 – June 30, 2008)   10
Table 4:   Race/Ethnicity of Current Legal Aid Attorneys Compared with California Poverty
Population and Clients Served by LSC-funded Organizations   12
Table 5:   Current Attorney Respondents' Personal Demographics   15
Table 6:   California Civil Legal Aid Median Attorney Salaries   18
Table 7:   Organizations' Starting Salaries for Attorneys Compared to Funding Size   19
Table 8:   Tuition for California ABA-Accredited Law Schools   27
Table 9:   Employer Loan Repayment Assistance Programs   29
Table 10:   Benefits Offered by the Organizations   32
Table 11:   Salaries of Deputy Public Defenders and Deputy District Attorneys   35
Table 12:   Salaries of California State Public Defenders and Deputy Attorneys General   36
Table 13:   Salaries of Family Law Facilitators   37
Table 14:   Salaries of Court Self Help Center Attorneys   37
Table 15:   Number of Organizations Providing Leave in Addition to Vacation,
Personal and Sick Leave   44
Table 16:   Number of Attorneys in Organization   54
Table 17:   Size of Budget   54
Table 18:   Comparison of Characteristics of Attorneys Employed on July 1, 2008
With Survey Respondents   55
Table 19:   Participating Organizations and their Characteristics   56
Table 20:   Current Legal Aid Attorneys' Race/Ethnicity Compared with Year They Started
with Organization   57
Table 21:   Possible Starting Compensation for Attorneys with Bilingual Supplement and LRAP   58
Table 22:   Law School Minority Enrollment   59

## Charts
**Page**

Chart 1:   Race/Ethnicity of Attorneys Hired between July 1, 2005 and July 1, 2008   7
Chart 2:   Race/Ethnicity of Former Attorneys   8
Chart 3:   Generations of Former Attorneys   8
Chart 4:   Generations of Current Legal Aid Attorneys   13

## Graphs
**Page**

Graph 1:   Law School Graduation Year of Attorneys Hired between 7/1/05 and 7/1/08   7
Graph 2:   Percent Attorneys of Color of Total Number of Attorneys Started by Year   7
Graph 3:   Graduation Years of Former Attorneys   8
Graph 4:   Former Attorneys' Length of Employment   9
Graph 5:   Gender of Current Legal Aid Attorneys Compared to All California Attorneys   11
Graph 6:   Race/Ethnicity of Current Legal Aid Attorneys compared to All California Attorneys   12
Graph 7:   Current Legal Aid Attorneys Who Speak Another Language   13
Graph 8:   Year Multilingual Attorneys Began Employment with Present Employer   13
Graph 9:   Current Legal Aid Attorneys' Law School Graduation Year   14

Shaping the Future of Justice: Effective Recruitment and Retention of Civil Legal Aid Attorneys in California

Graph 10:   Attorneys Who Think They Will Leave in Next Three Years and Within
            How Many Years                                                           15
Graph 11:   Positions of Attorneys Who Think They Will Leave                         16
Graph 12:   Gender of Attorneys Who Think They Will Leave                            16
Graph 13:   Languages Spoken by Current Legal Aid Attorneys Compared With Attorneys Who
            Think They Will Leave                                                    16
Graph 14:   Salaries of Attorneys Who Left Compared with Salaries of Attorneys Who Stayed   17
Graph 15:   Starting Salaries for Attorneys                                          19
Graph 16:   Year of Most Recent Increase in Salary Scale or Starting Salary for Attorneys   19
Graph 17:   Starting Salaries for Attorneys by Region                                20
Graph 18:   Number of Times Attorney Salaries Increased between July 1, 2005–June 30, 2008   20
Graph 19:   Amount of Current Educational Debt                                       26
Graph 20:   Median Current Educational Debt by Law School Graduation Year            26
Graph 21:   Primary Benefits and Supplements provided by the Organizations           31
Graph 22:   Payment of Health Insurance Premiums                                     31
Graph 23:   Opportunities Attorneys Would Like to Diversify Their Work               39
Graph 24:   Training and Advancement Desires and Opportunities                       39
Graph 25:   Reasons Attorneys Feel They Do Not Have the Opportunity to Advance or
            Do Not Want to Advance in Their Organization                             40
Graph 26:   Alternative Work Schedule Policies of the Organizations                  43
Graph 27:   Median Number of Vacation and Personal Days Combined                     43
Graph 28:   Median Number of Sick Leave Days                                         43

**Legal Aid Association of California**
433 California Street, Suite 815
San Francisco, CA  94104
415-834-0100
www.CALegalAdvocates.org
laacinfo@pic.org

**Carmody and Associates**
1124 E. Rose Lane, #8
Phoenix, AZ  85014
602-277-7008
www.carmodyandassociates.com
kelly@carmodyandassociates.com